Thomas Zito (CA BAR NO. 304629)
Sean Betouliere (CA BAR NO. 308645)
Jessica Agatstein (CA BAR NO. 319817)
Disability Rights Advocates
2001 Center Street, Fourth Floor
Berkeley, California 94704-1204
Tel:   (510) 665-8644
Fax:  (510) 665-8511
Email: tzito@dralegal.org

Michael Rawson (CA BAR NO. 95868)
Craig Castellanet (CA BAR NO. 176054)
Melissa A. Morris (CA BAR NO. 233393)
Public Interest Law Project
449 15th St., Suite 301
Oakland, CA 94612-06001
Tel:   (510) 891-9794
Fax:  (510) 891-9727
Email: mrawson@pilpca.org

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IAN SMITH, SUNDAY PARKER, and MITCH JESERICH, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF OAKLAND, a public entity,<br><br>Defendant. | Case No. 19-5398<br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF FOR VIOLATIONS OF THE AMERICANS WITH DISABILITIES ACT ("ADA"), 42 U.S.C. §§ 12132 *ET SEQ.*, AND THE CALIFORNIA DISABLED PERSONS ACT ("CDPA"), CAL. CIV. CODE §§ 54.1 *ET SEQ.*<br><br>**CLASS ACTION** |

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

## I.      INTRODUCTION

1.      Plaintiffs Ian Smith, Sunday Parker, and Mitch Jeserich bring this lawsuit on behalf of themselves and other Oakland renters with mobility disabilities who need accessible housing. Plaintiffs, and all other Oakland renters who need accessible housing, are discriminatorily excluded from the benefit of Defendant City of Oakland's ("City") Rent Adjustment Program ("Program"), because few if any of the more than 64,000 rental units covered by that Program are accessible.

2.      In failing to ensure that Plaintiffs and other people who need accessible rental housing have the same opportunity to benefit from its Rent Adjustment Program that nondisabled renters enjoy, on the same terms, the City of Oakland is violating the Americans with Disabilities Act ("ADA")[1] and analogous state law.

3.      Oakland's Rent Adjustment Program, which applies to over 60% of the City's private rental housing, provides substantial benefits to the large number of Oakland renters who live in units that it covers. Most importantly, the Program sets and enforces limits on allowable annual rent increases (currently set at 3.5%) for covered units, thus shielding the people living in those units from the City's rapidly rising rents, and helping to ensure that they can continue to live in their homes and communities.

4.      These benefits are more necessary now than ever, because the City of Oakland is experiencing a severe housing affordability and displacement crisis. The Rent Adjustment Program gives most Oakland renters some protection from this general trend. While the Program allows landlords to bring the asking rent for covered units up to market rate whenever an existing tenant leaves, it provides stability for each new tenant over time, by ensuring that subsequent rent increases will be governed by the Program's set limits and restrictions for as long as they remain in their unit.

---

[1] Title II of the Americans with Disabilities Act prohibits public entities like Oakland from discriminating against people with disabilities, and demands that they not be "excluded from participation in" or "denied the benefits of the services, programs, or activities" such entities offer. *See* 42 U.S.C. § 12132. This broad prohibition against discrimination applies to "anything a public entity does." *Cohen v. City of Culver City*, 754 F.3d 690, 695 (9th Cir. 2014).

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

5.      A majority of Oakland renters live in units that are subject to the City's Rent Adjustment Program, and its protections apply regardless of household income.

6.      However, Plaintiffs and other people who need accessible housing are uniquely barred from the Program's benefits because the Program excludes all rental housing built after January 1, 1983, from its coverage, and all or nearly all of Oakland's accessible rental units were built well after that date.

7.      Since the mid-1980s, various laws and regulations have mandated that at least some new private rental units be built with accessibility in mind. Under these laws and regulations, a unit is accessible if it has (among other things): at least one stair-free route into and through the unit and to common areas of the building; doorways that are wide enough for wheelchairs to get through; light switches, environmental controls, and outlets that are reachable from a wheelchair; reinforcements in the bathroom walls to allow a tenant to install grab bars; and enough space in the kitchen and bathroom to maneuver a wheelchair.[2] However, none of these laws or regulations went into effect until after the Rent Adjustment Program's current cutoff date of January 1, 1983, meaning that the units it covers will almost always lack such essential accessibility features.

8.      The need for accessible housing is not abstract: when a rental unit is not accessible, people with mobility disabilities may be barred from entering it entirely, or they may be able to get through the front door only to encounter doorways they can't pass, switches and outlets they can't reach, a kitchen they can't effectively use, or a bathroom that they have to crawl on their hands and knees to enter.

9.      For many renters with mobility disabilities—including Plaintiffs Smith and Parker—living in an inaccessible unit is simply not an option. People in this position have no choice but to live in accessible rental units that were built after the Rent Adjustment Program's current cutoff. As a result, they are excluded from the City's Program entirely, and from the protection against rising rents that nondisabled Oakland tenants have the opportunity to enjoy.

