Thomas Zito (CA BAR NO. 304629)
Sean Betouliere (CA BAR NO. 308645)
Jessica Agatstein (CA BAR NO. 319817)
Disability Rights Advocates
2001 Center Street, Fourth Floor
Berkeley, California 94704-1204
Tel:  (510) 665-8644
Fax:  (510) 665-8511
Email: tzito@dralegal.org

Michael Rawson (CA BAR NO. 95868)
Craig Castellanet (CA BAR NO. 176054)
Melissa A. Morris (CA BAR NO. 233393)
Public Interest Law Project
449 15th St., Suite 301
Oakland, CA 94612-06001
Tel:  (510) 891-9794
Fax:  (510) 891-9727
Email: mrawson@pilpca.org

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

IAN SMITH, SUNDAY PARKER, and MITCH JESERICH, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

CITY OF OAKLAND, a public entity,

Defendant.

**Case No. 4:19-cv-05398-JST**

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

Date:      December 18, 2019
Time:      2:00 P.M.
Place:     Courtroom 6, Second Floor
Judge:    Hon. Jon S. Tigar

Complaint Filed: August 28, 2019
Trial Date: None Set

# TABLE OF CONTENTS

I.     Introduction ........................................................................................................ 1

II.    Facts .................................................................................................................... 2

III.   Statutory And Regulatory Background ............................................................... 4

IV.    Argument ............................................................................................................ 6

       A.    Plaintiffs have standing to pursue their claims. ..................................... 6

             1.    Courts take a broad view of standing in civil rights
                   challenges under the Americans with Disabilities Act. ............. 6

             2.    The City's failure to apply its Rent Adjustment Program to
                   accessible units causes concrete injury to Plaintiffs, which
                   is traceable to the City and redressable by injunctive relief. ..... 7

       B.    Plaintiffs have stated valid claims of disability discrimination. ............ 9

             1.    Plaintiffs have properly pled their claims against the City. ........ 9

             2.    Plaintiffs do not have a meaningful and equal opportunity
                   to participate in or benefit from Oakland's Rent Adjustment
                   Program. .................................................................................... 10

             3.    Plaintiffs' exclusion from the Rent Adjustment Program is
                   by reason of disability. .............................................................. 15

             4.    Private landlords' fair housing obligations do not excuse
                   the City from its duty to administer its Rent Adjustment
                   Program in a nondiscriminatory manner. ................................... 16

       C.    Plaintiffs have adequately pled that the City failed to reasonably
             modify its Rent Adjustment Program to prevent discrimination. ......... 17

             1.    Plaintiffs' proposed modification of the Rent Adjustment
                   Program is facially reasonable, even if it would require the
                   City to disregard conflicting state and local law. ...................... 18

             2.    Plaintiffs' proposed modification is necessary to provide
                   meaningful and equal access to the Rent Adjustment
                   Program. .................................................................................... 21

             3.    The City's fundamental alteration defense is procedurally
                   premature. .................................................................................. 22

             4.    Even if the City's fundamental alteration defense were
                   procedurally appropriate, it would fail. ...................................... 22

V.     Conclusion ....................................................................................................... 24

1

## TABLE OF AUTHORITIES

2

**Cases**

3

*Albino v. Baca*, 747 F.3d 1162 (9th Cir. 2014) ........................................................................ 22

4

*Alexander v. Choate*, 469 U.S. 287 (1985) ...................................................................... passim

5

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ............................................................................... 9

6

*Barber v. Col. Dept. of Revenue*, 562 F.3d 1222 (10th Cir. 2009) ............................................. 19

7

*Barden v. City of Sacramento*, 292 F.3d 1073 (9th Cir. 2002) ...................................................... 5

8

*Bassilios v. City of Torrance, CA*, 166 F. Supp. 3d 1061 (C.D. Cal. 2015) ................................. 7

9

*Baughman v. Walt Disney World Co.*, 685 F.3d 1131 (9th Cir. 2012) .............................. 7, 17, 21

10

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) .................................................................. 9

11

12

*Civil Rights Educ. & Enf't Ctr. v. Hosp. Properties Tr.*, 867 F.3d 1093 (9th Cir. 2017) ........................................................................................................................... 9

13

*Cohen v. City of Culver City*, 754 F.3d 690 (9th Cir. 2014) ................................................. 4, 5, 16

14

*Communities Actively Living Indep. & Free v. City of L.A.*, No. CV 09-0287 CBM RZX, 2011 WL 4595993 (C.D. Cal. Feb. 10, 2011) .................................................... 16

15

16

*Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000) ................................................... 19

*Crowder v. Kitagawa*, 81 F.3d 1480 (9th Cir. 1996) ........................................................ passim

17

*Davis v. Astrue*, 874 F. Supp. 2d 856 (N.D. Cal. 2012) ........................................................ 7, 8

18

*Does 1–5 v. Chandler*, 83 F.3d 1150 (9th Cir. 1996) ............................................................. 12

19

*Doran v. 7–Eleven, Inc.*, 524 F.3d 1034 (9th Cir. 2008) ............................................................ 6

20

*Fidelity Federal Savings & Loan Ass'n v. de la Cuesta*, 458 U.S. 141 (1982) ............................ 19

21

*Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075 (9th Cir. 2004) .............................. 14, 17, 21

22

*Giebeler v. M & B Assocs.*, 343 F.3d 1143 (9th Cir. 2003) .................................................. 17, 21

23

*Godecke v. Kinetic Concepts, Inc.*, 937 F.3d 1201 (9th Cir. 2019) ............................................. 9

24

*Hason v. Med. Bd. of California*, 279 F.3d 1167 (9th Cir. 2002) ................................................ 4

25

*Hillsborough County v. Automated Med. Labs., Inc.*, 471 U.S. 707 (1985) ................................ 19

26

*Hindel v. Husted*, 875 F.3d 344 (6th Cir. 2017) ........................................................ 18, 22, 23

27

*Hubbard v. SoBreck, LLC*, 554 F.3d 742 (9th Cir. 2009) ........................................................ 19

28

*K.M. ex rel. Bright v. Tustin Unified Sch. Dist.*, 725 F.3d 1088 (9th Cir. 2013) .................. 15, 22

*Kirola v. City & Cty. of San Francisco*, 860 F.3d 1164 (9th Cir. 2017)........................................8

*Larson v. Valente*, 456 U.S. 228 (1982) ...........................................................................8

*Lentini v. Cal. Ctr. for the Arts, Escondido,* 370 F.3d 837 (9th Cir. 2004) ............................6, 22

*Liberty Res., Inc. v. Phila. Hous. Auth.*, 528 F. Supp. 2d 553 (E.D. Pa. 2007) ..........................13

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) .....................................................................6

*Martin v. PGA Tour, Inc.*, 204 F.3d 994 (9th Cir. 2000)...........................................................14

Martin v. PGA Tour, Inc., 532 U.S. 661 (2001) ...............................................................14, 23

*Mary Jo C. v. N.Y. State & Local Ret. Sys.*, 707 F.3d 144 (2d Cir. 2013)...................4, 18, 20, 23

*McGary v. City of Portland*, 386 F.3d 1259 (9th Cir. 2004) ............................................... passim

*Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494 (4th Cir. 2016) .....................................14, 19

*OSU Student All. v. Ray*, 699 F.3d 1053 (9th Cir. 2012)...........................................................9

*Quinones v. City of Evanston*, 58 F.3d 275 (7th Cir. 1995)......................................................19

*Rodde v. Bonta*, 357 F.3d 988 (9th Cir. 2004)................................................................15, 16

*Rodriguez v. City of New York*, 197 F.3d 611 (2d Cir. 1999)....................................................12

*Safe Air for Everyone v. Meyer*, 373 F.3d 1035 (9th Cir. 2004)..................................................6

*Townsend v. Quasim*, 328 F.3d 511 (9th Cir. 2003) ...............................................................22

*Trafficante v. Metro. Life Ins. Co.,* 409 U.S. 205 (1972).............................................................6

*U.S. Airways, Inc. v. Barnett*, 535 U.S. 391 (2002)................................................................18

*Wolfe v. Strankman*, 392 F.3d 358 (9th Cir. 2004) ..................................................................6

