Pages 1 - 26

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jon S. Tigar, Judge

| | | |
|---|---|---|
| Ian Smith, et al., | ) | |
| | ) | |
|          Plaintiffs, | ) | |
| | ) | |
|  VS. | ) | **NO. CV 19-05398-JST** |
| | ) | |
| City of Oakland, | ) | |
| | ) | |
|          Defendant. | ) | |
| _____ | ) | |

Oakland, California
Wednesday, December 18, 2019

**TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
RECORDING 2:08 P.M. TO 2:42 P.M.**

**APPEARANCES**:

For Plaintiffs:

                  Disability Rights Advocates
                  2001 Center Street - 4th Floor
                  Berkeley, CA 94704
        BY:  **SEAN P. BETOULIERE, ESQUIRE**
                  **THOMAS P. ZITO, ESQUIRE**

                  PUBLIC INTEREST LAW PROJECT
                  449 15th Street - Suite 301
                  Oakland, CA 94612
        BY:  **MICHAEL F. RAWSON, ESQUIRE**

For Defendant:

                  Oakland City Attorney's Office
                  One Frank H. Ogawa Plaza - Sixth Floor
                  Oakland, CA 94612
        BY:  **KEVIN P. MCLAUGHLIN, ESQUIRE**

Transcribed By:       Pamela A. Batalo,
                  Transcriber

| | |
|---|---|
| 1 | Wednesday, December 18, 2019                2:08 p.m. |
| 2 | ELECTRONICALLY RECORDED PROCEEDINGS |
| 3 | ---oOo--- |
| 4 | **THE CLERK:**  Your Honor, now calling Civil Matter |
| 5 | 19-5398, Ian Smith, et al., vs. City of Oakland. |
| 6 | If counsel could please come forward and state their |
| 7 | appearances for the record. |
| 8 | **MR. BETOULIERE:**  Good afternoon, Your Honor.  Sean |
| 9 | Betouliere for plaintiffs. |
| 10 | **MR. McLAUGHLIN:**  Good afternoon, Your Honor.  Kevin |
| 11 | McLaughlin for defendant, City of Oakland. |
| 12 | **MR. ZITO:**  Good afternoon, Your Honor.  Thomas Zito |
| 13 | for plaintiffs. |
| 14 | **MR. RAWSON:**  Good afternoon, Your Honor.  Michael |
| 15 | Rawson for plaintiffs. |
| 16 | **THE COURT:**  Very good.  Welcome. |
| 17 | You can see that we don't have a court reporter.  We are |
| 18 | using the court's electronic recording system, so if we need a |
| 19 | transcript, it is not difficult for one to be prepared. |
| 20 | It does mean that we all need to be very mindful of |
| 21 | speaking into the microphone, and just because we don't have a |
| 22 | court reporter to look up at me when one of you is talking too |
| 23 | fast, if that happens, it doesn't mean that we shouldn't all |
| 24 | think about it because we might still need a transcript. |
| 25 | I've read the papers.  I don't think I'll have a whole lot |

1   of questions.

2       It does seem very much like a lot of the motion rises and

3   falls on how the program is characterized.  There is a little

4   bit of eye of the beholder cast to the parties' arguments, so

5   I'm looking forward to hearing about that.

6       Part of the way I tend to think about my job is what is

7   the best case for a particular side.  That doesn't mean what

8   are the best five cases.  It means what is the best case.  So

9   on this question of is this more like a Tennessee restriction

10  on the number of days that you can spend in the hospital or is

11  it more like a dog quarantine, I don't know yet, but it's

12  useful to me, just because it's the way the common law works,

13  if you think that a case is particularly good for you or a case

14  that you think your opponent is overstating for you to point

15  that out in your remarks.

16      The City -- I'm sorry.  The plaintiffs charge pretty hard

17  on -- on the point that preemption is -- the need for

18  preemption is no impediment to the modification they're making,

19  and it would be useful to me to hear clearly from the City of

20  Oakland how strongly they disagree with that point.  And if

21  they have a case that they think says we cannot modify this

22  rent control program because it would conflict with state law,

23  identifying that case would be helpful.  On the other hand, if

24  they don't identify a case, that will also tell me something.

