Thomas Zito (CA BAR NO. 304629)
Sean Betouliere (CA BAR NO. 308645)
Shira J. Tevah (CA BAR NO. 307106)
Disability Rights Advocates
2001 Center Street, Fourth Floor
Berkeley, California 94704-1204
Tel: (510) 665-8644
Fax: (510) 665-8511
Email: tzito@dralegal.org

Michael Rawson (CA BAR NO. 95868)
Craig Castellanet (CA BAR NO. 176054)
Melissa A. Morris (CA BAR NO. 233393)
Public Interest Law Project
449 15th St., Suite 301
Oakland, CA 94612-06001
Tel: (510) 891-9794
Fax: (510) 891-9727
Email: mrawson@pilpca.org

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IAN SMITH and MITCH JESERICH, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF OAKLAND, a public entity,<br><br>Defendant. | Case No. 4:19-cv-05398-JST<br><br>**DECLARATION OF SHELLEY LAPKOFF IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |

DocuSign Envelope ID: F879E1B2-DEF6-4DE6-9DBC-2810FE365455

I, Shelley Lapkoff, declare as follows:

1. I am the President of Lapkoff & Gobalet Demographic Research, Inc. (LGDR), and have been one of the firm's principals since its inception. My office is located at 4367 Short Hill Road, Oakland, CA 94605-4646. This declaration is based on my personal knowledge, and if called to as a witness, I could competently testify to its contents.

I. **Objective and Summary of Findings**

2. Plaintiffs' counsel asked my firm, LGDR, to estimate the number and share of Oakland renter households that include at least one member with an ambulatory disability, which is defined by the United States Census Bureau as anyone who has "serious difficulty walking or climbing stairs." In addition, we were asked to estimate the number and share of Oakland renter households with at least one member who uses a wheeled mobility device (a wheelchair or scooter), as well as those that include at least one member who uses mobility devices more generally (wheelchairs, scooters, walkers, crutches, or canes).

3. Based on an analysis of American Community Survey (ACS) Public Use Microdata Sample (PUMS) data, we estimate that 10,627 Oakland renter households (or 11% of all rental households) include at least one person with an ambulatory disability, which is defined in the relevant survey as "serious difficulty walking or climbing stairs." Other national data sources suggest that this is a conservative estimate of the number of Oakland renter households that include a member with an ambulatory disability.

4. Based on the 2014 Survey of Income and Participation (SIPP) conducted by the U.S. Census Bureau, we estimate that 11,406 Oakland renter households include a member that uses a mobility device, such as a wheelchair, cane, crutches, or walker. This represents 12 percent of all Oakland renter households.

5. Based on the 2014 Survey of Income and Participation (SIPP) conducted by the U.S. Census Bureau, we estimate that 3,594 Oakland renter households include a member that uses a wheelchair/electric scooter/similar aid,[1] representing almost four percent of Oakland renter households.

---

[1] The SIPP questionnaire asks respondents whether they used a "wheelchair, electric scooter, or similar aid."

6. Our methodology and the rationale for these conclusions is discussed in more detail below.

## II. Background and Qualifications

7. I have been a professional researcher and demographer for over 30 years. My educational background includes a Ph.D. in Demography from the University of California, Berkeley (1988); an M.A. in Economics from the University of California, Berkeley (1984); and a B.A. with Honors in Economics from University of Maryland, College Park (1976).

8. I have taught Applied Demography at the University of California, Berkeley, and have presented seminars in the UC Berkeley Demography Department. I have also been active in the Population Association of America (PAA) and have been Chair of the PAA Committee on Applied Demography. My Curriculum Vitae, which includes publications and professional presentations on a variety of applied demography topics, is attached as **Exhibit A**.

9. Since 1985, I have provided demographic consulting services to a variety of governmental agencies and other entities. In 1989, I established a consulting business, Lapkoff Demographic Research. In 1992, the business was incorporated in California, another principal was added (Jeanne G. Gobalet, Ph.D.), and the name was changed to Lapkoff & Gobalet Demographic Research, Inc.

