1  BARBARA J. PARKER, City Attorney – SBN 069722
   MARIA BEE, Chief Assistant City Attorney – SBN 167716
2  DAVID A. PEREDA, Special Counsel – SBN 237982
   KEVIN P. MCLAUGHLIN, Supervising Deputy City Attorney – SBN 251477
3  One Frank H. Ogawa Plaza, 6th Floor
   Oakland, California  94612
4  Telephone:  (510) 238-2961 Fax:  (510) 238-6500
   Email: kmclaughlin@oaklandcityattorney.org
5  X05020/2991628

6  Attorneys for Defendant
   CITY OF OAKLAND

7

8                  UNITED STATES DISTRICT COURT

9              NORTHERN DISTRICT COURT OF CALIFORNIA

10                      OAKLAND DIVISION

11

12  IAN SMITH, SUNDAY PARKER, and MITCH          Case No. 4:19-cv-05398 JST
    JESERICH, on behalf of themselves and all
13  others similarly situated,                    **DEFENDANT CITY OF OAKLAND'S**
                                                  **OPPOSITION TO PLAINTIFFS'**
14              Plaintiffs,                        **MOTION FOR CLASS**
                                                  **CERTIFICATION**
15  v.

16  CITY OF OAKLAND, a public entity,            Date:  January 20, 2021
                                                 Time:  2:00 p.m.
17              Defendant.                        Crtm:  6 – 2nd Floor

18                                               Complaint filed: August 28, 2019
                                                 Trial Date: None set
19

20

21

22

23

24

25

26

27

28

---

DEFENDANT CITY OF OAKLAND'S OPPOSITION TO                        4:19-cv-05398 JST
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

**TABLE OF CONTENTS**

I.      INTRODUCTION ............................................................................................................... 1

II.     FACTUAL BACKGROUND ............................................................................................. 2

        A.      The City's Rent Adjustment Program. ................................................................... 2

        B.      Evidence Pertaining To Plaintiffs' Claims. ........................................................... 4

        C.      Objections To Plaintiffs' Evidence. ....................................................................... 6

III.    LEGAL STANDARD ........................................................................................................ 8

IV.     ARGUMENT ..................................................................................................................... 8

        A.      The Class Definition Is Unclear And Rests Upon An Unsupported
                Assumption. ........................................................................................................... 8

        B.      The Proposed Class Lacks Commonality. ............................................................ 12

                1.      The Accessibility Of Rent-Controlled Housing Is Highly
                        Individualized. .......................................................................................... 13

                2.      Plaintiffs' Evidence Fails To Show Commonality. .................................. 17

                3.      The Rent Adjustment Program Is Not A Centralized Policy
                        Addressed To Accessibility Of Rental Units. .......................................... 20

        C.      Plaintiffs' Claims Lack Typicality. ...................................................................... 22

        D.      Plaintiffs Fail To Demonstrate Numerosity. ........................................................ 23

        E.      The Requested Injunction Will Not Provide Relief To Many Class
                Members, And Will Impact Many Persons Not In The Class. .............................. 23

V.      CONCLUSION ................................................................................................................ 24

# TABLE OF AUTHORITIES

## CASES

*Armstrong v. Davis*,
  275 F.3d 849 (9th Cir. 2001).................................................................................. 21

*Blackie v. Barrack*,
  524 F.2d 891 (9th Cir. 1975).................................................................................. 19

*Cactus Corner, LLC v. U.S. Dep't of Agric.*,
  346 F. Supp. 2d 1075 (E.D. Cal. 2004)..................................................................... 7

*Californians for Disability Rights, Inc. v. Cal. Dep't of Transp.*,
  249 F.R.D. 334 (N.D. Cal. 2008)............................................................................ 21

*Castaneda v. Burger King Corp.*,
  264 F.R.D. 557 (N.D. Cal. 2009)............................................................................ 21

*Civil Rights Educ. & Enforcement Ctr. v. Hospitality Props. Tr.*,
  317 F.R.D. 91 (N.D. Cal. 2016) .............................................................. 9, 12, 20, 22

*Civil Rights Educ. & Enforcement Ctr. v. Hospitality Props. Tr.*,
  867 F.3d 1093 (9th Cir. 2017)............................................................................ 8, 20

*Crowder v. Kitagawa*,
  81 F.3d 1480 (9th Cir. 1996).................................................................................. 13

*Ellis v. Costco Wholesale Corp.*,
  657 F.3d 970 (9th Cir. 2011).................................................................................. 12

*Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*,
  618 F.3d 1025 (9th Cir. 2010)................................................................................ 19

*Gen. Tel. Co. of Sw. v. Falcon*,
  457 U.S. 147 (1982) .............................................................................................. 22

*Gonzalez v. U.S. Immigration & Customs Enforcement*,
  975 F.3d 788 (9th Cir. 2020).................................................................................. 21

*Gray v. Golden Gate Nat'l Rec. Area*,
  279 F.R.D. 501 (N.D. Cal. 2011)............................................................................ 21

*Hostetler v. Johnson Controls, Inc.*,
  No. 3:15-CV-226 JD, 2018 WL 3868848 (N.D. Ind. Aug. 15, 2018) ...................... 24

*Jamie S. v. Milwaukee Public Schools*,
  668 F.3d 481 (7th Cir. 2012).................................................................................... 8

//

*Kosta v. Del Monte Foods, Inc.*,
   308 F.R.D. 217 (N.D. Cal. 2015) ........................................................................... 8

*Lee v. City of Los Angeles*,
   250 F.3d 668 (9th Cir. 2001) .................................................................................. 7

*Noel v. N.Y. City Taxi & Limousine Comm'n*,
   687 F.3d 63 (2d Cir. 2012) .................................................................................. 21

*P.P. v. Compton Unif. Sch. Dist.*, No. CV 15-3726-MWF (PLAx),
   2015 WL 5752770 (C.D. Cal. Sept. 29, 2015) ..................................................... 23

*Parsons v. Ryan*,
   754 F.3d 657 (9th Cir. 2014) ................................................................................ 21

*Rodriguez v. Hayes*,
   591 F.3d 1105 (9th Cir. 2010) ............................................................................. 23

*Sali v. Corona Reg'l Med. Ctr.*,
   909 F.3d 996 (9th Cir. 2018) ................................................................................ 19

*Schulken v. Wash. Mut. Bank*,
   No. 09-CV-02708-LHK, 2012 WL 28099 (N.D. Cal. Jan. 5, 2012) ..................... 24

*Schwartz v. Upper Deck Co.*,
   183 F.R.D. 672 (S.D. Cal. 1999) .......................................................................... 23

*Shelton v. Bledsoe*,
   775 F.3d 554 (3d Cir. 2017) .................................................................................. 8

*Shook v. Bd. of Comm'rs of Cnty. of El Paso*,
   543 F.3d 597 (10th Cir. 2008) ............................................................................... 9

*Thompson v. Westboro Condo. Ass'n*,
   No. C05-1893JLR, 2006 WL 2473464 (W.D. Wash. Aug. 25, 2006) ................... 14

*Townsend v. Quasim*,
   328 F.3d 511 (9th Cir. 2003) ................................................................................ 13

*U.S. v. Cal. Mobile Home Mgmt. Co.*,
   29 F.3d 1413 (9th Cir. 1994) ................................................................................ 14

*U.S. v. Lizarraga-Tirado*,
   789 F.3d 1107 (9th Cir. 2015) ................................................................................ 7

*Vietnam Veterans of Am. v. C.I.A.*,
   288 F.R.D. 192 (N.D. Cal. 2012) ........................................................................... 8

//

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) .......................................................................................... *passim*

*Weinreich v. Los Angeles Cnty. Metro. Trans. Auth.*,
   114 F.3d 976 (9th Cir. 1997) ..................................................................................... 13

**STATUTES**

24 U.S.C. § 3604 ............................................................................................. 10, 11, 14

42 U.S.C. § 12132 ....................................................................................................... 14

Cal. Civ. Code § 1954.52 ......................................................................................... 1, 3

Cal. Civ. Code § 1946 ................................................................................................... 2

**RULES**

Fed. R. Civ. P. 23 .............................................................................................. *passim*

**REGULATIONS**

24 C.F.R. § 100.201 ................................................................................................... 18

24 C.F.R. § 100.203 ................................................................................................... 10

24 C.F.R. § 100.204 ................................................................................................... 10

28 C.F.R. § 35.130 ..................................................................................................... 13

DEFENDANT CITY OF OAKLAND'S OPPOSITION TO
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

4:19-cv-05398 JST

## I.   INTRODUCTION

The City of Oakland provides numerous benefits and protections for disabled tenants within the City.  But it is not able to provide the relief Plaintiffs Ian Smith and Mitch Jeserich seek:  the application of rent control to newer units.  The exemption from the City's rent control for rental units built after January 1, 1983 is required by the State of California's Costa-Hawkins Rental Housing Act, which prohibits rent control of units that were exempt from rent control as of February 1, 1995.  Cal. Civ. Code § 1954.52(a)(2).  The alleged discrimination Plaintiffs complain of is not caused by the City, but by federal and state accessibility laws, the Costa-Hawkins Act, and thousands of actions by individual landlords and tenants.

