# EXHIBIT C



CITY OF OAKLAND

# AGENDA REPORT

| | | | |
|---|---|---|---|
| **TO:** | Edward D. Reiskin<br>City Administrator | **FROM:** | Shola Olatoye<br>Director, HCDD |
| **SUBJECT:** | RAP Annual Report 2018-19 and<br>2019-20 | **DATE:** | February 1, 2021 |

City Administrator Approval                          Date:

## RECOMMENDATION

**Staff Recommends That The City Council Receive The Annual Report Of The Rent Adjustment Program For Fiscal Years 2018-19 And 2019-20.**

## EXECUTIVE SUMMARY

The preparation of an Annual Report to the City Council regarding the status of the Rent Adjustment Program (RAP) is mandated in Oakland Municipal Code (O.M.C.) Section 8.22.050.A with required components identified pursuant to Measure JJ, approved by voters in November 2016.  The last Annual Report presented to the City Council covered four years, from July 1, 2014 through June 30, 2018.  The hiring of the new RAP manager in October 2018 created the capacity to complete the delinquent reports and bring them current through fiscal year 2017-18. The report was presented to the Council in April 2019 and therefore did not include data for fiscal year 2018-19. As such, this report includes both fiscal years 2018-19 and 2019-20.

Fiscal years 2018-19 and 2019-20 were extremely productive for the Rent Adjustment Program. RAP increased internal efficiencies and targeted outreach strategies that applied an equity framework to increase the services provided to the community.  Significant achievements during the reporting period are detailed below, and include:

- Robust community outreach and educational programming
- Creation and distribution of numerous informational materials (information sheets, postcards, and guides) regarding the rent program and Oakland's rental housing laws
- Increased availability of holistic housing counseling services
- Eliminated the backlog of appeals cases and processing of petitions
- Partnering with the Neighborhood Law Corps to combat false owner move-in evictions and tenant harassment

Following the Background section below, the Annual Report provides information on the following areas for the reporting period:

City Council
March 2, 2021

P001144

Edward D. Reiskin, City Administrator
Subject:  RAP Annual Report 2018-19 and 2019-20
Date: February 1, 2021                                                                 Page 2

1. Policy
2. Community Outreach and Education
3. Petitions and Appeals
4. Rent Board Activities
5. Financial Reporting

## BACKGROUND/LEGISLATIVE HISTORY

In 1980, the Oakland City Council adopted Ordinance No. 9980 C.M.S., which established the Housing, Residential Rent Arbitration and Relocation Board (The Board) and the Rent Adjustment Program (RAP). Since then, the Ordinance has been amended many times. The current Ordinance (O.M.C. Section 8.22.010 et seq.) regulates most residential rent increases in Oakland. Additionally, in 2002, the Oakland voters passed the Just Cause for Eviction Ordinance, requiring a property owner to prove one of the eleven just causes before they could evict a tenant (O.M.C. Section 8.22.300 et seq.).

The Oakland Rent Adjustment Ordinance and Oakland's Just Cause for Eviction Ordinance respond to a severe and longstanding housing market failure in Oakland and in the surrounding Bay Area. In a genuinely competitive market where an adequate supply of housing increases as demand increases, competition would hold rents down to the minimum necessary to cover the operational costs and also provide property owners with a reasonable profit. Instead, Bay Area rents reflect the scarcity in a market where supply has failed to increase with demand for the past two decades, making rents among the highest in the United States. Under such circumstances, tenants are easily taken advantage of unless protected by strong and effective regulation. Together, the Rent and Just Cause for Eviction Ordinances were intended to mitigate this phenomenon, maintain affordable housing, preserve community diversity, prevent illegal rent increases and evictions, and encourage investment in rental property in Oakland.

The mission of the RAP is to promote community stability, healthy housing, and diversity for Oakland residents while preventing illegal rent increases and evictions and ensuring a fair return for property owners.

At its core, the RAP is about housing stability. Community stability and diversity are supported through safe, healthy, affordable housing. Excessive rent increases can have a devastating effect not only on the individual but also on the entire community. They force thousands of Oakland residents to choose between spending over half their income on rent, foregoing other necessities, or moving far away from jobs and community ties. For many, none of these choices are viable, and homelessness becomes the only option. The COVID-19 crisis has not only exacerbated this problem but has also made it even clearer that there is a need for a strong protective framework. As such, rent control and rent control agencies are necessary components to anti-displacement policy.

### *Program Highlights and Achievements*

The following are significant highlights and staff achievements from this reporting period (fiscal years 2018-19 and 2019-20):

Edward D. Reiskin, City Administrator
Subject:  RAP Annual Report 2018-19 and 2019-20
Date: February 1, 2021                                                                                    Page 3

- ***Community Outreach, Education, and Housing Counseling Services***
    - Staff facilitated fourteen (14) workshops and town halls for tenants and property owners, including one (1) Spanish-speaking workshop.
    - Staff engaged in targeted outreach to small property owners and facilitated two (2) workshops for East Bay Rental Housing Association members.
    - Staff engaged in targeted outreach to local real estate professionals and presented a workshop on new developments in Oakland rental housing laws for the Oakland/Berkeley Association of Realtors.
    - Staff engaged in targeted outreach to the African American community and facilitated two (2) tenants' rights presentations, one in East Oakland and another in West Oakland.
    - RAP staff attended thirteen (13) community events such as Art + Soul, Dia de los Muertos, and the Chinatown Street Festival.
    - In-house counseling hours for the public increased from twelve (12) to thirty-five (35) hours per week. This allowed RAP housing counselors to provide holistic housing counseling to approximately 8,200 community members.
    - Staff published and widely distributed information sheets on multiple topics and a "Guide to Oakland's Rental Housing Law."
    - Staff participated as panelists for five (5) town hall meetings on the local Emergency Moratorium on evictions.
    - Staff created and distributed an informational postcard on the local Emergency Moratorium to 22,000 property owners and 8,000 Oakland tenants targeting those with the highest risk for eviction based on an equity analysis.
    - Staff created an informational postcard on state and local rent control and eviction protections which will be mailed this month to Oakland tenants.
    - Staff created Wednesday evening drop-in housing counseling at local libraries throughout the city which include the Asian, 81st Avenue, Cesar Chavez, and West Oakland Branches.  Due to the Covid-19 Shelter- In-Place Order, the hours were temporarily suspended in April 2020.  RAP will begin online drop-in hours in partnership with the public libraries in February 2021.

