# EXHIBIT D

DISTRIBUTION DATE:  January 30, 2023



CITY OF OAKLAND

# MEMORANDUM

| | | | |
|---|---|---|---|
| **TO:** | HONORABLE MAYOR & CITY COUNCIL | **FROM:** | Christina Mun |
| | | | Interim Director Housing and Community Development Department |
| **SUBJECT:** | RAP Annual Report 2020-21 and 2021-22 | **DATE:** | January 23, 2023 |

City Administrator Approval _(signature)_          Date: Jan 30, 2023

## RECOMMENDATION

**Staff Recommends That The City Council Receives The Annual Report Of The Rent Adjustment Program for Fiscal Years 2020-21 And 2021-22.**

## EXECUTIVE SUMMARY

The preparation of an Annual Report to the City Council regarding the status of the Rent Adjustment Program (RAP) is mandated in the Oakland Municipal Code (O.M.C.) Section 8.22.250.A, with required components identified pursuant to Measure JJ, approved by voters in November 2016. The last Annual Report presented to the City Council covered one year, from July 1, 2019 through June 30, 2020, and it was presented to the Council in February 2021. This current report includes both fiscal years 2020-21 and 2021-22.

During the reporting period, RAP focused on three primary objectives:

1. Increasing internal efficiencies for online services by leveraging technology.
2. Developing internal capacity for greater community outreach and housing counseling services.
3. Moving from a passive complaint-based model to an active rent regulation and enforcement model.

The active enforcement approach uses extensive outreach to inform tenants and owners about their rights and obligations under the law and program regulations, maintains full and accurate records through reporting requirements for initial rents and eviction proceedings, provides mediation and dispute resolution services, and actively enforces the law and program regulations when it finds violations. To this end, RAP has made significant achievements during the reporting period, including:

- Regulatory amendments including the implementation of Oakland's first Rent Registry;

P001309

Edward D. Reiskin, City Administrator
Subject:  RAP Annual Report 2020-2021 and 2021-2022
Date: January 23, 2023                                                                    Page 2

- Technology solutions for hearing petitions and client management services as well as a robust community outreach and educational programming; and
- Eliminating the backlog of appeals cases and processing of petitions.

During this reporting period, while still working remotely due to the COVID-19 pandemic, RAP processed, prepared and mailed documents for 776 (through 5/30/22) cases that were scheduled for remote hearings. The outcome of these cases directly impacted thousands of Oakland residents, their rent amounts, and living conditions. In partnership with 3DI Systems, RAP also developed and launched a robust case management system to manage RAP correspondences with the public regarding housing-related issues. As a result, RAP now has real-time access to reporting and analytics which allows staff to accurately tailor outreach efforts towards the City's at-risk communities.

This RAP Informational Report provides summary information on the following areas for the reporting period from FY 2020-2021 and FY 2021-2022:

> ➢ RAP Background
> ➢ Current RAP Structure
> ➢ Program Highlights and Achievements
> ➢ Policy and Legislative Actions
> ➢ RAP Annual Activities and Updates
>   o Community Outreach and Education
>   o Petitions and Appeals
>   o Rent Board Activities
>   o Financial Reporting

## RAP BACKGROUND

In 1980, the Oakland City Council passed its first rent control ordinance which established the Housing, Residential Rent Arbitration and Relocation Board (The Board) and the Rent Adjustment Program (RAP). (Oakland No. 9980 C.M.S.). Since then, the Ordinance has been amended many times. The current Ordinance (O.M.C. Section 8.22.010 et seq.) regulates most residential rent increases in Oakland. Additionally, in 2002, the Oakland voters passed the Just Cause for Eviction Ordinance, requiring a property owner to prove one of the eleven just causes before they could evict a tenant. (O.M.C. Section 8.22.300 et seq.)

The City's Rent Adjustment and Just Cause for Eviction ordinances respond to a severe and longstanding housing market failure in Oakland and in the surrounding Bay Area. In a genuinely competitive market where an adequate supply of housing increases as demand increases, competition would hold rents down to the minimum necessary to cover the operation costs that also provide property owners with a reasonable profit. Instead, Bay Area rents reflect the scarcity in a market where supply has failed to increase with demand for more than two decades now, making them among the highest rents in the United States. Under such circumstances, tenants are easily taken advantage of unless protected by strong and effective regulation. Together, the Rent and Just Cause for Eviction ordinances were intended to mitigate this phenomenon, maintain affordable housing, preserve community diversity, prevent illegal rent increases and evictions, and encourage investment in rental property in Oakland.

The City's Rent Adjustment Program mission statement is as follows:

*RAP is committed to assisting both property owners and tenants to promote a stable housing market, prevent unjustified rent increases and evictions, encourage investment, and sustain a diverse community.*

At its core, the Rent Adjustment Program is about housing stability. Excessive rent increases can have a devastating effect not only on the individual but also on the entire community. The increases force thousands of Oakland residents to choose between spending over half their income on rent, foregoing other necessities, or moving far away from jobs and community ties. For many, none of these choices are viable, hence homelessness becomes the only option. The COVID-19 crisis has not only exacerbated this problem, but it has also made it even clearer that there is a need for a strong protective framework. As such, rent control and rent control agencies are necessary components to anti-displacement policy.

## CURRENT RAP STRUCTURE

The Rent Ordinance defines the Rent Adjustment Program as "the department in the City that administers (the Ordinance) and also includes the Board." (O.M.C. Section 8.22.020).

The Housing, Residential Rent and Relocation Board (The Rent Board) is a quasi-judicial body, independent from the Rent Adjustment Program (RAP), composed of seven (7) full members and seven (7) alternate members appointed by the Mayor and confirmed by City Council. The Rent Board hears appeals of the Rent Adjustment Program's hearing officer decisions and enacts regulations and policies to further the administration of the Oakland Rent Ordinance and the Just Cause for Eviction Ordinance.

RAP is presently a 28-staff program (26 staff members in FY 2020-2021, which then increased through mid-cycle budget to a 28-staff program) that falls under the purview of the City's Housing and Community Development Department (HCD).

RAP is currently divided into three units:

- The **Community Engagement and Enforcement Unit** (CEE) conducts extensive outreach to inform property owners and tenants of their rights and obligations through targeted mailings, informational postcards, and other print materials. CEE holds workshops for property owners, tenants, and the local real estate community. The CEE unit also provides comprehensive housing counseling services. Through phone calls and email, the RAP housing counselors are available throughout the day to answer questions and inform tenant and landlords of their rights and responsibilities. CEE currently consists of the following nine (9) full-time employees: Two (2) Project Managers I; three (3) Program Analyst II; one (1) Program Analyst III; two (2) Home Management Specialist II; one (1) Administrative Assistant. To fully staff the implementation and administration of the Rent Registry, two additional staff members are being hired to CEE: one (1) Administrative Analyst I and one (1) Administrative Assistant.

- The **Hearings Unit** is a judicial body of the RAP that holds administrative hearings, adjudicates and resolves disputes between the tenants and the property owners over the rent increases, conditions of the property and other issues relating to the tenancies by enforcing the Rent Adjustment Ordinance and Regulations. The Hearings Unit currently consists of the following twelve (12) full-time employees: One (1) Senior Hearing Officer (currently filled in an Acting capacity since the full time SHO retired in

Edward D. Reiskin, City Administrator
Subject:  RAP Annual Report 2020-2021 and 2021-2022
Date: January 23, 2023                                                                          Page 4

October of 2021); six (6) Hearing Officers (one is serving as the Acting SHO and (2) were recently hired); one (1) Program Analyst II; one (1) Administrative Analyst I; one (1) ELDE Legal Assistant[1]; and two (2) Administrative Assistants I.