---

[2] These are the basic requirements of accessibility under the Fair Housing Act effective March 13, 1991. *See* 42 U.S.C. § 3604(f)(3)(C).

10.     The consequences of this exclusion can be extreme. For example, since moving to his accessible Oakland apartment in 2012, Mr. Smith's monthly rent has increased by over 70%, including a 37% jump in 2015 alone. Mr. Smith now pays over $1,200 more per month than he paid in 2012 for the exact same apartment.

11.     If Mr. Smith had been able to rent an accessible apartment that was covered by the City's Rent Adjustment Program, his rent could have gone up by a maximum of about 14% during this period. This would amount to an increase of only $233, or roughly $980 less per month than he pays now. In other words, the lack of accessible units in the City's Rent Adjustment Program—and Mr. Smith's consequent inability to participate in that Program—is now costing him almost $12,000 a year.

12.     Plaintiff Sunday Parker has faced similar rent increases since moving to Oakland in 2014. Like Mr. Smith, Ms. Parker has been unable to find an accessible apartment covered by Oakland's Rent Adjustment Program, and she has repeatedly been forced to find new housing because the accessible apartment she was living in became unaffordable. Though she would prefer to live alone, Ms. Parker now lives with a roommate to offset the high and ever-rising cost of living in accessible apartment that is not covered by the City's Program.

13.     Because they cannot afford the rapid rent increases that exclusion from the Rent Adjustment Program entails, other people with mobility disabilities choose to "make do" with inaccessible but rent-stabilized apartments, even if doing so means struggling every day to do simple things like entering and exiting their home, using the bathroom, cooking a meal, or turning on the lights. These are all harms that Oakland's nondisabled renters need not endure as a condition of enjoying the benefit of the Program's protections.

14.     Plaintiff Mitch Jeserich—who needs an accessible unit but has lived in an inaccessible rent-stabilized apartment since 2015—falls into this latter camp. Mr. Jeserich's apartment is covered by the Rent Adjustment Program but is inaccessible in ways that impact his daily life.

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

15. By excluding all or nearly all of Oakland's accessible units from its Rent Adjustment Program, the City places people with disabilities who need such units in a discriminatory double-bind: either they can rent an apartment that meets their access needs but leaves them outside the Program's protections, or—if the nature of their disability allows it— they can attempt to get by in an inaccessible unit that is covered by the Program, but that forces them to endure the daily indignities, inconveniences, and potential dangers that living in an inaccessible unit inevitably entails. In either circumstance, people with disabilities are denied the same opportunity to participate in and benefit from Oakland's Rent Adjustment Program that the City's nondisabled tenants enjoy.[3]

16. Under the ADA, Oakland must reasonably modify its Rent Adjustment Program to avoid this discriminatory impact. And, because the ADA preempts conflicting state and local laws, this obligation applies even if the necessary changes would otherwise be barred by the Costa-Hawkins Rental Housing Act or the City's own ordinances.

17. On June 6, 2019, Plaintiffs sent a letter requesting that the City of Oakland modify its Rent Adjustment Program to encompass accessible units, so that people with disabilities who need such units have the same opportunity to access the Program's benefits that the City's nondisabled tenants currently enjoy. However, the City has not made the necessary changes, leaving Plaintiffs no choice but to file this lawsuit.

18. In filing this case, Plaintiffs are asking only for what the City's nondisabled renters already have: a meaningful opportunity to enjoy the benefit of Oakland's Rent Adjustment Program, without any burdensome administrative requirements or risk of retaliation, and without having to endure the hardship of life in an inaccessible unit as a condition of coverage.

---

[3] This City-caused discrimination adds insult to injury, as renters with mobility disabilities are already subjected to private housing discrimination at far-greater rates than their nondisabled peers. *See* Dept. of Housing and Urban Dev., *Discrimination in the Rental Housing Market Against People Who Are Deaf and People Who Use Wheelchairs: National Study Findings* at 1 (2015), *available at* https://www.huduser.gov/portal/sites/default/files/pdf/housing_discrimination_disability.pdf.

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

## II.    JURISDICTION, VENUE, AND INTRADISTRICT ASSIGNMENT

19.    This is an action for declaratory and injunctive relief, brought pursuant to Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12132 *et seq.*, and the California Disabled Persons Act ("CDPA"), Cal. Civ. Code §§ 54.1 *et seq.*

20.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 12188 for claims arising under the ADA.

21.    This Court has supplemental jurisdiction over Plaintiffs' claims arising under the CDPA pursuant to 28 U.S.C. § 1367.

22.    This Court has jurisdiction to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

23.    Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(b)–(c), because the City of Oakland is within this District, and this is the District in which the events and omissions giving rise to Plaintiffs' claims occurred.