*Wong v. Regents of Univ. of Cal.*, 192 F.3d 807 (9th Cir. 1999).................................................17

**Statutes**

29 U.S.C. § 794.................................................................................................................15

42 U.S.C. § 12101(b)(1) .................................................................................................4, 20

42 U.S.C. § 12132.....................................................................................................5, 7, 15

42 U.S.C. § 12134................................................................................................................5

42 U.S.C. § 12182(a) ........................................................................................................21

42 U.S.C. § 3604(f)(3)(A)..................................................................................................16

42 U.S.C. § 3604(f)(3)(C)....................................................................................................3

Cal. Civ. Code § 1946.2(e)(7) ............................................................................ 24

Cal. Civ. Code § 1954.52(a)(2) .......................................................................... 18

Cal. Civ. Code § 54.1(d) ...................................................................................... 4

Cal. Gov. Code § 12955.1(c) ............................................................................... 3

Cal. Gov. Code § 12955.1(e) ............................................................................... 3

U.S. Const. art. VI, cl. 2 ..................................................................................... 19

**Other Authorities**

1992 Cal. Legis. Serv. Ch. 182 (S.B. 1234) ........................................................ 3

Oakland, Cal., Mun. Code § 8.22.070 ................................................................. 2

Oakland, Cal., Mun. Code § 8.22.080 ................................................................. 2

Oakland, Cal., Mun. Code §§ 8.22.065–80 ...................................................... 23

Oakland, Cal., Mun. Code §§ 8.22.10–22.30 ..................................................... 2

Oakland, Cal., Mun. Code C §§ 8.22.090–120 .................................................. 2

**Regulations**

24 C.F.R. § 100.203(a) ...................................................................................... 16

24 C.F.R. § 100.205 ............................................................................................. 3

28 C.F.R. § 35.130(b)(1)(i)–(iii) .......................................................................... 5

28 C.F.R. § 35.130(b)(1)(ii) ............................................................................... 17

28 C.F.R. § 35.130(b)(3) ...................................................................................... 5

28 C.F.R. § 35.130(b)(7) .................................................................................... 17

28 C.F.R. § 35.130(b)(7)(i) ........................................................................ 5, 6, 22

28 C.F.R. Pt. 35 ................................................................................................... 5

# I.    INTRODUCTION

This case challenges the City of Oakland's ("City's") exclusion of renters with mobility disabilities from the benefit of its Rent Adjustment Program ("Program"). The Program, intended to "provid[e] relief to residential tenants in Oakland by limiting rent increases for existing tenants," conditions that relief on a tenant's ability to live in private housing built before January 1, 1983. Oakland, Cal., Mun. Code §§ 8.22.010(C), 8.22.030(A)(5). However, all or nearly all of Oakland's accessible rental units were built well after that date, making the Program's protections not meaningfully and equally available to renters with mobility disabilities who need accessible units. Nondisabled renters, on the other hand, have a real opportunity to access the Program's protections; roughly six out of every ten rental units they can live in are covered.

Many people with disabilities, including Plaintiffs Ian Smith and Sunday Parker, have no opportunity to enjoy the benefits that the Rent Adjustment Program provides, because they cannot live in any of the units that it covers. Others, including Plaintiff Mitch Jeserich, may technically be able to access the Program's protections, but their participation comes at an immense non-financial cost—life in a unit that is not accessible to them—that nondisabled renters need not incur. For people with mobility disabilities, living in an inaccessible unit that is covered by the Program can mean needing to drag themselves up and down steps, coping every day with a kitchen they cannot use, or having a bathroom that they must crawl on their hands and knees to enter because a wheelchair cannot fit.

Plaintiffs Smith, Parker, and Jeserich bring this suit under the Americans with Disabilities Act ("ADA") and California Disabled Persons Act ("CDPA"), on behalf of themselves and all other Oakland renters with disabilities who need accessible housing. They ask that the City modify its Rent Adjustment Program to encompass accessible units, so that they have the same opportunity to access the Program's benefits that nondisabled renters currently enjoy.

Defendant's arguments for dismissal are unavailing. The City's assertions that Plaintiffs lack standing, that Plaintiffs already have access to the Rent Adjustment Program, and that Plaintiffs are not excluded from the Program by reason of their disabilities fail because they misconstrue Plaintiffs' claims and either misunderstand or misapply established law regarding

1   cities' obligations to provide meaningful access to the benefit of their programs. Defendant's

2   arguments that no reasonable modification to the Program is necessary or possible, and that any

3   reasonable modification would fundamentally alter the nature of the Program, are both

4   procedurally improper and incorrect. And, finally, the City's argument that state or local law

5   prohibits the modifications requested ignores the fact that the federal Americans with Disabilities

6   Act preempts conflicting state and local laws.

7          Contrary to the City's assertions, the Plaintiffs' Complaint seeks equality of access, not a

8   guarantee of equal results. Plaintiffs ask only for what the City's nondisabled renters already

9   have: a meaningful opportunity to enjoy the benefits of Oakland's Rent Adjustment Program

10  without having to endure the hardship of life in an inaccessible unit as a condition of coverage.

11  The Court should deny the City's Motion to Dismiss.

12  **II.    FACTS**

13         Through its Rent Adjustment Program, the City provides a majority of Oakland tenants

14  with protection from excessive annual rent increases, so long as the tenants live in privately

15  owned units built before 1983. *See* ECF No. 1 ("Compl.") at ¶ 34; Oakland, Cal., Mun. Code

16  ("OMC") §§ 8.22.10–22.30. The Program allows landlords of covered buildings to set initial

17  rents at market rate, *id.* at § 8.22.080, but then ensures that tenants receive no more than a single

18  annual rent increase, which cannot exceed an amount calculated by the City based on changes in

19  the Consumer Price Index. *Id.* at § 8.22.070. The maximum allowable annual rent increase is

20  3.5% for this year, and it has ranged from 0.7% to 3.5% over the past decade. Compl. at ¶ 34.

21  Along with the benefit of rent control, the City provides administrative procedures that

22  implement and enforce the Program's protections. OMC §§ 8.22.090–120.

23         Few if any privately owned housing units in Oakland built before 1983 are physically

24  accessible to people with mobility disabilities. Compl. at ¶¶ 1, 39, 41–42, 49–50, 53, 60. Before

25  state and federal access requirements were adopted several years after 1983, nearly all residential

26  rental units were built without accessible design features—like a wheelchair-accessible route into

27  and through the home, doors wide enough to accommodate a wheelchair, kitchens and

28  bathrooms designed so that people who use wheelchairs can get in and out of them, reinforced

1  walls that allow for the later installation of grab bars, and controls and outlets placed so that

2  people who use wheelchairs can use them. Compl. at ¶¶ 7–8, 41; *see generally* 42 U.S.C.

3  § 3604(f)(3)(C) (requiring accessible construction for buildings approved for first occupancy

4  after March 13, 1991); 24 C.F.R. § 100.205 (same); 1992 Cal. Legis. Serv. Ch. 182 (S.B. 1234)

5  (enacting Cal. Gov. Code § 12955.1(c), (e)). As a result, although Oakland now has a substantial

6  amount of accessible private rental housing, almost all was constructed after 1983, and the

7  majority was constructed after 2000. Compl. at ¶¶ 1, 42.

8      Plaintiffs Ian Smith and Sunday Parker are Oakland tenants who use power wheelchairs

9  and who cannot live in inaccessible housing because of their disabilities. *Id.* at ¶¶ 25–26, 51, 58.