25      Anyway, those are my few opening remarks.  It's the City's

1   motion.  I will let the City go first.

2           **MR. McLAUGHLIN:**  Thank you, Your Honor.  I'm coming

3   off a cold.  Mindful of the recording going on, I'll try to

4   speak as clearly as I can and into the microphone.

5       With respect to the scope of the program, I think the

6   *Alexander vs. Choate* case and the *Does 1-5* case both provide

7   guidance here, that you have to look at how the program

8   actually operates in reality.  That's coming from the *Does 1-5*.

9   And you also have to look at the specific benefit provided, not

10  the general overall sort of aspirational purpose of the

11  program, and I think what plaintiffs are focused on is the

12  general purpose of what rent control is supposed to do, you

13  know, in a vacuum.

14      But when you look at how it's actually defined and then

15  how it actually operates, not everybody is entitled to the

16  benefits of the rent control program, whether they're disabled

17  or nondisabled and it does not apply to units built before 1983

18  for anybody.  That's how it is defined.

19      And so what we're --

20          **THE COURT:**  Does it make sense for the Court to

21  inquire as to why 1983 as opposed to something else?

22          **MR. McLAUGHLIN:**  I don't -- no, I don't think so.  The

23  Court is not supposed to be looking at whether new benefits

24  should be created or if there's --

25          **THE COURT:**  I'm not --

1   **MR. McLAUGHLIN:**  Or the wisdom of the benefit that the

2 City has created.  If it's equally accessible to all on its

3 face, then that should be the end of the Court's inquiry, in my

4 view.

5   I mean, that's -- that's essentially what *Alexander* says.

6 It's --

7   **THE COURT:**  All right.  I love a good analogy.  I'm

8 trying to think of one.  Maybe I'll come up with one while

9 you're there.

10   **MR. McLAUGHLIN:**  Well, there are many programs that

11 are not equally accessible to the disabled, but that doesn't

12 mean just because it has some potentially disparate impact,

13 that that is a violation of the ADA.  We put a couple of

14 examples in the reply briefing.

15   We regulate electric scooters, for example, but we can't

16 ensure equal outcomes with respect to the use of electric

17 scooters by private parties.  These are private scooters.  It

18 is just something that we regulate.

19   And it's similar here.  We're regulating private parties.

20 And to that point about --

21   **THE COURT:**  Does the City provide, for example,

22 tickets to arts performances of any kind, whether in its

23 schools or otherwise?  Do you know?

24   **MR. McLAUGHLIN:**  Well, the City doesn't have

25 schools --

1          **THE COURT:**  That's true.

2          **MR. McLAUGHLIN:**  -- although it does have a Head Start

3     program for preschoolers.  I don't know that it provides

4     tickets.  I know that we do have facilities that -- where

5     concerts are held and that we do provide auxiliary listening

6     devices and things of that sort when those kind of events are

7     held.

8          **THE COURT:**  Yeah.  Well, I don't want to -- I don't

9     want to offer an analogy that's not ground in reality.  I'll

10    let you continue.

11         **MR. McLAUGHLIN:**  Okay.

12         Your Honor had referred to whether this was maybe more

13    like the dog quarantine case of *Crowder* --

14         **THE COURT:**  That was just my way of telling you I read

15    the papers.

16         **MR. McLAUGHLIN:**  That's fine.

17         **THE COURT:**  I didn't mean -- I didn't mean to pick out

18    those as the best -- necessarily the best examples.

19         **MR. McLAUGHLIN:**  Well, but I think that there's --

20    there's an important sort of dichotomy there where you have

21    cases like *Crowder* and *McGary* where there is a mandatory law

22    that is applicable to the disabled individual.  It's applicable

23    to everybody.  They all have to comply with it; have their dogs

24    quarantined.

25         Or in *McGary*, it's a nuisance law.  Everybody has to clean

1    up their yards the same way.

2        If that creates some -- a special burden for disabled

3    persons that may not be reasonable and may be able to be

4    accommodated, then there is a claim stated.