10. As President of Lapkoff & Gobalet Demographic Research, Inc. (LGDR), I have conducted and overseen many demographic research projects. As a consultant and practitioner of applied demographics, I work for a range of clients, assembling and analyzing demographic data, evaluating demographic trends, preparing written reports on the findings, and making presentations on a variety of matters. My company has worked with more than 20 California school districts, including the very large San Francisco and Oakland Unified School Districts, many cities, special districts, and county supervisorial boards. National-level clients have included non-profits (Girl Scouts of the United States, United Way Worldwide) and the U.S. Department of Justice. LGDR provided many clients with political redistricting services after the 1990, 2000, and 2010 decennial Censuses. Redistricting services required expert use of Census data and Geographic Information Systems (GIS) software. My company

has also provided expert witness services and testimony in cases involving various forms of discrimination, on the side of both plaintiffs and defendants.

11. From 1998 to 2007, we were the consulting demographers for the Oakland Unified School District under several different superintendents and business managers.

12. Within the field of demography, my area of expertise is applied demography, which includes the analysis of client and third-party data, such as Census Bureau statistics and administrative data from federal and local governments, as well as client administrative data. The principals of Lapkoff & Gobalet are experts in using Census data. I have used data from the American Community Survey (ACS) for various projects, as well as decennial Census data and data from other non-Census sources. Many of my reports have focused on the population and socioeconomic characteristics of prescribed geographical areas.

13. Over the years, I have served as an expert witness on several cases that involved demographic analysis, including real estate "steering" of a bi-racial couple to African American neighborhoods, disability discrimination, housing discrimination against households with children, evaluation of school desegregation plans, political redistricting that conforms to civil rights legislation, and developer fee justifications for school districts.

14. In 2013, I worked with the U.S. Department of Justice (DOJ) to estimate the number of renter households that contain a member who has a physical disability in a set of large apartment buildings that were alleged to be non-accessible. That case settled out of court.

15. Below are some of the court cases and other matters in which I have served as an expert:

   a) *United States of America ex rel., Curtis Lockey and Craig MacKenzie v. City of Dallas*, *Texas and Housing Authority of City of Dallas, Texas*, 2012. I was retained by legal counsel for the Dallas Housing Authority (DHA) to evaluate claims that the actions of the DHA promoted racial segregation. My analysis of Census data, DHA data, and HUD-based data, showed that neighborhoods containing much of the public housing became minority concentrated after the developments were built; that renovations were made to all the older housing projects under DHA control; that over the decades, DHA had provided a variety of housing options for persons receiving

housing assistance; and that DHA is now part of an innovative program to encourage voucher holders to lease units in integrated neighborhoods. In short, I provided a broader context than Plaintiff's expert and showed the intention, efforts, and results of DHA's proactive measures to promote racial integration. DHA's Motion to Dismiss was accepted by the court.

b) *United States of America, vs. Donald Sterling et al., 2006-2009.* The lawsuit, filed by the Justice Department in August 2006, alleged that the defendants, Donald T. Sterling, his wife Rochelle Sterling, and the Sterling Family Trust, engaged in discriminatory rental practices on the basis of race, national origin, and familial status (having children under 18) at various apartment buildings that they own and manage in Los Angeles. Among other things, the suit alleged that the defendants discriminated against non-Korean tenants and prospective tenants at buildings the defendants owned in the Koreatown area of Los Angeles. LGDR was hired by the Department of Justice to investigate these claims. We had access to all tenant records in the Koreatown buildings. Using both time series and cross-sectional analyses of the tenant records, as well as an analysis of Census data, we found a disproportionate decline in the number of Hispanic and African American renters. Sterling paid the largest monetary payment ever obtained by the Justice Department, at the time, in the settlement of a case alleging housing discrimination in the rental of apartments.

c) *Thompson v. HUD, 2002-2005*. MJG-95-309. The U.S. Department of Housing and Urban Development (HUD) and the City of Baltimore were sued by the ACLU over the siting of public housing. I was hired by the U.S. Department of Justice to investigate Baltimore's neighborhoods at the time public housing was built and used Census data to reconstruct the housing mix in Baltimore's neighborhoods from 1940 to the present. My analysis showed that in many cases, the neighborhood ethnic mix changed after public housing was sited. I also reviewed the various changes in HUD policies regarding the delivery of public housing, from large housing developments, to Section 8 vouchers and projects, then to smaller developments and scattered sites.