Plaintiffs now move for class certification.  Conspicuously absent from Plaintiffs' motion is any discussion of how their claims can be proven through common evidence.  Plaintiffs identify several alleged common questions, but they are not "prepared to prove" that there are any "common *answers* apt to drive resolution of the litigation."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (citation and quotation omitted; emphasis in original).

Plaintiffs claim the City of Oakland's Rent Adjustment Program is not meaningfully accessible, because the rental housing covered by the Program is not accessible.  But for many reasons, the accessibility of the rental housing covered by the Program is highly variable to the putative class.  Because Plaintiffs' challenge to the Program depends upon the accessibility of thousands of private rental units to a diverse proposed class, it is a diffuse and decentralized inquiry lacking commonality.

Compounding the lack of commonality is a class definition that is uncertain and founded on an unproven premise.  Plaintiffs seek to certify a class of all Oakland tenants with mobility disabilities, but they do not define "mobility disability" and offer varied interpretations of that term.  Evidently it includes anyone who vaguely identifies as having "difficulty walking or climbing stairs," and it includes persons with temporary disabilities.  The class definition concludes – without foundation – that *all* of these persons need "accessible rental units."  There is no evidence *any* class member needs a unit meeting every element of Plaintiffs' definition of an "accessible" unit.  There is certainly no evidence that all mobility-disabled tenants who do not use

a wheelchair require wheelchair-accessible routes, doorways, bathrooms and kitchens.  The class definition is unclear.

Importantly, Plaintiffs' class definition, and theory of this case, treats a unit that can be made accessible through a reasonable modification or accommodation – as the Fair Housing Amendments Act ("FHAA") requires – as though it is still inaccessible.  No evidence, law, or logic supports Plaintiffs' position.

The lack of commonality also impacts typicality, and the lack of a clear class definition also impacts numerosity.  The requested remedy provides no relief to many class members, and substantially impacts many persons who are not in the class.  For all these reasons, as further discussed below, the motion for class certification should be denied.

## II.    FACTUAL BACKGROUND

### A.    The City's Rent Adjustment Program.

The City's Residential Rent Adjustment Program is part of Chapter 8.22 of the City's Municipal Code, which creates a number of requirements applicable to residential rent adjustments and evictions in various rental dwelling units in the City.  The purposes of this Chapter are several:

> Among the purposes of this Chapter are providing relief to residential tenants in Oakland by limiting rent increases for existing tenants; encouraging rehabilitation of rental units, encouraging investment in new residential rental property in the city; reducing the financial incentives to rental property owners who terminate tenancies under California Civil Code Section 1946 ("Section 1946") or where rental units are vacated on other grounds under state law Civil Code Sec. 1954.50, et seq. ("Costa-Hawkins") that permit the city to regulate initial rents to new tenants, and allowing efficient rental property owners the opportunity for both a fair return on their property and rental income sufficient to cover the increasing cost of repairs, maintenance, insurance, employee services, additional amenities, and other costs of operation.

Oakland Municipal Code ("OMC") § 8.22.010.C.[1]

The Rent Adjustment Program provides that owners of covered dwelling units may increase rents for continuously occupied units once each 12 months in a limited amount.  OMC §

---

[1] Chapter 8.22 of the Oakland Municipal Code is attached as Exhibit A to the City's Request for Judicial Notice ("RJN").

DEFENDANT CITY OF OAKLAND'S OPPOSITION TO
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

4:19-cv-05398 JST

8.22.070.A.1.a.  Following vacancy of a covered unit, the owner may set the initial rent without restriction, subject to certain exceptions.  OMC § 8.22.080.B.  The Program creates notice requirements; a petition process regarding rent increases, decreased housing service, exemptions, and other matters; a hearing and appeal procedure; and various remedies and reporting requirements.

Certain rental dwelling units are exempt from the Program, including those controlled, regulated, or subsidized by any government entity; accommodations in certain motels, hotels, and other temporary accommodations; and dwelling units in a nonprofit cooperative owned by a majority of the residents.  OMC § 8.22.030.A.  Also exempt are dwelling units "which were newly constructed and received a certificate of occupancy on or after January 1, 1983."  OMC § 8.22.030.A.5.[2]  Other exemptions and details apply but are not pertinent here.

The Rent Adjustment Program makes no reference to accessibility standards, does not provide any housing, and does not create any specific rights for disabled tenants.  However, several other ordinances within Chapter 8.22 do extend specific protections to disabled tenants.  For example, owner- or qualified-relative move-in evictions of a disabled tenant living in a unit for five or more years can occur only in very limited circumstances.  OMC § 8.22.360.A.9.e.  Increased damages are available to disabled tenants where an owner violates the City's Tenant Move-Out Ordinance.  OMC § 8.22.770.B.3.  Disabled tenants are entitled to one year (instead of 120 days) of notice of an Ellis Act eviction, and in all no-fault evictions, disabled tenants are entitled to an increased relocation payment.  OMC §§ 8.22.440.A, 8.22.820.B.  These ordinances, which are also administered by the Rent Adjustment Program, apply without regard to whether a unit is rent controlled.

In addition, the City operates an Access Improvement Program, which provides grants to that fund accessibility improvements such as ramps or lifts, bathroom modifications, and entry modifications for privately-owned housing units, whether the units are owner-occupied or tenant-

---

[2] An earlier version of the City's rent control ordinance exempted all units newly constructed on or after January 1, 1983 from rent control.  As a result, to this day all units newly-constructed in the City from January 1, 1983 to the present are exempt from rent control pursuant to state law. *See* Cal. Civ. Code § 1954.52(a)(2).

1  occupied.  (RJN, Ex. B.)  This Program is also available without regard to whether a unit is rent

2  controlled.

3  **B.      Evidence Pertaining To Plaintiffs' Claims.**

4        Plaintiffs seek to certify a class pursuant to Rule 23(b)(2) consisting of "all Oakland

5  renters who have mobility disabilities and thus need accessible rental units in the City of

6  Oakland."  As discussed further below, Plaintiffs do not define what constitutes a "mobility

7  disability," and utilize a definition of "accessible rental units" that is not supported by evidence.

8  Nor do Plaintiffs present evidence that all persons with a "mobility disability" require an

9  "accessible rental unit."

10        Further, Plaintiffs do not present evidence that the question of whether the proposed class

11  of Oakland tenants is denied meaningful access to the Rent Adjustment Program can be

12  adjudicated based upon common evidence.  Instead, Plaintiffs rely upon (1) anecdotal

13  declarations of the two named plaintiffs, and several class members, that are vague and lacking in

14  numerous details; (2) a "windshield survey" that is not admissible and not probative of whether

15  rental units built prior to 1983 are uniformly inaccessible; and (3) the dates of enactment of

16  federal and state accessibility laws, claiming that because units certified for occupancy prior to

17  March 13, 1991 were not subject to FHAA accessibility requirements, units built before that date

18  must be inaccessible, and units built after that date must be accessible.  None of this evidence or

19  argument supports a finding that there is any common means to resolve this case.

20        To the extent Plaintiffs' reliance on the March 13, 1991 enactment date of the FHAA

21  could be viewed as "evidence" of the accessibility of rental housing units built before or after that

22  time, it is unsupported.  In 2011, the U.S. Census Bureau's American Housing Survey ("AHS")

23  surveyed the presence of accessibility features in housing units.  According to the results of that

24  survey, there is a modest difference in accessibility of multi-family units built before 1990 and

25  after 1990, as shown in the table below.