- ***Hearings Process Improvements***
    - Staff eliminated the appeals cases backlog that was waiting to be adjudicated by the Board. In fiscal year 2018-19, there were approximately ninety-seven (97) backlogged appeals. To date there are none.
    - Staff eliminated the backlog in processing petitions and as follows:
        - In January 2019, it took nine (9) months to process petitions from the point of receipt to setting up a hearing. By the end of 2019, petitions were processed within one week.
        - In January 2019, it took five (5) months to schedule appeal hearings. By the end of the year, and to date, they are now being scheduled within thirty (30) days.

- ***Compliance Activities:*** Compliance activities have been put in place, including monitoring compliance with owner move-in requirements. Specifically:
        - Targeted mailings are sent to tenants who have received a no-fault eviction notice. These mailings provide information on tenants' rights including

> entitlement to relocation benefits and how to access attorney services to
> bring a private right of action against a property owner carrying out a false
> owner move-in.
> ▪ RAP has partnered with the Neighborhood Law Corps to combat false owner
>   move-in evictions, tenant harassment, and connect tenants with legal
>   providers when a false owner move-in eviction is identified.
> ▪ Staff engaged the Fuse Fellowship program to explore the implementation of
>   a Rent Registry which will enhance enforcement and prevent illegal rent
>   increases. RAP expects to present its recommendations to the City Council
>   mid-2021.

In addition, staff launched a landlord/tenant mediation program to help resolve landlord/tenant
related conflicts without a formal adjudicative process.  Specifically, the aim of the program
during the Covid-19 pandemic was to provide a method to assist landlords and tenants in
negotiating re-payment agreements for unpaid rent accrued during the pandemic.

### *The Structure of the Rent Adjustment Program*

The Rent Ordinance defines the RAP as "the department in the City that administers (the
Ordinance) and also includes the Board." (O.M.C. Section 8.22.020). The Rent Board is a
quasi-judicial body, composed of seven (7) full members and seven (7) alternate members
appointed by the Mayor and confirmed by City Council. The Board hears appeals and enacts
regulations and policies to further the administration of the Oakland Rent Ordinance and the
Just Cause for Eviction Ordinance.

Generally, there are two models of how to approach regulation of the property owner-tenant
relationship: passive enforcement and active enforcement. The passive enforcement approach
enforces regulations only in response to complaints, which usually find their way to the
regulatory agency only in egregious cases or where tenants have contact with an advocacy
organization. The active enforcement approach uses extensive outreach to inform tenants and
owners about their rights and obligations under the law and program regulations, maintains full
and accurate records through reporting requirements for initial rents and eviction proceedings,
provides mediation and dispute resolution services, and actively enforces the law and program
regulations when it finds violations. RAP has transitioned to an active enforcement model of rent
regulation during the reporting period.

In April 2019, the City Council increased the RAP fee from $63 to $101 to enable the program
to transition to the active enforcement model, increasing staffing from sixteen (16) to twenty-six
(26) full-time equivalent staff (FTEs).  During the reporting period, RAP experienced significant
restructuring to implement this model and is now divided into three distinct units: Administration
and Policy (7 FTEs), Community Engagement and Enforcement (8 FTEs), and Hearings
(11FTEs) (*Attachment A*).

The Community Engagement and Enforcement Unit (CEE) conducts extensive outreach to
inform property owners and tenants of their rights and obligations through targeted mailings,
informational postcards, and other print materials. CEE holds workshops for property owners,
tenants, and the local real estate community. For example, during the reporting period,
workshops included conflict resolution for property owners and tenants, tenants' rights, and
property owner 101, among others. CEE staff additionally held a targeted workshop specifically

for small property owners after the City Council eliminated the duplex/triplex exemption so that this community could have additional assistance navigating Oakland's rental housing laws. More than sixty (60) owners attended this workshop, and they expressed appreciation for the comprehensive presentations. During the reporting period, CEE staff members provided holistic housing counseling to approximately 8,200 community members and increased its internal processes' efficiencies. CEE sends information on the eviction for good cause requirements to tenants who have received a no-fault eviction notice. Although the Rent Program's current software does not provide detailed statistics, staff know that volume of inquiries and counseling has increased substantially over the past three (3) years as the economic situation has worsened.

The Hearings Unit, with eleven (11) FTE, includes five (5) Hearing Examiners and one (1) Senior Hearing Examiner who handles situations in which conflict has arisen between a property owner and a tenant. Community feedback regularly applauds the Hearings Unit for its fair and impartial adjudication of the Rent Ordinance. During this two-year reporting period, staff held hearings on 1,531 petitions for rent reductions or rent increases. In addition, the Hearings and CEE units jointly conduct a mediation program.

The Administrative/Policy Unit, with eight (8) FTE, includes the Program Manager and Assistant Program Manager who are responsible for providing leadership and managing the program, hiring and promotions, and adjudicating grievances and disciplinary actions. They also maintain effective relations with elected officials, other City departments, and the public. The unit is also responsible for office administration, staffing meetings of the Board, and conducting research, analysis, and producing reports.