- The **Administrative and Policy Unit** includes the Program Manager[2] and Assistant Program Manager, who are responsible for providing leadership and managing the Program, hiring and promotions, and adjudicating grievances and disciplinary actions. The unit maintains effective relations with elected officials, other City departments, and the public. The unit is also responsible for office administration, staffing meetings of the Board, and conducting research, analysis, and producing reports. Besides the Program Manager and Assistant Manager, this unit currently has three (3) additional full-time employees: Two (2) Administrative Analysts I and one (1) Administrative Assistant II.

## PROGRAM HIGHLIGHTS AND ACHIEVEMENTS

This section provides a synopsis of RAP's significant highlights and achievements during the reporting period. Over the last two fiscal years, RAP collaboratively worked with the Rent Board and City Council to establish a residential rent registry. RAP also expanded the reach of RAP's CEE Unit and continued to eliminate the backlog of RAP petition and appeal hearings. More details about these achievements are described under the RAP Activities and Updates section of this report below.

The following are three of the most significant highlights and staff achievements from this reporting period:

## A.      Ordinance Amendment to Establish Rent Registry

A key development for the 2020-22 period was the amendment to the Rent and Just Cause for Eviction ordinances to establish a residential rent registry that City Council approved on June 21, 2022, with March 1, 2023 as the deadline for registration of units subject to the ordinances. The rent registry is now expected to launch no earlier than March 2023.[3] This ordinance amendment represents RAP's final step in its shift toward an "active" model of rent regulation and enforcement, which has taken place over the past three years. An active rent regulation model utilizes extensive outreach to inform tenants and owners about their rights and obligations under existing laws, maintains full and accurate records through reporting requirements for initial rents and eviction proceedings, provides mediation and dispute resolution services, and actively enforces the law when violations are found.

Vulnerable communities are key beneficiaries of an active enforcement model for maintaining lawful rent levels. Generally, tenants are more economically vulnerable than homeowners; their housing costs are unpredictable over time compared to property owners, and their housing expenditures do not build equity.  African American, Latinx, and Asian populations are of

---

[1] An "Exempt Limited Duration Employee" (ELDE) position is: (1) with limited funding cycles of one year or less; (2) for short term, special projects longer than six (6) months in duration; or (3) necessary because the classification has not yet been created. In all cases, ELDE appointments may not exceed one (1) year in duration.

[2] Since July 2022 when the former RAP Manager, Chanée F. Minor, resigned, the HCD Deputy Director of Community Development, Emily Weinstein, has been acting as RAP Manager.

[3] On November 1, 2022, to allow more time to contract with the developer and to develop the rent registry software application, City Council extended the registration deadline for the first registration year to July 1, 2023. The deadline for subsequent years will be still March 1.

particular concern as they make up the majority of Oakland's tenant community. Additionally, the City's Oakland Equity Indicators data indicates that while almost half of renter households are rent burdened – meaning that they spend more than 30% of their annual income on rent – "it was more common among African American and Latino households, with 58.4% and 52.7%, respectively."[4] With the implementation of a rent registry, RAP will provide an important layer of protection for these disproportionately vulnerable tenants through the reduction of unlawful rent increases that too often lead to displacement.

1. <u>What is a Rent Registry?</u>

The RAP's rent registry is a database, currently under development, that will allow RAP to compile key data on rent-stabilized apartments, track allowable rent increases, monitor compliance with the City's rent and just cause for eviction ordinances, and communicate rental unit data on a regular basis to both owners and tenants. Through collection, monitoring and dissemination of allowable rents and rent increases, a rent registry clearly establishes and makes accessible the rent limits for each covered unit. This in turn eliminates doubt regarding rent maximums and provides a clear basis for both owners and tenants to verify that their rents and rent increases comply with the Rent Ordinance's requirements.

RAP can also monitor compliance with "just cause" rules through the Rent Registry. It will allow RAP to determine whether an owner serving the notice is in substantial compliance with the Rent Registry Ordinance and to inform tenants who have received eviction notices of their rights and responsibilities – as well as advising them on legal resources. It will allow RAP to monitor rental activity after an owner has evicted a tenant under the Ellis Act, which prohibits rent increases for a specified time period. Finally, as compliance with the registration requirement grows, the data collected through maintenance of a rent registry will allow the City to form a more comprehensive understanding of citywide rents and access readily available information to make informed, data-driven policy decisions to address affordability, homelessness, and displacement.

2. <u>Rent Registry Ordinance Requirements and Implementation</u>

Under the Rent Registry ordinance:

- Owners must register tenancy data with RAP by July 1, 2023 and update this tenancy data annually.
- If owners fail to register, they will not be able to increase rents, file rent increase petitions, or answer tenant petitions.
- Failure to register will be an affirmative defense in most eviction actions.

To implement the Rent Registry ordinance, RAP is:
- Working with a database developer to build and launch the registration database, with the goal of launching the registry no later than July 1, 2023;
- Engaging in extensive outreach to property owners who will need to meet the new registration requirements; and

---

[4] City of Oakland, "2018 Oakland Equity Indicators Report: Measuring Change Toward Greater Equity in Oakland," 2018.

Edward D. Reiskin, City Administrator
Subject:  RAP Annual Report 2020-2021 and 2021-2022
Date: January 23, 2023                                                                          Page 6

- Allocating staff from the existing staffing model to implement the registry.

It is expected that Rent Registry implementation, outreach and information will significantly augment the outreach efforts of the Community Engagement and Enforcement unit, which continues to provide counseling and other information/outreach to the Oakland rental community.

3. Community Engagement

RAP will extensively outreach to the property owner community during the latter half of 2022 and beginning of 2023.  Extensive outreach and training can help owners prepare for the upcoming requirements so that the registration period itself will be less burdensome. While RAP's primary rent registry access point will be through an online database, RAP will also create and disseminate registration forms for owners who do not have easy access to a computer. RAP has also worked creatively to implement a staffing model that utilizes existing resources so as not to necessitate a fee increase.

**B.      Community Outreach, Education, and Housing Counseling Services**

Through workshops and community presentations as well as partnering with the East Bay Rental Housing Association (EBRHA) and Centro Legal the la Raza (CLR), RAP's CEE conducted extensive outreach to inform property owners and tenants of their rights and obligations under local and state laws.

During the 2021-22 reporting period, CEE staff held a targeted workshop specifically for property owners and tenants shortly after expiration of the State's eviction moratorium to assist residents with understanding their rights and obligations within this changing legal landscape. During the 2020-22 reporting period, RAP saw an increase in the volume of eviction-related inquiries as the economic situation intensified[5]. Regularly, CEE sends information on the eviction for good cause requirements to tenants who have received a no-fault eviction notice.

Also, with the implementation of a new case-management system during the 2021-22 program year, RAP can now record and monitor the number of housing-related inquiries staff receives and responds to and will be able to provide more detailed reports on counseling inquiries.

Some of the key activities CEE accomplished were:

- Staff facilitated twelve (12) workshops for tenants and property owners, including one (1) Spanish-speaking workshop, one (1) Cantonese-speaking workshop, and one (1) Mandarin-speaking workshop, as well as one workshop on the local Emergency Moratorium. The full list of workshops is available in Attachments C and D.
- Staff engaged in targeted outreach to small property owners and facilitated one (1) workshops for East Bay Rental Housing Association members.
- Staff engaged in targeted outreach to the African American community and facilitated three (3) tenants' rights presentations.
- Despite the Local Emergency, RAP staff conducted outreach and provided on-site counseling services at five (5) community events.

---

[5] See more detailed information on eviction related inquiries and notices under the RAP Annual Activities and Updates section below.

Edward D. Reiskin, City Administrator
Subject:  RAP Annual Report 2020-2021 and 2021-2022
Date: January 23, 2023                                                                              Page 7

- RAP housing counselors provided holistic housing counseling to approximately 5,216 community members.
- Deployed a robust case management system used to track public inquiries, housing counseling sessions, demographic data, analysis, and reporting.
- Staff distributed information sheets on multiple topics, including a "Guide to Oakland's Rental Housing Law."
- Staff distributed an informational postcard on state and local rent control and eviction protections to Oakland tenants during community events.
- State Moratorium Expiration Workshop: Ninety-eight (98) community members attended this workshop and expressed appreciation for the comprehensive presentation.