24.    Because the events and omissions giving rise to Plaintiffs' claims occurred in Alameda County, this case should be assigned to the Northern District's San Francisco division or its Oakland division. L.R. Civ. 3-2(c).

## III.    PARTIES

25.    Plaintiff Ian Smith lives in Oakland, California and is a person with a disability. Mr. Smith uses a power wheelchair and, because of his disability, needs to live in accessible rental housing. Mr. Smith is currently denied meaningful access to the benefits of the City of Oakland's Rent Adjustment Program because few if any of the units covered by that program are accessible.

26.    Plaintiff Sunday Parker lives in Oakland, California and is a person with a disability. Ms. Parker uses a power wheelchair and, because of her disability, needs to live in accessible rental housing. Ms. Parker is currently denied meaningful access to the benefits of the City of Oakland's Rent Adjustment Program because few if any of the units covered by that program are accessible.

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

27. Plaintiff Mitch Jeserich lives in Oakland, California, and is a person with a disability who uses a manual wheelchair. Like many other renters with mobility disabilities, Mr. Jeserich is faced with a dilemma: either he may enjoy the protections of the Rent Adjustment Program but live in an inaccessible apartment, or he may choose an apartment that meets his access needs, but that is not covered by the Rent Adjustment Program. For now, Mr. Jeserich has enough strength, flexibility, and mobility to live in an inaccessible rent-stabilized unit, but he does so with significant difficulty. For example, the bathroom in his apartment is too small to accommodate his wheelchair; the kitchen is designed in a way that prevents him from having full access to his refrigerator; and he must routinely struggle to reach outlets, faucets, and other features of his apartment.

28. Defendant City of Oakland is a public entity subject to Title II of the Americans with Disabilities Act.

## IV.   FACTUAL AND LEGAL BACKGROUND
### A.   Housing Costs in Oakland Have Risen Dramatically, Leaving Many Residents Unable to Afford Market-Rate Rent.

29. The City of Oakland is experiencing a "severe housing affordability crisis." [4] Average market-rate rents in Oakland have almost doubled over the past decade, and as of January 2019 the median asking rent for a one-bedroom apartment was $2,370: a 13% increase over the previous year. [5] For a two-bedroom apartment, the median rent was $2,860—a 16% increase. [6] The City is now the sixth most expensive rental market in the United States. [7]

30. The City has found that many renters "would not be able to locate affordable housing within the city if displaced by rent increases." [8]

---

[4] Oakland Ord. No. 13542 (filed June 2019), available at
https://oakland.legistar.com/View.ashx?M=F&ID=7331138&GUID=1BC41736-D908-47BB-8E25-F7CE34E231D8
[5] *Id.*
[6] *Id.*
[7] *Id.*
[8] *Id.*

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

31.     People with disabilities who need accessible housing are particularly susceptible to this fate, because the rental housing they require is not covered by Oakland's Rent Adjustment Program.

32.     Even as they are shut out of Oakland's Rent Adjustment Program, people with disabilities are disproportionately likely to need the rent affordability protections that it provides. As the City acknowledges in the Housing Element of its General Plan, many people with disabilities "face limited earning potential"—often as a consequence of employment discrimination.[9] The City is also home to a "much greater" proportion of people with disabilities than the country as a whole, which means that the demand for affordable accessible housing that they can live in is "high."[10]

### B.     Over 60% Of Oakland's Rental Units Are Covered by the Rent Adjustment Program, Which Protects the Majority of Oakland Tenants from Excessive Rent Increases.

33.     The Rent Adjustment Program—which applies to over 60% of the City's rental units—provides most Oakland renters with some protection from rapidly rising rents. It is the City's primary program for protecting tenants from unreasonable rent increases in private rental housing, and the City's Housing Element designates the Rent Adjustment Program as a key mechanism to achieve its goal of preserving affordable rental housing.[11] The Program is expressly intended to "foster fair housing for a diverse population of renters."[12]

34.     The Program protects tenants, principally, by limiting allowable rent increases in the units that it covers based on the annual change in the regional Consumer Price Index; the maximum allowable rent increase is 3.5% between July 2019 and July 2020, and has ranged

---

[9] City of Oakland, *City of Oakland Housing Element: 2015–2023* at 171, available at http://www2.oaklandnet.com/oakca1/groups/ceda/documents/report/oak050615.pdf.
[10] *Id.*
[11] *Id.* at 315–16, Goal 5, Policy 5.3, Action 5.3.1.; *see also id.* at 315, Policy 4.4 (recognizing that to help prevent displacement of current residents and to preserve existing non-assisted housing affordable to low income residents the City must consider strengthening existing policies and introducing new policies).
[12] City of Oakland, *Rent Adjustment Program*, available at https://www.oaklandca.gov/topics/rent-adjustment-program.

between 0.7% and 3.5% per year for the last decade.[13] Tenants who live in units covered by the Program are therefore shielded from excessive rent increases, which helps them continue to live in their homes and communities. *See generally* Oakland Mun. Code §§ 8.22.010 *et seq.*

35.     In addition to setting a limit on annual rent increases for covered units, the City's Rent Adjustment Program administers the City's Rent Adjustment Ordinance (adopted in 1980), by reviewing landlord and tenant petitions, resolving disputes, issuing regulations, and educating tenants and landlords about their rights and responsibilities under the law; it also collects per-unit fees from landlords that fund the administration of the program.