10  Mr. Smith moved to Oakland in 2012 and tried to find an apartment in which he could access the

11  Rent Adjustment Program; however, he could not find any rent-controlled apartments that were

12  accessible to him, either then or in the years since. *Id.* at ¶¶ 52–53. Instead, Mr. Smith has lived

13  in a newer accessible apartment that is exempt from the Rent Adjustment Program, in which he

14  pays market rate rent. *Id.* at ¶ 54. Between 2012 and 2019, Mr. Smith's rent increased by over

15  70% while living in the same apartment. *Id.* at ¶ 55. If Mr. Smith had the opportunity to rent an

16  accessible apartment that was covered by the Program, his rent could only have gone up by about

17  14% in the same time period. *Id.* at ¶ 57. That differential now amounts to about $12,000 each

18  year. *Id.*

19      Ms. Parker moved to Oakland in 2014, and, like Mr. Smith, has since been unable to find

20  an apartment subject to the Rent Adjustment Program that she can access. *Id.* at ¶¶ 59–60. Since

21  2014, she has repeatedly moved due to extreme rent increases in various accessible apartments in

22  Oakland, including a rent increase of almost 40% in a single year. *Id.* at ¶ 61.

23      Plaintiff Mitch Jeserich is an Oakland tenant who uses a manual wheelchair, and who

24  lives in an apartment that is not accessible but is covered by the City's Rent Adjustment

25  Program. *Id.* at ¶¶ 63, 66. Although he previously lived in an accessible apartment in Oakland

26  not subject to the Program, in 2013, he moved to an inaccessible apartment so that he could have

27  rent control. *Id.* at ¶¶ 64–66. In his apartment, Mr. Jeserich cannot enter the bathroom in his

28  wheelchair, use most of his refrigerator, or reach half of the apartment's outlets. *Id.* at ¶ 67.

1    Although Mr. Jeserich has enough strength and flexibility to find other ways to access his

2    bathroom and other aspects of his apartment, navigating his inaccessible apartment requires a

3    significant amount of daily effort, and he worries he may become unable to expend that effort in

4    the future. *Id.* at ¶¶ 68–69.

5         All three of Plaintiffs' stories reflect the experiences of the putative class of all people

6    with mobility disabilities who need an accessible rental unit in the City of Oakland. *Id.* at ¶ 71.

7    Although over 64,000 pre-1983 rental units in Oakland are subject Oakland's rent protections

8    and procedures that enforce them, few, if any, are accessible. *Id.* at ¶ 1. Plaintiffs thus asked the

9    City to modify the Program by including existing accessible apartments, built after 1983, such

10   that Oakland tenants would have the same opportunity to access the Program's protections that

11   the City's nondisabled tenants currently enjoy. *Id.* at ¶¶ 17, 92. The City refused to make this

12   reasonable and necessary modification. *Id.*

13   **III.    STATUTORY AND REGULATORY BACKGROUND**

14        The Americans with Disabilities Act was enacted in 1990 "to provide a clear and

15   comprehensive national mandate for the elimination of discrimination against individuals with

16   disabilities." 42 U.S.C. § 12101(b)(1). "Courts must construe the language of the ADA broadly

17   in order to effectively implement [this] fundamental purpose." *Hason v. Med. Bd. of Cal.*, 279

18   F.3d 1167, 1172 (9th Cir. 2002); *see Cohen v. City of Culver City*, 754 F.3d 690, 695 (9th Cir.

19   2014) (holding the same). Because the ADA was intended to provide a "comprehensive" and

20   "national" mandate for the elimination of discrimination, 42 U.S.C. § 12101(b)(1), courts have

21   repeatedly held that it preempts conflicting lower laws or regulations. *See, e.g., Crowder v.*

22   *Kitagawa*, 81 F.3d 1480, 1485–86 (9th Cir. 1996); *Mary Jo C. v. N.Y. State & Local Ret. Sys.*,

23   707 F.3d 144, 161–64 (2d Cir. 2013).

24        This case concerns Title II of the ADA,[1] which prohibits public entities from

25

26   ─────────────────────
     [1] This case also concerns the California Disabled Persons Act, which states that "a violation of
     the right of an individual under the Americans with Disabilities Act . . . constitutes a violation
27   of" the CDPA as well. Cal. Civ. Code § 54.1(d); *see Cohen*, 754 F.3d at 701 ("A violation of the
     ADA constitutes a violation of the California DPA."). Because a violation of the ADA is also a
28   violation of the CDPA, all references to the ADA in this brief should be read to encompass
     Plaintiffs' claims under both laws.

─────────────────────

1    discriminating against people with disabilities, and which demands that they not be "excluded

2    from participation in or be denied the benefits of the services, programs, or activities" that public

3    entities offer. 42 U.S.C. § 12132. These broad prohibitions against discrimination apply to

4    "anything a public entity does." *Cohen*, 754 F.3d at 695 (9th Cir. 2014) (internal citation

5    omitted); *see Barden v. City of Sacramento*, 292 F.3d 1073, 1076–77 (9th Cir. 2002) (discussing

6    the ADA's broad application).

7            Title II's general prohibitions against discrimination are supplemented with more specific

8    requirements, which are contained in Department of Justice ("DOJ") regulations. *See* 42 U.S.C.

9    § 12134 (DOJ implementing authority); 28 C.F.R. Pt. 35 (regulations). These regulations specify

10   that, in providing any aid, benefit, or service, a public entity may not (1) "[d]eny a qualified

11   individual with a disability the opportunity to participate in or benefit from the aid, benefit, or

12   service"; (2) "[a]fford a qualified individual with a disability an opportunity to participate in or

13   benefit from the aid, benefit, or service that is not equal to that afforded others"; or (3) "[p]rovide

14   a qualified individual with a disability with an aid, benefit, or service that is not as effective in

15   affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the

16   same level of achievement as that provided to others." 28 C.F.R. § 35.130(b)(1)(i)–(iii).

17           Similarly, public entities may not adopt "criteria or methods of administration" that have

18   the effect of subjecting people with disabilities to discrimination, or that "defeat[] or

19   substantially impair[] accomplishment of the public entity's program with respect to individuals

20   with disabilities"; nor may they impose or apply "eligibility criteria that screen out or tend to

21   screen out" people with disabilities from "fully and equally enjoying" the services and programs

22   public entities provide. 28 C.F.R. § 35.130(b)(3), (b)(8).

23           Finally, DOJ regulations make clear that public entities' duty not to discriminate under

24   the ADA includes a duty to make "reasonable modifications in policies, practices, or procedures"

25   when "necessary to avoid discrimination on the basis of disability, unless the public entity can

26   demonstrate that the modifications would fundamentally alter the nature of the service, program,

27   or activity" in question. 28 C.F.R. § 35.130(b)(7)(i). Whether a necessary modification would

28   fundamentally alter the nature of a service, program, or activity "is an affirmative defense," on

1   which public entity defendants bear the burden of proof. *Lentini v. Cal. Ctr. for the Arts,*

2   *Escondido,* 370 F.3d 837, 845 (9th Cir. 2004); *see also* 28 C.F.R. § 35.130(b)(7)(i).

3   **IV.    ARGUMENT**

4         **A.    Plaintiffs have standing to pursue their claims.**

5                1.    Courts take a broad view of standing in civil rights challenges under the
                       Americans with Disabilities Act.

6
7         A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) may be facial or

8   factual. *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004) (noting distinction).

9   The City, which suggests that Plaintiffs have not adequately alleged the three elements of

10  standing, has brought a facial challenge to Plaintiffs' complaint. ECF. No. 20 ("Mot. to

11  Dismiss") at 14–15. In the context of such a challenge, the Court must accept all of Plaintiffs'

12  allegations as true and draw "all reasonable inferences" in their favor." *Wolfe v. Strankman*, 392

13  F.3d 358, 362 (9th Cir. 2004).

14        At the motion to dismiss stage, "general factual allegations of injury resulting from the

15  defendant's conduct" are all that are needed to establish standing, because courts "presume that

16  general allegations embrace those specific facts that are necessary to support the claim." *Lujan v.*

17  *Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (internal citations omitted). Moreover, courts take a

18  "broad view of constitutional standing in civil rights cases, especially where, as under the ADA,

19  private enforcement suits 'are the primary method of obtaining compliance with the Act.'"

20  *Doran v. 7–Eleven, Inc.*, 524 F.3d 1034, 1039–40 (9th Cir. 2008) (quoting *Trafficante v. Metro.*

21  *Life Ins. Co.*, 409 U.S. 205, 209 (1972)).

22        Plaintiffs here have alleged concrete and ongoing injuries directly traceable to the City's

23  ADA violations—exclusion from the Rent Adjustment Program, and denial of a meaningful and

24  equal opportunity to access the same Program benefits that the City's nondisabled renters

25  enjoy—that would be redressed by a favorable decision.