5        That's not the case here.  This is much more like the *Safe*

6    *Air* case or the *Liberty Resources* case where there is a

7    benefit.  Plaintiffs can take it or leave it.  They don't --

8    they're not affected by this law one way or another unless they

9    want to take the benefits of it.

10       And so, you know, to my mind, this is -- there is a

11   difference when it is a benefit as opposed to something that is

12   a facially-neutral law that creates some kind of

13   disproportionate burden.

14       You asked what the best case is?  I think the *Liberty*

15   *Resources* case.  I recognize it's a district court decision in

16   Pennsylvania, but I think it is very analogous to this case.

17   It was a challenge to a housing choice voucher program, and the

18   claim was that there is not enough units that are accessible,

19   that are available through the housing choice voucher program.

20       That's almost identical to the claim here where the claim

21   is there are not enough units that are accessible that are

22   covered by the rent control program.

23       And the problem is these are things in the hands of third

24   parties.  They're subject to other regulations that are not

25   under the City of Oakland's control, and when you look at the

1   program itself, plaintiffs certainly have access to everything

2   in the program on its face.  It's only when you take that step

3   removed to look at these market forces, to look at the

4   accessibility laws that we have no say in whatsoever, only then

5   do you start to reach towards some kind of violation.

6       And plaintiffs kind of, in my view, artificially narrow

7   the claim to focus on the benefits of the program, but the

8   Complaint is laced with all sorts of references to the housing

9   market, to these accessibility laws.  That's what the claim is

10  grounded in.  That's what the harm complained of is, is that

11  they don't have accessible, affordable housing.

12      That's not something that the program itself provides.  So

13  we really are talking about creating a new benefit here.

14  There's no authority that I've found under the, you know, many

15  years that the ADA has been in effect and the Rehabilitation

16  Act before that where courts can order the creation of some

17  kind of new benefit in order to assure a parity in outcomes.

18      And with respect to the preemption argument, I don't think

19  that we're there yet in this case.  I would agree that federal

20  law certainly is paramount over state law.  I have not been

21  able to locate a single case where a court orders a local

22  entity to violate state law and calls that a reasonable

23  accommodation.  The cases -- the preemption cases that

24  plaintiffs cite involve suing the state entity that's involved

25  with implementing the law in question --

1    **THE COURT:**  You had me at "we're not there yet."  It

2    just means I don't have to address it.

3    **MR. McLAUGHLIN:**  Okay.

4    **THE COURT:**  Plaintiffs don't want me to address it, so

5    I don't -- that's fine.

6    Okay.  Yeah.  I didn't mean to cut you off, though.

7    **MR. McLAUGHLIN:**  No.  That's fine.  Those were kind of

8    the essence of my remarks.  I don't want to belabor what's in

9    the papers.  I'm happy to respond to plaintiffs' arguments.

10    But, again, in my mind, this is the creation of a new

11    benefit.  You look at the program.  This is not -- it doesn't

12    apply to units built after 1983, so you're creating something

13    new that heretofore does not exist.

14    **THE COURT:**  Very good.  Thanks.

15    **MR. BETOULIERE:**  Thank you, Your Honor.

16    I want to clarify --

17    **THE COURT:**  Can you say your last name again for me,

18    please.

19    **MR. BETOULIERE:**  It's Betouliere.  Sean Betouliere.

20    **THE COURT:**  Betouliere.  Got it.  Thank you.

21    **MR. BETOULIERE:**  So I'd like to start just by

22    clarifying what it is that plaintiffs are seeking.

23    So plaintiffs aren't seeking generalized access to

24    affordable, accessible housing.  What they're seeking is an

25    equal opportunity to benefit from a specific city program, the

1    rent adjustment program.  And the benefit that that program

2    provides doesn't have anything to do with affordability

3    generally.  The program allows landlords to set initial rents

4    at whatever rate they want so landlords can set their rents at

5    market rate.

6         What the program does do is it provides -- it protects

7    tenants living in covered units from subsequent rent increases

8    and from the displacement that subsequent rent increases can

9    cause.