1  There were many experts in this case, and I was the one most quoted by the judge – I believe this was because I worked very hard to make sure that my report was impartial.

    d) *Project Sentinel v. Herman Christensen, Jr., 1994-95.* Project Sentinel, a nonprofit corporation, sued an apartment owner for discriminating against children under its occupancy standards. I analyzed unpublished Census data on residential patterns of children and provided an expert deposition. The case was settled out of court.

    e) *Michelle Porter, et al., v. Davis Realty Company, et al., 1983*. In this fair housing case, Michelle Porter (an African American) sued the Davis Realty Company for housing discrimination. While still in graduate school, I provided expert testimony for the plaintiff that indicated that the real estate agent had directed Ms. Porter to African American neighborhoods. Plaintiff won the highest damages award for housing discrimination ever received up to that time.

### III. Materials Reviewed

16. The research reported here is primarily based on data from two government surveys:

    a) The 2018 American Community Survey (ACS), conducted by the U.S. Census Bureau

    b) The 2014 Survey of Income and Program Participation (SIPP), conducted by the U.S. Census Bureau

17. In both surveys, respondents were members of the civilian non-institutionalized population. Thus, the population in nursing homes and long-term care hospitals was excluded.

18. We conducted our own tabulations of unpublished data from the 2018 ACS.

19. Disability-related data from the 2014 SIPP was derived from this report: "Americans with Disabilities: 2014," by Danielle M. Taylor, a Current Population Report, P70-152, November 2018.[2] Table A-1 provided information on mobility device usage and the severity of ambulatory disability. This table provided information on the adult population (aged 18 and older) from the 2014 SIPP.

---

[2] Available at https://www.census.gov/content/dam/Census/library/publications/2018/demo/p70-152.pdf.

*Smith et al. v. City of Oakland*, Case No. 4:19-cv-05398-JST
**Declaration of Shelley Lapkoff in Support of Plaintiffs' Motion for Class Certification**     5

20. I also reviewed Defendant City of Oakland's Responses to Plaintiff Ian Smith's Special Interrogatories—in particular, its Response to Special Interrogatory No. 1, which estimated that the City has either 89,400 or 95,994 rental units, depending on the data source consulted.

21. I consulted an article by Kaye, H. S., Kang, T. and LaPlante, M.P. (2000). Mobility Device Use in the United States. Disability Statistics Report, (14). Washington, D.C.: U.S. Department of Education, National Institute on Disability and Rehabilitation Research, Table A, page 14, to estimate the share of wheelchair users that do or do not use another mobility device.

22. I consulted an article: Stanley K. Smith, et al., "Aging and Disability: Implications for the Housing Industry and Public Policy in the United States," paper presented at the annual meeting of the Southern Demographic Association, Birmingham, AL, October 11-13, 2007, p. 8.

### IV. Household Versus Individual Rates of Ambulatory Disability

23. All the published estimates of ambulatory disability rates and use of mobility devices that I am aware of are for *individuals*. However, for the purposes of this project we needed to know the renter *household* rate of ambulatory disability (for example, the share of Oakland renter households in which at least one member has an ambulatory disability). The household disability rate is appropriate because it is households, not just individuals, that occupy rental housing, and we needed to estimate the rate of ambulatory disability and mobility device use among that renter population.

24. As discussed below, we analyzed American Community Survey Public Use Microdata estimates to obtain rates of ambulatory disability for households – that is, households that have at least one member with an ambulatory disability. The share of households that include at least one member with an ambulatory disability is about twice the rate of individuals. This accords with intuition because the average household size is about two. With about half as many households as people, the household disability rate would be about twice the individual rate (number of persons with a disability divided by number of households).[3]

---

[3] "Overall, household disability rates are roughly twice the magnitude of individual disability rates. This is not surprising, of course, because most households have two or more members." Stanley K. Smith, et al., "Aging and Disability: Implications for the Housing Industry and Public Policy in the United States," paper presented at the annual meeting of the Southern Demographic Association, Birmingham, AL, October 11-13, 2007, p. 8.