26  //

27  //

28  //

4

**Table A: Prevalence of Accessibility Features**

| Accessibility Features Present in Home | All Housing Units (Including Vacant Units) | All Renter-Occupied Units | All Owner-Occupied Units | All Multifamily Units (a) | Multifamily Units Built Before 1990 | Multifamily Units Built In 1990 or Later |
|---|---|---|---|---|---|---|
| **Original Accessibility Features** | | | | | | |
| Can Enter Unit Without Steps | 41.8% | 38.5% | 44.4% | 38.8% | 35.9% | 49.7% |
| Extra-Wide Doors/Hallways | 7.5% | 6.3% | 8.5% | 7.8% | 5.3% | 17.3% |
| No Steps Between Rooms | 62.9% | 70.6% | 59.9% | 75.2% | 74.8% | 76.6% |
| Ramps In Home | 0.6% | 0.5% | 0.7% | 0.7% | 0.7% | 0.7% |
| Hand Rails/Grab Bars In Home (b) | 25.0% | 14.8% | 31.9% | 10.8% | 10.3% | 12.5% |
| Handrails/Grab Bars In Bathroom | 16.7% | 15.4% | 18.9% | 16.8% | 15.0% | 23.6% |
| Handrails/Grab Bars In Other Areas | 2.3% | 1.4% | 2.8% | 1.5% | 1.3% | 2.3% |
| Door Handles Instead of Knobs | 10.6% | 8.3% | 12.6% | 10.8% | 7.1% | 25.0% |
| Sink Handles/Levers | 26.5% | 20.3% | 32.0% | 20.7% | 17.2% | 33.8% |
| Built-In Shower Seats | 7.7% | 3.8% | 10.6% | 3.8% | 3.1% | 6.8% |
| Raised Toilets | 6.3% | 3.6% | 8.3% | 3.9% | 3.3% | 6.4% |
| Kitchen Trays/Lazy Susans | 17.7% | 7.8% | 24.9% | 6.9% | 5.8% | 11.5% |
| Wheelchair Accessible Electrical Outlets | 59.7% | 58.1% | 64.6% | 56.7% | 54.4% | 65.5% |
| Wheelchair Accessible Electrical Switches | 60.9% | 58.8% | 66.2% | 57.4% | 55.2% | 65.7% |
| Wheelchair Accessible Climate Controls | 44.6% | 42.9% | 48.7% | 42.3% | 39.2% | 54.0% |
| Wheelchair Accessible Kitchen Cabinets | 15.2% | 14.8% | 16.8% | 14.1% | 13.8% | 15.2% |
| Wheelchair Accessible Countertops | 48.4% | 46.6% | 53.3% | 45.1% | 43.1% | 52.6% |
| Wheelchair Accessible Other Kitchen Features | 28.5% | 27.6% | 31.7% | 25.9% | 24.6% | 30.9% |
| Wheelchair Accessible Bathroom | 37.3% | 36.3% | 41.2% | 36.4% | 33.3% | 48.2% |
| Elevators In Home | 0.3% | 0.3% | 0.2% | 0.6% | 0.6% | 0.6% |
| Bedroom On Entry Level (c) | 74.9% | 78.1% | 72.5% | 76.6% | 76.3% | 77.8% |
| Full Bathroom On Entry Level (c) | 86.2% | 84.1% | 87.6% | 80.9% | 80.5% | 82.7% |
| **Constructed Accessibility Features** | | | | | | |
| Steps Between Rooms, Handrails, and Ramps (b) | 0.4% | 0.3% | 0.4% | 0.2% | 0.1% | 0.5% |
| Steps Between Rooms and Handrails, No Ramps (b) | 17.4% | 12.2% | 20.9% | 12.5% | 11.6% | 16.1% |
| Steps Between Rooms and Ramps, No Handrails (b) | 0.3% | 0.2% | 0.3% | 0.3% | 0.3% | 0.1% |
| Bedroom on Entry Level or Presence of Elevator | 74.9% | 78.1% | 72.6% | 76.7% | 76.4% | 77.9% |
| Full Bathroom on Entry Level or Presence of Elevator | 86.2% | 84.1% | 87.6% | 81.0% | 80.6% | 82.8% |
| **Total Number of Households/Housing Units** | | | | | | |
| AHS Sample | 72,413 | 23,834 | 37,085 | 61,001 | 45,319 | 1568200.0% |
| Weighted Count | 132,428,371 | 38,779,548 | 76,053,237 | 26,103,524 | 20,705,525 | 5,397,999 |

(a) Multifamily units refers to housing units in the AHS sample that are in buildings with four or more units.
(b) Based on units not reporting no steps within the unit.

(Declaration of Raymond Kennedy ("Kennedy Decl."), Table A.)

The same survey data shows that, both nationwide and in the Oakland Metropolitan Statistical Area, very few housing units are fully wheelchair accessible, while many units can be potentially modified to be accessible – regardless of when the units were constructed.

//

//

//

**Table B. Percent of All Housing Units with Critical Accessibility Features for U.S.**

| All Housing Units | Level 1: Potentially Modifiable | Level 2: Livable | Level 3: Wheelchair Accessible | Sample Size | Weighted Counts |
|---|---|---|---|---|---|
| **Total Sample** | 32.45% | 3.48% | 0.14% | 72,413 | 132,428,371 |
| | | | | | |
| **Occupancy Status** | | | | | |
| Renter-occupied | 30.89% | 3.91% | 0.16% | 23,834 | 38,779,547 |
| Owner-occupied | 33.47% | 3.57% | 0.14% | 37,085 | 76,053,237 |
| | | | | | |
| **Building Type** | | | | | |
| 1 Unit | 33.49% | 3.20% | 0.11% | 41,864 | 99,539,640 |
| 2-3 Units | 23.52% | 1.88% | 0.10% | 3,455 | 6,783,399 |
| 4-49 Units | 26.98% | 3.56% | 0.18% | 11,702 | 20,965,146 |
| 50+ Units | 46.21% | 10.62% | 0.77% | 3,980 | 5,138,378 |
| | | | | | |
| **Building Age** | | | | | |
| Built before 1920 | 13.42% | 1.34% | 0.15% | 4,010 | 9,063,280 |
| 1920s | 16.62% | 1.37% | 0.00% | 2,494 | 5,372,685 |
| 1930s | 18.58% | 1.60% | 0.00% | 2,592 | 5,706,997 |
| 1940s | 26.82% | 2.30% | 0.04% | 3,637 | 7,854,551 |
| 1950s | 34.50% | 3.20% | 0.08% | 6,247 | 13,379,331 |
| 1960s | 36.63% | 3.66% | 0.06% | 7,064 | 15,382,544 |
| 1970s | 35.16% | 3.37% | 0.09% | 11,526 | 24,908,987 |
| 1980s | 35.88% | 4.56% | 0.16% | 8,093 | 16,673,119 |
| 1990s | 34.62% | 4.41% | 0.27% | 7,485 | 16,052,745 |
| 2000 or after | 39.60% | 4.66% | 0.34% | 7,855 | 18,034,128 |

**Table C. Percent of All Housing Units with Critical Accessibility Features for Oakland MSA**

| All Housing Units | Level 1: Potentially Modifiable | Level 2: Livable | Level 3: Wheelchair Accessible | Sample Size | Weighted Counts |
|---|---|---|---|---|---|
| **Total Sample** | 30.00% | 3.31% | 0.13% | 3,994 | 986,666 |
| | | | | | |
| **Occupancy Status** | | | | | |
| Renter-occupied | 30.13% | 3.06% | 0.20% | 1,480 | 378,243 |
| Owner-occupied | 30.06% | 3.51% | 0.05% | 2,144 | 543,079 |
| | | | | | |
| **Building Size** | | | | | |
| 1 Unit | 30.51% | 3.15% | 0.08% | 2,250 | 691,163 |
| 2-3 Units | 24.70% | 3.08% | 0.00% | 197 | 58,573 |
| 4-49 Units | 25.52% | 2.56% | 0.00% | 649 | 192,608 |
| 50+ Units | 48.47% | 9.47% | 1.69% | 149 | 44,322 |
| | | | | | |
| **Building Age** | | | | | |
| Built before 1920 | 18.00% | 0.81% | 0.00% | 145 | 44,816 |
| 1920s | 15.71% | 0.64% | 0.00% | 164 | 49,232 |
| 1930s | 20.68% | 2.42% | 0.00% | 170 | 51,792 |
| 1940s | 25.40% | 2.45% | 0.00% | 280 | 84,931 |
| 1950s | 37.57% | 2.60% | 0.20% | 460 | 140,872 |
| 1960s | 37.20% | 3.93% | 0.00% | 537 | 162,932 |
| 1970s | 31.56% | 3.18% | 0.00% | 478 | 145,596 |
| 1980s | 26.99% | 3.10% | 0.34% | 413 | 125,682 |
| 1990s | 29.89% | 5.88% | 0.00% | 311 | 94,148 |
| 2000 or after | 30.38% | 5.25% | 0.67% | 290 | 86,664 |

(Kennedy Decl., Tables B & C.)

## C.   Objections To Plaintiffs' Evidence.

Plaintiffs submit various items with their Request for Judicial Notice, and a statement in

DEFENDANT CITY OF OAKLAND'S OPPOSITION TO
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

4:19-cv-05398 JST

1    the Declaration of Thomas Zito, that are subject to objection.

2          With respect to the Request for Judicial Notice, Plaintiffs seek judicial notice of the truth

3    of multiple matters that are not subject to judicial notice.  Exhibits 2, 3, 6 and 7 are documents

4    authored or published by public entities, but that does not mean the ***accuracy of the contents*** of

5    those documents is beyond question and therefore subject to judicial notice.  "[D]ocuments are

6    judicially noticeable only for the purpose of determining what statements have been made, not to

7    prove the truth of the contents."  *Cactus Corner, LLC v. U.S. Dep't of Agric.*, 346 F. Supp. 2d

8    1075, 1100 (E.D. Cal. 2004) (citations omitted); *see also Lee v. City of Los Angeles*, 250 F.3d

9    668, 689-90 (9th Cir. 2001).