## ANALYSIS AND POLICY ALTERNATIVES

O.M.C. Section 8.22.250.A (**Attachment B**) specifies the requirements for the RAP Annual Report to City Council. This Annual Report is comprised of data and information for two fiscal years from July 1, 2018 through June 30, 2020. This report addresses O.M.C. Section 8.22.250.A, along with other information, and is divided into the following sections:

1. Policy
2. Community Outreach and Education
3. Petitions and Appeals
4. Rent Board Activities, Meetings, and Attendance
5. Financial Reporting

**1. Policy**

The following policies related to rent adjustment, just cause for eviction, and related matters were adopted during the reporting period, including effective dates.

*A. Oakland Laws*

Fair Chance Ordinance No. 13581 C.M.S (February 4, 2020)

Prohibits owners from screening tenants based on criminal history or making rental decisions based on a tenant's criminal record. The ordinance applies to all rental units

except owner-occupied properties of three units or fewer. Federally subsidized or state subsidized properties will be allowed to screen for criminal history only to the extent required by federal or state law.

COVID-19 Eviction Moratorium Ordinance No. 13589 C.M.S. (March 27, 2020, last extended by Ordinance No. 13594 on July 21, 2020)

1. Prohibits all evictions in units covered by the Just Cause for Eviction Ordinance during the local Covid-19 emergency, except if the eviction is necessary for the health and safety of other occupants.
2. Prohibits eviction for non-payment of rent that accrued from March 2020 until the end of the local emergency, if the non-payment is due to Covid-19.
3. Prohibits rent increases above the annual CPI adjustment.
4. Amended the Just Cause for Eviction Ordinance to add defense if the owner impeded. (July 21, 2020)

### B. State Law

Assembly Bill (AB) 1482 (Tenant Protection Act of 2019, effective January 2020)

1. Caps rent increases statewide to five (5) percent plus change in Consumer Price Index (CPI).
   a. For Oakland, the cap is 6.1 percent until July 2021.
   b. The cap will be recalculated for rent increases effective on or after August 2021. The calculation will use the CPI change from April 2020 to April 2021 (see explanation of the amendment in AB 3088).
2. Created statewide Just Cause eviction protections.
3. The rent increase protections and Just Cause protections will apply to most rental properties except:
   a. Owner-occupied duplexes and single-family homes not owned by a corporation.
   b. Units with certificate of occupancy issued within the last fifteen (15) years.

### C. Federal Law

Centers for Disesase Control (CDC) Eviction Moratorium

Until December 31, 2020, this law prohibits eviction of tenants who submit a CDC declaration to the landlord. AB 3088 and Oakland's local eviction moratorium will usually be more protective of the tenant.

### 2. Community Engagement and Enforcement

### A. Outreach and Education Delivered Using and Equity Approach

Outreach and Education are crucial components to actively enforcing the rent ordinance and eviction protections.  Both tenants and property owners must first understand their rights and responsibilities in order to have access to the protections afforded under the law.

It is well established that African-Americans, Indigenous, Latinx, and communities where English is a second language are disproportionately affected by the housing crisis.  As such, RAP applied an equity approach to outreach in order to target those most vulnerable and with the highest risk of displacement.

During fiscal years 2018-19 and 2019-20, RAP dramatically expanded its community outreach efforts. RAP conducted workshops for property owners and tenants and distributed information at community events and festivals throughout the city in neighborhoods including deep east Oakland, West Oakland, Chinatown, Fruitvale, and Temescal.  Staff sent mailings to over 30,000 households, created more than twelve (12) new information sheets in multiple languages, and more than doubled drop-in counseling hours for tenants and property owners. Staff also began facilitating targeted evening drop-in hours at the 82nd Ave., West Oakland, Ceasar Chavez, and China Town Oakland Public Library branches in order to better serve community members who work during the day and are unable to visit or call RAP during business hours.  This service was temporarily suspended due to the Covid-19 pandemic but will transition to virtual library office hours in early 2021.

### B. Workshops

During this two-year reporting period, RAP staff conducted more workshops than had been conducted in the last several fiscal years combined, as illustrated in **Table 1** below. Specifically, RAP facilitated and presented twenty (20) workshops and at town halls for tenants and property owners, including five (5) specifically related to the Covid-19 pandemic and the City's Eviction Moratorium. RAP staff engaged in targeted outreach aimed at small property owners and facilitated two workshops for the East Bay Rental Housing Association members. RAP staff also engaged in targeted outreach aimed at local real estate professionals and presented a workshop on new developments in Oakland rental housing laws for the Oakland/Berkeley Association of Realtors. RAP expanded efforts in targeted outreach aimed at the African American community and facilitated two (2) tenants' rights presentations, one in East Oakland and another in West Oakland.

**Table 1: Community Workshops and Townhalls Meetings: FY 2014/15 – FY2019/20**



### C. Community Outreach

The number of community events that RAP staff attended increased by eighty percent (80%) in fiscal year 2018-19. RAP staff was scheduled to attend a larger number of community outreach events in fiscal year 2019-20, however, due to the Covid-19 pandemic, five (5) events were

P001294

canceled.  **Table 2** Illustrates the increased community outreach during reporting period, and *Attachment C* provides a full list of workshops and community events.

RAP staff participated in outreach events in diverse neighborhoods across the City of Oakland. Staff performed on-site housing counseling at community festivals including Art + Soul, the Juneteenth Celebration, the Chinatown Street Festival, Rockridge Out and About, Octoberfest, and the Día de los Muertos Celebration in Fruitvale. At each event, in addition to answering questions about rent control, evictions, and other housing issues, RAP staff distributed information about RAP and its services.