**C.      Hearings Process Improvements**

Through its Hearings Unit, RAP holds administrative hearings, adjudicates and resolves disputes between tenants and property owners over rent increases and conditions of the property under the Rent Adjustment Ordinance and Regulations requirements.

- Working with the Board and creating Board appeal panels to add capacity, staff successfully continued eliminating the appeals cases backlog that was waiting to be adjudicated by the Board. To date, there is no appeal case backlog.

**POLICY AND LEGISLATIVE ACTIONS**

The following policies related to rent adjustment, just cause for eviction, and related matters were adopted during the reporting period, including effective dates[6].

**A.      Oakland Laws**

1. COVID-19 Eviction Moratorium (March 27, 2020, last extended on July 21, 2020)

- Prohibits most evictions in units covered by the Just Cause for Eviction Ordinance during the local Covid-19 emergency, except for Ellis Act evictions or if the eviction is necessary for the health and safety of other occupants.
- Prohibits eviction for non-payment of rent that accrued from March 2020 until the end of the local emergency, if the non-payment is due to Covid-19.
- Prohibits rent increases above the annual CPI adjustment.
- City Council also amended the Just Cause for Eviction Ordinance to add a defense to non-payment cases if the owner impeded the tenant's ability to obtain or pay with third-party rental assistance.

2. Rent Registry Ordinance

---

[6] Even though it does not fall under the reporting period, we would like to mention the voters' approval of November 8, 2022 Measure V amending the Just Cause Ordinance to: (1) prohibit no-fault evictions of children and educators during the school year; (2) extend eviction protections to tenants in recreational vehicles (RVs), tiny homes on wheels, and newly constructed units except during the first 10 years after issuance of the certificate of occupancy; (3) remove failure to sign a new lease as grounds for eviction.

Edward D. Reiskin, City Administrator
Subject:  RAP Annual Report 2020-2021 and 2021-2022
Date: January 23, 2023                                                                                      Page 8

On June 21, 2022, City Council adopted the Rent Registry ordinance. Under this ordinance:

- Owners must register tenancy data with RAP starting March 1, 2023 and update this tenancy data annually.[7]
- If owners fail to register, they will not be able to file rent increase petitions or answer tenant petitions.
- Failure to register will be an affirmative defense in most eviction actions.

**B.      County Law**

Alameda County COVID-19 Eviction Moratorium - The Alameda County Board of Supervisors also enacted a temporary moratorium on evictions countywide in response to the COVID-19 pandemic. The temporary moratorium imposes a ban on evictions for renters, homeowners and those living in mobile home parks throughout Alameda County beginning March 24, 2020 until 60 days after the expiration of the local health emergency. To date, this moratorium is still in effect.

**C.      State Law**

Under the COVID-19 Tenant Relief Act of 2020 (AB 3088), later amended by the state legislature (SB 91, AB 832):

- Landlords could not pursue evictions lawsuits based on non-payment of rent caused by the economic impact of the pandemic on the tenant.
- Landlords could not pursue eviction lawsuits based on non-payment of rent unless the landlord shows that they applied for rent relief and was denied.
- Tenants could use their approved rental assistance application to prevent an eviction in court.
- The state moratorium expired on June 30, 2022.

**D.      Federal Law**

   1.   CDC Eviction Moratorium

The CDC eviction moratorium, first adopted in March 2020, expired on July 31, 2021 after being extended several times. This moratorium prohibited eviction of tenants who submitted a CDC declaration to the landlord.

**RAP ANNUAL ACTIVITIES AND UPDATES**

**A.      Community Outreach and Education Activities**

   1.   Outreach and Education

It is well established that African-Americans, Indigenous, Latinx, and communities where English is a second language are disproportionately affected by the housing crisis.[8]  As such,

---

[7] See footnote number 1 in page 4.
[8] City of Oakland, "2018 Oakland Equity Indicators Report: Measuring Change Toward Greater Equity in Oakland," 2018

RAP applied an equity approach to outreach efforts in order to target those most vulnerable and with the highest risk of displacement.

During the reporting period, RAP distributed information at community events throughout the city in neighborhoods including the following zip codes in East Oakland (94603, 94605, and 94621) and West Oakland (94607). Staff distributed more than twelve (12) new information sheets in multiple languages through partnerships with local organizations and weekly farmer's markets. RAP also began promoting its program, services, and owner-focused workshops in a bi-monthly newsletter published by the East Bay Rental Housing Association (EBRHA), a full-service nonprofit that provides city-specific support to east bay rental property owners and managers.

In response to the end of the State-wide eviction and rent increase moratorium, RAP expanded its outreach with the launch of its "Ask Before You Act" campaign. The goal of this outreach effort was to increase awareness of the RAP and its services, inform Oakland residents that the City's eviction moratorium remains in place, and to encourage both tenants and property owners to discuss their housing-related issues and/or concerns with a RAP Housing Counselor before taking any action. The Ask Before You Act advertising has been displayed alongside AC Transit's buses and benches throughout Oakland. Staff also advertised via KTOP-TV 10, the City's Friday newsletter, City department press releases, websites, and social media. Since the campaign launch, RAP has observed an increase in housing-related inquiries from the general public (for this data, please see **Table 3** on page 11).

    2.  <u>Workshops</u>

Due to the COVID-19 pandemic and staffing constraints, RAP had a slight reduction in the number of workshops offered during this reporting period, as illustrated in **Table 1** below. However, RAP continued to maintain its outreach efforts to reach more members of the diverse Oakland community. Specifically, RAP virtually conducted twelve (12) workshops for tenants and property owners, including three (3) Small Property Owners workshops, and one (1) workshop specifically related to the COVID-19 pandemic and the City's Eviction Moratorium.

RAP maintained its efforts in targeted outreach aimed at the African American community and at the largest non-English speaking communities. RAP facilitated three (3) Tenants' Rights workshops aimed at the African American community. Staff provided a Tenants Rights presentation to members of the East Oakland community in partnership with the East Bay Permanent Real Estate Cooperative's Anti-Displacement Project. RAP staff also engaged in targeted outreach aimed at non-English speakers, facilitating one (1) Tenants' Rights workshop in Spanish, and two (2) separate Rent Control and Evictions in Oakland workshops in Cantonese and in Mandarin. RAP promoted its Cantonese and Mandarin Workshops in the Sing Tao Daily, a Chinese language newspaper and has translated RAP outreach materials into these languages.

In 2021, RAP Hearings Unit hosted one (1) virtual Lunch and Learn presentation regarding changes to RAP's petitions and hearings process. Staff also provided one (1) Rental Laws in Oakland 101 presentation in partnership with Oakland REACH, a parent-run, parent-led organization committed to improving the academic outcomes of Oakland youth. RAP facilitated a total of seventeen (17) workshops in the 2021 calendar year.

Edward D. Reiskin, City Administrator
Subject:  RAP Annual Report 2020-2021 and 2021-2022
Date: January 23, 2023                                                    Page 10

**Table 1: Community Workshops and Townhalls Meetings: FY 2015/16 – FY20210/22**



3.   Community Outreach

**Table 2** illustrates the number of community outreach events RAP attended during the reporting period, and Attachment C provides a full list of workshops and community events.

Due to the COVID-19 pandemic and staff turnover, staff could only participate in five (5) outreach events in fiscal year 2021-22. Staff performed on-site housing counseling at community events in neighborhoods across the City of Oakland including Oakland Farmers Market at 9th Street and Broadway and the Akoma Market at Liberation Park in West Oakland. RAP staff attended and provided on-site housing counseling to members of the East Bay Rental Housing Association (EBRHA) during its Annual Expo and provides quarterly RAP updates to EBRHA members during the organization's monthly member meetings. At each event, in addition to answering questions about rent control, evictions, and other housing issues, RAP staff distributes information about RAP and its services.