36.     A majority of Oakland renters live in rent-stabilized units and benefit from the Rent Adjustment Program's protections—meaning that even in the midst of the City's current housing crisis most Oakland renters have some security, and some assurance that they will not be forced from their homes by rapidly rising rents. This population spans all income levels, but the majority of Program beneficiaries are at or below the City's median income.

37.     Without the protection from rising rents that Oakland's Rent Adjustment Program provides, an even larger share of Oakland renters would have faced extreme rent increases in recent years, and many more longtime residents would have had to leave the City as a result.

**C.     Few If Any Units Covered by the Rent Adjustment Program Are Accessible, Meaning That People with Disabilities Who Need Accessible Units Are Uniquely Excluded from the Program's Benefits.**

38.     Though the Rent Adjustment Program protects the majority of Oakland renters from the area's rising rents, Plaintiffs and other people with mobility disabilities who need accessible housing are either excluded from the Program's benefits entirely, as are Plaintiffs Parker and Smith, or forced to choose between living in a rent-stabilized unit and living in one

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

---

[13] There are some exceptions to this generally applicable limit. For example, landlords may be permitted to increase rent by more than the Program's set percentage if they can show that the increase is necessary to account for higher costs, to compensate for capital improvements, or to provide them with a fair return on their investment. Rents in covered units can also be raised to market rate when an existing tenant leaves—a measure known as "vacancy decontrol"—but subsequent tenants of those units are still entitled to the Rent Adjustment Program's protections. This means that while the starting rent for a new tenant in a covered unit may be in line with then-current market rates for units that are *not* subject to the Program, further rent increases during that tenancy will be governed by the Program's set limits.

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1  that better meets their access needs, as is Plaintiff Jeserich.

2      39.    This is so because the Program's protections do not apply to units that were newly

3  constructed and certified for occupancy on or after January 1, 1983, and because every standard

4  governing the accessibility of the City's private rental housing went into effect *after* that date—

5  thus leaving all or nearly all of Oakland's accessible rental units outside the Program's scope.

6  *See* Oakland Mun. Code § 8.22.030(A)(5).

7      40.    The Program's 1983 cutoff date is reinforced, at the state level, by the Costa-

8  Hawkins Rental Housing Act, which prohibits a local jurisdiction from regulating rents of any

9  unit that "has already been exempt from the residential rent control ordinance of a public entity

10  on or before February 1, 1995, pursuant to a local exemption for newly constructed units." Cal.

11  Civ. Code § 1954.52(a)(2).

12      41.    Before the adoption of laws and regulations governing the accessibility of some

13  newly-built rental housing—in the mid-1980s in California, and in the early 1990s across the

14  United States—almost none of Oakland's rental units were built to be accessible to people with

15  mobility disabilities.

16      42.    Indeed, an independent analysis of American Housing Survey data confirms that

17  most of the accessible housing in Oakland and surrounding cities was built after the year 2000—

18  well over a decade after the Rent Adjustment Program's current cutoff.[14]

19      43.    In general, both the federal Fair Housing Amendments Act ("FHAA") and the

20  California Fair Employment and Housing Act ("FEHA") consider a housing unit to be accessible

21  if (1) there is an accessible route into and through the building; (2) the public and common areas

22  are accessible; (3) all interior and exterior doors intended for passage are wide enough to

23  accommodate people who use wheelchairs; (4) all light switches, electrical outlets, thermostats,

24  and other environmental controls are placed in accessible locations; (5) the bathroom walls are

25  reinforced to allow later installation of grab bars; and (6) the kitchens and bathrooms are usable,

26  _____
[14] U.S. Department of Housing and Urban Development Office of Policy Development and
27  Research, *Accessibility of America's Housing Stock: Analysis of the 2011 American Housing Survey (AHS)* at E-35 (March 19, 2015), available at
28  https://www.huduser.gov/portal/sites/default/files/pdf/accessibility-america-housingStock.pdf.

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

such that an individual in a wheelchair can maneuver around the space. *Compare* 42 U.S.C. § 3604(f)(3)(C) (federal requirements) *with* Cal. Gov. Code § 12955.1 (state requirements).