26
27
28

1        2.    <u>The City's failure to apply its Rent Adjustment Program to accessible units causes concrete injury to Plaintiffs, which is traceable to the City and redressable by injunctive relief.</u>

Plaintiffs' complaint is not, as the City contends, that "their rent is higher than they would prefer," or that "their unit is less accessible than they would prefer." Mot. to Dismiss at 14:27–28. It is that they and the class of people they seek to represent are denied the same opportunity to participate in and benefit from Oakland's Rent Adjustment Program that the City's nondisabled tenants enjoy, because the City has set and maintains an exemption for all units built after January 1983 that leaves few if any of Oakland's existing accessible rental units subject to the Program's protections. As a consequence, people with disabilities who need accessible housing are either excluded from the Program entirely, as are Mr. Smith and Ms. Parker, or forced to endure unique disability-related hardships just to access its protections, as is Mr. Jeserich. Compl. at ¶¶ 9, 13–15, 25–27, 38, 53, 60, 63–70.

The City seeks to minimize these harms, framing them in terms of Plaintiffs' "preference" for accessible housing that they can afford. *See* Mot. to Dismiss at 14. Yet the outright exclusion that Mr. Smith and Ms. Parker experience, as well as the hardships that Mr. Jeserich and others must endure as a condition of participation in Oakland's Rent Adjustment Program, are cognizable forms of discrimination under the ADA. 42 U.S.C. § 12132; *see, e.g.*, *Crowder v. Kitagawa*, 81 F.3d 1480, 1482, 1484 (9th Cir. 1996) (regulation that burdens people with disabilities "in a manner different and greater than it burdens others" is discriminatory, including when plaintiffs were "severely restricted" in use of services); *Baughman v. Walt Disney World Co*., 685 F.3d 1131, 1135 (9th Cir. 2012) (holding that the ADA demands "more than mere access"); *Bassilios v. City of Torrance, CA*, 166 F. Supp. 3d 1061, 1083–84 (C.D. Cal. 2015) (holding a modification necessary to avoid discrimination where plaintiff exposed to more "difficulty, risk, pain, and inconvenience," as "compared to what persons without a disability experience").

The injury at the heart of Plaintiffs' complaint "is the alleged discrimination suffered," which "clearly can be an injury in fact for purposes of standing." *Davis v. Astrue*, 874 F. Supp. 2d 856, 863 (N.D. Cal. 2012) (collecting cases); *see Kirola v. City & Cty. of S.F.*, 860 F.3d 1164,

1175 (9th Cir. 2017) (finding injury in fact, when plaintiff allegedly did not have the "same

degree of access as a person without a mobility disability"). Moreover, these injuries are not

conjectural or hypothetical—Plaintiffs are *currently* being denied a meaningful opportunity to

access the same Program benefits that the City makes available to nondisabled tenants on the

same terms. Compl. at ¶¶ 25, 26, 53, 60, 69.

The City's suggestion that Plaintiffs are not suffering from discrimination because they

are still able to rent in Oakland is meritless. *See Davis*, 874 F. Supp. 2d at 864 (rejecting

argument that there was no injury under federal disability law unless plaintiffs suffered a

complete "denial of benefits," and finding allegations that they were "subject to discrimination in

the process and denied equal access" sufficient to support standing). It also ignores that all three

Plaintiffs are seeking to serve as class representatives, and to advance the interests of other

people affected by the same discrimination—people whose access to housing may be much more

precarious, or whose struggles with inaccessible units may be much more severe, than their own.

Compl. at ¶¶ 71–78.

Moreover, the discrimination that this case seeks to address is not traceable to

"landlords," "the housing market," or "accessibility regulations," as the City asserts. Mot. to

Dismiss at 15:9–10. The injury pled by Plaintiffs is a lack of access to a particular City program

that affords tenants stability in their rental housing. This harm is a direct consequence of (1) the

City exempting all or almost all accessible units from the Program, through its cutoff date of

January 1, 1983; and (2) the City's refusal to reasonably modify that Program, so that Plaintiffs

and other people who need accessible housing the same opportunity to live in rent-stabilized units

that nondisabled renters currently enjoy. Compl. at ¶¶ 38–39, 50, 92–93.

If the Court orders the City to bring its Rent Adjustment Program into compliance with

the ADA and CDPA, people with disabilities will have a meaningful and equal opportunity to

participate in the Program for the first time. *See* Compl. at ¶ 18. Such equality of opportunity is

all that Plaintiffs seek. *Id.* at ¶¶ 15–18, 87–92. It is also all that the redressability element of

standing demands. *See Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982) ("[A] plaintiff satisfies

the redressability requirement when he shows that a favorable decision will relieve a discrete

1    injury to himself. He need not show that a favorable decision will relieve his *every* injury.").

2    Whether Plaintiffs are ultimately able to secure accessible housing that is subject to the

3    Program's protections, once they are on equal footing with nondisabled renters, is immaterial to

4    this analysis. *See, e.g.*, *Civil Rights Educ. & Enf't Ctr. v. Hosp. Properties Tr.*, 867 F.3d 1093,

5    1102 (9th Cir. 2017) (finding redressability where plaintiff "requested that the court fashion an

6    injunction mandating" compliance with the ADA).

7                    **B.       Plaintiffs have stated valid claims of disability discrimination.**

8                           1.      Plaintiffs have properly pled their claims against the City.

9           Dismissal under Federal Rule of Civil Procedure 12(b)(6) is appropriate only when the

10   complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory.

11   *Godecke v. Kinetic Concepts, Inc.*, 937 F.3d 1201, 1208 (9th Cir. 2019). Federal Rule of Civil

12   Procedure 8(a)(2) requires only that the plaintiff set forth a "short and plain statement of the

13   claim showing that the pleader is entitled to relief," and "give the defendant fair notice of what

14   the . . . claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S.

15   544, 555 (2007).

16          A complaint survives a motion to dismiss if it contains enough facts to "state a claim to

17   relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting

18   *Twombly*, 550 U.S. at 570). In determining whether a plaintiff has met the plausibility standard,

19   the Court must accept all well-pleaded factual allegations in the complaint as true and construe

20   them in the light most favorable to the plaintiff. *OSU Student All. v. Ray*, 699 F.3d 1053, 1061

21   (9th Cir. 2012). That a "claim does not fall within the four corners of . . . prior case law does not

22   justify dismissal under Rule 12(b)(6)." *McGary v. City of Portland*, 386 F.3d 1259, 1270 (9th

23   Cir. 2004). On the contrary, Rule 12(b)(6) dismissals "are especially disfavored in cases where

24   the complaint sets forth a novel legal theory." *Id.* (internal citations omitted).

25          To state a claim of disability discrimination under the ADA's Title II, Plaintiffs need only

26   allege four elements: (1) that they are people with disabilities; (2) that they are "otherwise

27   qualified to participate in or receive the benefit of some public entity's services, programs, or

28   activities"; (3) that they were "either excluded from participation in or denied the benefits of the

1  public entity's services, programs, or activities, or [were] otherwise discriminated against by the

2  public entity"; and (4) that "such exclusion, denial of benefits, or discrimination was by reason

3  of [their] disability." *McGary*, 386 F.3d at 1265 (internal citations omitted).

4        The City does not dispute that Plaintiffs are people with disabilities, or that they are

5  otherwise qualified to participate in and receive the benefit of Oakland's Rent Adjustment

6  Program. *See* Mot. to Dismiss at 4:15–16, 6:19–24. However, it contends that Plaintiffs already

7  "enjoy full and equal access" to the benefits of the Program, and that, even if they did not, their

8  exclusion and denial would not be "by reason of disability." Both contentions are baseless, and

9  should be rejected by this Court.

10          2.    <u>Plaintiffs do not have a meaningful and equal opportunity to participate in</u>
                <u>or benefit from Oakland's Rent Adjustment Program.</u>

11

12        Oakland's Rent Adjustment Program provides a majority of the City's renters with

13  protection from rising rents; even nondisabled renters who do not currently live in one of the

14  over 64,000 units to which the Program applies have a real opportunity to benefit from its

15  protections, because more than 60% of the units they might rent in the future are covered.