10        A majority of Oakland tenants live in covered units, and

11   they enjoy those protections from displacement.  And even

12   tenants who don't currently living in covered units have a real

13   opportunity to get those protections because 6 out of 10 units

14   that they can live in are covered.

15        Our plaintiffs don't have that same opportunity.  Either

16   they're locked out of the program entirely, as are Plaintiffs

17   Smith and Parker, or they have to endure disability-related

18   burdens just to get access to its protections, as does

19   Plaintiff Jeserich.

20        And as a consequence of that lack of equal opportunity,

21   our plaintiffs are uniquely susceptible to displacement and

22   they're uniquely susceptible to rising rents.

23        Plaintiffs are not seeking a new benefit or a different

24   benefit.  What they're seeking is access to the benefit that

25   the City already provides, protection from rising rents.

1    **THE COURT:**  Well, that's interesting because one thing

2    I think you both agree on is that the benefit that is being

3    provided by the current program is the control of the rents

4    that can be charged for buildings constructed before 1983.

5    That's the benefit.  That's the program.

6    And what the City would say is that's being offered on a

7    take-it-or-leave-it basis, and when I asked counsel should I be

8    wondering why it is that we chose 1983 as a cutoff date, he

9    said, "We don't have to" -- "I don't want to get into that.

10   The City doesn't want to get into that.  It's not relevant."

11   That's their position.

12   Your position is it's deeply relevant because of the

13   effect that cutoff date has on the housing stock that then

14   becomes included with the program.  But you both agree that

15   what's being offered is a rent control program that covers a

16   particular housing stock that has that cutoff date.

17   So I need some help from you in understanding how it's

18   true that we say we wouldn't be changing the benefit -- we

19   wouldn't be changing the kind of benefit, but it seems to me

20   almost unarguable that the benefit itself would be changed.

21   You need it to be changed.  That's what your -- your plaintiffs

22   need.  So that's one thing.

23   The other thing is -- and maybe you'll succeed in getting

24   me out of that tree and I'll start thinking about the case a

25   little bit differently.  But if you don't, then -- or even if

1   you do, it would be helpful to respond to Mr. McLaughlin's

2   point that the cases that are good for you involve requirements

3   imposed on disabled individuals that impose extra burdens

4   that -- the programs that impose requirements on the general

5   public but impose extra burdens on disabled individuals, and to

6   Mr. McLaughlin's way of thinking, there aren't cases where a

7   benefit is being provided on a facially-neutral basis that has

8   a disproportionate impact on disabled persons, so if he's wrong

9   about that, telling me why he's wrong and citing some cases

10  would be helpful.

11        **MR. BETOULIERE:**  Sure, Your Honor.

12        So addressing, I guess, the second point first, you know,

13  we cite several case for the proposition that, you know,

14  neutral rules that disproportionately deny people with

15  disabilities the benefit of public services are discriminatory

16  and can come within -- within the ADA.  And, *Crowder* is

17  probably, you know, the best example of that, so there you have

18  this neutral quarantine rule that applied to everybody but --

19        **THE COURT:**  That wasn't a benefit.  Having your dog

20  locked up for 120 days is not a benefit.

21        Mr. McLaughlin's point is he wants to draw a line, and on

22  one side of that line are cases where you're burdening

23  people -- the rule burdens people.  It just burdens disabled

24  persons more.  And on the other side of the line is a benefit.

25        Sorry for interrupting you, but maybe I just didn't ask

1    the question very well before.

2         **MR. BETOULIERE:**  Well, I think what we have here is a

3    benefit that folks with disabilities can't access, and they

4    can't access that benefit because of their disabilities.  You

5    know, because they are -- so in *Crowder* you had folks who were

6    uniquely dependent on guide dogs, and because of this neutral

7    rule and because of their unique dependence on guide dogs, that

8    rule affected them in a different and greater way.

9         And it -- it's correct that, you know, the quarantine

10   requirement itself wasn't the benefit, but the neutral rule had

11   the effect of keeping them out of other benefits, other

12   benefits and services.