25. While the household rate is much higher than the individual rate, note that the *number* of households with a member with an ambulatory disability will always be less than the number of individual renters with an ambulatory disability, because households with more than one member with an ambulatory disability will be counted only once (in other words, two renters who use wheelchairs and live together only count as one *renter household* whose members have ambulatory disabilities).

26. As explained below, ACS data indicate that Oakland's individual ambulatory disability rate is 5.4 percent for renting individuals, and 11.3 percent for renter households. This means that the renter household ambulatory disability rate is a little more than double that of the individual rate (2.0926 higher, or 209 percent higher). We used this factor to estimate household rates of ambulatory disability or mobility device use from individual rates reported in the 2014 Survey of Income and Program Participation (SIPP).

V. **National Versus Local Oakland Rates of Ambulatory Disability and Device Usage**

27. The SIPP rates of ambulatory disability and device use are based on a national sample. The 2018 ACS survey indicated that Oakland's rate of ambulatory disability for individuals was lower than the national rate (5.4 percent for Oakland renters versus 6.8 percent for the whole U.S. population (owners and renters)). The 2018 rate for Oakland renters is 79.412 percent of the national rate. We used this .79412 adjustment factor to estimate Oakland rates of ambulatory disability and mobility device use based on national rates from the SIPP.

VI. **Estimating Rates of Ambulatory Disability Among Oakland Renter Households Using American Community Survey (ACS) Public Use Microdata Sample (PUMS) Data.**

28. The United States Census Bureau collects information on disability as part of the American Community Survey (ACS), which is an annual survey of approximately three million households. This is the largest sample survey conducted by the U.S. Census Bureau. The Census Bureau publishes tables from the ACS as well as the decennial censuses on its website and has links to ACS data so that users can download exactly what they need to use for particular analytic purposes. The ACS includes many questions regarding characteristics of persons, households, housing, and income.

29. Rates of "ambulatory disability" from the ACS are based on responses to the following question, asked of persons age five or older: "Does this person have serious difficulty walking or climbing stairs?"

A. **Determining the Rate of Ambulatory Disability for Oakland Renter Households, and the Approximate Number of Such Households.**

30. Disability rates for households—and specifically renter households—can be derived from the ACS survey data but are not published on the Census Bureau's website. Instead we performed a special tabulation of the ACS Public Use Microdata Sample (PUMS) files, which consist of untabulated records for individuals and households. We then analyzed this data to obtain both the number and share of renter households that include a member with an ambulatory disability - that is, renter households that have at least one member with "serious difficulty walking or climbing stairs." The ACS analysis showed 10,627 such renter households, consisting of 11.3 percent of all renter households in Oakland.

31. The *number* of Oakland renter households can also be directly estimated from our tabulations of the 2018 ACS. As shown below, it showed 5.4 percent of renters with an ambulatory disability.

B. **Determining the Relevant Public Use Microdata Areas for Oakland.**

32. Because PUMS provides very specific information, the results are reported for large geographic areas to protect individuals' privacy. These large areas are called PUMAs, or Public Use Microdata Areas. There are four PUMAs that include at least part of the City of Oakland. Map 1 shows the four PUMAs of interest, the label shows the percentage of households with at least one member who has an ambulatory disability. Cities are color-coded: Oakland is light brown.

//
//
//
//
//
//
//

//Map 1:  Oakland Area PUMAs



33.     Table 1 shows the estimated number of renter households in each PUMA and in the City of Oakland.  These estimates show 130,558 total renter households in each of the four PUMAs, of which an estimated 94,025 are located in the City of Oakland.[4]

---

[4] We estimated the share of each split PUMA that was in the city of Oakland.  It is important to recognize that each PUMA is an aggregation of Census tracts.  We know which tracts are in Oakland. We used ACS 2014-2018 five-year estimates of each Oakland Census tract's population using the tracts we determined were in Oakland.  To determine the share of each split PUMA's population that are in Oakland, we aggregated the total populations of tracts within and outside the city.  Then we calculated the share of each PUMA's population that are in the city of Oaklan