10         Exhibits 4 and 5 to the Request for Judicial Notice are claimed to be Google "Street

11   View" images of two housing units in Oakland.  There is no evidence of the reliability or

12   accuracy of these images.  *See U.S. v. Lizarraga-Tirado*, 789 F.3d 1107, 1110 (9th Cir. 2015)

13   (admissibility of Google Earth image depends upon evidence of Google Earth's reliability and

14   accuracy).  The accuracy and authenticity of these two images is not beyond question.  Nor are

15   the images relevant:  there is no evidence the units depicted are multi-family units subject to rent

16   control, or that the Google photos depict the conditions existing when the 2014 "windshield

17   survey" was performed.  Indeed, Plaintiffs offer the images to cast doubt on the accuracy of the

18   very windshield survey ***they rely upon***.  (*See* Dkt. 52 at 7 n. 17.)  And just as a windshield survey

19   (meaning a survey done from inside a car) cannot determine the accessibility of entrances to a

20   unit that are not visible from the street, neither can a Google Street View image.

21         With respect to Mr. Zito's declaration, he claims that based on the 2014 "windshield

22   survey" for the City's Housing Element, 658 of 886 multifamily units surveyed "are accessible

23   only by steps[.]"  (Dkt. 52-1, ¶¶ 16-17.)  That statement lacks any foundation.  For support, the

24   declaration cross-references Exhibit 3 to Plaintiffs' Request for Judicial Notice, but that very

25   limited excerpt of a summary of survey results refers to whether "the main entry was accessible

26   from the street only by steps."  Whether the main entry of a unit is accessible from the street only

27   by steps does not address whether the entire unit is accessible only by steps.

28   //

III.    LEGAL STANDARD

"A party seeking class certification must demonstrate that (1) 'joinder of all members is impracticable,' (2) 'there are questions of law or fact common to the class,' (3) the named plaintiffs' claims or defenses are typical of those of the class, and (4) 'the representative parties will fairly and adequately protect the interests of the class.'"  *Civil Rights Educ. & Enforcement Ctr. v. Hospitality Props. Tr.*, 867 F.3d 1093, 1103 (9th Cir. 2017) (quoting Fed. R. Civ. P. 23(a)).

"If a party succeeds in establishing all four of the 23(a) elements, it must then satisfy one of the three requirements of Rule 23(b)."  *Id.*  Plaintiffs rely upon Rule 23(b)(2), which requires that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole[.]"

IV.    ARGUMENT

A.    The Class Definition Is Unclear And Rests Upon An Unsupported Assumption.

"While it is not an enumerated requirement of Rule 23, courts have recognized that in order to maintain a class action, the class sought to be represented must be adequately defined and clearly ascertainable."  *Vietnam Veterans of Am. v. C.I.A.*, 288 F.R.D. 192, 210 (N.D. Cal. 2012) (citation and quotation omitted) (analyzing proposed Rule 23(b)(1) or (b)(2) class action); *see also Jamie S. v. Milwaukee Public Schools*, 668 F.3d 481, 493-96 (7th Cir. 2012) (analyzing ascertainability of Rule 23(b)(2) class).  While some courts consider the requirement of ascertainability more relaxed in the context of Rule 23(b)(2) class actions, "even where certification is sought only for purposes of injunctive relief, a class definition must be clear in its applicability so that it will be clear later on whose rights are merged into the judgment in order to avoid satellite litigation… over who was in the class in the first place."  *Kosta v. Del Monte Foods, Inc.*, 308 F.R.D. 217, 223 n. 4 (N.D. Cal. 2015) (citations and quotations omitted).

Other courts find the requirement of a clear class definition to flow from Rule 23(c)(1)(B)'s requirement that the "class action must define the class…."  *Shelton v. Bledsoe*, 775 F.3d 554, 560-63 (3d Cir. 2017) (requiring a "readily discernible, clear, and precise statement of

1   the parameters defining the class" for a Rule 23(b)(2) class); *Civil Rights Educ. & Enforcement*

2   *Ctr. v. Hospitality Props. Tr.*, 317 F.R.D. 91, 104 (N.D. Cal. 2016).  And still others find a

3   requirement of a clear class definition to be a product of the need for sufficiently definite

4   injunctive relief under Rule 23(b)(2):  the problem is not identifying individual class members for

5   purposes of issuing notice, but "identifying characteristics of the class essential to determining

6   whether class-wide relief is appropriate."  *Shook v. Bd. of Comm'rs of Cnty. of El Paso*, 543 F.3d

7   597, 612 (10th Cir. 2008).

8        Here, Plaintiffs seek to certify a class defined as "all Oakland renters who have mobility

9   disabilities and thus need accessible rental units in the City of Oakland."  This definition is

10  premised upon two terms:  "accessible rental units," which is somewhat defined, and "mobility

11  disability," which conspicuously is not.  The class definition assumes a conclusion that all renters

12  with a "mobility disability" require an "accessible unit."  No evidence supports this vague and

13  sweeping assumption.

14       <u>First</u>, Plaintiffs define an "accessible unit" to mean "any rental unit that was required to be

15  accessible to people with mobility disabilities under the FHAA, the Fair Employment and

16  Housing Act, and/or the California Building Code, including all applicable regulations."  (Dkt. 52

17  at 1, n. 1.)  It is unclear whether this refers to current requirements, the requirements in place

18  when the unit was constructed, the requirements put in place upon the original enactment of these

19  laws, or something else.  Subsequently, and perhaps honing this definition, Plaintiffs claim –

20  without citation to evidence – that "For a rental unit to be accessible to Plaintiffs and other

21  members of the class, there must be a stair-free route into and through the building; the public and

22  common areas must comply with the accessible design and construction requirements of state or

23  federal law; the doors, hallways, and other pathways must be wide enough for wheelchairs to get

24  through; the light switches, environmental controls, and outlets must be reachable; there must be

25  enough space in the kitchen and bathroom to maneuver a wheelchair; and the bathroom walls

26  must be reinforced in a way that allows for installation of grab bars."  (*Id*. at 8:3-9.)

27       Plaintiffs present no evidence that ***all*** of these requirements are in fact necessary for a unit

28  to be accessible to them.  Neither Plaintiff Smith nor Plaintiff Jeserich claim they need reinforced

1    bathroom walls allowing for the installation of grab bars in order for a unit to be accessible.  (Dkt.

2    52-11, at ¶ 4; 52-12, at ¶ 4.)  And none of the declarants attests that these requirements are in fact

3    necessary for a unit to be accessible to them.  As discussed further in conjunction with

4    commonality, whether a unit is in fact accessible is not "binary" but is based on a variety of

5    factors.  (Declaration of Kevin P. McLaughlin ("McLaughlin Decl."), Ex. A at 107:8-19.)

6         <u>Second</u>, by defining an "accessible unit" as one "that was required to be accessible[,]"

7    Plaintiffs adopt a definition that covers only units constructed pursuant to FHAA, FEHA, and

8    CBC requirements – in other words, units certified for occupancy no earlier than March 13, 1991.

9    This definition therefore assumes that all units built before that date are not accessible – an

10   assumption lacking factual support.  Whether units built prior to 1983 are, or may be, accessible

11   is an issue in this case, but Plaintiffs' definition of "accessible unit" assumes the answer to that

12   issue.  Moreover, this definition assumes that a unit is or is not accessible; it fails to recognize

13   that a unit can be made accessible.  Ramps can be installed, doorways can be widened, light

14   switches can be lowered, and so forth.  The FHAA and its regulations presume as much.  42

15   U.S.C. §§ 3604(f)(3)(A)-(B); 24 C.F.R. §§ 100.203, 100.204.  In fact, many units built before

16   March 13, 1991 are accessible, and many units built after March 13, 1991 are not accessible.

17   (Kennedy Decl., Tables A-C.)  There is simply no reason to define an "accessible unit" as one

18   that was built subject to FHAA, FEHA, and CBC requirements – i.e., built after March 13, 1991.

19        <u>Third</u>, Plaintiffs' use of the term "mobility disability" amplifies the uncertainty of the

20   class definition.  ***Plaintiffs do not define what mobility disability means***.  Perhaps it is persons

21   with an "ambulatory disability" – which Plaintiffs define as anyone over age 5 who has "serious

22   difficulty walking or climbing stairs."  (Dkt. 52 at 9:14-17.)[3]  It is unclear whether this would

23   include people with vertigo, serious cardiovascular conditions, vision disabilities, and so forth –

24   all of whom may have difficulty walking or climbing stairs.  Or, perhaps "mobility disability" is

25   limited to those persons who use a "wheelchair, electric scooter, or similar aid" – in which case it

26   _____

[3] Elsewhere Plaintiffs distinguish between a "severe ambulatory disability" and a "non-severe
27   ambulatory disability," not defining a "non-severe ambulatory disability" but defining a "severe
     ambulatory disability" to include adults who need to use a mobility device, are unable to walk or
28   climb stairs, or need assistance to walk or climb stairs.  (Dkt. 52-9, ¶ 38.)  It is unclear whether
     those with non-severe ambulatory disabilities are claimed to be within the putative class.