**Table 2: Number of Community Events**



Number of Community Events

### D.  Drop-in Counseling

The Rent Adjustment Program provides holistic, non-advocacy housing counseling, helping both property owners and tenants navigate landlord-tenant issues and connecting them to additional resources when necessary.  At the beginning of fiscal year 2018-19, RAP was open to the public only twelve (12) hours a week, but since then the hours have more than doubled. RAP is now open for drop-in counseling for a total of thirty-one (31) hours a week.  Counseling is currently conducted remotely through phone and email communication

As the number of hours and community presence increased, the number of tenants and property owners seeking housing counseling increased as well. During fiscal year 2018-19, the average number of counseling sessions was 262 per month. In fiscal year 2019-20, this number almost doubled to an average of 421 per month.

### E.  Publications

During fiscal years 2018-19 and 2019-20, RAP created sixteen (16) new information sheets on topics such as security deposits, rent control, the Emergency Moratorium, and evictions protections. Information sheets are translated into Spanish and Chinese and are available on the RAP website (https://www.oaklandca.gov/topics/rent-adjustment-program). In 2019, staff also published the Guide to Oakland Rental Housing Law, which is a comprehensive overview of local and state laws. The Guide is available in Spanish, English, and Chinese.

Edward D. Reiskin, City Administrator
Subject:  RAP Annual Report 2018-19 and 2019-20
Date: February 1, 2021                                                                                          Page 9

In August 2019, staff created an informational postcard about the changes in the law affecting owner-occupied duplexes and triplexes. This postcard, which outlined owners' new rights and responsibilities, was sent to over 8,000 households in Oakland.

A second postcard about the Emergency Moratorium Ordinance, which highlighted the eviction, rent increase, late fees, and Good Samaritan sections of the Ordinance, was sent to roughly 22,000 property owners. In the absence of a rental registry of tenancies in the City of Oakland, RAP determined the best approach would be to apply a racial equity lens to a targeted mailing campaign, and sent the information postcard to 8,000 tenants in highly impacted areas based on data.  A rent registry would facilitate a complete mailing to all registered tenancies.

### F.  Legal Services

In the past two fiscal years, RAP contracted with two legal service providers: Centro Legal de la Raza (Centro) and Housing and Economic Rights Advocates (HERA). Centro provided legal assistance to tenants and offered in-house counseling and workshops to tenants in coordination with RAP. HERA provided legal advice and counseling and presented workshops to small property owners. Both service partners have made adjustments to assist the community remotely via phone and email since the Covid-19 pandemic began.

### G.  Response to Covid-19 Pandemic

On March 27, 2020, the Oakland City Council adopted the Covid-19 Eviction Moratorium Ordinance No. 13589 C.M.S.  imposing a moratorium on residential evictions, rent increases above the CPI amount of 2.7 percent, and prohibiting late fees during the Covid-19 pandemic. Staff has worked to inform the community about the moratorium and to answer tenant and owner questions on virtual platforms.

Shifts in outreach in response to the pandemic include:
- Remote counseling by phone and email.
- Counselors received specialized training on the moratorium.
- Coordination with Centro and HERA to continue supporting community outreach efforts virtually.
- Planning for virtual workshops and training.
- Postcard mailing for tenants and owners
- Emergency Moratorium information sheet and frequently asked questions (FAQ)
- Increased referrals to Neighborhood Law Corps for concerns about potential moratorium violations and tenant harassment.
- Regular website updates, including a banner with moratorium information.

### H.  Eviction Tracking and Enforcement

Evictions Notices

The Just Cause for Eviction Ordinance requires property owners to file a copy of every eviction notice served to residents of a covered unit within ten (10) days of service with RAP. RAP has been receiving a decreasing number of notices, as depicted in **Table 3** below. The decreased number of eviction notices may be the result of an increase in rent increase notices that cause tenants to move out prior to receiving an eviction notice for nonpayment of

City Council
March 2, 2021
P001152

Edward D. Reiskin, City Administrator
Subject:  RAP Annual Report 2018-19 and 2019-20
Date: February 1, 2021                                                                                    Page 10

rent. Additionally, significant decreases occurred after the adoption of the Emergency Moratorium in response to the Covid-19 pandemic (**Table 4**). Prior to the adoption of the moratorium, the program received approximately 250 eviction notices per week. This number dropped dramatically to approximately 35-40 notices per month after the City Council adopted the Emergency Eviction Moratorium.

**Table 3: Total Eviction Notices Received Fiscal Years 2018-19 and 2019-20**

| Fiscal Year | Number of Notices Received |
|---|---|
| 2018 -19 | 6,714 |
| 2019-20 | 4,696 |

**Table 4: Eviction Notices Received After City Council Adopted the Emergency Moratorium**

| Notices | Mar (27-31) | April | May | June | Total |
|---|---|---|---|---|---|
| Pay or quit | 0 | 57 | 17 | 15 | 89 |
| Cure violations | 4 | 4 | 0 | 0 | 8 |
| Change of Tenancy | 0 | 1 | 0 | 0 | 1 |
| Notice to Cease | 1 | 0 | 2 | 3 | 6 |
| Belief of Abandonment | 0 | 0 | 1 | 0 | 1 |
| OMI | 0 | 0 | 1 | 0 | 1 |
| Ellis | 0 | 0 | 1 | 1 | 2 |
| Claimed exemption | 0 | 1 | 0 | 1 | 2 |
| Resident Intent to vacate | 0 | 0 | 0 | 1 | 1 |
| Quit Nuisance | 0 | 0 | 0 | 4 | 4 |
| Quit (health & safety) | 0 | 0 | 0 | 4 | 4 |
| **Total** | **5** | **63** | **22** | **29** | **119** |