**Table 2: Number of Community Events**



4.   Drop-in Counseling

During this reporting period, RAP continued to provide drop-in counseling remotely through phone and email communication for a total of thirty-one (31) hours a week, Monday through Thursday from 9:30 AM-4:30 PM.

Edward D. Reiskin, City Administrator
Subject:  RAP Annual Report 2020-2021 and 2021-2022
Date: January 23, 2023                                                                                    Page 11

As the number of hours and outreach efforts increased, the number of tenants and property owners seeking housing counseling increased as well.

**Table 3: CEE's Average Monthly Counseling Sessions**

| Program Year | Average Monthly Counseling Sessions |
|:---:|:---:|
| 2018-2019 | 262 |
| 2019-2020 | 421 |
| 2020-2021 | 434 |
| 2021-2022 | 306 |

5.   Case Management System

In partnership with 3DI Systems, RAP developed and launched a robust case management system to manage RAP correspondences with the public regarding housing-related issues. As a result, RAP can have real-time access to reporting and analytics, which can allow staff to accurately tailor outreach efforts towards the City's at-risk communities. RAP can also use this new system to obtain, track, and report on demographic data provided by property owners and tenants who are willing to disclose such information. RAP is currently considering how to reliably obtain more complete demographic information for more holistic reporting.

6.   Publications

During the reporting period, RAP continued creating educational materials. To date, RAP created twenty-one (21) information sheets on topics such as security deposits, rent control, the Emergency Moratorium, and evictions protections. Information sheets are translated into Spanish and Chinese and are available on the RAP website[9], including RAP's Guide to Oakland Rental Housing Law, a comprehensive overview of local and state laws. RAP plans to translate all its educational materials into Vietnamese.

7.   Compliance Activities

Compliance activities have been put in place, including monitoring compliance with owner move-in requirements. Specifically:

a.   Targeted mailings are sent to tenants who have received a no-fault eviction notice. These mailings provide information on tenants' rights including entitlement to relocation benefits and how to access attorney services to bring a private right of action against a property owner carrying out a false owner move-in. RAP has also been advising property owners and tenants about owner-move-in tenancy terminations not being allowed during the eviction moratorium.

b.   RAP partnered and continued to work with the Neighborhood Law Corps to combat false owner move-in evictions, tenant harassment, and connect tenants with legal providers when a false owner move-in eviction is identified.

8.   Eviction Tracking and Enforcement

a.   Eviction Notices

---

[9] Rent Adjustment Program's website: https://www.oaklandca.gov/topics/rent-adjustment-program

Edward D. Reiskin, City Administrator
Subject: RAP Annual Report 2020-2021 and 2021-2022
Date: January 23, 2023                                                                 Page 12

Eviction notice filings have been dramatically impacted by the ongoing Eviction Moratorium, which has been in place for the entire two-year fiscal period.

The Just Cause for Eviction Ordinance requires property owners to file with RAP a copy of every eviction notice served to residents of a covered unit within ten (10) days of service. Prior to the Moratorium, RAP received an average of 6,500 notices annually.

Under the City's Moratorium, however, owners may evict tenants only to go out of the rental business under the Ellis Act, or if the owners are alleging the tenant presents a threat to the health and safety of other occupants of the property. As a result of these limitations on evictions, there has been a stark reduction in eviction notices filed with RAP. It is important to note that prior to the pandemic and adoption of the Moratorium, RAP received an average of 550 eviction notices per month. In the 2020-2021 and 2021-2022 fiscal years, RAP only received approximately 70-75 notices per month. Many of these eviction notices represent an effort on the owner's part to record incidents of nonperformance – i.e., nonpayment of rent – in advance of the eventual lifting of the Moratorium, rather than initiating an eviction proceeding.

Upon receipt of an eviction notice, RAP sends a postcard to the affected unit informing the tenant of the limitations imposed by the Eviction Moratorium, as well as notification of community legal services that they could access.

**Table 4: Total Eviction Notices Received**

| Fiscal Year | Number of Notices Received |
|---|---|
| 2018-19 | 6,714 |
| 2019-20 | 4,696 |
| 2020-21 | 881 |
| 2021-22 | 807 |

**Table 5: FY2020-22 Eviction Notices By Zip Code**

RAP tracks eviction notices by zip code, and the zip code data is available on the public-facing evictions portal. This table contains information solely on non-performance termination notices. Thus, notices such as Ellis Act notices are not included here. This table, however, gives a close idea of the zip codes most impacted by termination of tenancy notices. Zip Codes 94601, 94606, 94607, and 94608 are primarily characterized by people of color and immigrant communities.[10] The case can then be made for RAP to provide more translated outreach to- and bilingual workshops for- tenants/owners of those areas in the coming program year.

---

[10] Unitedstateszipcodes.org

Edward D. Reiskin, City Administrator
Subject:  RAP Annual Report 2020-2021 and 2021-2022
Date: January 23, 2023                                                                Page 13

| ZIP Codes | 2020-21 FY | 2021-22 FY | Totals |
|-----------|-----------|-----------|--------|
| 94601 | 170 | 107 | 277 |
| 94602 | 24 | 14 | 38 |
| 94603 | 25 | 63 | 88 |
| 94605 | 57 | 53 | 110 |
| 94606 | 67 | 112 | 179 |
| 94607 | 138 | 65 | 203 |
| 94608 | 114 | 73 | 187 |
| 94609 | 76 | 32 | 108 |
| 94610 | 27 | 21 | 48 |
| 94611 | 63 | 32 | 95 |
| 94612 | 69 | 98 | 167 |
| 94618 | 7 | 2 | 9 |
| 94619 | 17 | 17 | 34 |
| 94621 | 27 | 70 | 97 |
| **Totals** | **881** | **759** | **1640** |

**Table 6: FY2020-22 Eviction Notices By Type**

| Notice Type | Fiscal Year 2020-21 | Fiscal Year 2021-22 |
|-------------|---------------------|---------------------|
| Pay or Quit | 671 | 440 |
| Violation of Lease Term | 63 | 81 |
| Disturbing the Peace and Quiet Enjoyment | 18 | 54 |
| Engaging in Unlawful Activity | 15 | 55 |
| Other | 54 | 53 |
| Causing Substantial Damage | 10 | 23 |
| Ellis Act | 21 | 41 |
| Property Exempt | 0 | 11 |
| Owner/Relative Move-In | 13 | 9 |
| Disorderly Conduct | 0 | 29 |
| Substantial Repairs Required | 0 | 5 |
| Refusal to Allow Entry | 0 | 3 |
| Refusal to Sign New Lease | 0 | 2 |
| Cease and Desist | 0 | 1 |
| **TOTAL** | 865 | 807 |

Tables 7, 8, and 9 provide information on Ellis Act and other No-Fault Evictions.

Edward D. Reiskin, City Administrator
Subject: RAP Annual Report 2020-2021 and 2021-2022
Date: January 23, 2023                                                                    Page 14

**Table 7: Ellis Act Evictions**

A trend to note for FY 2021-22 is the significant increase in eviction notices received pursuant to the Ellis Act, which allows an owner to remove units from the residential rental market. Again, this type of eviction remains allowable under the Moratorium.