44.     The precise contours of the FHAA's accessibility requirements are set forth in the Fair Housing Accessibility Guidelines promulgated by the Department of Housing and Urban Development. These Guidelines, while not themselves mandatory, provide developers and builders with a "safe harbor," and describe the components of federally compliant design and construction. *See* 24 C.F.R. § 100.205. California's FEHA does not have detailed design and construction standards of its own, but the law incorporates the requirements of the FHAA and the California Building Code by reference, and it requires builders to abide by whichever would provide people with disabilities with the greatest level of accessibility. *See* Cal. Gov. Code § 12955.1(c), (e).

45.     The federal Fair Housing Amendment Act's accessibility requirements apply only to dwellings built after March 13, 1991, and those imposed by California's Fair Employment and Housing Act apply only dwellings built after January 1, 1994. 42 U.S.C. § 3604(f)(3)(C); 1993 Cal. Legis. Serv. Ch. 1277 (A.B. 2244). The California Building Code has imposed accessibility requirements on at least some newly built rental housing since September 1984, when standards governing the accessibility of newly constructed apartment houses containing five or more dwelling units went into effect.[15] Before that date, no federal or state law or regulation required Oakland's private rental housing built without government funds to be accessible to people with disabilities.

46.     The FHAA's accessible design and construction requirements apply to buildings containing four or more condominium or rental dwelling units that were newly constructed and certified for first occupancy on or after March 13, 1991. *See* 42 U.S.C. § 3604(f)(7). If such buildings have an elevator, every unit in the building must be accessible. *Id.* If there is no elevator, the standards only apply to units on the ground floor. *Id.*

---

[15] *See* California Department of Housing and Community Development, *State Housing Law Program*, at http://www.hcd.ca.gov/building-standards/state-housing-law/index.shtml (describing history of state regulations requiring accessibility, under link titled "Program History").

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

47.     The coverage of California's FEHA is analogous but slightly broader, in that it also applies to buildings that contain three or more rental apartment dwelling units. Cal. Gov. Code § 12955.1.1.

48.     The precise requirements imposed by these access laws can be technical, but their impact is profound: By mandating that at least *some* newly-built private rental units be accessible, they help ensure that people with mobility disabilities have a chance to find housing that meets their needs, and that provides them with the same level of independence, dignity, and community integration that renters without disabilities enjoy as a matter of course.

49.     However, the City's Rent Adjustment Program—with its cutoff date frozen in time—does not encompass *any* of the accessible units that these laws helped create.

50.     By operating a Rent Adjustment Program that covers over 60% of Oakland's rental housing but that exempts all or nearly all of its accessible rental units, the City discriminates against Plaintiffs and other people with mobility disabilities who need accessible housing, and it denies them meaningful access to the same benefit that the City's nondisabled renters enjoy.

D.     **By Operating a Rent Adjustment Program That Does Not Cover Accessible Units, the City Harms Plaintiffs and a Class of People with Mobility Disabilities.**

　　1.     Plaintiff Ian Smith Is Harmed by the Rent Adjustment Program's Exclusion of Accessible Housing.

51.     Plaintiff Ian Smith uses a power wheelchair and, because of his disability, needs to live in accessible housing. Even if Mr. Smith were able to enter an inaccessible rental unit (in most cases, he could not), living in one would likely mean to relying on help from others to perform the basic activities of daily life. By contrast, accessible housing allows Mr. Smith to live independently.

52.     When Mr. Smith first moved to Oakland in 2012, he attempted to find accessible rental housing that was subject to the City's Rent Adjustment Program, but he was unable to do so. He has been similarly unable to find such a unit in the years since.

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

53.     To the best of Mr. Smith's knowledge, there are no units that are both accessible and subject to the Program, meaning that he has no opportunity to enjoy the benefits that the Rent Adjustment Program provides.

54.     Because Mr. Smith could not find an accessible unit that was covered by Oakland's Rent Adjustment Program, he was forced to choose a newer apartment that was exempt from the Program, but that met his access needs. He has lived in that same accessible unit since May 2012.

55.     When Mr. Smith first moved in to his accessible rental unit, his rent was $1,697 a month. In the years since, it has increased by over 70%, meaning that Mr. Smith is now paying over $1,200 more per month for the exact same apartment than he paid in 2012.

56.     These increases were often both sudden and large. For example, in 2015, Mr. Smith's monthly rent jumped by almost 37%, a roughly $700 increase.

57.     If Mr. Smith had been able to rent an accessible apartment that was covered by the City's Rent Adjustment Program, his rent could only have gone up by about 14% between 2012 and today. This would have amounted to an increase of only $233, or roughly $980 less per month than he pays now. In other words, the lack of accessible units in the City's Rent Adjustment Program, and Mr. Smith's consequent inability to participate in that Program, is now costing him almost $12,000 a year.

> 2.     Plaintiff Sunday Parker Is Harmed by the Rent Adjustment Program's Exclusion of Accessible Housing.

58.     Plaintiff Sunday Parker also uses a power wheelchair and, because of her disability, needs to live in accessible housing. As with Mr. Smith, Ms. Parker's accessible apartment allows her to live independently.