16  Compl. at ¶¶ 1, 3, 5, 33–36. For Plaintiffs and other people with disabilities who need accessible

17  housing, that percentage is closer to zero, because the Program exempts every unit built after

18  January 1, 1983—a date that has the effect of excluding every accessible unit in the City from

19  the Program's coverage.[2] Compl. at ¶¶ 38–50.

20        The consequence, as discussed above, is that many people with disabilities—including

21  Mr. Smith and Ms. Parker—have no opportunity to participate in the Program because they

22  cannot live in any of the units that it covers. Compl. at ¶¶ 9, 15, 25–26, 38, 53, 60. Others,

23  including Mr. Jeserich, can only access the Program's protections if they are willing to live in an

24  inaccessible unit, and to endure the daily indignities, inconveniences, and potential dangers that

25  doing so entails. Compl. at ¶¶ 13–15, 27, 38, 63–70. This is a harm that no nondisabled tenant is

26  asked to endure as a condition of Program coverage, and it is not trivial: for people who use

27  wheelchairs,  living in an inaccessible unit can mean needing to drag themselves up and down

28

[2] With the possible exception of a few pre-1983 units that, by chance, might be accessible.

1    steps, coping every day with a kitchen they cannot use, or having a bathroom that they have to

2    crawl on their hands and knees to enter. *See id.*

3         The ADA was intended to cover exactly the sort of "facially neutral" "barriers to full

4    participation" at issue in this case. *Crowder*, 81 F.3d at 1483. Indeed, the Ninth Circuit's

5    decision in *Crowder* is instructive. There, the Court considered a facially neutral state regulation

6    that required all carnivorous animals entering the state of Hawaii, including guide dogs, to be

7    quarantined for 120 days. *Crowder*, 81 F.3d. at 1481–82. The Court found that this requirement

8    discriminated against people with disabilities who relied on guide dogs, and "effectively

9    denie[d]" them "meaningful access" to public services and programs that "remain[ed] open and

10   easily accessible by others." *Id.* at 1484. As *Crowder* observed, while the quarantine requirement

11   "applie[d] equally to all persons entering the state with a dog," it had a discriminatory effect on

12   people with disabilities who used guide dogs, because it burdened them "in a manner different

13   and greater than it burden[ed] others." *Id*. The same sort of discriminatory effect, and "different

14   and greater" burden, is present here. *Id*.

15               **a.    The Program's failure to cover accessible rental housing has a**
                        **"particular exclusionary effect" on people with disabilities.**
16
17         The City relies on *Alexander v. Choate*, 469 U.S. 287 (1985), to argue that Plaintiffs are

18   not denied meaningful access to the City's Rent Adjustment Program. But *Alexander*—which

19   concerned a plan to reduce the number of inpatient hospital days Tennessee would cover under

20   its Medicaid program, from 20 to 14—offers the City no help. *See id.* at 289.

21         *Alexander* held that Tennessee's planned reduction did not discriminate against people

22   with disabilities for two reasons. First, the revised program did not "have a particular

23   exclusionary effect on the handicapped," or condition coverage "on the basis of any test,

24   judgment, or trait that the handicapped as a class are less capable of meeting or less likely of

25   having." *Id.* at 302. In fact, the record did not "contain any suggestion that the illnesses uniquely

26   associated with the handicapped or occurring with greater frequency among them" could not be

27   "effectively treated" under the revised program. *Id.* at 302, n.22. Second, the planned reduction

28   would "leave both handicapped and nonhandicapped Medicaid users with *identical and effective*

hospital services *fully available for their use*, with both classes of users subject to the same durational limitation." *Id.* at 302 (emphasis added). In sum, there was no discrimination in *Alexander* because the "same benefit—14 days of coverage"—had been "meaningfully and equally offered" to people with disabilities, and was "equally accessible to both handicapped and nonhandicapped persons." *Id.* at 309, 308.

By contrast, the current design of Oakland's Rent Adjustment Program does have a "particular exclusionary effect" on Plaintiffs and other people with disabilities. *Id.* at 302. The City effectively conditions participation in the Program on a trait people with disabilities are "less likely of having": the ability to live in inaccessible housing. *Id.* As a result, the Program is neither "fully available for their use" nor "equally accessible" to people with disabilities. *Id.* at 302, 309. Plaintiffs and others who need accessible housing are either shut out of it entirely, or forced to endure unique hardships just to access the same Program protections that are available to nondisabled renters as a matter of course.

*Does 1–5* is likewise distinguishable. *Does 1–5* concerned two functionally distinct programs, one for "needy families," and "a separate program of support for the needy disabled." *Does 1–5 v. Chandler*, 83 F.3d 1150, 1155 (9th Cir. 1996). The Court held that there was no need for these two distinct programs to offer "equivalent benefits," and that the "needy families" program "would not violate the ADA as long as disabled people with children were not excluded from full participation in the program." *Id.* Yet that is exactly the situation here: there is one Program—the Rent Adjustment Program—and people with disabilities who need accessible housing are "excluded from full participation" in it. *Id.*

*Rodriguez v. City of New York*, 197 F.3d 611 (2d Cir. 1999), is also inapposite. There, the Second Circuit found that New York's decision not to fund "safety monitoring" as a distinct and compensable personal care service for people with mental disabilities was not discriminatory, because the state did not fund that service for anyone. *Id.* at 618. Here, though, every nondisabled renter in Oakland has a real opportunity to benefit from the protections of the City's Program, but people who need accessible housing are disproportionately denied the same opportunity.

1   In the last case on which the City relies, *Liberty Resources*, the Eastern District of

2   Pennsylvania found that people with disabilities had the same access to housing assistance

3   vouchers and associated services as did nondisabled applicants. *Liberty Res., Inc. v. Phila. Hous.*

4   *Auth.*, 528 F. Supp. 2d 553, 568 (E.D. Pa. 2007). That many people with disabilities still could

5   not find accessible housing using their vouchers was not the fault of the Philadelphia Housing

6   Authority or its voucher program, but of private landlords, who could choose whether they

7   would make their housing accessible, and whether they would participate in that program or not.

8   *Id.* at 590, 561 (noting that "there was little willingness on the part of landlords to add

9   accessibility features to their units, or to accept voucher holders if they already had accessible

10  units").

11  Here, however, it is the City itself that decides which units will be subject to the Program

12  and which will not; it is the City, not individual private landlords, that has adopted and maintains

13  a cutoff date that effectively exempts all of the City's existing accessible units from regulation.

14  *See* Compl. at ¶¶ 38–50.

15              **b.      *The City's motion promotes an inaccurately narrow***
16                        ***interpretation of the Program's purpose, nature, and scope.***

17  To support its argument that Plaintiffs already have equal access to the Rent Adjustment

18  Program, the City promotes a narrow view of what the Program is and what it does. The City

19  asserts that the benefit provided by the Program is "regulating rent increases on a specific set of

20  rental units" built before 1983—all or nearly all of which are completely inaccessible. *See* Mot.

21  to Dismiss at 8:17. This narrow definition of the Program and its benefit should be rejected for

22  several reasons.

23  First, it ignores the City's own plain statements about one of the main purposes of the

24  Program: to "provid[e] relief to residential tenants in Oakland by limiting rent increases for

25  existing tenants." *Id.* at 2:23–24 (quoting OMC § 8.22.010(C)). Second, it conflates the

26  Program's current exemption date with the concrete benefit—protection from excessive rent

27  increases—that the Program actually provides to a majority of the City's renters, and that *all*

28  nondisabled renters have a chance to access. Compl. at ¶¶ 33–37.

1       Third, it ignores a key lesson from *Alexander* itself: that a benefit "cannot be defined in a

2   way that effectively denies otherwise qualified handicapped individuals the meaningful access to

3   which they are entitled." *Alexander*, 469 U.S. at 301. Indeed, "[t]he Supreme Court has

4   cautioned against defining the scope of a public benefit so as to avoid questions of

5   discriminatory effects." *Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 504 (4th Cir. 2016).