13        And here you have a similar thing.  You have folks with

14   disabilities who are uniquely dependent on accessible housing,

15   and because they have that disability-related need for

16   accessible housing, they cannot get these same protections that

17   are available to nondisabled tenants.

18        Did you have further questions about that?

19        **THE COURT:**  No.

20        **MR. BETOULIERE:**  Okay.  And then with regard to what

21   Mr. McLaughlin said about not citing cases where a local entity

22   is being required to -- being required to do something in

23   violation of state law, really the preemption analysis there is

24   the same.  Whether it's a state entity saying that, you know,

25   the discriminatory thing that they're trying to do is required

1   or permitted by state law or whether it's a local entity saying

2   that the discriminatory thing that they're trying to do is

3   required or permitted by state law, the same analysis applies.

4       And then with -- with regard to, you know, what is -- what

5   is the benefit here, what is the nature of the benefit, I think

6   the thing that you have to look at is what do folks get from

7   the program, so what -- what people get, what tenants get from

8   the program is, you know, protection from displacement and

9   protection from rising rents, and if you're a tenant looking

10  for a unit covered by the program and looking for the

11  protections of the program, what matters to you is not what

12  year your unit was built, but whether or not you have those

13  protections.  And, again, people without disabilities can get

14  them, have a real opportunity to get them.  People who need

15  accessible housing do not.

16      And -- and *Crowder* is actually, you know, I think

17  illustrative there.  So in *Crowder*, the benefit that people got

18  was 14 days of Medicaid-covered in-patient care, and the reason

19  that that Medicaid program did not discriminate or that

20  Medicade regime did not discriminate against people with

21  disabilities is that both people with disabilities and people

22  without had access to the exact same amount of coverage, the

23  exact same amount of care, 14 days.  And here that's just not

24  the case.  Again, nondisabled tenants can get the protections.

25  People who need accessible housing either cannot or have to

1    undergo particular burdens to get it.

2              **THE COURT:**  Very good.  Thank you.

3        Mr. McLaughlin.

4              **MR. McLAUGHLIN:**  Just to briefly address the causation

5    question, you know, counsel argued that the program can't be

6    accessed because of the plaintiffs' disabilities, but, again, I

7    think the *Weinreich* case points this up that when you have

8    other causal factors -- here, as plainly alleged in the

9    Complaint, the over-heated housing market and the accessibility

10   laws -- that, frankly, your legislative determinations at the

11   state and federal level that those bodies thought were the

12   right stopping point for when accessibility laws should apply,

13   that is, full accessibility laws, those are the things that are

14   causing inaccessible, unaffordable housing for the plaintiffs.

15       The rent control program does not cause inaccessible,

16   unaffordable housing for the plaintiffs.  It's just one small

17   piece in a much larger puzzle.  It doesn't purport to solve it

18   and provide accessible, affordable housing to people.  It

19   doesn't guarantee results to anybody.

20       So I think --

21             **THE COURT:**  Well, I don't -- I'm not sure that's

22   right.  It does guarantee results to some people.  It

23   guarantees to people who are covered by the program that their

24   rents, absent some exception that's in the code, will not

25   increase beyond a percentage set by the law or approved by the

1   Rent Board.  It does guarantee them that.  And if they -- and

2   if they -- and if their landlord attempts to increase their

3   rent beyond what's allowed, they have the right to do something

4   about it and force the landlord to return the rent to the level

5   set by the City; right?

6          MR. McLAUGHLIN:  My point was, though, that it's not a

7   lack of access to the program on its current terms but a lack

8   of access to affordable, accessible housing that the plaintiffs

9   complain of.

10      If we had a depressed housing market, there would not be a

11  Complaint in this case.  There would be ample affordable,

12  accessible housing.

13         THE COURT:  I mean, I think this is actually a very

14  hard case, I'll just tell you.  It's a hard case.  There's some

15  very interesting and compelling equitable considerations, and

16  the question of how you characterize the problem and how you

17  characterize the intended effect of the program -- there's --

18  you know, are very interesting.

19      But -- now I've lost my train of thought.  I wish I had a

20  realtime transcript, but I don't.