Table 1: Oakland Area PUMA Coverage

| Coverage | PUMA | # Renter Households | % of Renter Households in Oakland | # Renter Households in Oakland |
|---|---|---|---|---|
| Oakland and Emeryville | 102 | 56,874 | 90% | 51,187 |
| Oakland and Piedmont | 103 | 19,520 | 90% | 17,568 |
| Oakland only | 104 | 24,681 | 100% | 24,681 |
| Alameda, San Leandro, Oakland Airport and surrounding area, small part of Castro Valley | 105 | 29,483 | 2% | 590 |
| All | | 130,558 | 72% | 94,025 |

C. **Our Analysis of 2018 ACS-PUMS Data Reveals That an Estimated 10,627 Oakland Renter Households Include Someone With "Serious Difficulty Walking Or Climbing Stairs."**

34. Table 2 summarizes the estimates of ambulatory disability for renter households in each PUMA. Overall, an estimated **10,627 renter households** in Oakland include at least one person with an ambulatory disability (at least one person has "serious difficulty walking or climbing stairs"). This represents **11.3 percent of all the city's renter households**.

35. PUMA 103 has the lowest rate of ambulatory disability (five percent). It includes Piedmont (a very affluent community) and some of the more affluent areas of Oakland. The other three PUMAs have rates ranging from 12 to 15 percent.

Table 2: Ambulatory Disability of Renter Households in Oakland, by PUMA, 2018

Ambulatory Disability of Renter Households in Oakland

| PUMA | Without Ambulatory Disability | With Ambulatory Disability | Total | % with Ambulatory Disability | Share of PUMA in Oakland | Oakland renter households including a person with an ambulatory disability | % Oakland renter households with a member having an ambulatory disability |
|---|---|---|---|---|---|---|---|
| 102 | 50,236 | 6,638 | 56,874 | 12% | 90% | 5,974 | 12% |
| 103 | 18,509 | 1,011 | 19,520 | 5% | 90% | 910 | 5% |
| 104 | 21,009 | 3,672 | 24,681 | 15% | 100% | 3,672 | 15% |
| 105 | 25,922 | 3,561 | 29,483 | 12% | 2% | 71 | 12% |
| All | 115,676 | 14,882 | 130,558 | 11.4% | 94,025 | 10,627 | 11.3% |

36. Using the ACS PUMS data, we have also obtained the *number* of renters, rather than renting households, that has an ambulatory disability. Table 3 shows that there are an estimated 12,342 individual Oakland renters with an ambulatory disability, representing 5.4 percent of the renter population. As discussed above, note that the number of persons with an ambulatory disability (12,342) is higher than the number of households that contain at least one member with an ambulatory disability (10,627).

**Table 3: Ambulatory Disability of Individual Renters in Oakland, by PUMA, 2018**

| PUMA | Without Ambulatory Disability | With Ambulatory Disability | Total | % with Ambulatory Disability | Share of PUMA in Oakland | Renting Persons with an Ambulatory Disability |
|---|---|---|---|---|---|---|
| 102 | 115,467 | 7,774 | 123,241 | 6.3% | 90% | 6,997 |
| 103 | 39,023 | 1,011 | 40,034 | 2.5% | 90% | 910 |
| 104 | 75,763 | 4,357 | 80,120 | 5.4% | 100% | 4,357 |
| 105 | 71,297 | 3,918 | 75,215 | 5.2% | 2% | 78 |
| All | 301,550 | 17,060 | 318,610 | 5.4% | 228,572 | 12,342 |

Source: Tabulations of ACS PUMS data by LGDR.