1    would not include those who use a cane, walker, or crutch.  (*Id*. at 16:9.)  Or perhaps it is those

2    who use any mobility aid, which would include those who use a cane, walker, or crutch.  (Dkt.

3    52-9, ¶¶ 44, 51.)  But abandoning such clarification, Plaintiffs go on to assert, *ipso facto*, that

4    "Whether an Oakland renter uses a wheelchair, scooter or similar device; relies on some other

5    mobility aid; has a 'severe ambulatory disability;' or simply reports 'serious difficulty walking or

6    climbing stairs;' they need accessible housing, and are members of Plaintiffs' proposed class."

7    (Dkt. 52 at 16:17-19.)

8         These are distinctions with a meaningful difference.  Plaintiffs estimate that there are

9    3,594 Oakland renter households where at least one member uses a wheelchair, electric scooter,

10   or similar aid.  (*Id*. at 16:7-11.)  Meanwhile, Plaintiffs estimate there are over 10,000 Oakland

11   renter households where a member of the household relies on "some mobility aid," has a "severe

12   ambulatory disability," or reports "serious difficulty walking or climbing stairs."  (*Id*.)  Putting

13   aside that these are estimates of numbers of households and not class members, these variations

14   potentially multiply the size of the class by more than double, and may have significant impact on

15   what "meaningful access" to the Rent Adjustment Program would look like.  The amorphous term

16   "mobility disability" in the class definition also makes it exceedingly difficult to determine who

17   might be bound by in the future by a judgment in this case.

18        Fourth, there is a significant internal inconsistency in the class definition.  Plaintiffs'

19   proposition that those who use a cane or have "serious difficulty walking or climbing stairs…

20   need accessible housing" is entirely unsupported.  (*Id*. at 16:17-19.)  Numerous of the basic

21   FHAA accessibility requirements Plaintiffs incorporate in their definition of "accessible housing"

22   are focused on ***wheelchair access***.  The FHAA requires that all doors in new construction "are

23   sufficiently wide to allow passage by handicapped persons in wheelchairs[.]"  24 U.S.C. §

24   3604(f)(3)(C)(ii).  Bathrooms and kitchens are the same:  they must be designed "such that an

25   individual in a wheelchair can maneuver about the space."  24 U.S.C. § 3604(f)(3)(C)(iii)(IV).

26   Requirement 7 of the FHA Design Manual, pertaining to kitchens and bathrooms, is almost

27   exclusively focused on wheelchair access.  (RJN, Ex. C at pp. 7.2-7.83.)  And, the concept of an

28   accessible route means a route "that can be negotiated by a person with a severe disability using a

1    wheelchair, and that is also safe for and usable by people with other disabilities." (*Id.* at p. 1.2.)

2         There is no reason a person who has serious difficulty climbing stairs requires a kitchen

3    with room for a wheelchair to maneuver – as just one example.  Plaintiffs do not address the fact

4    that their definition of an "accessible unit" includes requirements that are irrelevant to

5    accessibility for many members of the putative class.  Elsewhere, Plaintiffs claim that stairs are a

6    barrier to all members of the putative class (Dkt. 52 at 17:1-13), but they do not raise this

7    contention with respect to any other FHAA accessibility requirement.

8         Plaintiffs seem to anticipate that there is uncertainty and inconsistency within the class,

9    and propose that the Court could come up with a workable class definition.  (*Id.* at 15:2-11.)  But

10   it is Plaintiffs' burden to propose a class with a clear definition.  And the lack of a clear or

11   ascertainable class blends with the lack of commonality, typicality, and numerosity.  The class

12   should not be certified as it is presently defined.

13   **B.    The Proposed Class Lacks Commonality.**

14        A party seeking class certification "must be prepared to prove that there are *in fact*…

15   common questions of law or fact[.]"  *Wal-Mart Stores, Inc.*, 564 U.S. at 350 (emphasis in

16   original).  "What matters to class certification ... is not the raising of common 'questions' – even

17   in droves – but rather, the capacity of a class-wide proceeding to generate common *answers* apt to

18   drive the resolution of the litigation."  *Id.* (citation and quotation omitted; emphasis in original).

19   "Additionally, commonality requires the plaintiff to demonstrate that the class members have

20   suffered the same injury, which cannot merely be the suffering of a violation of the same

21   provision of law."  *Civil Rights Educ. & Enforcement Ctr.*, 317 F.R.D. at 100 (citation and

22   quotations omitted).  This "'rigorous analysis' will entail some overlap with the merits of the

23   plaintiff's underlying claim" and the "factual and legal issues comprising the plaintiff's cause of

24   action[.]"  *Wal-Mart Stores, Inc.*, 564 U.S. at 351 (citations and quotations omitted).  "[I]t is not

25   correct to say a district court *may* consider the merits to the extent that they overlap with class

26   certification issues; rather, a district court *must* consider the merits if they overlap with the Rule

27   23(a) requirements."  *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 981 (9th Cir. 2011)

28   (citations omitted; emphasis in original).

1    Here, Plaintiffs must prove that they were excluded from or denied the benefits of the

2    City's Rent Adjustment Program; that they lack "meaningful access" to the benefits of the

3    Program.  42 U.S.C. § 12132; *Crowder v. Kitagawa*, 81 F.3d 1480, 1484 (9th Cir. 1996).

4    Plaintiffs must also prove that this denial of meaningful access is "by reason of" disability.

5    *Weinreich v. Los Angeles Cnty. Metro. Trans. Auth.*, 114 F.3d 976, 978 (9th Cir. 1997).[4]

6        Plaintiffs do not describe at all how they are "prepared to prove" by common evidence

7    that the class is denied meaningful access to the Rent Adjustment Program, or how that denial is

8    by reason of their disabilities.  This analysis is completely lacking.  Plaintiffs identify a few

9    allegedly common questions, but provide no indication that there could be common answers to

10   these questions.  In fact, a lack of commonality is pervasive to the class.

11       1.    The Accessibility Of Rent-Controlled Housing Is Highly Individualized.

12       Plaintiffs' claim is that the Rent Adjustment Program is inaccessible because "few if any

13   of Oakland's accessible rental units are covered by the rent control Program[.]"  (Dkt. 52 at 11:9,

14   *see also id.* at 18:8-11.)  This claim lacks commonality for numerous reasons.

15       As discussed above, Plaintiffs present no evidence that all renters with mobility

16   disabilities need an "accessible unit" as Plaintiffs define that term.  There is no evidence that, for

17   example, a person who walks with a cane requires doorways, bathrooms, and kitchens designed

18   for operation of a wheelchair.  Many rent-controlled units may be accessible to persons with

19   mobility disabilities who do not use a wheelchair, yet inaccessible to persons who use a

20   wheelchair.  This illustrates a lack of commonality within the putative class.

21       Plaintiffs also would include persons with temporary disabilities in the class, such as Mr.

22   Renton, who is recovering from a torn meniscus.  (Dkt. 52-18, ¶ 3.)  But there is no evidence, or

23   reason to conclude, that persons with short-term disabilities make long-term rental housing

24   [4] Plaintiffs' claim under the California Disabled Persons Act is derivative of their ADA claim.
     (Compl. ¶¶ 97-98.)  To the extent Plaintiffs allege a separate "reasonable modification" claim
25   pursuant to 28 C.F.R. section 35.130(b)(7)(i), that claim is dependent upon a finding that the
     modification is "necessary to avoid discrimination on the basis of disability"– in other words, that
26   there is discrimination in violation of Title II.  *See Townsend v. Quasim*, 328 F.3d 511, 517 (9th
     Cir. 2003) ("*When a state's policies discriminate against the disabled in violation of the ADA*, the
27   ADA's regulations mandate reasonable modifications to those policies in order to avoid
     discrimination on the basis of disability, at least when such modification would not fundamentally
28   alter the nature of the services provided by the state.") (citation omitted; emphasis added).

decisions based upon accessibility.  A person who may be fully mobile in a few months would not plan to move from an existing unit to one that fully meets his accessibility needs, when those accessibility needs will disappear in short order.  And rent control would not be any factor in that decision-making, when the rent of the unit would almost certainly not go up by the time that person no longer has a mobility disability.  Rent control does not apply to hotels and other short-term rentals, or to hospitals and convalescent facilities.  OMC §§ 8.22.030.A.2-.3.  Plaintiffs make no showing that they can prove by common evidence that persons with temporary mobility disabilities are deprived of meaningful access to the benefits of the Rent Adjustment Program.