**Tables 5, 6**, and **7** Provide information on Ellis Act and Other No-Fault Evictions.

Edward D. Reiskin, City Administrator
Subject:  RAP Annual Report 2018-19 and 2019-20
Date: February 1, 2021                                                                        Page 11

**Table 5: Ellis Act Eviction Notices**

| Fiscal Year | Number of Notices Received |
|---|---|
| 2018-19 | 26 |
| 2019-20 | 10 |

**Table 6: No-Fault – Owner/Relative Move-In Evictions**

| Fiscal Year | Number of Notices Received |
|---|---|
| 2018-19 | 71 |
| 2019-20 | 54 |

**Table 7: No-Fault – Relocation for Necessary Repairs**

| Fiscal Year | Number of Notices Received |
|---|---|
| 2018-19 | 20 |
| 2019-20 | 10 |

<u>Tenant Move-Out Agreements</u>                    .

In January 2018, City Council adopted the Tenant Move-Out Agreement Ordinance No. 13483
C.M.S. which defines the requirements for property owners if they wish to offer a tenant
compensation to vacate their rental unit. RAP tracks owner filings and compliance requirements
under the Ordinance. Property owners are required to provide a disclosure form to tenants prior
to negotiating a move-out agreement. This disclosure informs the tenants of their rights. These
rights include a tenant's right to refuse a move-out offer, and if the property owner re-opens the
negotiations within six months of the tenant's refusal, this constitutes harassment under the
City's Tenant Protection Ordinance. The property owner must also provide a Pre-Move Out
Negotiation Disclosure form to the City regarding their intent to negotiate a move-out
agreement. Owners are not required to send the City a copy of their Move-Out Agreement if
successful, but some have.

In fiscal year 2018-19, staff received 425 Disclosure Certification forms and 98 Agreements that
provide for payments in amounts ranging from $2,500 to $125,000. In fiscal year 2019-20, staff

P001298

Edward D. Reiskin, City Administrator
Subject: RAP Annual Report 2018-19 and 2019-20
Date: February 1, 2021                                                    Page 12

received 221 Disclosure Certification forms and 62 Agreements that provide for payments in amounts ranging from $6,560 to $75,000.

### 3. Hearings and Appeals

#### A. Petitions Filed

Through the petition process, tenants can compel property owners to make necessary repairs by petitioning to the Rent Board to decrease their rent until the habitability problems are corrected.  Conversely, property owners can petition for rent increases to offset increased maintenance costs and capital improvements. In fiscal year 2017-18, 826 petitions were filed with RAP. In fiscal year 2018-19, 745 petitions were filed. In fiscal year 2019-20, RAP processed 599 petitions. This is a decrease of one hundred and forty-six (146) petitions since last fiscal year, as illustrated in **Table 8** below. This number includes petitions filed by both tenants and property owners. Generally, the tenant petitions contest a rent increase (or a series of rent increases) or claim decreased housing services, or both. Petitions filed by property owners include petitions where the owner is seeking an exemption or petitions where the owner is requesting approval of a rent increase for capital improvements, increased housing service costs or fair return. Often, more than one claim is made on a single petition, therefore the total number of specific grounds is greater than the number of petitions filed. **Table 9** provides information on the specific grounds presented in tenant petitions filed and **Table 10** provides information for property owner petitions.

**Table 8: Number of Petitions Filed Per Fiscal Year**



| | 2017-2018 | 2018-2019 | 2019-2020 |
|---|---|---|---|
| Owner Petitions | 219 | 250 | 214 |
| Tenant Petitions | 607 | 495 | 385 |

Edward D. Reiskin, City Administrator
Subject:  RAP Annual Report 2018-19 and 2019-20
Date: February 1, 2021                                                                        Page 13

**Table 9: Grounds for Petitions Filed by Tenants**

| Grounds for Tenant Petitions | 2017-18 | 2018-19 | 2019-20 |
|---|---|---|---|
| Costa Hawkins Violation | 5 | 2 | 1 |
| Decrease in Housing Services | 300 | 286 | 249 |
| Enhanced Notice Error | 1 | 1 | 1 |
| Exceeds 30% in 5 years | 82 | 74 | 53 |
| Exemption Based on Fraud or Mistake | 29 | 47 | 18 |
| Health, Safety, Code Violations | 253 | 225 | 150 |
| Incorrect Rent Increase | 110 | 176 | 107 |
| No Concurrent RAP Notice | 237 | 173 | 129 |
| No Ground Selected | 6 | 7 | 3 |
| No Pre-Approval of Increase | 121 | 162 | 103 |
| No RAP Notice at Inception or 6 months Prior | 257 | 210 | 142 |
| No Rent Reduction after Cap Improvement Increase | 15 | 7 | 8 |
| No Summary Provided | 45 | 35 | 29 |
| Rent Increase Exceeds CPI or more than 10% | 338 | 248 | 148 |
| Rent Increase Violates State Law | 117 | 155 | 102 |
| Second Increase in 12 months | 84 | 62 | 56 |

The most common grounds for tenant petitions throughout the reporting period were for rent increases exceeding the CPI, decreased housing services, and health, safety and code violations.

Decreased housing services are based on a tenant's claim that there is a loss of services that the property owner is obligated to provide by law or by the terms of the lease. While RAP does not collect data at present on types of "lost" or "decreased" services, staff finds these issues the most common: rodent and insect infestation, water intrusion from roof or windows, deteriorated carpet or flooring, need for painting, and mold issues.