During the FY 2021-22, 41 eviction notices were received as a part of an Ellis Act withdrawal, compared to 21 in the FY 2020-21 year, and 10 in the FY 2019-20.

| Fiscal Year | Number of Notices Received |
|-------------|----------------------------|
| 2018-19 | 26 |
| 2019-20 | 10 |
| 2020-21 | 21 |
| 2021-22 | 41 |

Other no-fault eviction notices remained far below non-Moratorium numbers, as the following tables show:

**Table 8: No-Fault – Owner/Relative Move-In Evictions**

| Fiscal Year | Number of Notices Received |
|-------------|----------------------------|
| 2018-19 | 71 |
| 2019-20 | 54 |
| 2020-21 | 13 |
| 2021-22 | 9 |

**Table 9: No-Fault – Relocation for Necessary Repairs**

| Fiscal Year | Number of Notices Received |
|-------------|----------------------------|
| 2018-19 | 20 |
| 2019-20 | 10 |
| 2020-21 | 0 |
| 2021-22 | 5 |

    b.   Tenant Move-Out Agreements

In January 2018, City Council adopted the Tenant Move-Out Agreement Ordinance (O.M.C. 8.22.700 et seq.), which defines the requirements for property owners seeking to negotiate move-out agreements with tenants (e.g., offering compensation to voluntarily vacate). RAP tracks owner filings and compliance requirements under the ordinance. Property owners are

P001322

Edward D. Reiskin, City Administrator
Subject:  RAP Annual Report 2020-2021 and 2021-2022
Date: January 23, 2023                                                                          Page 15

required to provide a disclosure form to tenants prior to negotiating a move-out agreement. This disclosure informs the tenants of their rights. These rights include a tenant's right to refuse a move-out offer, and if the property owner re-opens the negotiations within six months of the tenant's refusal, this constitutes harassment under the City's Tenant Protection Ordinance. The property owner must also provide a Pre-Move Out Negotiation Disclosure form to the City regarding their intent to negotiate a move-out agreement. Owners are not required to send the City a copy of their Move-Out Agreement if successful, but some have.

Likely due to the moratorium on most evictions, the FY 2020-2022 period saw an overall increase in both the number of Pre-Move Out Negotiations forms filed with RAP, as well as an increase in the number of actual tenant move-out agreements filed with the agency.

**Table 10:  Tenant Move-Out Agreements**

This table provides figures for both the FY 2018-2020 and FY 2020-2022 periods, as well as the average amount move-out payment negotiated:

| Fiscal Year | Number of Certifications Prior to Move-Out Negotiations Filed | Number of Move-Out Agreements Filed | Average Move-Out Payment |
|---|---|---|---|
| 2018-19 | 414 | 86 | $22,492 |
| 2019-20 | 221 | 84 | $22,629 |
| 2020-21 | 322 | 96 | $19,326 |
| 2021-22 | 414 | 144 | $21,716 |

**B.      Petitions and Appeals**

During this reporting period, while working remotely, the Hearings Unit staff processed, prepared and mailed documents for 776 (through 5/30/22) cases that were scheduled for remote hearings. The outcome of those cases directly impacted thousands of Oakland residents, their rent amounts, and living conditions.

   1.   Hearings

Since July 1, 2020, the Hearings Unit staff has learned to conduct hearings, settlement conferences and mediations remotely via Zoom, and began converting case files to electronic files that can be remotely accessed for all pending and new cases. Staff continues to keep and maintain electronic files for all cases, in addition to physical case files. Community feedback regularly applauds the Hearings Unit for its fair and impartial adjudication of the cases and fair and impartial application of the Rent Ordinance.

From July 1, 2020 to June 30, 2021, staff scheduled 533 cases for remote hearings. From July 1, 2021 to June 30, 2022, staff scheduled 263 cases for remote hearings. Anecdotally, the parties expressed their preference for remote hearings over in-person hearings for the following reasons: remote hearings alleviated extra financial burdens on the parties, such as the need to take time off work to attend an in-person hearing, to pay for expensive parking at the City Center, and/or to pay for childcare while the parent attends the hearing. Attendance and punctuality at hearings has improved markedly since the switch to remote hearings took effect.

P001323

Edward D. Reiskin, City Administrator
Subject:  RAP Annual Report 2020-2021 and 2021-2022
Date: January 23, 2023                                                                                      Page 16

2.  Petitions Filed

During this reporting period, the Hearings Unit adjudicated approximately 1,074 claims raised in 643 petitions from Oakland residents and property owners. Most tenant petitions contested one or more rent increases, and/or included claims of decreased housing services. Petitions filed by property owners include petitions seeking an exemption from the Rent Ordinance and petitions requesting approval of a rent increases. A small number of owner petitions requested an extension of time to complete repairs while the tenant is temporarily displaced.

In fiscal year 2020-21, RAP received and processed 336 petitions. This is a decrease from the prior fiscal year. This is most likely attributed to the Moratorium on rent increases, which prohibited rent increases above the CPI amount. Out of 336 total petitions, 226 petitions were filed by tenants and 110 petitions were filed by owners.

In fiscal year 2021-22, RAP received and processed 307 petitions. As with the prior year, this decrease is likely due to the continued Moratorium and the fact that many owners are not imposing new increases, according to anecdotal community feedback.

**Table 11: Number of Petitions Filed Per Fiscal Year**

| Fiscal Year | Tenant Petitions | Owner Petitions | Total Petitions Filed |
|---|---|---|---|
| 2018-2019 | 494 | 246 | 740 |
| 2019-2020 | 490 | 301 | 791 |
| 2020-2021 | 226 | 110 | 336 |
| 2021-2022 | 228 | 79 | 307 |

3.  Processing Petitions

Since July 1, 2020, in an effort to continue to provide services to Oakland tenants and owners remotely during the pandemic, staff developed and implemented new procedures for electronic filings of petitions, streamlined the processing of the petitions, and developed new petition forms, form letters, notices and checklists. Currently, the new petitions are opened, processed, entered into a database, and scheduled for a remote hearing within 60-90 days of the filing of the petition.

4.  Claims Alleged in Petitions

Generally, more than one claim is made in a single petition. Therefore, the total number of specific grounds is much greater than the number of petitions filed. **Table 10** provides information on the specific grounds presented in tenant petitions filed, and **Table 11** provides information on specific grounds for owner petitions.

**Table 12: Claims Alleged in Petitions Filed by Tenants**

Edward D. Reiskin, City Administrator
Subject: RAP Annual Report 2020-2021 and 2021-2022
Date: January 23, 2023                                                                     Page 17

| Claims Alleged in Tenant Petitions | 2020-21 | 2021-22 |
|---|---|---|
| Rent Increase Exceeds the CPI, violates State Law or is deficient on other grounds | 144 | 152 |
| No RAP Notice (at inception of tenancy, or with rent increase notice, or not provided in 3 languages or never provided) | 69 | 67 |
| Decreased / Loss of Housing Services | 143 | 169 |
| Health, Safety, Building Code Violations | 50 | 14 |
| Other Grounds, no pre-approval of Rent Increase | 39 | 2 |
| Contesting Exemption or Capital Improvements | 12 | 14 |

The most common grounds for tenant petitions throughout this reporting period were for rent increases and decreased housing services. "Decreased housing services" refers to a loss in services being provided by the landlord, and includes claims relating to bad conditions at the property. While RAP does not currently track data on types of "lost" or "decreased" services, staff finds these issues to be the most common: loss of parking and/or storage, utilities (owner begins charging for utilities or the cost of utilities is shared by the tenants), lack of resident manager, and repairs and maintenance issues not timely addressed.

**Table 13: Claims Alleged in Petitions Filed by Property Owners**

| Claims Alleged in Owner Petitions | 2020-21 | 2021-22 |
|---|---|---|
| Exemption – New Construction | 34 | 20 |
| Exemption – Costa-Hawkins (e.g., single-family homes) | 32 | 22 |
| Approval of Rent Increase based on Capital Improvements | 37 | 22 |
| Approval of Rent Increase based on other grounds - such as increased housing service costs, fair return, banking | 17 | 11 |
| Extension of Time to complete repairs | 4 | 0 |

During this reporting period, the two most common types of petitions filed by property owners were exemption claims and rent increase approval requests based on capital improvements.