59.     Ms. Parker has lived in Oakland since being pushed out of San Francisco by rising rents in 2014.

60.     Like Plaintiff Smith, Ms. Parker has been unable to find any accessible units that are subject to the City's Rent Adjustment Program. As far as Ms. Parker is aware, no such units

exist, which means she has no opportunity to enjoy the protections that the Rent Adjustment Program provides.

61.     Because she is unable to live in a unit covered by the City's Rent Adjustment Program, Ms. Parker has endured extreme rent increases—including one increase of almost 40% in a single year—and she has repeatedly been forced to find new housing because the accessible apartment she was living in became unaffordable. Often, these increases meant that Ms. Parker paid well-over 30% of her income to live in her accessible apartment, and that she qualified as "cost burdened" under federal standards.[16]

62.     Though she would prefer to live alone, Ms. Parker now lives with a roommate to offset the high and rising cost of living in accessible apartment that is not covered by the City's Program.

3.     Plaintiff Mitch Jeserich Is Harmed by the Rent Adjustment Program's Exclusion of Accessible Housing.

63.     Plaintiff Mitch Jeserich lives in Oakland, California and uses a manual wheelchair.

64.     From 2009 until 2015, Mr. Jeserich lived in an apartment that was not subject to the City's Rent Adjustment Program. That apartment's bathroom was large enough to enter, and Mr. Jeserich could use the kitchen, switches, outlets, and other features with ease.

65.     However, in 2013, the rent for this unit began to increase dramatically, and Mr. Jeserich was told that it would continue to go up each year.

66.     Unable to afford such continuing increases, Mr. Jeserich decided to move to a nearby apartment that was covered by Oakland's Rent Adjustment Program, even though it was much less accessible than the one that he left. Mr. Jeserich has lived in this inaccessible, but rent-stabilized, unit since 2015.

---

[16] *See* U.S. Dep't of Housing & Urban Dev., *Who Needs Affordable Housing?*, available at https://www.hud.gov/program_offices/comm_planning/affordablehousing/ (noting that "[f]amilies who pay more than 30 percent of their income for housing are considered cost burdened and may have difficulty affording necessities such as food, clothing, transportation and medical care").

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

67. At present, Mr. Jeserich has enough strength, flexibility, and mobility to make life in his inaccessible apartment work. However, half the unit's outlets are too high for him to reach; the kitchen is designed in a way that prevents him from having access to most of his refrigerator; and the bathroom is far too small to accommodate his wheelchair.

68. Navigating these and other barriers requires a significant amount of daily effort, and Mr. Jeserich worries that he is only one injury away from not being able to do it at all.

69. While Mr. Jeserich is able to live in a covered, inaccessible unit, and participate in the Rent Adjustment Program for now, he does not have access to the same benefit that the City's nondisabled renters enjoy. Mr. Jeserich's participation in the Program comes at a cost—life in housing that is in many ways inaccessible to him—that nondisabled renters need not pay.

70. Mr. Jeserich would move to an accessible apartment that was covered by the City's Rent Adjustment Program, if any such units existed.

## V. CLASS ACTION ALLEGATIONS

71. Pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure, Plaintiffs bring this action on behalf of themselves and all other persons similarly situated. The proposed Class consists of all people with mobility disabilities who need an accessible rental unit in the City of Oakland, and who are consequently excluded from or denied the benefit of the City's Rent Adjustment Program.

72. Plaintiffs are unable to state the precise number of potential members of the proposed Class. However, as of 2017, an estimated 16,000 Oakland renters had ambulatory disabilities that made walking or climbing stairs seriously difficult or impossible.[17] Even if only a portion of this total population were members of Plaintiffs' proposed Class, it would still number in the thousands. Moreover, this number does not account for people with ambulatory disabilities who currently live outside of Oakland, but who work in Oakland or who would like

[17] U.S. Census Bureau, 2013-2017 American Community Survey 5-Year Estimates; *see also* American Community Survey and Puerto Rico Community Survey 2016 Subject Definitions at 60-61, available at https://www2.census.gov/programs-surveys/acs/tech_docs/subject_definitions/2016_ACSSubjectDefinitions.pdf (defining "ambulatory difficulty").

1  to find an accessible rental unit in the City for other reasons—a population that includes renters

2  seeking to move from other cities throughout the greater Bay Area. Thus, members of Plaintiffs'

3  proposed Class are sufficiently numerous that joinder is impracticable.

4     73. Common questions of fact and law predominate, because Plaintiffs and putative

5  Class members are all excluded from participation in, denied meaningful access to the benefit of,

6  or otherwise subjected to discrimination in connection with Defendant's Rent Adjustment

7  Program, because of the Program-wide effective exclusion of accessible rental units.

8     74. Plaintiffs' claims are typical of, and not antagonistic to, the claims of all other

9  members of the Class.  Defendant's discriminatory actions, alleged herein, have harmed

10  Plaintiffs and members of the proposed class in ways that are either identical or substantially

11  similar. Plaintiffs, by advancing their claims, will also advance the claims of all other similarly

12  situated individuals.