6   As acknowledged in *Alexander*, "[a]ntidiscrimination legislation can obviously be emptied of

7   meaning if every discriminatory policy is 'collapsed' into one's definition of what is the relevant

8   benefit." *Alexander*, 469 U.S. at 301, n.21 (internal quotation marks omitted). This, however, is

9   precisely what the City is attempting to do. To say that the benefit the Rent Adjustment Program

10  provides is the regulation of units "built before 1983" is effectively the same as saying that the

11  benefit the Program provides is "the regulation of inaccessible units."

12      The discriminatory import of such a narrow definition is clear. Just as the City could not

13  lawfully operate a Rent Adjustment Program that expressly excluded all accessible units, or that

14  expressly excluded tenants with disabilities from its protections, it cannot maintain an arbitrary

15  cutoff date for Program coverage that has the same effect.

16      Further, the fundamental nature of the City's programs, services, or benefits is a question

17  to be determined by this Court. *See Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1084

18  (9th Cir. 2004) (determining that the "nature of the service provided by" a theater was "screening

19  films"); *Martin v. PGA Tour, Inc.*, 204 F.3d 994, 1000 (9th Cir. 2000), *aff'd*, 532 U.S. 661, 683

20  n.39 (2001) (determining that golf tournament provided a "competition in shot-making");

21  *Lamone*, 813 F.3d at 504 (determining that absentee voting was a separate program, distinct from

22  the state's voting program as a whole). The City's attempt to narrowly define the benefit of its

23  Rent Adjustment Program as the regulation of rent increases on a specific set of private rental

24  units built before 1983 is, in this light, more properly considered as an argument that any change

25  to that exemption date would fundamentally alter its existing Program. Of course, fundamental

26  alteration is an affirmative defense, which the City must plead and prove. *See* § IV.C.3, *infra*.

27

28

3.   Plaintiffs' exclusion from the Rent Adjustment Program is by reason of disability.

The City's Motion to Dismiss seeks to minimize the relationship between Plaintiffs' status as persons with disabilities and their exclusion from the Program, noting that "undoubtedly many non-disabled Oakland tenants would like to find rent-controlled housing, but cannot." Mot. to Dismiss at 11:2–3. The apparent implication is that there is no discrimination against people with disabilities unless every nondisabled renter in the City also suffers the same fate. This, though, is not how the ADA works. While it is true that the ability to live in a unit covered by the Rent Adjustment Program is not *guaranteed* to anyone, and that some nondisabled people may be unable to find housing in one of the 64,000 units it covers, Plaintiffs and other people with disabilities are disproportionately denied access to the Program's protections because it does not apply to *any* of the accessible units that they need.

Plaintiffs have alleged that the City's facially neutral choice to exempt post-1983 units from Rent Adjustment Program coverage burdens them in a manner different from and greater than it burdens others, because it has the effect of excluding all or nearly all of Oakland's accessible rental units from the Program, and thus, of denying them the same opportunity to enjoy the Program's benefits that is available to others. *See, e.g.*, Compl. at ¶¶ 9, 13–15, 25-27, 38, 53, 60, 63–70. No more is needed to establish discrimination by reason of disability. *McGary*, 386 F.3d at 1265 (holding that neutral policies that unduly burden people with disabilities discriminate "by reason of disability"); *Crowder*, 81 F.3d at 1484 (same).[3]

The Ninth Circuit has repeatedly affirmed that, "in the wake of *Alexander*, state action that disproportionately burdens the disabled because of their unique needs remains actionable under the ADA." *Rodde v. Bonta*, 357 F.3d 988, 998 (9th Cir. 2004); *see Crowder*, 81 F.3d at

---

[3] Although not important to this case, Plaintiffs note that the City's contention that the ADA's Title II requires discrimination to be "solely" by reason of disability is wrong. *See* Mot. to Dismiss at 10:16. "Title II's prohibition of discrimination or denial of benefits by reason of disability establishes a motivating factor causal standard for liability when there are two or more possible reasons for the challenged decision and at least one of them may be legitimate," even as "the causal standard for the Rehabilitation Act is even stricter, requiring a plaintiff to show a denial of services solely by reason of disability." *K.M. ex rel. Bright v. Tustin Unified Sch. Dist.*, 725 F.3d 1088, 1099 (9th Cir. 2013) (internal citations and quotation marks omitted); *compare* 29 U.S.C. § 794 (Rehabilitation Act) *with* 42 U.S.C. § 12132 (ADA Title II).

1483 (holding that, in enacting the ADA, Congress intended to address "forms of discrimination

which deny disabled persons public services disproportionately due to their disability"). Where,

as here, a public entity's action "would deny certain disabled individuals meaningful access to

government-provided services because of their unique needs, while others retain access to the

same class of services," actionable discrimination has occurred. *Rodde*, 357 F.3d at 998; *see also*

*Communities Actively Living Indep. & Free v. City of L.A.*, No. CV 09-0287 CBM RZX, 2011

WL 4595993, at *13–*15 (C.D. Cal. Feb. 10, 2011) (holding that "the City disproportionately

burdens [people with disabilities] through its facially neutral practice of administering its

[emergency planning] program in a manner that fails to address [their] needs").

> 4.   Private landlords' fair housing obligations do not excuse the City from its duty to administer its Rent Adjustment Program in a nondiscriminatory manner.

Finally, the City observes that the Fair Housing Amendments Act ("FHAA") "requires

landlords to permit reasonable modification of units constructed prior to March 13, 1991 to

accommodate disabled persons," and, on that basis, argues that Plaintiffs' claim that "rent-

controlled units in Oakland are not accessible, and cannot be accessible . . . lacks plausibility."

Mot. to Dismiss at 13:1–8. This argument is neither convincing nor procedurally appropriate.

The City neglects to mention that such modifications must be made at the tenants' own

expense, meaning that tenants with disabilities would need to bear the burden of funding

accessibility upgrades to have the same mobility access to rent-controlled units as other tenants.

*See* 42 U.S.C. § 3604(f)(3)(A) (allowing for certain reasonable modifications "at the expense of

the handicapped person"); 24 C.F.R. § 100.203(a) (same). Further, many necessary changes to

inaccessible units—such as widening a hallway, constructing a ramp, or remodeling a kitchen or

bathroom—are simply not the type of features that can be achieved via tenant-funded

modifications to existing inaccessible housing. *See* Compl. at ¶¶ 43–44 (describing requirements

for accessible housing). Moreover, the City's suggestion that some rent-controlled units may be

more accessible than alleged is a factual question, which is not appropriate at this stage.

### C. Plaintiffs have adequately pled that the City failed to reasonably modify its Rent Adjustment Program to prevent discrimination.

The ADA defines discrimination to include an entity's failure to reasonably modify its policies, practices, or procedures, when such "modifications are necessary to avoid discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(7). When considering a reasonable modifications claim, the relevant inquiry is not simply whether people with disabilities have *any access* to the services, programs, activities, or benefits a public entity provides, but whether they have *full and equal* enjoyment of those things, on par with members of the non-disabled public.[4] *See Baughman*, 685 F.3d at 1135 (discussing cases); *see also* 28 C.F.R. § 35.130(b)(1)(ii) (public entities may not provide people with disabilities with an "opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others"); 28 C.F.R. § 35.130(b)(8) (prohibiting "eligibility criteria that screen out or tend to screen out" people with disabilities from "fully and equally enjoying" the services and programs they provide). "The purpose of the ADA's reasonable accommodation requirement is to guard against the facade of 'equal treatment' when particular accommodations are necessary to level the playing field." *McGary*, 386 F.3d at 1267.

Plaintiffs allege that Oakland has refused to "extend the January 1, 1983, cutoff date for its Rent Adjustment Program" or otherwise modify that Program to "encompass accessible units, so that people with disabilities who need such units have the same opportunity to access the Program's benefits that the City's nondisabled tenants currently enjoy." Compl. at ¶¶ 92, 17. Plaintiffs have thus adequately pled every element of their prima facie reasonable modification claim. *See Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1082 (9th Cir. 2004) (articulating prima facie test under Title III).