21      What -- could you make the point you just made again?

22         MR. McLAUGHLIN:  Well, if there was a depressed

23  housing market --

24         THE COURT:  Oh.

25         MR. McLAUGHLIN:   -- presumably there would be ample

1 accessible, affordable housing.

2    **THE COURT:** The plaintiffs are not -- they're not

3 trying to -- and I don't think legally they could.  They would

4 not have a theory where they can take existing rents and lower

5 those somehow retroactively.  So they're not -- they are not

6 trying to force anybody to create affordable housing that does

7 not exist.

8   My guess is that at the end of the day, the best result

9 they could hope for is to extend the protections of the current

10 rent control law to housing stock created after 1983 which

11 would require those landlords to say, "This is my market rate,

12 the rate that I'm charging now, and here are on out, I will be

13 subject to the limitations of the rent control law."

14   So -- so I agree that the plaintiffs -- I think we all

15 agree, the plaintiffs cannot do anything by this lawsuit to

16 change whatever the current lack of affordability is.  I think

17 their lawsuit probably is just forward looking, and if I got

18 that wrong -- I'm actually going to let Mr. Betouliere have a

19 second crack at the microphone, too.  If I got that wrong,

20 he'll tell me.

21    **MR. McLAUGHLIN:** No.  I think that's right.  They seek

22 prospective relief, not some sort of damages retrospectively.

23 That's true.  But I think what can't be divorced is the

24 operation of the rent control program in the context of the

25 housing market and the accessibility laws.  Those are the

1   things that are actually causing the harm here, not the

2   program.  That is the point that I was trying to make, and

3   that's the point that the *Weinreich* case makes where it was a

4   person's financial inability to pay for a qualifying exam that

5   caused his harm, not his disability itself.

6           **THE COURT:**  Yes.

7           **MR. McLAUGHLIN:**  And I think that the Complaint

8   demonstrates amply that those are the forces causing the harm

9   here, not the rent adjustment program.

10          **THE COURT:**  Yeah.

11          **MR. McLAUGHLIN:**  The program itself on its face is

12  accessible.  It provides a variety of services.  You know,

13  there is a notice procedure, there is a hearing procedure, an

14  appeal procedure, all those sorts of things.  All that stuff is

15  accessible to anybody.  There is no allegation that it's not.

16  It's just that the underlying units, which aren't the City's

17  units, are inaccessible.

18          **THE COURT:**  Yeah.

19          **MR. McLAUGHLIN:**  So we're divorcing -- the program

20  itself is accessible.  It's only when you look to this market

21  situation and to the accessibility laws that you find some

22  problem with accessibility.  That's not a problem created by

23  the program.

24          **THE COURT:**  Yeah.

25      Mr. Betouliere, your last words.

1      **MR. BETOULIERE:**  So if you think about it, it is

2   absolutely a program created by the program.  You know, the

3   City created the rent adjustment program.  The City set this

4   date that has the effect of excluding accessible units.  And

5   the City has the power to change that date.

6      And so this is -- this is very different from *Liberty*

7   *Resources*, which Mr. McLaughlin said was the City's best case.

8   So, you know, in *Liberty Resources*, everybody had a chance to

9   get Section 8 vouchers.  Both disabled and nondisabled folks

10  could get Section 8 vouchers, and the fact that people couldn't

11  find accessible units with their Section 8 vouchers was the

12  fault of landlords who could choose whether or not to accept

13  Section 8 vouchers and whether or not to make their units

14  accessible.

15     Here the City is the entity that has the power, we

16  believe, to extend the -- you know, to extend the date, the

17  current cutoff date for their program so that accessible

18  units -- at least some are covered and so that folks with

19  disabilities have an opportunity, an equal opportunity, to get

20  these benefits that are available to other tenants.

21     And I just -- I also want to just briefly address, you

22  know, this -- this issue of the 1983 date and whether the 1983

23  date itself is fundamental to the program.

24     **THE COURT:**  Well, I think you just did.  I mean,

25  what's interesting, I think, is that I think when I took the

1    bench, I had been thinking about this a little bit in terms of

2    are -- the question who has access to the program, and the

3    answer is everybody has access to the program, not that my

4    tentative went one way or the other.  I didn't really have one.