### VII. Estimating Rates of Mobility Device Use Based On 2014 Survey of Income Program and Participation (SIPP) Data.

37. SIPP is a long-standing longitudinal survey by the U.S. government to measure socioeconomic characteristics of the population. Beginning in 2014, the SIPP was redesigned and the topical modules – including disability - were removed. However, the Social Security Administration funded a supplement to the 2014 SIPP, which collected data on people who experience limitations in their ability to perform certain activities and the degree to which they experience those limitations. A telephone survey was requested by the Social Security Administration (SSA) to collect the data. This supplement, called the SSA Supplement, provides the information on disability from the 2014 SIPP.[5] In the 2014 panel of the SIPP, disability is collected using a variety of questions about limitations to Activities of Daily Living (ADL), such as difficulty using stairs and walking a quarter mile. If a

---

[5] While the SIPP disability measure covers a broader spectrum of activities than the ACS, a drawback to the SIPP as a data source is the relatively small sample size.

*Smith et al. v. City of Oakland*, Case No. 4:19-cv-05398-JST
**Declaration of Shelley Lapkoff in Support of Plaintiffs' Motion for Class Certification**  11

respondent said they had difficulty walking or climbing stairs, they followed up by asking if they could do it *at all* and whether they could do it with assistance. The survey also asked about mobility device usage.

### A. National Rates of Ambulatory Disability, According To the 2014 SIPP

38. According to the 2014 SIPP, 16.2 percent of all persons reported having an ambulatory disability, with 8.5 percent reporting a severe ambulatory disability and 7.7 percent with a non-severe ambulatory disability. An adult was considered to have a severe ambulatory disability if they (1) needed to use a mobility device; or (2) if they were unable to walk or climb stairs; or (3) if they needed assistance in order to walk or climb stairs.

39. Note that the SIPP estimate that 8.5 percent of the population has a severe ambulatory disability is higher than the ACS national ambulatory disability rate of 6.8 percent. This suggests that the ACS national ambulatory disability is a conservative measure of ambulatory disability.

### B. Mobility Device Usage, 2014 SIPP

40. The 2014 SIPP asked whether the respondent used a wheelchair/motorized scooter/similar aid. Another question asked if the respondent used a cane, crutches, or walker. Table 4 shows the various rates of use of mobility devices.

41. Some of the wheelchair/motorized scooters/similar aid users also use another device, and we have worked to account for such duplication. Based on a study from the NHIS,[6] 41 percent of wheelchair users did not use another device, or 0.9 percent. Adding this number to those using another mobility device (6.4 percent), we estimate that 7.3 percent of individuals use at least one mobility device (wheelchair, cane, crutches, or walker).

42. To translate the national SIPP individual rate of mobility device usage into an Oakland renter household rate, we used the adjustment factors from our ACS analysis, discussed above:

---

[6] Kaye, H. S., Kang, T. and LaPlante, M.P. (2000). Mobility Device Use in the United States. Disability Statistics Report, (14). Washington, D.C.: U.S. Department of Education, National Institute on Disability and Rehabilitation Research, Table A, page 14. As of the 1994-95 NHIS study, there were 6.8 million persons using some mobility device and 6.1 million using a non-wheelchair device, and 1.7 million using a wheelchair. The difference between total persons with a device and persons with a non-wheelchair device is .7 million. These are the added wheelchair users that do not use another device. .7 divided by the 1.7 million total wheelchair users = 41%.

---

*Smith et al. v. City of Oakland*, Case No. 4:19-cv-05398-JST
**Declaration of Shelley Lapkoff in Support of Plaintiffs' Motion for Class Certification**    12

      a) To translate individual rates into household rates, we used the ACS conversion rate of 2.0926

      b) To translate the national rate into an Oakland rate, we used the ACS conversion rate of .79412.

43. Thus, the 7.3 percent national SIPP individual rate is multiplied by 2.0926 (the individual to household conversion) and then by .79412 (the national to Oakland renter conversion) to obtain an estimate of Oakland's renter households that have at least one member that uses a mobility device (wheelchair or, for at least six months, a cane, crutch, or walker).