Significantly, the accessibility of a particular rental unit is not static.  The FHAA requires that landlords permit tenants to reasonably modify units to improve or achieve accessibility.  *See* 42 U.S.C. § 3604(f)(3)(A).  And landlords must make reasonable accommodations to their rules and policies, even where it creates financial cost to the landlord.  42 U.S.C. § 3604(f)(3)(B); *U.S. v. Cal. Mobile Home Mgmt. Co.,* 29 F.3d 1413, 1416 (9th Cir. 1994).  It is up to the tenant and landlord as to whether any such modifications or accommodations are made; the inquiry focuses on the specific tenant's needs and is "highly fact-specific[.]" *Id.* at 1418.[5]  For example, at prior housing, Mr. Smith installed a ramp (McLaughlin Decl., Ex. A at 64:16-65:10), and at her current unit, declarant Ms. Savin has done the same.  (Dkt. 52-17, ¶ 9.)

Whether units can be accessible through reasonable modifications or accommodations has nothing to do with the City, and is highly individualized to each tenant's disability, the inaccessible features at the unit, the costs of modifications, the presence of undue burdens to the landlord, and so forth.[6]  Mr. Smith and Mr. Jeserich testified that where inaccessible elements can be reasonably

---

[5] Most litigation arises under the FHAA's reasonable accommodation requirement of section 3604(f)(3)(B).  However, the requirement to permit a reasonable structural modification under section 3604(f)(3)(A) is just as inherently fact-specific as a reasonable accommodation, and a tenant's request to make a modification can often implicate reasonable accommodation to a landlord's rules, policies, practices or services.  *See, e.g., Thompson v. Westboro Condo. Ass'n,* No. C05-1893JLR, 2006 WL 2473464, at *4-5 (W.D. Wash. Aug. 25, 2006) (question of fact whether condominium association refused to make a reasonable accommodation to its rules, where the rules prohibited the resident from installing her own ramp).

[6] The City provides a grant program that funds accessibility improvements such as ramps or lifts, bathroom modifications, and entry modifications for owner-occupied or rental units.  (RJN, Ex. B.)  Whether a putative class member or landlord opts to take advantage of this option is an individualized decision.

1    modified at low cost to become accessible, they are no longer barriers to access. (McLaughlin Decl.,

2    Ex. A at 113:23-119:6; Ex. B at 179:25-182:1.) Plaintiffs' definition of what is or is not an

3    accessible unit ignores the modifications and accommodations to older units that routinely can and

4    do occur.

5            No reason is suggested why Plaintiffs or members of the putative class cannot pursue

6    reasonable measures to address accessibility at any unit. In essence, Plaintiffs' claim is that the

7    reasonable modification and accommodation requirements applicable to older units must be

8    completely disregarded; that whether a unit can be made accessible is irrelevant to determining

9    whether that unit is accessible. This is not a credible way to measure what is or is not an accessible

10   unit. It is directly contrary to the statutory scheme of the FHAA, ignores the City's evidence that

11   many older units are accessible, and implies that the FHAA's statutory scheme applicable to older

12   units is itself a barrier to access. There is no basis to conclude that units that can reasonably be made

13   accessible are not accessible.

14           More generally, whether a class member lives in an accessible, rent-controlled unit turns

15   on a host of individualized considerations, even beyond the fact-specific inquiry inherent in

16   analyzing a reasonable modification or accommodation. For example, Mr. Jeserich opted for his

17   current unit because he was familiar with the building; likes the location near Lake Merritt and

18   downtown Oakland because it is generally flat and has good proximity to BART; the monthly

19   rent for his unit was within his budget when he rented it in 2019; there is laundry in the building;

20   and rent control helps ensure the rent does not rise dramatically. (McLaughlin Decl., Ex. B at

21   84:2-17, 96:25-98:13, 109:1-111:25, 141:9-144:9.) He previously lived in a unit that he describes

22   as accessible and not rent-controlled. (Dkt. 52-12, ¶ 7.) But the unit was built before 1991,

23   undermining Plaintiffs' claim that all units built before 1991 are not accessible. (RJN, Ex. D.)[7]

24           On the other hand, Mr. Smith chose his unit because it is near to public transportation to

25   get to San Francisco; the unit is accessible; and price was also a factor. (McLaughlin Decl., Ex.

26

_____

27   [7] Mr. Jeserich's deposition testimony about the accessibility of this unit at 1448 Madison Street
     was more equivocal than in his declaration. He claimed he was unable to access the microwave,
28   and that because of a concern with scraping the bathroom doorway, he did not often take his
     wheelchair into the bathroom. (McLaughlin Decl., Ex. B at 123:8-124:13.)

A at 69:15-70:22.)  Notably, several common areas in Mr. Smith's building – the package lockers, a pathway in common areas, a lounge, a bike workshop, and the roof deck – are not accessible, even though the building was built after 2000.  (*Id.* at 34:1-14, 38:12-39:13, 40:8-42:14.)  This directly undermines Plaintiffs' premise that all units built after 1991 are uniformly accessible.  Mr. Smith has a complaint pending with the California Department of Fair Employment and Housing about the accessibility of the package lockers.  (*Id.* at 30:15-31:19.)

Neither Mr. Smith nor Mr. Jeserich could confirm that if he located an accessible rent-controlled unit, he would take it, because finding a *desirable* accessible rent-controlled unit – and being selected by the landlord – is based upon a host of variables.  (*Id.*, Ex. A at 89:20-92:21; Ex. B at 145:21-146:15.)  And both Mr. Smith and Mr. Jeserich confirmed that whether a building and unit is accessible is not based upon strict FHAA design guideline compliance, but is based upon whether, in the composite, the building and unit is accessible to them individually.  (*Id.*, Ex. A at 107:8-19 (Mr. Smith's current building is not fully accessible; accessibility is "not really binary" and trade-offs are always involved); Ex. B at 172:24-173:17 (living in an otherwise accessible unit with an unreachable microwave would not be an accessible unit for Mr. Jeserich, even though no FHAA requirement governs microwave placement).)

The proposed class definition also makes no allowance for Oakland renters with "mobility disabilities" who opt to live in housing that is exempt from the Rent Adjustment Program.  These exemptions include units controlled, regulated or subsidized by any governmental unit, and housing in any dormitory, nonprofit home for the aged, extended care facility or convalescent home.  OMC §§ 8.22.030.A.1-.3.  The City estimates that approximately 19,000 rental units have some form of government subsidy, a significant proportion of the roughly 96,000 rental units in the City.  (McLaughlin Decl., Ex. C at pp. 3-4.)  Many persons in senior living, extended care, or convalescent homes may have mobility disabilities, but also live in units exempt from rent control.  Single-family residences are also excluded from rent control by the Costa-Hawkins Act, and excluded from the FHAA's design and construction requirements.  Including the occupants of all of these units in the putative class, when the units they live in cannot be subject to rent control, further demonstrates a lack of commonality within the class.

1    Nor does the class definition take any account of Oakland renters with mobility

2    disabilities who may prefer to live in non-rent controlled units because they are more modern,

3    have better finishes and amenities, and because the presence of rent control is not an important

4    factor to some people, such as those who may plan to move or purchase a home in the near future.

5    The class definition presupposes that *all* Oakland renters with mobility disabilities are excluded

6    from rent-controlled housing, but no evidence is presented supporting this supposition.  The

7    variation within the proposed class is pervasive.

8         2.   Plaintiffs' Evidence Fails To Show Commonality.

9    Plaintiffs assert their claims are "capable of classwide resolution."  (Dkt. 52 at 18:20.)

10   But they never attempt to show how that is so.  The only "common evidence" they refer to is the

11   statements of Plaintiffs and the class declarants.  (*Id*. at 19:21-24 (identifying sections III(C) and

12   III(D) as Plaintiffs' evidence of common lack of meaningful and equal opportunity).)  Yet

13   Plaintiffs present no evidence that the anecdotal testimony of these declarants can support any

14   sort of reliable extrapolation to the proposed class.  *See Wal-Mart Stores, Inc*., 564 U.S. at 358

15   (120 anecdotes failed to demonstrate a companywide policy of discrimination).

16   Much of the information in these declarations is too vague to be meaningful.  For

17   example, no plaintiff or declarant states that, in order for a unit to be accessible to him or her, that

18   unit must meet the all same FHAA accessibility standards that Plaintiffs' assert should define the

19   class.  Plaintiffs claim that all plaintiffs and declarants require all basic accessibility features

20   required by the FHAA (Dkt. 52 at 8:2-10), but none of the plaintiffs or declarants actually say

21   that.

22   Nor does any plaintiff or declarant describe any attempt to pursue a reasonable

23   modification of any barrier to access, aside from Ms. Savin's successful installation of a ramp.

24   (Dkt. 52-17, ¶ 9.)  Nor is there any discussion, anywhere, about what meaningful access to the

25   Rent Adjustment Program would consist of – the central issue in this case.  Only Ms. Savin and

26   Mr. Renton declare that they desire to move to an accessible rent-controlled unit, though Mr.

27   Renton states that the rent would have to be comparable to the $1,450 he and his sister pay now,

28   and there is no evidence such an inexpensive unit exists.  (Dkt. 52-17, ¶ 11; 52-18, ¶ 10.)