Edward D. Reiskin, City Administrator
Subject:  RAP Annual Report 2018-19 and 2019-20
Date: February 1, 2021                                                              Page 14

**Table 10: Grounds for Petitions Filed by Property Owners**

| Grounds for Owner Petitions | 2017-18 | 2018-19 | 2019-20 |
|---|---|---|---|
| Approval of Increase | 76 | 133 | 78 |
| Exemption | 96 | 114 | 119 |
| Extension of Time | 0 | 23 | 17 |

In 2017, Ordinance No. 13418 C.M.S. amended the Rent Adjustment Program Ordinance (Article I of O.M.C Chapter 8.22) to require property owners to file petitions when they sought a rent increase greater than the CPI or banked increases. Property owners have filed an increased number of petitions with RAP based on this change.

The most common ground for a property owner to petition RAP is to request an exemption. The 2019-2020 fiscal year reflected the height of this type of activity. Additionally, property owners also commonly file requests for capital improvement rent increases (not specified here as its own ground, but as a part of a request to approve a rent increase).

### B.  Processing Petitions

In fiscal year 2017-18, the RAP developed a substantial backlog in processing petitions. By the end of 2018, processing times for petitions were approximately nine (9) months from the point of receipt to the scheduling of the hearing. In early 2019, internal processes were examined, and new procedures were developed and implemented. Within nine (9) months, the backlog was eliminated, and petitions were being processed within one week.

### C.  Capital Improvement Cases Mediations and Alternative Dispute Resolution

In fiscal year 2019-20, property owners have filed sixty-two (62) cases seeking capital improvement rent increases. Of the cases filed in this fiscal year, Hearing Decisions have been issued in three (3) of them and one (1) Administrative Decision was issued. Dismissals have been issued in nine (9) of the cases, and two (2) of these cases settled at settlement conferences held prior to beginning the hearing.[1] The sixty-two (62) capital improvement cases that were filed involved buildings with 700 total units with rent increases sough on 581 of the units.[2]

### D.  Mediations and Alternative Dispute Resolution

While RAP has offered mediations to property owners and tenants who have pending petitions and requested mediation for many years, this was the only method of alternative dispute resolution the program offered to property owners and tenants. At the beginning of fiscal year 2018-19, RAP began providing two additional methods of dispute resolution to

---

[1] Of the nine dismissals, two of them were involuntary, which means that the property owner did not appear at the Hearing. Seven of them were voluntary, which means that the property owner dismissed the petition prior to the Hearing date.
[2] Since a property owner can only seek a rent increase to those units that have benefitted from the improvements and for those tenants who moved in prior to the work being done, the number of total units is always more than the total of affected units.

Edward D. Reiskin, City Administrator
Subject:  RAP Annual Report 2018-19 and 2019-20
Date: February 1, 2021                                                                 Page 15

tenants and property owners: 1) RAP provides an opportunity to settle most cases by holding a Settlement Conference prior to every hearing if a settlement conference is possible[3] and 2) RAP provides a forum for tenants and property owners who are not yet in the petition process to seek RAP mediation services.  **Table 11** represents those cases that were in the petition process that have settled at a mediation or settlement conference.

**Table 11. Settlements Reached through Mediation or Settlement Conferences**



### 4.  Board Activities

#### A.  Rent Board Appeals Hearings

In the past few years, RAP has seen a decrease in the number of cases presented to the Rent Board for hearings, as depicted in **Table 12** below. Additionally, several appeal hearing procedures were canceled due to a lack of quorum of the Board. The result was an extreme backlog of cases that made it difficult for appeals to be heard in a timely manner.

In July 2018 there were ninety-six (96) pending appeals. Appeal panels were created to increase the capacity of the Board to hear appeals cases. As a result, in January 2020, the backlog was eliminated.

**Tables 12** and **13** below provide information regarding the number of petitions, appeals and hearings.

---

[3] Settlement conferences can only be held in hearings where all required parties appear and cannot be held in cases where a property owner is seeking an exemption.

Edward D. Reiskin, City Administrator
Subject:  RAP Annual Report 2018-19 and 2019-20
Date: February 1, 2021                                                        Page 16

**Table 12: RAP Petition and Appeal Data by Year**

| Fiscal Year | Number of Petitions | Number of Appeals | Number of Appeals Heard |
|---|---|---|---|
| 2018-19 | 774 | 61 | 96 |
| 2019-20 | 634 | 56 | 51 |

**Table 13: How Appeals Resolved**

| | 2018-19 | 2019-20 |
|---|---|---|
| Appealable Decisions | 515 | 406 |
| Number of Appeals | 61 | 56 |
| Resolved at end of fiscal year | 96 | 51 |
| Appeal Rate | 18.6% | 13.8% |

### B.  Board Activities: Fiscal Year 2018-19

o  Proposed revision to Rent Adjustment Regulations, including the following:
- o  Efficiency Ordinance
  - ▪  Streamlined the appeal process, allowed panels to hear more appeals, a staff member to hear appeals when there are "no shows" and to change the attendance requirements.
o  Changes in Rent Adjustment Program Ordinance/Regulations:
- o  Passage of increase from $68 to $101 per unit for the Rent Adjustment Program Fee.
- o  Elimination of duplex/triplex exemption for owner-occupied units.
- o  Elimination of substantial rehabilitation as grounds for exemption from Rent Adjustment Ordinance.
- o  Removal of exemption for owner-occupied units of three (3) or fewer from Just Cause for Eviction Ordinance.
o  Policy discussions were held on the following topics:
- o  Board attendance.
- o  Deferred maintenance versus capital improvement (dry rot).

### C.  Board Activities: Fiscal Year 2019-20

o  Proposed revision to Rent Adjustment Regulations, including the following:
- o  Amendments to the Just Cause and Rent Regulations.
- o  Tenant Protection Ordinance
  - ▪  Limits the maximum rent increase in any one year to conform to state law.
  - ▪  Makes failure to pay required relocation benefits an affirmative defense to eviction.
  - ▪  Limits late fees to three (3) percent.
  - ▪  Prohibits unilaterally imposed changes to terms of tenancy.
  - ▪  Adds one-for-one replacement of roommates to the definition of housing services.