In 2019, the City Council passed a Mandatory Seismic Retrofit Ordinance which required owners to retrofit the foundations in certain soft-story buildings.[11] The ordinance allowed 70% of the cost of the project to be passed on to the tenants via a RAP petition as a capital improvement. After the adoption of this ordinance, there was an increase in owner petitions for approval of rent increase based on capital improvements even though the approved rent increases cannot be passed to the tenants during the Moratorium. Thus, property owners will be only able to start collecting on any approved capital improvements once the Moratorium is lifted.

The most common petitions for exemptions were based on the property being a single-family residence or a condominium (pursuant to California's Costa-Hawkins Act), or the property was newly constructed and received a Certificate of Occupancy after January 1, 1983.

   5.  <u>Alternative Dispute Resolution and Mediations</u>

---

[11] O.M.C. §15.27

Edward D. Reiskin, City Administrator
Subject:  RAP Annual Report 2020-2021 and 2021-2022
Date: January 23, 2023                                                                                   Page 18

The Hearings Unit continues to offer remote mediations during the pandemic to those property owners and tenants who have pending petitions and have requested mediation. The Hearings Unit also provides an opportunity to settle most cases by holding a remote Settlement Conference prior to every remote hearing if a settlement conference is possible.[12] Additionally, the Hearings Unit continues to provide a forum for tenants and property owners who are not yet in the petition process to seek RAP mediation services through a process called Community Mediations. However, during the pandemic, RAP has not received any requests for Community Mediations. This is likely because of the Moratorium on rent increases and evictions, and because many owners did not issue rent increases and many tenants had access to COVID-related rental assistance programs.

   6.   Rent Board Appeals Hearings

During the pandemic, RAP staff trained the Board to hold and conduct remote Board meetings, including the Appeal Hearings. After a several-month break at the beginning of the pandemic, the Board meetings resumed remotely in August of 2020.

Because the full Board was effective at making determinations on pending appeals and because of the decreased number of appeals in the last two fiscal years, appeal panels (groupings of three Board members who met separately from the full Board to hear appeals) did not have to be scheduled during the last fiscal year.[13] The full Board meets regularly twice a month. During the reporting period, the Board eliminated a backlog of appeal cases, and hearings were typically scheduled within 30-60 days after filing. As a result, property owners and tenants seeking legal relief of their claims through the Board's quasi-judicial process have seen a final resolution to their matters in a timelier manner during this reporting period.

**Table 14** provides information regarding the number of petitions filed, appeals filed, appeal hearings held, appeals resolved each fiscal year, and the appeal rate.

**Table 14: RAP Appeal Data by Fiscal Year**

| Fiscal Year | 2020-21 | 2021-22 |
|---|---|---|
| Petitions Filed | 336 | 307 |
| Appeals Filed | 49 | 37 |
| Appeal Hearings held | 34 | 36 |
| Resolved at end of fiscal year | 34 | 35 |
| Appeal Rate | 14.5% | 11.4% |

---

[12] Settlement conferences can only be held in hearings where all required parties appear and cannot be held in cases where a property owner is seeking an exemption.
[13] Appeals panels were created in 2018 to increase the capacity of the Board to hear appeals cases and eliminate the backlog of appeals.

Edward D. Reiskin, City Administrator
Subject:  RAP Annual Report 2020-2021 and 2021-2022
Date: January 23, 2023                                                                       Page 19

**Table 15: Appealing Party and Type of Appeal Case**

| Appealing Party | 2020-21 | 2021-22 |
|---|---|---|
| Property Owner | 26 | 19 |
| Tenant | 23 | 18 |
| **Type of Appeal Case*** | | |
| Above CPI Rent Increase Petition | 2 | 7 |
| Exemption Certificate Petition | 2 | 5 |
| Unlawful Rent Increase Petition | 36 | 17 |
| Decrease Housing Service Petition | 9 | 8 |

**\* Type of Appeal Case:** A substantial number of unlawful rent increase petitions are combined with decrease in housing service petitions; however, they are being reported as unlawful rent increase petitions for purposes of this report.

**C.      Rent Board Activities**

The Rent Board hears appeals from decisions by RAP hearing officers and develops and amends regulations for RAP. The Board may also make recommendations to the City Council or appropriate City Council committee pertaining to the residential rent, eviction, or other City housing policy when requested to do so by the City Council or when the Board otherwise acts to do so.

During the reporting period, in addition to hearing appeals, the Rent Board provided a public forum for property owners, tenants, advocates, residents, and the general public to voice concerns regarding a number of issues, including changes to the Rent Adjustment and Just Cause Ordinances and regulations, the City's eviction moratorium, and the newly-enacted Rent Registry Ordinance.

  1.  Fiscal Year 2020-2021 Board Activities

   o  Proposed revisions to Just Cause for Eviction Ordinance, including amendments allowing subtenants to file rent increase petitions and property owners to increase rents to market when a tenant no longer occupies the unit as their principal residence.

   o  Changes in the Implementing Regulations:
      •  Regarding new occupant's credit worthiness and owner's reasonable denial.
      •  Discussed and changed the term "neutral" Board members to "undesignated" Board members.

   o  Trainings. Some of the training that Board received were in the following topics:
      •  Brown Act
      •  Board's quasi-judicial powers

Edward D. Reiskin, City Administrator
Subject:  RAP Annual Report 2020-2021 and 2021-2022
Date: January 23, 2023                                                                                    Page 20

- o Legislative Updates – The Board was given updates by the City Attorney's Office and the Rent Adjustment Program and provided a public forum for tenants and property owners to voice their support and opposition to:
    - The Council's emergency moratorium
    - Amendments to the Tenant Protection Ordinance to:
        - o Limit the Maximum Rent Increase in any one year to conform to state law.
        - o Make failure to pay required relocation benefits an affirmative defense to eviction.
        - o Limit late fees to 3%.
        - o Prohibit unilaterally imposed changes to terms of tenancy.
        - o Add one-for-one replacement of roommates to the definition of housing services.
        - o Prohibit eviction based on additional occupants if landlord unreasonably refused tenant's written request to add occupant(s) based on number of rooms; owner can charge a 5% rent increase.
        - o Strengthen tenants' rights and enforcement of tenants' rights under the Tenant Protection Ordinance.
    - Amendments to the Just Cause for Eviction Ordinance to:
        - o Clarify additional occupants and rent increase for addition to existing tenancy.
        - o Add refusal of tenant's written request to sublet or add additional tenants.
        - o Define primary residence, base occupancy level and additional occupant.
        - o Add definition for master tenant and sub tenant.
        - o Set maximum rent for subtenant and allows petition for overcharges by master tenant.
        - o Allow rent increase of 5% for additional occupant.
        - o Clean up regulations regarding capital improvements.
        - o Allow tenants to waive hearings regarding petitions for rent increases based on additional occupant.

2. Fiscal Year 2021-2022 Board Activities

   a. Election of a new Board chair was conducted. Denard Ingram and Charles Oshinuga were selected as the new Board Chair and Vicechair, respectively.

   b. Trainings. Some of the training that Board received were in the following topics:
      - Robert's Rules of Order
      - Rules of Evidence and Appeal proceedings

   c. Legislative Updates – The Board was given updates by the City Attorney's Office and the Rent Adjustment Program and provided a public forum for tenants and property owners to voice their support and opposition to:
      - The City's proposed Rent Registry Ordinance
      - City's eviction moratorium

**Table 16 - Appeal Hearings Activity**

Edward D. Reiskin, City Administrator
Subject:  RAP Annual Report 2020-2021 and 2021-2022
Date: January 23, 2023                                                                         Page 21

| Fiscal Year | Full Rent Board | | Board Appeal Panels | |
|---|---|---|---|---|
| | No. of Meetings | No. of Appeals Heard | No. of Meetings | No. of Appeals Heard |
| 2020-2021 | 18 | 34 | 4 | 11 |
| 2021-2022 | 17 | 36 | 0 | 0 |

3.  <u>Board Attendance: Fiscal Year 2020-2021</u>

No Rent Board meetings were cancelled due to a lack of a quorum between July 1, 2020 and June 30, 2021. Having a quorum for every scheduled meeting allowed the Rent Board to complete its statutorily assigned duties and to also to be a forum for property owners, tenants, and advocates to raise their concerns about the impact of the pandemic. This also highlighted the important roles the Rent Board and the Rent Adjustment Program have to educate property owners and tenants about the available resources to prevent displacement and about newly adopted state and city laws.