13     75. Plaintiffs are adequate class representatives because they are directly impacted by

14  Oakland's failure to ensure that people with disabilities who need accessible units have the same

15  access to the City's Rent Adjustment Program that nondisabled renters enjoy. The interests of the

16  Plaintiffs are not antagonistic to, or in conflict with, the interests of the Class as a whole, and

17  there are no material conflicts between Plaintiffs' claims and those of absent class members that

18  would make class certification inappropriate.

19     76. The attorneys representing the Class are highly trained, duly qualified, and very

20  experienced in representing plaintiffs in civil rights class actions.

21     77. Defendants have acted and failed to act on grounds generally applicable to the

22  Class as a whole, thereby making appropriate final declaratory and injunctive relief with respect

23  to the class as a whole.

24     78. References to Plaintiffs shall include Plaintiffs Smith, Parker, Jeserich, and each

25  member of the Class, unless otherwise indicated.

26

27

28

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

## VI.    LEGAL CLAIMS

### FIRST CAUSE OF ACTION
### Violation of Title II of the Americans with Disabilities Act
### 42 U.S.C. §§ 12132, *et seq.*

79.     Plaintiffs incorporate by reference all foregoing and subsequent paragraphs as though fully set forth herein.

80.     Title II of the Americans with Disabilities Act provides in pertinent part that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

81.     This prohibition against discrimination in "services, programs, or activities" applies to "anything a public entity does." *Cohen v. City of Culver City*, 754 F.3d 690, 695 (9th Cir. 2014) (citation omitted); *see also Barden v. City of Sacramento*, 292 F.3d 1073, 1076-77 (9th Cir. 2002) (discussing rationale for broad construction).

82.     Defendant the City of Oakland is a public entity within the meaning of Title II of the ADA. 42 U.S.C. § 12131.

83.     The Rent Adjustment Program is service, program, or activity that the City provides to the general public.

84.     Plaintiffs are individuals with disabilities within the meaning of Title II of the ADA, and, as members of the general public, they meet the essential eligibility requirements for participation in, and receipt of the benefits of, the Rent Adjustment Program.  42 U.S.C. § 12131.

85.     As a public entity, Oakland must operate each program, service, or activity it offers "so that, when viewed in its entirety, it is readily accessible to and useable by individuals with disabilities." 28 C.F.R. § 35.150.

86.     Moreover, in providing any aid, benefit, or service, the City may not (1) "[d]eny a qualified individual the opportunity to participate in or benefit from the aid, benefit, or service"; (2) "[a]fford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others"; or (3) "[p]rovide a qualified individual with a disability with an aid, benefit, or service that is not as effective in

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others." 28 C.F.R. § 35.130(b)(1)(i)–(iii).

87.     By operating a Rent Adjustment Program that covers over 60% of Oakland's rental housing but that exempts all or nearly all of its accessible rental units, the City subjects Plaintiffs and the putative class to discrimination, denies them the benefit of its Rent Adjustment Program, and excludes them from participation in that Program, in violation of the ADA. *See* 42 U.S.C. § 12132.

88.     In such situations, the Americans with Disabilities Act obligates the City of Oakland to eliminate discriminatory policies and practices. *See* 28 C.F.R. § 35.130(b)(1)(i)–(iii), (b)(2), (b)(3), (b)(8).

89.     The Americans with Disabilities Act also requires the City of Oakland "make reasonable modifications in policies, practices, or procedures . . . to avoid discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(7)(i).

90.     To comply with these obligations, Oakland must ensure that people who need accessible housing are provided with a meaningful and equal opportunity to access the same Rent Adjustment Program benefits that the city affords to its nondisabled renters, on the same terms, and without having to endure the hardship of life in an inaccessible unit as a condition of coverage.

91.     Moreover, because the Americans with Disabilities Act preempts inconsistent state and local laws, this obligation applies even if it would require the City to adopt a new Program exemption date that is inconsistent with state or local law, including California Civil Code section 1954.52(a)(2), or any other provision of the Costa-Hawkins Rental Housing Act. *See, e.g., Crowder v. Kitagawa*, 81 F.3d 1480, 1485 (9th Cir. 1996) (holding that reasonable modification requirement of ADA may preempt state law); *Mary Jo C. v. N.Y. State & Local Ret. Sys.*, 707 F.3d 144, 162–63 (2d Cir. 2013) (same).