Each of the City's arguments to the contrary—that any reasonable modification would

---

[4] When analyzing reasonable modification claims, the Ninth Circuit generally applies ADA, Rehabilitation Act, and Fair Housing Amendments Act case law interchangeably. *Giebeler v. M & B Assocs.*, 343 F.3d 1143, 1156 (9th Cir. 2003). Similarly, it has held that the terms "reasonable accommodation" (as used in Title I of the ADA) and "reasonable modification" (as used in Titles II and III) "do not differ in the standards they create." *Wong v. Regents of Univ. of Cal.*, 192 F.3d 807, 816 n.26 (9th Cir. 1999), *as amended* (Nov. 19, 1999).

---

1   violate state and local law, that no modification is necessary, and that any modification would be

2   a fundamental alteration—is without merit.

3           1.      Plaintiffs' proposed modification of the Rent Adjustment Program is
                    facially reasonable, even if it would require the City to disregard
4                   conflicting state and local law.

5           To establish the reasonableness of a requested modification, a Plaintiff need only show

6   that it "seems reasonable on its face, *i.e.*, ordinarily, or in the run of cases." *U.S. Airways, Inc. v.*

7   *Barnett*, 535 U.S. 391, 401 (2002). Plaintiffs' request that Oakland "extend the January 1, 1983,

8   cutoff date for its Rent Adjustment Program" or otherwise modify that Program to "encompass

9   accessible units" meets this standard.

10          As the Supreme Court has recognized, to assure that people with disabilities have

11  meaningful access to public programs, benefits, and services, "reasonable adjustments in the

12  nature of the benefit offered must at times be made." *Alexander*, 469 U.S.at 302, n.22. This is

13  true even where a necessary modification under federal law might conflict with state and local

14  law—here, section 8.22.030(A)(5) of Oakland's Municipal Code, which sets the January 1, 1983

15  cutoff date for Rent Adjustment Program coverage, and California's Costa-Hawkins Rental

16  Housing Act, which reinforces that date. *See* Compl. at ¶¶ 39–40, 91; OMC § 8.22.030(A)(5);

17  Cal. Civ. Code § 1954.52(a)(2).

18          Multiple courts, including the Ninth Circuit, have held that the ADA's reasonable

19  modification requirement can preempt conflicting state and local laws. *Crowder*, 81 F.3d at 1485

20  (holding that reasonable modification requirement of the ADA can require modifying conflicting

21  state administrative regulation); *Mary Jo C. v. N.Y. State & Local Ret. Sys.*, 707 F.3d 144, 162

22  (2d Cir. 2013) (finding "nothing in the statutory phrase 'reasonable modification' to suggest that

23  Congress intended to exclude modifications that require violation or waiver of mandatory state

24  statutes in some circumstances"); *Hindel v. Husted*, 875 F.3d 344, 349 (6th Cir. 2017) (finding

25  that state law requiring all voting machines to be certified did not make requested modification

26  involving uncertified machines facially unreasonable, because "a state procedural requirement

27  may not excuse a substantive ADA violation," and "[r]equiring public entities to make changes

28  to rules, policies, practices, or services is exactly what the ADA does") (internal quotation marks

1   omitted); *Lamone*, 813 F.3d at 508–09 (rejecting the argument "that the mere fact of a state

2   statutory requirement insulates public entities from making otherwise reasonable modifications

3   to prevent disability discrimination").

4          Courts have reached similar results when considering situations in which state and local

5   laws conflict with other aspects of the ADA, or with analogous federal antidiscrimination

6   statutes. *See Hubbard v. SoBreck, LLC*, 554 F.3d 742, 747 (9th Cir. 2009) (holding that state law

7   permitting award of attorneys' fees to prevailing defendants conflicted with the ADA provisions

8   regarding fees and was thus preempted); *Barber v. Col. Dep't. of Revenue*, 562 F.3d 1222, 1232–

9   33 (10th Cir. 2009) (rejecting argument that modifying a state driving statute would be a "*per se*

10  not reasonable" modification under the Rehabilitation Act, and holding that "[r]eliance on state

11  statutes to excuse non-compliance with federal laws is simply unacceptable under the Supremacy

12  Clause"). As the Seventh Circuit has aptly observed in a suit under the Age Discrimination in

13  Employment Act brought against a city acting under a state pension law, "[a] discriminatory

14  state law is not a *defense* to liability under federal law; it is a *source* of liability under federal

15  law." *Quinones v. City of Evanston*, 58 F.3d 275, 277 (7th Cir. 1995) ("Evanston believes that it

16  is compelled to follow the directive from the state, but the Supremacy Clause of the Constitution

17  requires a different order of priority.").

18         Each of these decisions is required by the Supremacy Clause, which provides that "the

19  laws of the United States . . . shall be the supreme law of the land . . . anything in the

20  Constitution or laws of any State to the contrary notwithstanding." U.S. Const. art. VI, cl. 2.

21  "Congress has the power to preempt state law," and state law must yield when it "stands as an

22  obstacle to the accomplishment and execution of the full purposes and objectives of Congress."

23  *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372–73 (2000) (internal quotation marks

24  omitted). Federal regulations can likewise preempt state or local laws because such regulations

25  "have no less pre-emptive effect than federal statutes." *Fidelity Federal Savings & Loan Ass'n v.*

26  *de la Cuesta*, 458 U.S. 141, 153 (1982); *accord Hillsborough County* v. *Automated Med. Labs.,*

27  *Inc.*, 471 U.S. 707, 713 (1985).

28         Congress enacted the ADA "to provide a clear and comprehensive national mandate for

1   the elimination of discrimination against individuals with disabilities." 42 U.S.C.

2   § 12101(b)(1). "Title II of the ADA represents Congress's attempt to apply this clear and

3   comprehensive national mandate to the services, programs, or activities of any State or local

4   government," as well as "any department, agency, or instrumentality" thereof. *Mary Jo C.*, 707

5   F.3d at 163 (internal quotation marks, citations, and alterations omitted). Thus, when a conflict

6   arises between a state or local law and the ADA's requirement that public entities make

7   reasonable modifications to ensure equal opportunity, state and local laws must yield to the

8   "comprehensive national mandate" of the ADA. *Id.* Indeed, "[t]he 'natural effect' of Title II's

9   'reasonable modification' requirement . . . requires preemption of inconsistent state law when

10  necessary to effectuate a required 'reasonable modification.'" *Id*. at 163. The same principle

11  applies here.

12          The City disagrees, arguing that this Court cannot address the current discriminatory

13  design of its Rent Adjustment Program without interjecting itself into a "political thicket," and

14  that any modification of the Program would be an "outcome never envisioned by the drafters of

15  the ADA." Mot. to Dismiss at 13:18–19. However, such judicial review is exactly what the

16  ADA's drafters intended.

17          As the Ninth Circuit observed in *Crowder*, "in virtually all controversies involving the

18  ADA and state policies that discriminate against disabled persons, courts will be faced with

19  legislative (or executive agency) deliberation over relevant statutes, rules and regulations." 81

20  F.3d at 1485. A "court's obligation" in such instances "is to ensure that the decision reached by

21  the state authority is appropriate under the law and in light of proposed alternatives." *Id.*

22  "Otherwise, any state could adopt requirements imposing unreasonable obstacles to the disabled,

23  and when haled into court could evade the antidiscrimination mandate of the ADA merely by

24  explaining that the state authority considered possible modifications and rejected them." *Id.*

25          In sum, Plaintiffs have properly, and plausibly, pled the existence of a needed reasonable

26  modification to the Rent Adjustment Program: that the City "extend the January 1, 1983, cutoff

27  date for its Rent Adjustment Program." Compl. at ¶ 92. To the extent Oakland's Municipal Code

28  or the provisions of the Costa-Hawkins Rental Housing Act conflict with this reasonable and

1   necessary change, they must be preempted by the ADA.

2          2.     Plaintiffs' proposed modification is necessary to provide meaningful and
                  equal access to the Rent Adjustment Program.
3

4          In analyzing the necessity of requested reasonable modifications, the Ninth Circuit has

5   noted that the word "necessary" means necessary to provide people with disabilities with "full

6   and equal enjoyment" of the services, programs, activities, or benefits in question. *Baughman*,

7   685 F.3d at 1134–35 (quoting 42 U.S.C. § 12182(a)); *see Fortyune*, 364 F.3d at 1083 (because

8   plaintiff "require[d] an attendant to enjoy the viewing of a film, the modification that he

9   requested, *i.e.,* that [the theater] ensure that his companion could be seated next to him, was

10  necessary"). Contrary to Defendants' arguments, Plaintiffs have pled the necessity of a

11  reasonable modification here.