5    But -- but that's the way I was thinking about it.

6         Now it's really a question of "what resources are we going

7    to put in the basket" -- "are we, the City" -- this is what

8    you're saying.  I'm not saying this is my thinking.  But I now

9    understand your argument a little better to be what

10   resources -- "We're going to put a basket out there, and

11   everybody can reach in the basket and get a benefit.  That's

12   what we're going to do.  We're the City of Oakland.  What

13   resources are we going to put in the basket?"

14        And you would say, "well, they only put in housing stock

15   that was created before 1983, and the Complaint says" -- and

16   this is not disputed.  I mean, we're at the motion to dismiss

17   stage, but, I mean, no one says the allegation is implausible.

18   "We say that that has the effect of eliminating from the basket

19   any significant housing stock that would be open to disabled

20   persons."

21             **MR. BETOULIERE:**  Correct.

22             **THE COURT:**  But I just said it so simple, I'm not sure

23   why I wasn't thinking about that when I took the bench.

24        But, anyway...

25             **MR. BETOULIERE:**  Yeah.  And, you know, I think we make

1   this point in our brief, but, you know, in the same way that

2   the City couldn't have a rent adjustment program that expressly

3   excluded accessible units or that expressly said, you know,

4   "we're not going to cover people with disabilities who need

5   accessible housing," it can't have, you know, an arbitrary

6   cutoff date for coverage that has the same effect.

7        And, you know, as the Supreme Court said in *Choate*, you

8   know, you can really empty antidiscrimination legislation of

9   meaning by defining a benefit in a way that avoids questions of

10  discriminatory effects.  And that's what the City is doing here

11  by saying the benefit isn't, you know, protection from rising

12  rents, which is the actual tangible thing that people get, but

13  protection from rising rents is a regulation of units built

14  before January 1st, 1983.  That really -- that dodges the

15  question of whether or not people with disabilities are

16  excluded.

17       And so, you know -- yeah.  Just really thinking about what

18  is -- what is the tangible benefit that folks get from this

19  program and whether people with disabilities have the same

20  access to it.

21       And the -- you know, the other thing that I would like to

22  say is in -- in saying that, you know, the January 1st, 1983

23  date is itself fundamental, can't be changed, you know, the

24  City is basically making a fundamental alteration argument,

25  which is something they have the burden of pleading and

1  proving.

2       **THE COURT:**  Yes.  That -- that procedural point I have

3  firmly in mind, and I tentatively agree that that is not an

4  issue that can be resolved at this stage of the case.

5       **MR. BETOULIERE:**  Thank you, Your Honor.

6       **THE COURT:**  Gentlemen, thanks very much for these

7  arguments.  I will now take the motion under submission.

8     We have a Case Management Conference today, don't we?

9       **MR. McLAUGHLIN:**  We do.

10      **THE COURT:**  And you have a March 6th Settlement

11  Conference with Judge Ryu.  Do I have the right date in mind?

12  Or a deadline or somehow -- oh, wait.  I don't have to do this

13  from memory.  I think I printed your Case Management Statement.

14      **MR. ZITO:**  That is correct, Your Honor.  This is

15  Thomas Zito stepping in for plaintiffs.

16      **THE COURT:**  Mr. Zito, I printed out the Case

17  Management Statement.  I'm not sure it made its way to the

18  bench.

19      **MR. ZITO:**  That's okay.  I have the dates in front of

20  me.

21     March 6th is the tentative date.

22      **THE COURT:**  With Judge Ryu?

23      **MR. ZITO:**  With Judge Ryu.

24      **THE COURT:**  So I have a little more thinking and

25  reading to do, and I'm about to go out of town for a couple of

1   weeks, but I think I should be able it get you something in

2   January, and then you have proposed some dates in your Case

3   Management Statement.

4       This is a putative class action.  When I'm setting a

5   schedule in a putative class case, I only set dates through

6   class certification, because after that, you don't really know

7   what the case -- the character of the case is until that

8   question has been decided.  It doesn't make sense usually to

9   set a trial date and that kind of thing.