44. When we adjusted for these factors, an estimated 12.131 percent of Oakland renter households include at least one member who uses a mobility device. With the ACS estimate of 94,025 households, that results in 11,406 households.

| Table 4: The Percentage of the U.S. Population that Uses a Mobility Device, SIPP 2014 | | |
|---|---|---|
| | Individual Rate | Oakland Renter Household Rate (Individual Rate x 2.0926 x .79412) |
| Used a wheelchair/motorized scooter/similar aid | 2.3% | 3.822% |
| Used any mobility device | | |
|   Used a wheelchair (etc.) but no other device* | 0.9% | |
|   Used a cane, crutches, or walker for more than 6 months | 6.4% | |
| Total | 7.3% | 12.131% |

* Use of a wheelchair and no other device is estimated at 41% of all wheelchair users, based on Kaye, H. S., Kang, T. and LaPlante, M.P. (2000). Mobility Device Use in the United States. Disability Statistics Report, (14). Washington, D.C.: U.S. Department of Education, National Institute on Disability and Rehabilitation Research, Table A.

Sources: Taylor, Danielle M., "Americans with Disabilities: 2014," *Current Population Reports*, P70-152, U.S. Census Bureau, Washington, D.C., Issued November 2018; LGDR calculations for Oakland renter household rate

**C. Usage of Wheelchairs, Motorized Scooters, or Similar Aids, 2014 SIPP**

45. As Table 4 (above) shows, 2.3 percent of individuals in the population use a wheelchair/motorized scooter/similar aid.

DocuSign Envelope ID: F879F1B2-DEF6-4DE6-9DB6-2810FF365455

46. To translate the national SIPP individual rate of wheelchair usage into an Oakland renter household rate, we used the adjustment factors from our ACS analysis, discussed above:

    a) To translate individual rates into household rates, we used the ACS conversion rate of 2.0926

    b) To translate the national rate into an Oakland rate, we used the ACS conversion rate of .79412.

47. Thus, the 2.3 percent SIPP national, individual rate is multiplied by 2.0926 (the individual to household conversion) and then by .79412 (the national to Oakland renter conversion) to obtain an estimate of Oakland's renter households that have at least one member that uses a wheelchair.

48. When we adjusted for these factors, an estimated 3.822 percent of Oakland renter households include at least one member who uses a wheelchair/motorized scooter/similar aid. This translates into 3,594 Oakland renter households.

## VIII. Conclusion

49. Table 5, below, summarizes our results. Our tabulation of the ACS shows that 11.3 percent of Oakland renter households, or 10,627 households, include at least one member with an ambulatory disability, defined as someone with serious difficulty walking or climbing stairs.

50. The 2014 SIPP showed a higher rate of ambulatory disability than the ACS and suggests that 13,281 Oakland renter households include at least one member with a severe ambulatory disability. This suggests that our 10,627 renter household estimate derived from the ACS PUMS data is conservative.

51. On a national level, the SIPP suggests that 7.3 percent of all individuals use a mobility device to get around. When we apply this percentage to Oakland renter households, we estimate that 12,131 percent of households, or 11,406 households, include one member that uses a mobility device. Because ACS PUMS data suggests that the number of renter households with members who report "serious difficulty walking or climbing stairs" (10,627) is similar, there is likely substantial overlap between people who use mobility devices, and people who would report "serious difficulty walking or climbing stairs" on the ACS.

---

*Smith et al. v. City of Oakland*, Case No. 4:19-cv-05398-JST
**Declaration of Shelley Lapkoff in Support of Plaintiffs' Motion for Class Certification**    14

52. If we considered only those using wheelchairs/motorized scooters/similar aids, we estimate that 3.822 percent of Oakland's renter households, or 3,594 households, include at least one member that uses a wheelchair or the like.

**Table 5: Summary of Results**

| Data Source | U.S. Individual Rate | Oakland, Renter Household Rate (U.S. Individual Rate x 2.0926 x .79412) | # of Oakland Renter Households Affected (assuming 94,025 total households) |
|---|---|---|---|
| 2018 ACS, "ambulatory disability" | 6.8% | 11.3% | 10,627 |
| 2014 SIPP, "severe ambulatory disability" | 8.5% | 14.125% | 13,281 |
| 2014 SIPP, Mobility Device Usage | 7.3% | 12.131% | 11,406 |
| 2014 SIPP, Wheelchair Usage | 2.3% | 3.822% | 3,594 |

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, to the best of my knowledge.

DATED: October 21, 2020          Respectfully submitted,

*Shelley Lapkoff*
Shelley Lapkoff