1      Ms. Savin lives in a unit that is not subject to FHAA accessibility requirements (no in-law

2      units are), but the unit evidently is accessible to her, though not some of her visitors.  (Dkt. 52-17,

3      ¶¶ 8-9.)  Ms. Cannington does not disclose whether her prior one-bedroom unit was rent-

4      controlled or accessible.  (Dkt. 52-14, ¶ 4.)  Ms. Parker is a homeowner who resides in Texas and

5      is not a member of the putative class.  (Dkt. 52-15, ¶ 9.)

6      The primary access issues identified by Liv Grace and Mr. Renton are that their units are

7      on the second or third floor and only accessible by stairs.  (Dkt. 52-16, ¶¶ 4, 9-10; 52-18, ¶¶ 6-8.)

8      However, there is no requirement, under the FHAA or otherwise, that all floors of multifamily

9      housing buildings be accessible without stairs.  Rather, for multi-story buildings without elevators

10     certified for occupancy after March 13, 1991, only the ground floor units must be accessible.  *See*

11     24 C.F.R. § 100.201 (defining FHAA-covered multifamily dwellings).  Meanwhile, elevators

12     were in widespread use well before 1983.  The fact that some declarants live in second- or third-

13     floor walk-ups has absolutely no correlation with the City's Rent Adjustment Program, a

14     building's age, or with FHAA accessibility requirements.

15     Plaintiffs may assert, as they already have to a degree, that these are simply questions of

16     variation in personal accessibility needs, budgets, renting preferences, and so forth.  Plaintiffs

17     claim this is all irrelevant, because all class members "are denied the same meaningful and equal

18     opportunity to access the City's rent control Program[.]"  (Dkt. 52 at 19:21-22.)  But that

19     reasoning is circular.  Whether an individual with a mobility disability has a meaningful

20     opportunity to access the Rent Adjustment Program – i.e., to rent a unit that is covered by rent

21     control and accessible to that person – depends upon a host of variables, all of which are beyond

22     the City's purview.

23     Plaintiffs present no evidence that they can show through common proof that units built

24     prior to 1983 are uniformly inaccessible to persons with mobility disabilities.  They simply point

25     to the applicable dates of the City's rent control program, and the FHAA's accessibility

26     requirements, and assert that "it stands to reason that few if any do."  (Dkt. 52 at 7:6-7.)  This is

27     not *evidence*.  Plaintiffs' assumption is squarely refuted by U.S. Census Bureau data showing that

28     units built prior to 1983 are not uniformly inaccessible, and that units built after 1990 are not

1   uniformly accessible.  (Kennedy Decl., Tables A-C.)

2          Aside from anecdotal class member declarations, and pointing to the applicable dates of

3   the statutory rent control and accessibility schemes, Plaintiffs' only other submission related to

4   commonality is data from a "windshield survey" conducted in 2014 from which they identified

5   886 multifamily units in Oakland, claiming that of those, 658 had steps at an entrance.  (Dkt. 52

6   at 7:8-9.)  Plaintiffs do not describe the methods or purpose of this survey, or any indicia of

7   reliability.  *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc*., 618 F.3d 1025,

8   1036 (9th Cir. 2010) (survey evidence may be admitted if it is conducted according to accepted

9   principles and is relevant).[8]  By its terms, this was a survey of the condition of housing stock as

10  visible from the exterior, not an accessibility survey.  (Dkt. 53-3 at p. 5.)  There is no evidence

11  that a survey of this size and method permits any sort of reliable conclusion about the

12  accessibility of all of Oakland's rental housing stock.  Meanwhile, as Mr. Jeserich testified, the

13  presence of stairs is not a reliable indicator of accessibility, as a building with stairs at one

14  entrance may have other entries accessible by elevator or at street level.  (McLaughlin Decl., Ex.

15  B at 113:10-114:14.)[9]  And as Mr. Smith testified, and the FHAA contemplates, a ramp can be

16  installed.  (*Id*., Ex. A at 64:16-65:10.)

17         Further, Plaintiffs' claim that 74% of these units surveyed had steps at the entrance

18  implies that 26% did not.  At the same time, Plaintiffs claim that 3.822% of Oakland renter

19  households have a person with a wheelchair or similar mobility aid.  (Dkt. 52-9, ¶ 48.)  The most

20  logical implication is that far more rental units in Oakland are accessible – at least as far as entry

21  steps go – than the proportion of renters who use wheelchairs would require.

22  _____

23  [8] The City recognizes that evidence need not be strictly admissible to be considered at class
    certification.  *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1004-06 (9th Cir. 2018).  But the
24  lack of any foundation, or evidence of reliability or methodology of this survey, indicates it has
    little probative value on any issue of import in this case.  This survey is not "sufficient to form a
25  reasonable judgment" on any Rule 23(a) requirement.  *Id*. (quoting *Blackie v. Barrack*, 524 F.2d
    891, 900-01 (9th Cir. 1975)).

26  [9] This comports with FHAA guidelines, which require that covered units have at least one
    accessible entrance.  (RJN, Ex. C at p. 1.10)  Plaintiffs' counsel claims this survey found that 658
27  multifamily buildings are "accessible only by steps" (Dkt. 52-1, ¶ 17), but according to the
    summary of the survey Plaintiffs submit, the survey assessed whether "the *main entry* was
28  accessible from the street only by steps."  (Dkt. 53-3, p. 6 (emphasis added).)

3.   The Rent Adjustment Program Is Not A Centralized Policy Addressed To Accessibility Of Rental Units.

Putting aside Plaintiffs' failure to put on any evidence that the alleged common questions in this case can be resolved by common answers, the most fundamental problem is that Plaintiffs' challenge to the Rent Adjustment Program, and the alleged lack of rent-controlled accessible units, are one step removed from each other.  The indirect connection between the policy or practice that is challenged, and the alleged harm or lack of accessibility, precludes a finding of commonality.  Numerous cases are in accord.

In *Wal-Mart Stores, Inc.*, the plaintiff class alleged a pattern or practice of discriminatory employment decision-making.  However, these discriminatory decisions were not made pursuant to a centralized policy, but were regional and decentralized.  "Because respondents provide no convincing proof of a companywide discriminatory pay and promotion policy, we have concluded that they have not established the existence of any common question."  564 U.S. at 359.  Here, as in *Wal-Mart Stores, Inc.*, "Without some glue holding the alleged reasons for all those decisions together, it will be impossible to say that examination of all the class members' claims for relief will produce a common answer to the crucial question" of why a class member does not live in an accessible, rent-controlled unit.  *Id*. at 352.

Several cases are similar in the context of disability class actions.  In *Civil Rights Educ. & Enforcement Ctr.*, the defendant real estate investment trust owned 142 hotels, but did not manage or operate them, and there was no evidence of a centralized or common policy that led to the operation of hotel shuttle services in a manner that violated the ADA.  867 F.3d at 1103-05.  "[F]actual issues regarding alleged ADA violations are significantly different at the various hotels" and "merely pointing to a pattern of harm, untethered to the defendant's conduct, is insufficient."  *Id*. at 1104.[10]  The same is true here:  the factual issues governing access to class

---

[10] As this district court noted, "while many of Defendant's properties may not be in compliance with the ADA, the manner in which they are potentially out of compliance, and the proof of that non-compliance, differs significantly from property to property."  *Civil Rights Educ. & Enforcement Ctr.*, 317 F.R.D. at 101.  As demonstrated by the declarations Plaintiffs submit, the same is true here with regard to the accessibility of the class members' rental units (although further dispersing the issue, none of the units in question in this case are the City's property).  Whether a unit is meaningfully accessible to a tenant depends on the features of that unit, the needs of that tenant, and the actions of the tenant and landlord.

DEFENDANT CITY OF OAKLAND'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

4:19-cv-05398 JST

1   members' rental units, and thereby access to the Rent Adjustment Program, vary significantly

2   from person to person, and are not tied to any common policy of the City.

3   In *Castaneda v. Burger King Corp.*, 264 F.R.D. 557 (N.D. Cal. 2009), there was no

4   centralized policy governing accessibility at 92 different Burger King locations, precluding a

5   finding of commonality.  *Id*. at 568.  Again, as in that case and the *Civil Rights Educ. &*

6   *Enforcement Ctr.* case, here there is no centralized decision-maker or uniform policy on the

7   accessibility issues driving Plaintiffs' claims.  The City has no hand in deciding what units are or

8   are not accessible or in regulating accessibility at all.[11]

9   This is not, as Plaintiffs assert, simply a difference in how discrimination might affect the

10   members of the putative class.  (Dkt. 52 at 19:7-20:2.)  It is a difference in whether there is a

11   denial of access at all, and whether that denial of access was caused by the Rent Adjustment

12   Program.  And it is based on thousands of landlord-tenant relationships around the City, each of

13   which presents a myriad of individual circumstances.