Edward D. Reiskin, City Administrator
Subject:  RAP Annual Report 2018-19 and 2019-20
Date: February 1, 2021                                                                                            Page 17

- ▪ Prohibits eviction based on additional occupants if property owner unreasonably refused tenant's written request to add occupants based on number of rooms; property owner can charge a five (5) percent rent increase.
- ▪ Strengthens tenants' rights and enforcement of tenants' rights under the Tenant Protection Ordinance.

- o Change in Rent Adjustment Program Ordinance/Regulations
  - o Passage of Local Emergency with Moratorium limiting rent increases to the CPI Adjustment; prohibits any evictions under the Just Cause for Eviction Ordinance except for Ellis Act actions or imminent threat to the health and safety of other occupants; Moratorium provides complete defense to an eviction proceeding if the tenant can prove rent non-payment was related to the Covid-19 pandemic.

- o Election of a new Board chair was conducted. Robert Stone is the new Board chair. Jessie Warner's term expired, and she was replaced by Saneta Devuono-Powell.

- o Discussions related to establishing an ad hoc committee versus a standing committee.

### D.  Appeal Hearings Activity:

Fiscal Year 2018-2019

- o Board meetings: There were twenty-three (23) full Board meetings held between July 1, 2018, and June 30, 2019. The Board heard sixty-one (61) cases.

- o Appeal Panel meetings: There were fifteen (15) Appeal Panel meetings held between July 1, 2018, and June 30, 2019. The Appeal Panel heard thirty-five (35) cases.

Fiscal Year 2019-2020

- o Board meetings: There were thirteen (13) full Board meetings held between July 1, 2019, and March 5, 2020. The Board heard twenty-six (26) cases.

- o Appeal Panel meetings: There were twelve (12) Appeal Panel meetings held between July 1, 2019, and March 5, 2020. The Appeal Panel heard twenty-five (25) cases.

- o Due to the Covid-19 pandemic, all Board and Appeal Panel meetings were postponed on March 19, 2020 until the close of fiscal year 2019/2020.  Meetings resumed in September 2020.

### E.  Board Attendance: Fiscal Year 2018-19

- o Eight meetings were cancelled between July 1, 2017 and June 30, 2018 due to a lack of a quorum. As noted above, cancellations became less frequent toward the end of fiscal year 2017-18 and into fiscal years 2018-19.

- o There were two (2) Board members who had not been attending meetings for a period of twelve months, who resigned in the fall of 2018.

### F.  Board Attendance; Fiscal Year 2019-20

o   Since July 1, 2019, most Board members are currently attending the majority of all planned Board and Panel meetings. The number of cancelled meetings has declined to four (4) due to a lack of a quorum.

**Table 14** depicts the current composition of the Board including their terms, vacancies and upcoming appointments.

**Table 14: Current Composition of the Board**

| Position | Designation | Name | Term |
|---|---|---|---|
| Property Owner | Regular Member | Terrence Williams | 2/12/20-2/11/23 |
| | Regular Member | Karen Friedman | 2/12/18-2/11/21 |
| | Alternate | Benjamin Scott | 2/12/19-2/11/22 |
| | Alternate | Kathleen Sims | 2/12/19-2/11/22 |
| Tenant | Regular Member | Rose Auguste | 2/12/19-2/11/22 |
| | Regular Member | Tanaiia Hall | 2/12/20-2/11/23 |
| | Alternate | Vacant* | |
| | Alternate | Hannah Flanery | 2/12/19-2/11/22 |
| Neutral | Regular Member | Saneta Powell | 2/12/20-2/11/23 |
| | Regular Member | Ardis Graham | 2/12/19-2/11/22 |
| | Regular Member | Robert Stone | 2/12/18-2/11/21 |
| | Alternate | Julia Ma Powers | 2/12/19-2/11/22 |
| | Alternate | Edward Lai | 2/12/17-2/11/20 |

*Corean Todd was the tenant alternate. On June 1, 2020, she vacated the position due to employment with the City of Oakland. There is currently one vacancy for a tenant alternate representative.

### G.  Other Activities: Administrative Writs

During the reporting period, City Attorney staff handled the following administrative writs that were all appeals from Rent Board decisions:

o   Murray v. Rent Board (property owner writ)
o   Regan v. Rent Board (property owner writ)
o   Michelsen v. Rent Board (property owner writ)
o   Marker v. Rent Board (tenant writ)
o   Hyde Street v. Rent Board (property owner writ)
o   Sherman v. Rent Board (tenant writ)
o   Turner v. Rent Board (tenant writ)
o   Golden State Ventures v. Rent Board (property owner writ)
o   Baragano v. Rent Board (tenant writ)
o   Owens v. Rent Board (property owner writ)
o   Dezarega v. Tenants (property owner writ)

Edward D. Reiskin, City Administrator
Subject:  RAP Annual Report 2018-19 and 2019-20
Date: February 1, 2021                                                    Page 19

### 5.  Financial Reporting

**Table 15** presents the actual revenue and expenditures for the reporting period.

### Table 15: Actual Revenue and Expenditures for Fiscal Years 2018-19 and 2019-20

| | Actual | Actual | |
|---|---|---|---|
| | FY 2018-19 | FY 2019-20 | |
| Beginning Fund Balance | **1,902,902.00** | **3,183,389.43** | |
| | | | |
| **REVENUE** | | | |
| Investment Interest | 41,869.55 | 40,441.82 | |
| RAP Fees | 6,869,206.22 | 7,994,654.01 | |
| Service Fees | 63.70 | 216.10 | |
| Collection Fees | | 4,685.50 | |
| Unrealized Gain/(Loss) | 9,058.75 | (910.91) | |
| **Total Revenues** | **6,920,198.22** | **8,039,086.52** | |
| **Total Available Financing (Revenue + Fund Balance)** | **8,823,100.22** | **11,222,475.95** | |
| | | | |
| **EXPENDITURES** | | | |
| Salaries and Employee Benefits | 4,439,290.04 | 6,306,734.15 | |
| Services and Supplies | 52,479.73 | 59,393.42 | |
| Services Expenditures | 18,397.39 | 58,332.57 | |
| Contract Expenditures | 326,179.19 | 386,366.62 | |
| Travel and Education | 16,160.81 | 30,942.29 | |
| City Internal Services | 233,341.00 | 342,206.00 | |
| Bank and Credit Card | 17,388.29 | 42,712.48 | |
| Burden and Overhead | 443,644.92 | 569,617.35 | |
| Interest | 1,580.42 | 292.97 | |
| Operating Transfer | 91,249.00 | 408,851.00 | |
| **Total Expenditures** | **5,639,710.79** | **8,205,448.85** | |
| | | | |
| **Surplus/Deficit** | **3,183,389.43** | **3,017,027.10** | |
| | | | |
| **FUND BALANCE CALCULATION** | | | |
| Net Gain/(Loss) | 1,280,487.43 | (166,362.33) | |
| Beginning Fund Balance | 1,902,902.00 | 3,183,389.43 | |
| **Ending Fund Balance** | 3,183,389.43 | 3,017,027.10 | |

There was a 16.38 percent increase in revenue in fiscal year 2019-20 which reflects the increase of the RAP fee, approved by City Council in April 2019.  The increased expenditures relate to the increase in staff that was deemed necessary by the City Council when adopting the fee increase.  The increased staff capacity, along with funding of the outreach activities described in this Agenda Report have been fundamental to the success that RAP has achieved in improving program processes, transparency, public outreach and education, and compliance, as described in this Report.

City Council
March 2, 2021
P001162

Edward D. Reiskin, City Administrator
Subject: RAP Annual Report 2018-19 and 2019-20
Date: February 1, 2021                                                                    Page 20

 The current fund balance for fiscal year 2019-20 is a carryover from past years related to the following two features: 1) Central Service Overhead (CSO) was budgeted in fiscal year 2017-18 for non-RAP positions and 2) extensive staff vacancies for fiscal years 2017-19. As opposed to drawing it down retroactively, the balance is retained by RAP for future uses.  The program did experience a minimal net loss of $166,362 (2 percent of total expenditures) in 2019-20. The fund balance serves to fill this net loss for the year 2019-20 fiscal year.  The development of the next two-year budget will ensure that the program operates without a loss in the future.  While budgeting for the coming two-year budget cycle is underway and factoring in the current fiscal crisis, the RAP fee is restricted by O.M.C. Section 8.22.500(A) for uses associated with the Rent Adjustment Program.

Approximately half of the fund balance will be used to cover construction costs to re-configure the sixth floor of 250 Frank H. Ogawa Plaza to better conform with the work performed at RAP, specifically related to administrative hearings conference rooms and office space for service delivery. Staff further believe an investment of the remaining funds can reconfigure the existing underutilized Housing & Community Development Department (HCD) space on the sixth floor. The reconfiguration will create the type of hearing spaces recommended in the 2016 audit as well as ensure sufficient workstations for all RAP staff positions and storage space. These changes will, in turn, facilitate high functioning program performance.  HCD staff anticipate that additional fund balance will be expended on limited duration positions, expanded outreach related to the Covid-19 pandemic, and additional technology upgrades.

Retaining a small fund balance is important for the program to sustain potential reductions in fee revenue related to the economic impacts of the Covid-19 pandemic, as well as for future unforeseen circumstances.  The proper sizing of a fund balance will be addressed in the upcoming two-year budget cycle process.

**<u>FISCAL IMPACT</u>**

This report is for informational purposes and has no direct fiscal impact or cost.

**<u>COORDINATION</u>**

This Agenda Report was prepared in coordination with the City Attorney's Office and the Budget Bureau.

**<u>SUSTAINABLE OPPORTUNITIES</u>**

**_Economic_**: There are no economic opportunities associated with this report.

**_Environmental_**: There are no environmental opportunities associated with this report.

**_Race and Equity_**: African Americans continue to have the highest rate of displacement and remain the most vulnerable community in Oakland's housing crisis.  The Covid-19 has exacerbated this problem.  RAP has identified an opportunity to launch a targeted "Ask Before You Act – Know Your Rights" Campaign focused on empowering Oakland's African American

Edward D. Reiskin, City Administrator
Subject:  RAP Annual Report 2018-19 and 2019-20
Date: February 1, 2021                                                                                     Page 21

small property owners and tenants in partnership with KBLX radio station.  The campaign will use diverse tools including radio and social media to ensure that Black people have knowledge of and access to their rights under local and state housing laws.

.
**ACTION REQUESTED OF THE CITY COUNCIL**

Staff recommends that the City Council receive the Rent Adjustment Annual Report for fiscal years 2018-2019 and 2019-2020.

For questions regarding this report, please contact Chanée Franklin Minor at 510.238.3262.

Respectfully submitted,

_____

SHOLA OLATOYE
Director, Housing & Community Development Department

Reviewed by:
Maryann Leshin, Deputy Director, HCD

Prepared by:
Chanée Franklin Minor, RAP Manager, HCD

Attachments (3)

A –  RAP Organization Chart
B –  O.M.C. Section 8.22.250.A
C -  Workshop and Community Outreach Schedule