4.  <u>Board Attendance: Fiscal Year 2021-2022</u>

Most Board members attended nearly all planned Board and Panel meetings between July 1, 2021 and June 30, 2022. Due to a lack of a quorum; however, three full Rent Board meetings were cancelled. Nevertheless, there was no need to schedule any Appeal Panel meetings because the full Board was effective at hearing and making determinations on pending appeals during this fiscal year.

**Table 17** depicts the current composition of the Board, including terms, vacancies, and upcoming appointments.

**Table 17: Composition of the Board (2021-2022)**

| Position | Designation | Name | Term |
|---|---|---|---|
| Property Owner | Regular Member | Terrence Williams | 2/12/20-2/11/23 |
| | Regular Member | Nikitra Hudson | 2/12/21-2/11/24 |
| | Alternate | Vacant | |
| | Alternate | Kathleen Sims | 2/12/19-2/11/22 |
| Tenant | Regular Member | Rodney Nickens, Jr. | 5/21/21-5/21/24 |
| | Regular Member | Pedro Viramontes | 2/12/22-2/11/25 |
| | Alternate | John DeBoer | 2/12/22-2/11/25 |
| | Alternate | Vacant | |
| Neutral | Regular Member | Denard Ingram | 2/12/21-2/11/24 |
| | Regular Member | Charles Oshinuga | 2/12/20-2/11/23 |
| | Regular Member | Evelyn Torres | 2/12/22-2/11/25 |
| | Alternate | Vacant | |
| | Alternate | Vacant | |

5.  <u>Other Activities: Administrative Writs</u>

During the reporting period, City Attorney staff handled the following administrative writs that were all appeals from Rent Board decisions:
o  *Owens v. City of Oakland* (property owner writ)

Edward D. Reiskin, City Administrator
Subject:  RAP Annual Report 2020-2021 and 2021-2022
Date: January 23, 2023                                                          Page 22

- o *Farley Levine v. City of Oakland* (property owner writ)
- o *Dezerega v. City of Oakland* (property owner writ)
- o *Niko Arms, LLP v. City of Oakland* (property owner writ)
- o *Donnelly v. City of Oakland* (property owner writ)
- o *Donnelly v. City of Oakland* (property owner writ)
- o *Kelly v. City of Oakland* (tenant writ)
- o *Beasley v. City of Oakland* (tenant writ)

**D.    Financial Reporting**

**Table 18: Actual Revenue and Expenditures for Fiscal Years 2020-21 and 2021-22**

|  | ACTUAL FISCAL YEAR 2020-21 | ACTUAL FISCAL YEAR 2021-22 |
|---|---|---|
| **Beginning Fund Balance** | **3,017,027.10** | **4,749,956.27** |
|  |  |  |
| **REVENUE** |  |  |
| Interest: Investment | 6,569.86 | 10,080.07 |
| Other Fees: Misc (RAP) | 10,959,434.16 | 7,485,270.39 |
| Penalties: Service Fee | (25.00) | (31.85) |
| Unrealized Gain/(Loss) | (11,597.29) | (39,804.22) |
| **Total Revenues** | **10,954,381.73** | **7,455,514.39** |
|  |  |  |
| **Total Available Financing (Revenue + Fund Balance)** | **13,971,408.83** | **12,205,470.66** |
|  |  |  |
| **EXPENDITURES** |  |  |
| Salaries and Employee Benefits | 7,031,023.24 | 7,215,324.46 |
| Office Supplies | 56,437.34 | 21,455.98 |
| Services Expenditures | 123,250.37 | 103,604.54 |
| Contract Expenditures | 494,374.13 | 342,857.79 |
| Travel and education | 69,820.70 | 42,086.52 |
| City Internal Services | 346,458.00 | 468,158.00 |
| Bank and Credit Card | 64,530.63 | 59,331.06 |
| Overhead | 597,322.15 | 639,050.27 |
| Operating Transfer | 438,236.00 | 463,501.00 |
| **Total Expenditures** | **9,221,452.56** | **9,355,369.62** |
|  |  |  |
| **Surplus/Deficit** | **4,749,956.27** | **2,850,101.04** |
|  |  |  |
| **FUND BALANCE** |  |  |
| Net Gain/ (Loss) | 1,732,929.17 | (1,899,855.23) |
| Beginning Fund Balance | 3,017,027.10 | 4,749,956.27 |
| Ending Fund Balance | 4,749,956.27 | 2,850,101.04 |

Edward D. Reiskin, City Administrator
Subject: RAP Annual Report 2020-2021 and 2021-2022
Date: January 23, 2023                                                    Page 23

The Rent Adjustment Program is funded by the RAP fee, which is a fee charged on all rental units subject to the Rent and/or Just Cause Ordinances. The fee is charged to property owners, who may then pass half of the fee cost to tenants. The RAP fee is restricted by O.M.C. Section 8.22.500(A) to uses associated with the Program. During the fiscal year 2021-2022, there was a 33% decrease in revenue. The City's Revenue and Tax Office confirmed that the decrease in revenue was due to property owners failing to pay the annual fee. In the past, the Tax Office issued a Notice of Determination to delinquent residential rentals, which included business taxes and the RAP fee. However, during the 2021-2022 fiscal year, the Tax Office did not mail any letters due to a lack of resources. In the coming Spring/early Summer, the Tax Office intends to send those letters out for the 2022-2023 fiscal year, which will include prior unpaid RAP fees. As a result, by then, the City would be likely demanding payment of the uncollected fees for two fiscal years from those delinquent properties.

The expenditures, however, decreased by about 0.87%. Although there was an expected increase in salaries and employee benefits, the total amount of expenditures for the two fiscal years stayed about the same because a decrease in contract expenditures of around 39% during fiscal year 2021-22. The department expects an increase in contract services due to the implementation of the Rent Registry Ordinance recently adopted by Council, as well as more noticeable increases in salaries and benefits once RAP fills its current vacancies.

The current fund balance for fiscal year 2022-2023 is a carryover from past years related to extensive staff vacancies during the reporting period. RAP continues to work with Human Resources and has been able to fill some of the positions on permanent and temporary bases. The carryover balance is retained by RAP for future uses. The fund balance serves to fill the decrease in revenue while the City collects some of the 2021-2022 fees yet to be collected.

Retaining a small fund balance is important for the Program to sustain reductions in fee revenue related to the economic impacts of the COVID-19 pandemic, and for future unforeseen circumstances. The proper sizing of a fund balance will be addressed in the upcoming two-year budget cycle process.

Edward D. Reiskin, City Administrator
Subject:  RAP Annual Report 2020-2021 and 2021-2022
Date: January 23, 2023                                                          Page 24

For questions regarding this report, please contact Victor Ramirez at 510.238.3220.

Respectfully submitted,

CHRISTINA MUN

Interim Director, Housing & Community
Development Department

Reviewed by:
Emily Weinstein
Deputy Director, Housing & Community
Development Department

Prepared by:
Victor Ramirez, Assistant Program Manager
Rent Adjustment Program
Housing & Community Development
Department

Attachments (4)

A - RAP Organization Chart
B - O.M.C. Section 8.22.250.A
C - RAP's 2021 Workshop and Community Outreach Schedule
D - RAP's 2022 Workshop Schedule

Edward D. Reiskin, City Administrator
Subject:  RAP Annual Report 2020-2021 and 2021-2022
Date: January 23, 2023                                                                                              Page 25

## **ATTACHMENT A**

## **RAP ORGANIZATION CHART**

# RAP ORGANIZATION CHART



**Program Manager**
(VACANT)

**Senior Hearing Officer**
**(VACANT)**
Rent Board Appeals Recommendations & Admin. Decisions

**Hearing Officer**
**(Linda)**

**Program Analyst II**
**(Roberto)**

**Hearing Officer**
**(Maimoona)**

**Admin. Analyst I**
**(Ava)**

**Hearing Officer**
**(Élan)**

**Admin. Assistant I**
**(Brittni)**

**Hearing Officer**
**(Marguerita)**

**Admin. Assistant I**
**(Deborah)**

**Hearing Officer**
**(Susan)**

**Admin. Assistant I**
**(Teresa)**

**Hearing Officer**
**(Brian)**

**Assistant Program Manager**
**(Victor)**

**Admin. Analyst I**
**(Cindy)**

**Admin. Analyst I**
**(Briana)**

**Admin. Assistant II**
**(Merna)**

**Project Manager I**
**(Allison)**
**Community Engagement, & Enforcement Division Supervisor**

**Program Analyst III**
**(VACANT)**

**Program Analyst II**
**(Silvia)**

**Project Manager I**
**(Marvin)**
**Community Engagement, & Enforcement Division Supervisor**

**Home Mgmt. Spec. II**
**(VACANT)**
Housing Counselor, Public Info/Outreach

**Home Mgmt. Spec. II**
**(Jimmy)**
Housing Counselor, Public Info/Outreach

**Program Analyst II**
**(Christina)**
Housing Counselor, Public Info/Outreach

**Program Analyst II**
**(VACANT)**
Housing Counselor, Public Info/Outreach

**Admin. Assistant I**
**(Anya)**
Public Info/Outreach

Hearings Division

Admin. & Policy Division

Public Information, Outreach, & Enforcement Division

CURRENT STAFFING MODEL_08.12.2022

Edward D. Reiskin, City Administrator
Subject:  RAP Annual Report 2020-2021 and 2021-2022
Date: January 23, 2023                                                              Page 26

## ATTACHMENT B

### O.M.C. SECTION 8.22.250.A

8.22.250 - Administration, Reports, and Notices to Owners and Tenants.

A.   The City Administrator shall report annually on the status of the Rent Adjustment Program to the City Council or to such City Council Committee as the City Council may designate. Such reports shall include, but shall not be limited to the following:

1.   Rent Board vacancies.

2.   Rent Board meeting cancellations.

3.    Statistics on the number and type of petitions filed and outcomes. including rent increases granted.

4.    The timeliness of petition hearings and appeals,

5.   Statistics on numbers and types of eviction notices filed pursuant to the Just Cause for Eviction Ordinance (Chapter 8, Article II, O.M.C. 822.300, et seq.)

6.    Number and types of rental units covered by this Chapter.

7.    Any other information the City Council or Committee may request.

Edward D. Reiskin, City Administrator
Subject:  RAP Annual Report 2020-2021 and 2021-2022
Date: January 23, 2023                                                                    Page 27

## ATTACHMENT C

**2021-22**
**Workshops & Community Outreach**

Workshops

| | |
|---|---|
| February 16, 2021 | Local and State Eviction Moratorium |
| February 17, 2021 | Local and State Eviction Moratorium |
| February 24, 2021 | Fair Chance Ordinance |
| March 3, 2021 | Tenant Rights |
| March 10, 2021 | Small Property Owner |
| April 14, 2021 | Tenant Rights |
| April 26, 2021 | Tenant Rights Student |
| May 12, 2021 | Security Deposits |
| June 9, 2021 | Taller de Derechos del Inquilino |
| July 14, 2021 | Small Property Owner |
| August 11, 2021 | Rent Control and Evictions in Oakland (Cantonese) |
| August 25, 2021 | Rent Control and Evictions in Oakland (Mandarin) |
| September 15, 2021 | Tenant Rights |
| October 13, 2021 | Security Deposits |
| October 28, 2021 | Local and State Eviction Moratorium |
| April 27, 2022 | Tenant Rights |
| May 11, 2022 | Security Deposits |
| May 25, 2022 | Small Property Owner |
| June 8, 2022 | Taller de Derechos del Inquilino |
| June 22, 2022 | Tenant Rights |
| July 13, 2022 | Small Property Owner |
| August 10, 2022 | Rent Control and Evictions in Oakland (Cantonese) |
| August 24, 2022 | Rent Control and Evictions in Oakland (Mandarin) |
| September 14, 2022 | Tenant Rights |
| September 28, 2022 | Security Deposits |

Community Outreach Events

| | |
|---|---|
| April 4, 2021 | Akoma Market |
| April 18, 2021 | Akoma Market |
| April 30, 2021 | Old Oakland Farmers Market |
| May 2, 2021 | Akoma Market |
| May 14, 2021 | Old Oakland Farmers Market |
| May 16, 2021 | Akoma Market |
| May 28, 2021 | Old Oakland Farmers Market |
| June 6, 2021 | Akoma Market |
| June 11, 2021 | Old Oakland Farmers Market |
| June 20, 2021 | Akoma Market |

Edward D. Reiskin, City Administrator
Subject:  RAP Annual Report 2020-2021 and 2021-2022
Date: January 23, 2023                                                                    Page 28

|  |  |
| --- | --- |
| June 25, 2021 | Old Oakland Farmers Market |
| July 9, 2021 | Old Oakland Farmers Market |
| July 18, 2021 | Akoma Market |
| July 23, 2021 | Old Oakland Farmers Market |
| September 29, 2021 | EBRHA Trade Expo |
| April 26, 2022 | EBRHA Monthly Member Meeting |

Additional Presentations

|  |  |
| --- | --- |
| January 13, 2021 | Lunch and Learn: New Petitions and Response Forms. Rent Adjustment Program |
| February 9, 2021 | Rental Laws in Oakland, 101. Oakland REACH |
| June 1, 2022 | Tenant Rights, East Bay Permanent Real Estate Cooperative's Anti-Displacement Project |

Edward D. Reiskin, City Administrator
Subject:  RAP Annual Report 2020-2021 and 2021-2022
Date: January 23, 2023                                                                                   Page 29

## ATTACHMENT D

### RAP's 2022 WORKSHOPS SCHEDULE

All workshops will be conducted by Zoom.
Please register at www.oaklandca.gov/RAP

| EVENT | DATE AND TIME |
|---|---|
| Tenant Rights Workshop | Wednesday, April 27<br>5:30 – 7:00 pm |
| Security Deposits | Wednesday, May 11<br>5:30 – 7:00 pm |
| Small Property Owner Workshop | Wednesday, May 25<br>5:30 – 7:00 pm |
| Taller de Derechos del Inquilino (español/Spanish) | Wednesday, June 8<br>5:30 – 7:00 pm |
| Tenant Rights Workshop | Wednesday, June 22<br>5:30 – 7:00 pm |
| Small Property Owner Workshop (staff) | Wednesday, July 13<br>5:30 – 7:00 pm |
| Owner and Tenant Workshop – Rent Control and Evictions in Oakland (Cantonese) | Wednesday, August 10<br>5:30 – 7:00 pm |
| Owner and Tenant Workshop – Rent Control and Evictions in Oakland (Mandarin) | Wednesday, August 24<br>5:30 – 7:00 pm |
| Tenant Rights Workshop | Wednesday, September 14<br>5:30 – 7:00 pm |
| Security Deposits | Wednesday, September 28<br>5:30 – 7:00 pm |

City of Oakland, Rent Adjustment Program
250 Frank Ogawa Plaza, Suite 5313, Oakland, CA 94612
510-238-3127 │ rap@oaklandca.gov
www.oaklandca.gov/RAP