92.     On June 6, 2019, Plaintiffs sent the City of Oakland a letter requesting that it extend the January 1, 1983, cutoff date for its Rent Adjustment Program or otherwise reasonably

1  modify its Program, such that Plaintiffs and other people with disabilities who need accessible

2  housing would have the same meaningful opportunity to live in rent-stabilized housing that the

3  City's nondisabled renters currently enjoy. However, the City has failed to make these

4  reasonable and necessary modifications to its Program even as the City's Housing Element

5  provides that the City's ADA Programs Division will "ensure that requirements for accessibility

6  are met throughout the City's programs."[18]

7      93.    As a direct and proximate result of Defendant's acts and omissions, Plaintiffs

8  have suffered and will continue to suffer injuries for which they have no adequate remedy at law.

9      94.    Because Defendant's discriminatory conduct is ongoing, declaratory and

10 injunctive relief are appropriate.

11     95.    Pursuant to 42 U.S.C. § 12133, Plaintiffs are entitled to declaratory and injunctive

12 relief, and to recover from Defendants the reasonable attorneys' fees and costs incurred in

13 bringing this action.

14     WHEREFORE, Plaintiffs pray for relief as set forth below.

15              **SECOND CAUSE OF ACTION**
       **Violation of the California Disabled Persons Act**
16              **(California Civil Code §§ 54–54.3)**

17     96.    Plaintiffs incorporate by reference all foregoing and subsequent allegations as

18 though fully set forth herein.

19     97.    The California Disabled Persons Act incorporates the Americans with Disabilities

20 Act, and states that "a violation of the right of an individual under the Americans with

21 Disabilities Act . . . constitutes a violation of" the CDPA. Cal. Civ. Code § 54.1(d).

22     98.    Thus, by violating the ADA as alleged in Plaintiffs' First Cause of Action, above,

23 the City of Oakland is also violating the CDPA.

24     99.    Plaintiffs are aggrieved and potentially aggrieved by Defendant's acts and

25 omissions, as alleged herein. Moreover, as a direct and proximate result of those acts and

26

27 _____

[18] City of Oakland, *City of Oakland Housing Element: 2015-2023* at 318 (Action 6.2.1),
28 available at http://www2.oaklandnet.com/oakca1/groups/ceda/documents/report/oak050615.pdf

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1  omissions, Plaintiffs have suffered and will continue to suffer injuries for which they have no

2  adequate remedy at law.

3      100.    Because Defendant's discriminatory conduct is ongoing, declaratory and

4  injunctive relief are appropriate.

5      101.    Under the CDPA, Plaintiffs are entitled to declaratory and injunctive relief. *See*

6  Cal. Civ. Code §§ 54–55.

7      102.    Plaintiffs are also entitled to an award of attorneys' fees, costs and expenses. *Id.*

8      WHEREFORE, Plaintiffs pray for the relief set forth below.

9
## THIRD CAUSE OF ACTION
### Declaratory Relief

10

11      103.    Plaintiffs incorporate by reference each of the preceding paragraphs as if fully set

12  forth herein.

13      104.    An actual controversy has arisen and now exists between the parties in that

14  Plaintiffs contend, and are informed and believe that Defendants deny, that by engaging in the

15  conduct described herein Defendants have violated the Americans with Disabilities Act, 42

16  U.S.C. §§12101, *et seq.*

17      105.    A judicial declaration is necessary and appropriate at this time in order that each

18  of the parties may know their respective rights and duties and act accordingly.

19      **VII.    PRAYER FOR RELIEF**

20  Based on the foregoing, Plaintiffs respectfully request the following relief:

21      1.    An order certifying this case as a class action, and appointing Plaintiffs Smith,

22  Parker, and Jeserich as representatives of the Class, and Plaintiffs' counsel as Class Counsel;

23      2.    A declaration that Oakland's acts and omission as set forth herein unlawfully

24  discriminate against Plaintiffs and members of the Class;

25      3.    An order requiring the City of Oakland to bring its Rent Adjustment Program into

26  compliance with state and federal law, such that people with disabilities who need accessible

27  housing have a meaningful and equal opportunity to access the same Rent Adjustment Program

28

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

benefits that the city affords to its nondisabled renters, on the same terms, and without having to endure the hardship of life in an inaccessible unit as a condition of coverage.

4.    Such other and further relief as the Court may deem just and proper to ensure that Plaintiffs and other people with mobility disabilities who need accessible housing are not excluded from or denied meaningful access to the benefits of the City's Rent Adjustment Program; and

7.    An award of Plaintiffs' attorneys' fees, costs and expenses incurred in the filing and prosecution of this action, as authorized by 42 U.S.C. § 12188 and California Civil Code section 54.3.

DATED:  August 28, 2019                    Respectfully submitted,

DISABILITY RIGHTS ADVOCATES

Thomas Zito
Sean Betouliere
Jessica Agatstein
Attorneys for Plaintiffs

PUBLIC INTEREST LAW PROJECT

Michael Rawson
Craig Castellanet
Melissa A. Morris
Attorneys for Plaintiffs

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644