12         Many people with disabilities, including Mr. Smith and Ms. Parker, cannot physically

13  live in any of the units to which the Program's protections attach. Compl. at ¶¶ 51–54, 58–61.

14  Some modification to the Program is plainly necessary for them to be able to have a meaningful

15  opportunity to access its benefits. For Mr. Jeserich, who can live in his rent-controlled unit only

16  at a daily physical and dignitary cost, a modification is still necessary to provide him with equal

17  access to the Program's benefits. Compl. at ¶¶ 67–69.

18         In arguing otherwise, the City seems to adopt the exact position rejected as inappropriate

19  and "retrograde" in *Baughman*, 685 F.3d at 1134. There, the Ninth Circuit rejected a similar

20  argument, reasoning that under the defendant's argument "a paraplegic *can* enter a courthouse by

21  dragging himself up the front steps, so lifts and ramps would not be 'necessary' under [the

22  defendant's] reading of the term." *Id.* (internal citation omitted).

23         Further, the City's contention that Plaintiffs seek more affordable rents than other

24  Oakland tenants misunderstands the modification that Plaintiffs propose. Regardless of the dicta

25  in *Giebeler*, 343 F.3d at 1154, which suggested that requiring lower rents cannot be a reasonable

26  accommodation because a tenant with a disability is poor, this case presents a fundamentally

27  different situation. Here, Plaintiffs do not seek to access the Rent Adjustment Program on

28  preferential economic terms. For example, they do not seek a lower annual allowable rent

increase than other tenants, or the ability to have guaranteed access to an apartment in the Program. In requesting that the Program be modified to encompass at least some of Oakland's existing accessible units, Plaintiffs seek only what the City's nondisabled renters already have: an opportunity to access Oakland's Rent Adjustment Program, without having to endure life in an inaccessible unit as a condition of coverage. Compl. at ¶¶ 17, 92; § VII at ¶ 3. Plaintiffs have thus properly pleaded the existence of a reasonable modification that is necessary to provide them with meaningful access to the Rent Adjustment Program.

>          3.      The City's fundamental alteration defense is procedurally premature.

Finally, the City contends that no reasonable modification to their Rent Adjustment Program exists, because *any* change to the January 1, 1983 cutoff date would be "fundamental." Mot. to Dismiss at 13–14.

Such an argument is inappropriate at the motion to dismiss stage, because "[w]hether an accommodation fundamentally alters a service or facility is an affirmative defense." *Lentini*, 370 F.3d at 845; *see* 28 C.F.R. 35.130(b)(7)(i). The City bears the burden of proving this affirmative defense, and whether a modification would constitute a fundamental alternation is "an intensively fact-based" inquiry. *Lentini*, 370 F.3d at 845 (internal quotation marks omitted); *accord K.M.*, 725 F.3d at 1096; *cf. Albino v. Baca*, 747 F.3d 1162, 1171 (9th Cir. 2014) (holding that affirmative defenses must be pled and proved, and are usually not properly raised at the motion to dismiss stage).

The Ninth Circuit has repeatedly held that a determination on such defenses must come after discovery, and be based on findings of fact. *See Crowder*, 81 F.3d at 1485–86; *McGary*, 386 F.3d at 1270; *Townsend v. Quasim*, 328 F.3d 511, 520 (9th Cir. 2003). Other Circuits agree: "Affirmative defenses to ADA claims such as this [fundamental alteration defense] are typically fact-based and not capable of resolution on the basis of the pleadings alone." *Hindel*, 875 F.3d at 347 (collecting cases from the Second, Sixth, and Seventh Circuits).

>          4.      Even if the City's fundamental alteration defense were procedurally appropriate, it would fail.

Even if the City's fundamental alteration defense were procedurally proper at this point,

1   it would fail. First, the City argues that Plaintiffs' requested modification would fundamentally

2   alter the Program because it would require the City to apply rent control to some post-1983 units,

3   in violation of state law. Mot. to Dismiss at 13–14. As discussed above, the ADA's reasonable

4   modification requirement preempts conflicting state and local laws, and multiple Courts of

5   Appeal have rejected arguments to the contrary. *See* § III.C.1, *supra*.

6       Moreover, in considering a fundamental alteration defense, the Supreme Court has

7   expressly rejected the contention that "all the substantive rules . . . are sacrosanct and cannot be

8   modified under any circumstances." *Martin*, 532 U.S. at 689. To the contrary, courts must

9   "carefully weigh the purpose, as well as the letter, of [a given] rule before determining that no

10  accommodation would be tolerable." *Id.* at 691; *see also Crowder*, 81 F.3d at 1485 (court must

11  determine whether "the decision reached by the state authority is appropriate under the law and

12  in light of proposed alternatives"); *McGary*, 386 F.3d at 1270 (noting that court must consider

13  purpose of nuisance law—"protection of the community" from disease, danger, rodents, toxic

14  runoff, and other hazards—in determining whether requested accommodation was susceptible to

15  an affirmative defense); *Hindel*, 875 F.3d at 348–49 (weighing the purpose of requiring voting

16  on voting machines, rather than online, in considering a fundamental alteration defense); *Mary*

17  *Jo C.*, 707 F.3d at 159 (noting that courts must "analyze the importance" of existing program

18  elements, rather than "defer[ring] automatically" to current program design).

19      As the City acknowledges, the Rent Adjustment Program is intended to "provid[e] relief

20  to residential tenants in Oakland by limiting rent increases for existing tenants" while also

21  "encouraging investment in new residential rental property in the city." OMC § 8.22.010(C); *see*

22  *also* Mot. to Dismiss at 14:4–6. The Program balances these competing purposes through several

23  rules, including those governing the calculation of the maximum allowable rent adjustment,

24  those allowing landlords to set initial rents without any limitation, and those limiting rent

25  increases to once per year, as well as those regarding the 1983 cutoff date. *See* OMC

26  §§ 8.22.065–80.

27      While *some* reasonable cutoff for coverage may be fundamental to this balance, there is

28  no reason to think that the exact January 1, 1983 date currently in place is itself essential,

1   particularly in the absence of a developed factual record. Indeed, when it was adopted, about a

2   decade before the ADA's mandate to make government programs accessible to people with

3   disabilities, the January 1983 cutoff achieved this balance by exempting units that had yet to be

4   built: almost every existing rental unit in the City was covered. Now, the cutoff serves to exempt

5   rental units that were developed decades ago, including every accessible rental unit in the City.

6   Furthermore, cities across California have adopted a variety of different exemption dates for

7   similar rent stabilization programs. And in the Tenant Protection Act of 2019, known as AB

8   1482—which the City has asked this Court to take judicial notice of—the California Legislature

9   adopts a statewide anti-rent-gouging regulation applying to units on a rolling date, exempting

10  only "housing that has been issued a certificate of occupancy within the previous 15 years."

11  Future Cal. Civ. Code § 1946.2(e)(7), *see* ECF No. 21, Ex. C (effective Jan. 1, 2020). These

12  facts, among others to be developed at a later stage, indicate that there is no one sacrosanct date

13  that balances tenant and development interests.

14       The City is free to adopt a cutoff date that protects tenants without discouraging

15  development, but it must—and can—choose a date that does not bar people who need accessible

16  housing from having a meaningful and equal opportunity to access the Program's protections, as

17  the current date does.

18  **V.    CONCLUSION**

19       For the foregoing reasons, Plaintiffs urge the Court to deny the City's Motion to Dismiss.

20  However, if the Court does grant the City's Motion to Dismiss in whole or in part, Plaintiffs

21  request that the Court grant them leave to amend their Complaint.

22

23  DATED:  November 19, 2019              Respectfully submitted,

24

25                                        DISABILITY RIGHTS ADVOCATES

26

27                                        _____
                                          Sean Betouliere
28                                        Thomas Zito
                                          Jessica Agatstein

PUBLIC INTEREST LAW PROJECT

Michael Rawson
Craig Castellanet
Melissa A. Morris

Attorneys for Plaintiffs