10      So my suggestion would be, you put in there, I want to

11  say, a September certification date.

12          MR. ZITO:  I think it's -- I think we had a filing --

13  a filing date of three months -- we proposed three months after

14  March 3rd.  Let me look at the date.

15      June 19th filing date for a class cert motion.

16          THE COURT:  Let's put you on calendar here, say, in

17  April for a Case Management Conference, and if I don't have a

18  ruling yet or you're having some other problem, then you can

19  ask for a different date, but I think -- let's -- let's set a

20  date, though, so everyone's got a date on their calendars

21  rather than just not have any dates.

22          MR. ZITO:  Are you looking for a date for a CMC or a

23  class cert hearing?

24          THE COURT:  I'm looking -- oh, not a hearing.  I set

25  filing dates, not hearing dates.

1    I'm trying to think of a filing deadline for you on your

2    class cert motion, just so we have something on the books.

3    It -- it just sort of puts -- my wife likes to say deadlines

4    clarify the mind.

5            MR. ZITO:  They do do that.

6            THE COURT:  So let's adopt your proposed date of --

7    say it again.  June?

8            MR. ZITO:  June 19th.

9            THE COURT:  What day of the week is that?  Do you

10   know?

11           MR. ZITO:  It's a Friday, if I had anything to say

12   about it, because that's how I tend to set my filing deadlines.

13           THE COURT:  I also do that, and sometimes people

14   suggest Mondays, which I try to avoid.

15       Is it a Friday, Ms. Lee?

16           THE CLERK:  Yes, sir.

17           THE COURT:  Very good.

18       We'll just set that date, January -- I'm sorry --

19   June 19th of 2020, class cert filing date, and let's have you

20   in here for a Case Management Conference, say, second or third

21   week of April.

22       Ms. Lee, could I have a Tuesday when I'm likely to be

23   here?

24           THE CLERK:  April 7th.

25           THE COURT:  Did you say 7?

1        **THE CLERK:**  Yes.

2        **THE COURT:**  Yeah.  That sounds good.  Because you will

3   have seen Judge Ryu about a month before that.  And that's

4   April.  So that would make your Case Management Statement due

5   March 31st, and that will be a CMC April 7th at 2:00 p.m.

6        And that will just give me a chance to ask you, "Well, the

7   Judge Ryu thing didn't work.  Is there anything else I should

8   be doing to help you?"  Because of course if I see you then, it

9   will mean that the Judge Ryu thing didn't work.  And if it does

10  work, then you can just file a notice of settlement and say,

11  "Can you please vacate that CMC date.  We need to do X, Y and

12  Z," whatever it is.

13       **MR. ZITO:**  Given that this is a class action,

14  Your Honor, we'd probably have to do a little bit more than

15  just notice of settlement.

16       **THE COURT:**  Yes.  But you would say --

17       **MR. ZITO:**  Set updates for a preliminary approval

18  hearing.

19       **THE COURT:**  Right.  Exactly.

20       So people will very often tell me after they've -- because

21  we have a lot of class actions -- after they've mediated a case

22  successfully, "we've reached a settlement in principle, but we

23  have to document it, and one of the things we have to do is

24  file a motion, and this is the date by which we propose to do

25  it."  It's almost never consistent with whatever the, you know,

1    CMC is, so I'll end up vacating that, and then I set a new

2    schedule based on whatever you tell me, if that even -- if the

3    case even goes that way.

4         Okay.  Very good.  Thank you all.

5              **MR. McLAUGHLIN:**  Thank you, Your Honor.

6              **MR. ZITO:**  Thank you, Your Honor.

(Proceedings adjourned at 2:42 p.m.)

CERTIFICATE OF TRANSCRIBER


        I, Pamela A. Batalo, certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages of the official electronic sound recording provided to me by the U.S. District Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

        I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken; and, further, that I am not financially nor otherwise interested in the outcome of the action.



        Wednesday, March, 18, 2020




*Pamela A. Batalo*

_____
Pamela A. Batalo