14   Plaintiffs' claims are not like other ADA or civil rights cases where class certification has

15   been granted.  For example, in *Gray v. Golden Gate Nat'l Rec. Area*, 279 F.R.D. 501 (N.D. Cal.

16   2011), the challenge was to a series of access barriers all owned, maintained, and controlled by

17   the defendant.  In *Californians for Disability Rights, Inc. v. Cal. Dep't of Transp.*, 249 F.R.D.

18   334, 346 (N.D. Cal. 2008), the challenge was to the defendant's "use of improper design

19   guidelines and the failure to ensure compliance with even those deficient guidelines" on its own

20   premises.  In *Gonzalez v. U.S. Immigration & Customs Enforcement*, 975 F.3d 788 (9th Cir.

21   2020), the government policy at issue was for its agents to arrest based upon less than probable

22   cause.  In *Parsons v. Ryan*, 754 F.3d 657 (9th Cir. 2014), government policies systematically and

23   directly exposed inmates to harm.  In *Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir. 2001), a

---

[11] Frankly, the City's role in regulating the rental increases of certain private units is like regulating or licensing any other private conduct.  Public entities are not liable under Title II for regulating businesses or activities that may be inaccessible.  *See Noel v. N.Y. City Taxi & Limousine Comm'n*, 687 F.3d 63, 65-74 (2d Cir. 2012) (rejecting claim that city violated Title II because there were "too few accessible taxis in New York City" despite city's "pervasive control over the taxi industry").  While this may be primarily a merits issue, it also illustrates the lack of commonality, because there is inherently great variation in accessibility of rental housing – something not subject to any centralized City policy or procedure.

DEFENDANT CITY OF OAKLAND'S OPPOSITION TO                          4:19-cv-05398 JST
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

1    systematic policy directly impacted disabled parolees.

2          In each of these cases, the challenged policy directly harmed or operated upon the plaintiff

3    class.  That is not so here.  Plaintiffs' claims are centered on the accessibility of rental units – not

4    the accessibility of the rent control program itself.[12]  Whether the Rent Adjustment Program is

5    inaccessible **must turn on** whether rent-controlled units are inaccessible.  And the answer to that

6    question lies only in an individualized inquiry into whether a particular unit is accessible to a

7    particular individual, based on that individual's accessibility needs and the complex set of factors

8    that go into selecting and being accepted to rent a particular unit, and other factors that go into

9    determining whether to modify a unit that may otherwise have a barrier to access.  None of these

10   issues are common to the putative class.

11   **C.      Plaintiffs' Claims Lack Typicality.**

12         "The commonality and typicality requirements of Rule 23(a) tend to merge."  *Gen. Tel.*

13   *Co. of Sw. v. Falcon*, 457 U.S. 147, 157 n. 13 (1982).  Where injuries are not incurred due to a

14   common policy, the named plaintiffs' claims lack typicality of those alleged by the class.  *Civil*

15   *Rights Educ. & Enforcement Ctr.*, 317 F.R.D. at 103.  "By contrast, the cases… finding typicality

16   where plaintiffs alleged violations of the ADA across many locations each involved an alleged

17   common policy or practice instituted by a single defendant operating each of the accommodations

18   in question."  *Id.* (citations omitted).

19         For all the reasons discussed above, the same is true here.  There is no common policy

20   creating any lack of access to the members of the class.  Whether any class member lives in a rent

21   controlled accessible unit is dependent on a vast number of variables, having very little to do with

22   the Rent Adjustment Program.  These include, amongst other things, whether the mobility

23   disability is permanent or temporary; whether the tenant is a wheelchair user and requires a unit

24   _____

25   [12] The Court rejected this view of Plaintiffs' claims in denying the City's motion to dismiss,
     finding that Plaintiffs' claims were about a lack of access to the Rent Adjustment Program, not a
     lack of access to housing.  (Dkt. 38 at 8:10-12, 14:20-22.)  However, this case is no longer at the
26   pleading stage.  Essentially all of the evidence submitted with Plaintiffs' class certification
     motion demonstrates that this is a case about the accessibility of housing – something inherently
27   decentralized and not within the purview of the Program.  Put differently, Plaintiffs point to
     nothing about the Rent Adjustment Program that is inaccessible, except that the housing it covers
28   is allegedly not accessible.  (Dkt. 52 at 18:8-11.)

1    accessible by wheelchair; whether the tenant has pursued any reasonable modifications to the unit

2    to improve accessibility; whether the tenant has any interest in a unit covered by rent control, or

3    prefers an exempt unit for a variety of reasons; and whether, should the tenant locate a rent-

4    controlled accessible unit, the tenant would have the income to pay market rate or would choose

5    the unit based on its location, amenities, lease terms, and a host of other variables.  Plaintiffs fail

6    to show that the considerations driving accessibility of the named plaintiffs' rental units are

7    typical of the considerations driving accessibility of the remaining rental units in the City.

8    **D.    Plaintiffs Fail To Demonstrate Numerosity.**

9         "The central question [with regard to numerosity] is whether Plaintiffs have sufficiently

10   identified and demonstrated the existence of the numbers of persons for whom they speak."

11   *Schwartz v. Upper Deck Co.*, 183 F.R.D. 672, 680-81 (S.D. Cal. 1999); *see also P.P. v. Compton*

12   *Unif. Sch. Dist.*, No. CV 15-3726-MWF (PLAx), 2015 WL 5752770, at * 9 (C.D. Cal. Sept. 29,

13   2015) (finding lack of numerosity due to lack of a "link between the statistics presented and the

14   class definition").

15        Because of the defects discussed above in the proposed class definition, it cannot be

16   determined who is in or not in the class.  Plaintiffs do not define what a "mobility disability" is, or

17   explain why all Oakland renters with such a disability necessarily need an "accessible unit."

18   Plaintiffs do not identify a single person who needs a unit meeting all FHAA accessibility

19   standards, while claiming those are the standards that should define an "accessible unit."  Nor do

20   Plaintiffs present evidence identifying all persons denied a meaningful opportunity to utilize the

21   City's Rent Adjustment Program, which turns upon a highly variable set of factors.  Plaintiffs'

22   efforts to identify the number of all renters with mobility disabilities, and all renter households

23   with at least one person with a mobility disability, do not address these concerns.

24   **E.    The Requested Injunction Will Not Provide Relief To Many Class Members,
        And Will Impact Many Persons Not In The Class.**

25        Rule 23(b)(2) applies "only when a single injunction or declaratory judgment would

26   provide relief to each member of the class."  *Wal-Mart Stores, Inc.*, 564 U.S. at 360.  The relief

27   must be from a practice "applicable to all of them."  *Rodriguez v. Hayes*, 591 F.3d 1105, 1125

28

1   (9th Cir. 2010).  In other words, the injunctive relief sought must be "appropriate for the *class as*

2   *a whole*."  *Schulken v. Wash. Mut. Bank*, No. 09-CV-02708-LHK, 2012 WL 28099, at *7 (N.D.

3   Cal. Jan. 5, 2012) (emphasis in original).

4         Here, many putative class members – such as those who live in rental units exempt from

5   rent control for reasons other than the January 1, 1983 cut-off date – do not suffer the exclusion

6   from rent control that Plaintiffs allege, and would obtain no relief from the requested injunction.

7   And as discussed above, there is no evidence that class members who do not use a wheelchair

8   require a unit that is wheelchair-accessible, and would benefit at all by the relief Plaintiffs seek.

9   Nor would those with temporary mobility disabilities benefit.  "The problem here is not that some

10  class members may not have been injured, but that many of them do not stand to benefit from and

11  would not be affected by any injunction."  *Hostetler v. Johnson Controls, Inc.*, No. 3:15-CV-226

12  JD, 2018 WL 3868848, at *10 (N.D. Ind. Aug. 15, 2018) (citation omitted).

13        On the other hand, the relief sought would directly apply to many Oakland renters who do

14  not have mobility disabilities.  In fact, far more people outside the class would be impacted by the

15  requested injunction than those inside the putative class.  While the proper scope of injunctive

16  relief may be a merits issue, nonetheless the substantial impact on non-parties of Plaintiffs'

17  proposed injunction further illustrates that the relief sought is not appropriate for the class as a

18  whole.

19                          **V.   CONCLUSION**

20        For the foregoing reasons, Defendant City of Oakland respectfully requests that Plaintiffs'

21  motion for class certification be denied.

22                          Respectfully submitted,

23  Dated:  November 13, 2020

24                          BARBARA J. PARKER, City Attorney

25

26        By:   /s/ Kevin P. McLaughlin
              KEVIN P. MCLAUGHLIN, Supervising Deputy City Attorney
27            Attorneys for Defendant
              CITY OF OAKLAND

28

DEFENDANT CITY OF OAKLAND'S OPPOSITION TO                    4:19-cv-05398 JST
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION