# EXHIBIT E



**CITY OF OAKLAND**

CITY HALL • ONE FRANK H. OGAWA PLAZA, 4TH FLOOR • OAKLAND, CALIFORNIA 94612

Office of the City Auditor
Brenda D. Roberts, CPA, CFE, CIA
City Auditor

(510) 238-3378
FAX (510) 238-7640
TDD (510) 238-3254
www.oaklandauditor.com

June 27, 2016

OFFICE OF THE MAYOR
HONORABLE CITY COUNCIL
CITY ADMINISTRATOR
CITY ATTORNEY
CITIZENS OF OAKLAND
OAKLAND, CALIFORNIA

**RE: Performance Audit of the City of Oakland Rent Adjustment Program**

Dear Mayor Schaaf, President McElhaney, Members of City Council, City Administrator Landreth and Oakland Citizens:

Over the past four years, Oakland has seen tremendous growth in jobs and opportunities for its citizens. And yet, housing has not kept up with this pace and home prices and residential rental rates have increased to the point that many Oaklanders can no longer afford to live in this city – a city in which the majority of its residents are renters.

The Rent Adjustment Ordinance was adopted in 1980 by the Oakland City Council to provide stable housing to tenants and to encourage investment in residential rental properties. Since then, there have been amendments to further strengthen tenant protections.

The objective of this audit was to confirm that efficiencies are utilized to enhance the process and that appropriate controls are in place so that the Rent Adjustment Program (RAP) is successful in meeting its intended goals—to administer the Rent Adjustment Ordinance that promotes relief to Oakland residents and limits rent increases and promotes investment in residential rental housing.

The audit provides for recommendations that are intended to assist the City in supporting the RAP and developing action plans for improvement. Specifically, our recommendations call for timely appointments of vacant positions on the Rent Board, a formal training program for Rent Board members, and a broader outreach and education program to tenants and landlords that leverages newer technologies and embraces the City's commitment to transparency.

P001066

The audit recommends changes to the Rent Program fee, proposing to increase the fee to be between $63 to $70 per unit per year.  This recommendation is contingent upon the City Administrator's thorough review of the listing of residential rental properties in Oakland, to determine accurate billings of rental properties covered under the RAP and Just Cause Ordinances.

Other recommendations relate to budget monitoring, review of workflow processes, upgrading city offices to be better suited for public hearings, review of resource needs and ordinance redundancies to achieve greater efficiencies, and the institution of a quality review program.

I want to express our appreciation to the Oakland Housing & Community Development Director and her staff for their cooperation during this audit and to their commitment to the mission and goals of the Rent Adjustment Program.

I am most appreciative of the work conducted by the students assigned to this project under the UC Berkeley Goldman School of Public Policy's Introduction to Policy Analysis class.  Their contributions to the audit's recommendations for public outreach are thoughtful, comprehensive and forward-thinking.


Respectfully submitted,


BRENDA D. ROBERTS
City Auditor


Enclosure

cc:     Michele Byrd, Director, Housing & Community Development
        Margaret O'Brien, Interim Director, Department of Revenue
        Kirsten LaCasse, Interim Controller

P001067

City Auditor
Brenda Roberts
CPA



**Performance Audit of the City of Oakland Rent Adjustment Program**

June 27, 2016

Audit Team:
Alessia Dempsey
CIA
Audit Consultant

Mark Howard
Carnes
Performance
Auditor



CITY OF OAKLAND

# OFFICE OF THE CITY AUDITOR

P001068

## Table of Contents

**INTRODUCTION & BACKGROUND**

Executive Summary ................................................................................................. 1

Housing availability and affordability crisis.......................................................... 3

Rent Adjustment Ordinance (RAP Ordinance)...................................................... 4

**AUDIT RESULTS**

Housing Residential Rent - Relocation Board (Rent Board)................................. 6

Rent Adjustment Program Operations .................................................................. 9

Statement of Compliance with Government Auditing Standards..........................19

Audit Scope and Objectives ................................................................................19

Methodology .......................................................................................................19

**APPENDIX A** – A Best Practices Analysis of Municipal Landlord & Tenant Education and Outreach

**CITY ADMINISTRATOR'S RESPONSE** ……...……………………………………………..29

P001069

# Introduction & Background

## Executive Summary

The Rent Adjustment Ordinance was adopted in 1980 by the Oakland City Council to provide stable housing to tenants and to encourage investment in residential rental properties.

Rental housing rates have increased approximately 34% since 2011 making Oakland one of the most expensive rental markets in the U.S.  Tenants filing claims for rent hikes greater than the allowable limit have increased over the same period by more than 50% to 723 in FY2015, the highest in the past 7 years.  Rent Adjustment Program (RAP) staff had to contend with this increase in petitions and cases without a corresponding increase in staffing and resources.  This trend is not sustainable.

City Administrative staff manages the on-going operations of RAP:  accepting petitions, conducting hearings and performing public outreach.  The Housing Residential Rent-Relocation Board (Rent Board) adjudicates appeals and proposes policy updates taking into consideration legislative, economic, and industry changes.  The Rent Board is comprised of volunteers appointed by the Mayor.

This audit is a review of where the RAP program is today in light of the current housing landscape and is intended to assist management in determining how the City can effectively support the program to service the needs of its tenant, landlord, and community stakeholders.

The objective of this audit is to ensure the Rent Adjustment Program is meeting its mission and goals—to administer the Rent Adjustment Ordinance that promotes relief to residential residents through the limitations of rent increases while fostering investment in residential rental housing properties.

The audit recommendations can assist City Administration in developing action plans that will result in RAP operational stability as a resource platform for tenant, landlord and community stakeholders.  These recommendations propose to maximize workflow efficiencies to ensure timely resolution of tenant and landlord petitions.

Housing disputes between tenants and landlords must be resolved timely.  The increase in petitions filed over the past several years is a factor in the bottleneck of scheduling hearings and appeals, and the delays in finalizing cases.  Management should hire temporary employees to help alleviate the backlog.

Rent Board member absenteeism exacerbates delays.  Board meetings were canceled 26% of the time in 2015 due to lack of a quorum and hearings had to be rescheduled.  Board appointments must be prioritized and a formal training program developed to

1

P001070

## Introduction & Background

provide adequate instructions to carry out the Rent Adjustment Ordinance and relevant City policies and procedures.

Adopting and keeping up with current technologies will ensure RAP operational efficiencies, provide transparency to the public, and broaden stakeholder outreach and education.  This should include implementing an automated case management system, updating websites to facilitate access to program information including upcoming Rent Board meetings and RAP caseload and decisions statistics, and the use of social media to broadcast events relevant to rental housing.

RAP management needs to focus on improving process efficiencies, including workflow analysis to identify opportunities to leverage staff and limit document handling. Management should review the Rent Adjustment Ordinance for cumbersome legislation that exacerbates process delays and create a dedicated professional office space for hearings.

The Rent Program Service fee (Program fee), currently $30 per rental unit per year, funds RAP operations.  It is assessed to owners of properties covered under the Rent Adjustment or Just Cause for Eviction Ordinances.  Neither RAP nor the Department of Revenue maintains a comprehensive list of these properties to validate the completeness and accuracy of assessments.  Revenue management estimates that as many as 10% of property owners possibly overpay and, conversely, it is also probable that other owners of properties not included in Revenue's Business Tax system are not billed at all.

Forecasted RAP revenues are based on this incomplete and inaccurate information which should be revised once the City Administrator puts a plan in place to maintain an accurate database of properties that must comply with the ordinances.

The audit includes an analysis of the RAP budget and its financial results.  It includes historical, current, budgeted, and projected revenues and expenditures, without taking into account the aforementioned potential revenue adjustments.  Expenditures currently exceed revenues.  At this current rate of spending, the accumulated reserve from prior years will be depleted within the next fiscal year.  We recommend increasing the annual Program fee to at least $63 from $30 per unit, not accounting for potential revenue adjustments.   This is based on our analysis as well as the expected costs of implementing the audit recommendations, which include systems upgrades.

Finally, management should develop and monitor the RAP budget in detail, confirming that current and projected expenditures and allocations are valid and add value to RAP operations and stakeholders.

2

# Introduction & Background

## Housing availability and affordability crisis

The Bay Area is experiencing significant economic and population growth bringing with it a demand for available and affordable housing that continues to exceed the supply for new and longtime residents alike.

| City | Housing Units Built (2010 - 2014)[1] | Occupied housing units |
|---|---|---|
| **Oakland, CA** | **711** | **155,918** |
| Sacramento, CA | 581 | 177,578 |
| Berkeley, CA | 212 | 45,569 |
| San Francisco, CA | 1,732 | 348,832 |
| San Jose, CA | 2,028 | 310,584 |
| Portland, OR | 2,043 | 252,185 |
| Sunnyvale, CA | 612 | 54,267 |
| Seattle, WA | 5,365 | 290,822 |

Population increased by 22,000 (2010 – 2014)

*Source: U.S. Census Bureau - American Fact Finder*

Skyrocketing rents have become routine.  Oakland was named the fifth most expensive rental market in the country in February 2016, where a one bedroom apartment averages $2,290/month.[2]

Many Oakland residents, particularly from lower socio-economic groups, have already been adversely impacted by the increasing pressures of the rental housing market.  This has likely contributed to increased displacement, including homelessness.

According to the 2016 Oakland City Mayor's report on housing titled "A Roadmap Towards Equity," the City's African-American population declined by 24% in the past decade,[3] owing much to the increased financial burdens of finding and maintaining affordable rental housing.

---

[1] Includes all residential units.
[2] O'Brien, D. (February 2016). *Zumper National Rent Report: February 2016.* Retrieved from https://www.zumper.com/blog/2016/2/zumper-national-rent-report-february-2016/
[3] Rose, K.& Lin, M. (2015). *A Roadmap Towards Equity: Housing Solutions for Oakland, California.* Retrieved from https://www.policylink.org/sites/default/files/pl-report-oak-housing-070715.pdf

3

P001072

# Introduction & Background

### Rent Adjustment Ordinance (RAP Ordinance)

The RAP Ordinance was adopted in 1980 by the Oakland City Council as an alternative to strict rent control[4] and to encourage open communication and foster a climate of understanding between tenants and landlords.

RAP is responsible for adjudicating certain disputes and petitions brought forward under the RAP Ordinance and to ensure compliance with the Just Cause for Eviction Ordinance (Just Cause Ordinance).[5]

There are approximately 156,000 occupied[6] units of housing in Oakland. Of those units, approximately 60% (approximately 94,000) are rentals and 40% (approximately 62,000) are owner-occupied.  Rent increases and other management practices for properties built and occupied before January 1, 1983, are guided and directed by the RAP Ordinance. These RAP properties account for 41% (63,981) of occupied housing units.



---

4 OMC §8.22.
5 OMC §8.22.300.
6 Source: US Census Bureau: American Fact Finder

P001073

## Introduction & Background

Residential rental units and buildings covered under the RAP Ordinance are located throughout the city. The map that follows shows the distribution by RAP accounts. These are not shown as individual residential rental units, but as Business Taxpayer accounts.



Rental Adjustment Program Accounts by Council District

Source: City of Oakland, Department of Revenue, Business Tax taxpayer system of record

5

P001074

## Audit Results

### Housing Residential Rent-Relocation Board (Rent Board)

The Rent Board is a city created board comprised of volunteer members, appointed by the Mayor and confirmed by the City Council.[7]  Members of the Rent Board adjudicate Hearing Officer decisions that are appealed by landlords and tenants.

Other Rent Board functions include making recommendations for regulations and changes to the RAP Ordinance, and adopting regulations for the Just Cause for Eviction Ordinance and Oakland's Ellis Act Tenant Protections.



The seven-member Board is comprised of two landlord members, two tenant members, and three neutral members. A quorum requires four members present with, at minimum, one representative from each category and an additional member from any of the three categories.

The Rent Board represents the City of Oakland as one of its governing bodies and conducts the city's business by establishing policy and adjudicating rulings.  As such, it should fully represent the city in a professional manner in the administration and execution of its duties.

Board functions are serious and critical to the community.  Members should be diligent in board meeting attendance and objective in their deliberations, regardless of the board seat they fill (tenant or landlord).  Open board seats must be filled promptly in order to ensure a quorum is always met at the regularly scheduled meetings.  Cancelations due to lack of quorum delays the hearing and adjudication of petitions.

**Finding 1:  The Rent Board positions are not filled in a timely manner**

The audit found that the Rent Board quorum was not met in six out of twenty-three (26%) scheduled meetings in 2015. Consequently, meetings were canceled and cases and other business of the Board were rescheduled to later meetings.  Appeals were delayed for as many as six months.  Currently, there is a six month to one year backlog of hearing appeals.

These delays adversely impact both tenants and landlords.  Once a petition begins, the proposed rent increase by a landlord is suspended until the case is resolved.  If the

---

[7] OMC Article VI Section 601.

P001075

## Audit Results

board confirms a decision in favor of the landlord, the tenant will be responsible for the additional rent from the date of the rent increase.  In some instances, these appeals have been delayed for so long that the cumulative rent increase can be burdensome for the tenant.[8]

We noted two instances of the appeal process extending for more than 2 years.  Another petition took more than 13 months to confirm that the property was in fact exempt from the Ordinance.

**Recommendation:**

A proposal to increase the number of Rent Board alternates was presented to City Council in order to address the backlog of appeals. [9]  The intent of this proposal is to provide sufficient volunteer Board members so that single absences will not result in a lack of quorum and disrupt case appeals scheduling.

The Mayor is responsible for appointing members to open Board positions and must fully communicate to appointees their responsibilities and obligations as members of this Board including attendance.  Attendance records should be provided to the Mayor on a semiannual basis[10] so that members not fulfilling their duties can be replaced with others who can step up to the required Rent Board responsibilities.

**Finding 2:  A formalized training program is not in place for Rent Board members**

Board members must be knowledgeable of the ordinance, possess an understanding of rental and housing practices, and should be fully familiar with *Robert's Rules of Order*, by which City of Oakland public meetings are professionally conducted.

The City Attorney and the RAP management have provided training to Board members in the past consisting of the responsibilities of the member, RAP Ordinance topics, and the protocols for public meetings under Oakland's procedures and guidelines.  The current practice provides training on an annual basis – an orientation is given to newly appointed Board members.  City Attorney staff also make themselves available for questions and clarifications from Board members, prior to Rent Board meetings and during the proceedings.

The current process does not adequately prepare members for all of the RAP Ordinance responsibilities and meeting procedures they are charged with.  Board members absent for the annual training may not fully understand their duties as Board members.

---

[8] The Hearing Officer may order Rent adjustments for overpayments or underpayments over a period of months.  OMC §8.22.110(E)(4).
[9] https://oakland.legistar.com/calendar.aspx 04/26/16 Special Community & Economic Development Committee Agenda  Item 4.
[10] OMC §8.22.040(B)(3).

P001076

## Audit Results

**Recommendations:**

- A training program should be developed for Board members that is content-focused relevant to the RAP Ordinance, RAP regulations, policies and procedures, and includes case studies and past decisions by Hearing Officers and the Rent Board.  This program should be scheduled over the course of the year with expected time frames for completion.  In some instances, the training may be presented at regular Board meetings in short time segments.  Such sessions will benefit tenants, landlords, and other attending members of the public.  Additionally, videos can be produced so that Board members can view them at their convenience.
- RAP management should track the progress of the training sessions and include completion information and Board member attendance records in the semi-annual report to the Mayor.

**Finding 3:  Appeals packets and preparatory materials are not always readily available to Board members**

Appeals packets include the tenant petitions, responses, evidence documents, and the decision of the Hearing Officers.  These are mailed to each Board member one week prior to the Rent Board meeting scheduled for these appeals.  A Board member related that these documents are generally received late, allowing for only one or two days for preparatory review.

The time required to compile, copy, and mail the packets twice a month creates an unnecessary burden on the RAP staff and results in an ineffective process—time could be better spent on other tasks.  As the number of appeals has increased during the past few years, this problem has compounded.

The e-Government Act of 2002[11] provides guidelines to promote easier public access to government information and to improve administrative processes, recommending greater use of internet-based technologies.  Although this directive relates to federal activities, the intent can be well taken—fostering the use of technology to improve access and efficiency is a worthwhile effort.

**Recommendations:**

The Rent Board should adopt a communication strategy that allows for ease of access and use for different types of users.  This must include internet-based technology.

---

[11] The **e-Government Act of 2002** enacted on December 17, 2002, with an effective date for most provisions of April 17, 2003. Establishes a Federal Chief Information Officer within the Office of Management and Budget. (Pub.L. 107–347, 116 Stat. 2899, 44 U.S.C. §101, H.R. 2458/S. 803).

P001077

# Audit Results

- Appeals packets should be scanned and uploaded to the RAP website as soon as practical and prior to the Rent Board meetings. This allows the Board members to prepare adequately in advance, ensuring informed decision-making. These can also be mailed upon request to stakeholders without readily available internet access.

- The Board should formulate an accessible on-line public communication strategy that provides interested parties with all appropriate information in advance of the meeting and other relevant staff reports.

**Finding 4:  Case and Appeal Decisions are not readily available for online access**

Petition hearings and Rent Board meetings are public and their decisions should be made available to the public.[12]  This ensures an open and transparent process and allows for the appropriate scrutiny of tenants and landlords.  Providing the basis for the determination of cases can be helpful to others as they consider similar complaints and petitions.

**Recommendation:**

RAP management should post Petition Hearing and Rent Board decisions to the RAP website or other electronic portals to make these more accessible to the public.

## Rent Adjustment Program Operations

Rent Adjustment Process

Tenant and landlord dispute petitions are typically resolved through the RAP hearing process where cases are heard and evaluated by a Hearing Officer who applies the Rent Adjustment Ordinance rules and regulations.  The Hearing Officer renders a decision which may be regarding a rent increase or decreased housing services.[13]

A tenant or landlord can appeal a hearing decision to the Rent Board if either party disagrees with a Hearing Officer's decision.  Grounds for appeal range from insufficient opportunity to present arguments and inconsistencies in the application of Rent Board regulations to cases decided on sparse evidence or that raise new policy issues.

---

[12] Brown Act CA Gov code 54952(b) and Sunshine Open Meetings Ordinance OMC §2.20.030(e)(2).

[13] Housing Services – means all services provided by the Owner related to the use or occupancy of a covered unit, included, but not limited to, insurance, repairs, maintenance, painting, utilities, heat, water, elevator service, laundry facilities, janitorial service, refuse removal, furnishings, parking, security service, and employee services.

P001078

## Audit Results



**Finding 5:  The increasing caseload has strained RAP resources; Management has not focused on efficient processes**

Tenant petition filings have been increasing since FY2011. The current projection for petitions filed in FY2016 is nearly 820; this is a 264% increase from 5 years ago. This has added to the Hearing officers' workload, created a bottleneck so that it takes between 90 and 120 days to schedule a hearing.

It is important to note that since the City Council passed the 90 Day Moratorium on Rent Increases Ordinance,[14] effective April 5, 2016, the number of petitions has not significantly decreased.



*Source: Rent Adjustment Program Annual Reports*

---

[14] Oakland City Council Ordinance 13360, April 5, 2016.

# Audit Results

**Recommendations:**

Temporary staff should be hired to facilitate reducing the backlog.  Management must determine the specific resource needs and work towards filling these positions, preferably with experienced personnel, so that minimal training is required.
Other recommendations for management are as follow:

- Review workflow processes for efficiencies and identify opportunities to leverage staff, limit document handling, and maximize consistent and secure file organization.  Management should update policies and procedures accordingly.
- Determine appropriate staffing levels given the current and expected workload and prepare a budget for additional full time personnel expense.  (See below, Finding 10).
- Implement a formal, routine quality assurance program to ensure conformance to set standards and compliance with the RAP Ordinance and regulations, and department and city procedures - a standard in legal practices.  Such a program will identify errors timely and allow for prompt re-training of staff, avoiding time-consuming re-work and standardize the quality of work product.
- Hearing officers should not conduct onsite inspections of properties.  They do not have the expertise to assess non-compliance with building codes or to identify unsafe living conditions.   Rather, RAP should contract professional building inspector services in the Planning & Building Department to perform these site inspections, allowing Hearing Officers to devote their time to case file preparations.
- Management should work with the City Attorney to propose changes to the RAP Ordinance and regulations to eliminate inefficiencies that may be creating delays in adjudicating cases.

**Finding 6:  The current case management system is not adequate**

The current system that is used for tracking RAP cases is a Microsoft Access database which is no longer adequate to support the volume of petitions and cases submitted to the RAP.  Standard practices include a regular reporting of workflow metrics that is not only useful for the public but can be used by management to better manage its staffing resources to resolve cases on a timely basis.  For instance, the San Francisco Rent Board compiles caseload data and publishes a monthly statistics report that shows the number and types of petitions, arbitrations, and evictions.

**Recommendation:**

RAP management should evaluate the type of system that would be most cost-effective given its workflow – one that will allow the department to track cases, store records electronically, reduce reliance on paper documents, and produce performance metrics and trend analyses that can be used to regularly report on RAP activities.

P001080

## Audit Results

**Finding 7:  The RAP's public outreach program does not provide the education needed for tenants and landlords**

Housing is a basic need in any city – especially one where the majority of its residents are renters.  Tenants need adequate and safe housing.  Landlords need tenants to rent their properties.  Both parties must build a mutual relationship so that the needs of both are met.

RAP currently relies on limited venues to ensure that stakeholders (both tenants and landlords) are aware of the RAP Ordinance and the rights and responsibilities of all parties.  These have typically included workshops conducted by service providers and RAP staff and one-on-one consultations with tenants provided by non-profit agencies.

It is not evident that the dissemination of RAP information is broad and intended to reach both tenants and landlords.  RAP management has stated that most of the funds for education and assistance have been directed to tenants.  For example, Centro Legal de la Raza [15] uses city office space to provide services to tenants.   No similar accommodations are provided to landlords or property owners.  Contracts with the local American Bar Association, to provide landlord education were not successful, as few property owners attended or requested services.

In our discussions and meetings with tenants and landlords, both groups expressed their frustrations at the difficulty in obtaining information and direction to help them resolve their housing disputes.

> *"I had to learn it all the hard way, by scouring through the Ordinance and calling on other tenants to help me – I didn't know what I was doing…"*
> (Tenant)
>
> *"I purchased this property 2 years ago.  No one told me what to expect, what I was supposed to do as a landlord – if I had known, I would have done things differently…"*
> (Landlord)

Little or no technology has been implemented to disseminate critical information tenants and landlords need to better understand their rights, responsibilities, and obligations. The RAP website is not user-friendly, information is not easily retrieved, and in some instances confusing, so that landlords and tenants have difficulties understanding how to proceed to the next steps in the hearing or appeals process.  Providing the public with needed information is a basic responsibility of government.  Efficiencies are gained as common topics are explained in descriptive narratives and clear instructions.  Staff may likely spend less time responding to frequently asked questions if information is consistently formatted in a useable and clear manner.

**Recommendations:**

Formulate a strategy to develop a public outreach communication plan.   RAP management must first prepare a curriculum for this plan that is based on the current

---

[15] http://centrolegal.org/

P001081

## Audit Results

ordinance written in plain and easy-to-understand language that can be consistently communicated in all media.   Incorporate innovative ideas to create a broad strategic communication and education plan.

Goldman School recommendations

The City Auditor's Office coordinated a policy analysis project for the UC Berkeley Goldman School of Public Policy's Introduction to Policy Analysis class.   These graduate students were tasked with identifying best practices in communication and outreach that could be adopted by Oakland's Rent Adjustment Program.   Their conclusions were based on analysis of other local jurisdictions and agencies responsible for rent stabilization and oversight.

These are their recommendations, with which we concur, for RAP's public outreach communication plan.  For more in-depth details, see Appendix A.

- Re-design the RAP website using webpage design best practices that include PDF fillable forms for online submission and links to critical information.
- Coordinate social media campaigns and other similar content for widespread education of the RAP (Facebook, Twitter and Instagram).
- Host information centers at City public events that attract residents and others to communicate RAP materials (e.g. First Fridays, Art & Soul, Sundays in the Redwoods, etc.) and at housing trade fairs and other industry functions.

Other practices should be considered in this public outreach strategy:

- Develop and distribute brochures, postcards and notices to libraries, city buildings, escrow offices and legal firms that include information on RAP.
- Include direct mail inserts with the annual business tax invoice informing recipients of links and references to RAP.

**Finding 8:  The meeting facilities for the Public Hearings are inadequate**

RAP hearings are public meetings as defined by the Brown Act,[16] which allow for public attendance.   However, there are few city dedicated spaces set aside for these meetings, unlike other City Board and community gatherings.

Many RAP hearings are arranged to take place in conference rooms as they are available on various floors of city offices.  Some of these rooms are located within staff work areas so that attendees must be directed through office workspace to the hearing meeting.

---

[16] Brown Act  - Government Code 54950-54963.

P001082

# Audit Results

**Recommendations:**

- Design a dedicated professional office space for hearings and other public business of RAP that is appropriate for the seriousness of the matters discussed. These spaces should be separate from staff work areas.
- Confirm that standard security measures for city offices used for public meetings are applied, including security cameras and locking doors to secure areas.

**Finding 9:  A comprehensive list is not available of properties which require fee assessment under the RAP or Just Cause ordinances**

The ordinances apply to residential rental properties built prior to 1983 and 1980 for RAP and Just Cause, respectively.  RAP exempts single family rentals while Just Cause does not.  Both exclude 3-unit rentals when one of the units is occupied by the owner and rooms rented in a single family home.  Condominiums are exempt rental properties under RAP but are covered under Just Cause.  There are other differences and similarities in the exemptions and applications of each ordinance.  Owners pay the fee if the property conforms to the requirements of either ordinance.

Tenants are afforded certain protections when a property conforms to the specific requirements of either ordinance.  RAP tenants are protected from excessive rent increases while Just Cause tenants are protected against certain evictions.  The Rent Service Program Revenue is currently generated through a $30 fee applied to residential rental units and paid by the property owner.  It is assessed because the property is covered under either RAP or Just Cause.

The Department of Revenue (Revenue) does not have a comprehensive list of properties that must comply with the RAP or Just Cause Ordinances but is responsible for the program fee billing based on the taxpayer information in its central database. However, this system does not specify the properties to be assessed under either ordinance. Rather, Revenue submits an annual billing to all landlords registered in their business tax system, permitting taxpayers to 'opt out' of the fee.

It is uncertain how many residential rental units are covered by these ordinances.  The City Administrator's May 5, 2016 report estimates 63,981 RAP rental units based on the County Assessor's report of multi-family units built before 1983 without a homeowner's exemption.[17]  Just Cause units (built before 1980) are estimated at 87,404.

The $2.1 million per year in budgeted revenues, by comparison, approximates 70,000 units assessed the annual $30 Program fee per unit.

---

[17] A homeowner's exemption is a filing with Alameda County, indicating the property is owned and occupied as the owner's principal place of residence and is not let out to rent or lease.

P001083

## Audit Results

Given the absence of a systematic process that identifies and assesses the appropriate fees, Revenue management estimates that between 5 and 10 percent of taxpayers pay the Program fee when not required to do so, approximating more than $200,000 in annual overpayments.  Conversely, it is likely that owners of properties covered under Just Cause have not paid the annual fee.

**Recommendation:**

The City Administrator should conduct an audit of the RAP and Just Cause assessments databases using the Alameda County Assessor's or other data sources to validate properties are appropriately assessed under the RAP or Just Cause Ordinances.  Likewise, budgeted revenues should be revised to account for all valid assessments.

**Finding 10:  The RAP budget does not adequately account for current financial operations**

The current annual RAP budget is approximately $2.1 million based on the Program fee of $30 per unit per year.  Collections were greater than the costs to administer the program in prior years, resulting in an accumulation of a reserve.  This reserve was more than $2.4 million at the end of FY 2012-13.  Reserves have had to make up deficits beginning in FY 2013-14, where expenditures exceeded revenues.



P001084

# Audit Results

Primary expenditure components include:

- <u>Salaries & Benefits</u> – Approximately 50% of program expenses are for staffing: Hearing Officers, Analysts, Administrative Assistants, and the Program Manager. Fringe benefits, medical benefits, and cost of living adjustments increased this category from $969,000 in FY2011-12 to $1.7 million, as projected for FY2015-16.

- <u>City Attorney</u> – Expenses related to the City Attorney's office staffing Rent Board meetings and providing legal counsel to RAP staff, advising on proposed legislative changes, enforcement actions and reporting to City Council have comprised between 14% and 21% of total RAP expenditures over the past four years.  These are projected to be more than 27% ($933,000) of the FY2015-16 budget – an increase over the 4 year period of more than $584,000.  An additional one-time $300,000 budget allocation was made in FY2014-15 and a paralegal position was added in the FY2015-16 budget to assist RAP staff in managing the increased caseload.

- <u>Department of Revenue charges</u> – Inter-department allocations for billing, noticing, and collecting the Program fee comprise this budget component.  RAP staff prepared and processed the annual billings prior to this becoming a function of the Department of Revenue.

- <u>RAP Overhead charges and other costs</u> – These include office supplies and equipment, City Administrator staffing costs, facilities expenses, and other allocated costs.

**Recommendations:**

Management should develop and monitor the RAP budget in detail, confirming that expenditures are accurate and allocations to the RAP budget are valid and add value to RAP operations and stakeholders.  Management should perform the following steps:

- Confirm that efficiencies are in place in the department that will provide short- and long-term savings for the City, and that resource needs are thoughtfully considered so that urgent needs are met and longer term strategies can be accommodated.  This is consistent with a budgetary review expected of all city department managers.

- Use financial planning tools such as trends and statistics and economic forecasts to anticipate and estimate how changes in the housing market will impact RAP so that they can respond appropriately to fluctuations in the markets.

- Develop a policy for reserves management (Program fees collected in excess of expenditures) outlining the disposition of these funds including taxpayer refunds, program enhancements, or funding future investments in RAP systems and operations.

- Develop a Capital Investment plan to identify necessary significant investments that will reduce costs over the long term.  Long-term planning for these ensures

P001085

## Audit Results

funds are available at the projected acquisition date.  The City Administrator should determine if the RAP Ordinance should be amended to provide funding for capital costs.

Our recommendations focused on the immediate need to address the increased petition and hearing volume; reduce the backlog of cases; adopt process efficiencies and cost-savings measures through the use of newer technologies; and redefine its public outreach program.

We have proposed expense ranges below that management may consider in developing its budget and Program fee structure – weighing the investment against the future benefits. These cost estimates are based on inquiries, reviews and comparisons; to determine costing structures of similar programs, applications and compensation packages.  Actuals could be more or less than these figures.

- Hire temporary staffing – Management should hire temporary staff so that petitions and cases can be addressed promptly to minimize delays in their resolution.  The annual cost is estimated at $200,000.
- Increased permanent staffing – RAP management wants to increase staffing initially by 3 full-time staff given the increase in workload volume.  We estimate this to be approximately $400,000 per year.[18]
- Planning & Building Inspector – Allocating one-half FTE for an Inspector to conduct property inspections needed to gather evidence for Petition Hearings is estimated to cost $70,000 per year.
- Maximizing technology – Gain efficiencies and enhance public outreach so that tenants and landlords can readily access documents, forms and other materials, reducing the need for staff to be the primary source of RAP data and information.
  - Acquiring and implementing an automated case management system that will increase efficiencies in workflow and caseload is estimated to cost $100,000 initially, with annual licensing and maintenance fees of $25,000.
  - Upgrading the RAP website and incorporating other social media into the RAP communication and is estimated to cost $50,000; annual maintenance costs are estimated to be $8,000.
- Other costs include additional educational materials and improvements to the RAP offices, so that space is made available for hearings, workshops, clinics, and other sessions for both tenants and landlords.  This cost is estimated to be $365,000.

**Analysis of Rent Program Service Fee**

The Program Service Revenues may not be a valid forecast of future revenues as noted earlier.  We used a base number of RAP units of 70,000, as a conservative estimate, to

---

[18] Program Analyst I, Administrative Assistant I, and Hearing Officer.

## Audit Results

determine the required Program fee to sustain the RAP program and to fund future improvements.

The current annual Program fee is $30 per unit.  This generates approximately $2.1 million in revenues, which is not sufficient to cover annual operating expenses of $3.5 million.  As the number of units covered under the RAP and Just Cause ordinances is in question, we assumed a population of 70,000 RAP rental units.  Our recommended fee increase calculation is as follows:

- $20 per unit to make up for the spending deficit for RAP operations;
- $10 per unit to adopt the practices from the audit report recommendations;
- $3 per unit to fund a reserve that can be used for capital investments, such as technological implementations and upgrades as well as unforeseen events.

The Program fee should be increased from the current $30 per unit to between $63 and $70.

**Recommendation:**   City Auditor recommends that management perform their independent analysis based on a revised and accurate count of residential rental units covered under RAP and Just Cause.  It should consider all relevant costs and future expenditures to establish a Program fee structure that will adequately fund current RAP operations and anticipated investments and contingencies.   Management must also regularly review the Program fee, at least annually, to confirm that revenues are adequate to cover RAP operations costs.



P001087

# Statement of Compliance, Scope, Objectives & Methodology

## Statement of Compliance with Government Auditing Standards

We conducted this performance audit in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

## Audit Scope and Objectives

The scope of our project covered fiscal years 2014-2015 and 2015-2016. Our objective was to ensure the Rent Adjustment Program is meeting its mission and goals—to administer the Rent Adjustment Ordinance that promotes relief to residential residents through the limitations of rent increases while fostering investment in residential rental housing properties.

## Methodology

In conducting the audit, we:
- Performed walk-throughs with rent adjustment personnel
- Interviewed rent board members, tenant and landlord representatives
- Reviewed rent adjustment policies and ordinances
- Reviewed the rent adjustment program manual
- Reviewed case files to ensure compliance with policies and procedures and fairness in decision making
- Attended Rent Board meetings
- Coordinated a policy analysis project for the Goldman School's Introduction to Policy Analysis class, identifying best practices in communication and outreach that could be adopted by Oakland's Rent Adjustment Program.

P001088

## Appendix A

**(This page intentionally left blank)**

P001089



# Oakland City Auditor

## A Best Practices Analysis of Municipal Landlord & Tenant Education and Outreach

**Christian Arana, Kevin Howard, and Adithi Vellore**



RICHARD AND RHODA
**GOLDMAN SCHOOL**
OF
**PUBLIC POLICY**
UNIVERSITY OF CALIFORNIA BERKELEY

P001090

## Acknowledgements

We would like to thank Oakland City Auditor, Brenda Roberts, for her steadfast support, encouragement and positive attitude throughout this project.  As an elected official tasked with protecting taxpayers from waste, fraud and mismanagement by ensuring responsible, transparent financial practices, our efforts to improve landlord and tenant education and outreach in Oakland gained much from her tremendous passion to deliver effective governance to the city's residents.

We would also like to thank the City Auditor's staff, and in particular, Mark Carnes, Performance Auditor in the City Auditor's office.  Mr. Carnes' facilitation of key resources and data proved crucial in helping us arrive at concrete recommendations in improving landlord and tenant resources in the City of Oakland.

Finally, we would like to thank our advisor, Amy Lerman, for her terrific guidance and input on this project.

P001091

**Best Practice Analysis: Landlord & Tenant Education and Outreach**

## Executive Summary

**UC Berkeley – Goldman School of Public Policy – Introduction to Policy Analysis**

Policy consulting services are offered pro-bono each spring to public sector agencies and non-governmental organizations as part of the graduate workshop class, Introduction to Policy Analysis (IPA).  Graduate students work in small teams under faculty supervision to offer analysis and recommendations for complex policy problems and opportunities facing public and non-profit agencies.  Student teams identify and weigh policy options, generate analysis and recommendations that they present to the client in oral and written reports.

Our team assignment was to evaluate Oakland's Rent Adjustment Program (Oakland RAP or RAP) public outreach and education.  The objectives were to determine whether these include best practices so that information is broadly disseminated to the stakeholders (tenants, landlords, associations supporting these groups and other concerned citizens); that tenants and landlords have the critical information required to act; and that these communication plans promote and support the efficient operations of government.

Our research identified educational programs and applications in other benchmark cities – San Francisco, San Leandro, and Berkeley, and our recommendations are based on these practices.

### Key Findings:

The following Best Practices were identified at other Municipalities.

1. **Organizational & Procedural Transparency**.  Municipalities provide sufficient information on rent programs so that tenants and landlords fully comprehend their rights and responsibilities, with clear directives to navigate through the process to resolve disputes.

2. **Clear & Consolidated Web Resources**.  Internet-based (web) resources that are easy to read and accessible to users have become crucial in the effort of government agencies to provide clear and transparent resources and education to stakeholders.

3. **Social Media Presence & Programming.**  These tools can have a powerful effect in disseminating essential information and this usage has increased across all age groups.

4. **Workshops & Seminars.**  Hosting such events allows property owners and managers to learn about the complex legal and procedural aspects of being a landlord, and tenants to have a clear understanding of the rights and protections afforded them.

5. **Collaboration with other Agencies.**  Collaborative partnerships offer new, shared means of outreach and education for landlords and tenants to receive critical information.

1

P001092

## Best Practice Analysis: Landlord & Tenant Education and Outreach

## Overview of Best Practices - Case Studies

Education programs and tools used by other municipalities were used as benchmarks to establish standards and best practices for Oakland RAP.  We analyzed best practices for San Francisco, San Leandro, and Berkeley, which are facing similar rental housing pressures. The following sections describe each of these municipalities' rent board services.

### Rent Adjustment Program Comparisons by Municipality

| Type of Service | Berkeley | Oakland | San Francisco | San Leandro[1] |
|---|---|---|---|---|
| Rent Program Fee | $213 | $30 | $37 | $0 |
| Rent Increase Petitions | Landlord-Based | Tenant-Based | Landlord-Based | Tenant-Based |
| Website | X | X | X | X |
| Workshops/Seminars | X | X | | X |
| Social Media Presence | X | | X | X |
| Counseling | X | X | X | X |
| Community Events | X | X | X | X |

## San Francisco Rent Board

This Board became effective on June 13, 1979 as a result of the San Francisco Rent Ordinance to address the housing crisis occurring in the city at the time[2].  Its authority is three-fold: (1) "to promulgate rules and regulations to effectuate the purposes of the Rent Ordinance," (2) "to hire staff, including administrative law judges," and (3) "to conduct rental arbitration hearings, mediations and investigatory hearings on Reports of Alleged Wrongful Eviction."

It has taken a strong lead in providing information in a way that all stakeholders can understand. Examples, all of which are available in digital format and are easily printed, include the following:

- Overview of Rent Board services – what we do and what we don't do
- Form center with digitally fillable forms
- Cross-indexed popular topics and most requested documents
- Board Meeting Agendas, meeting minutes and audio and video archives
- Monthly and annual workload statistics
- Stand-alone website, distinct from other offices of the city government
- A toolbar at the top of the page featuring the most important topics
- Accessibility features for non-English speakers to translate the site into Mandarin or Spanish
- Buttons to turn the site into text only and other ADA compliant formats

---

[1] San Leandro's landlord services are contracted out to the Eden Council for Hope and Opportunity, a nonprofit organization that works on housing/rental issues in the East Bay.
[2] San Francisco Rent Board, "The Mission of the Rent Board," http://sfrb.org/mission-rent-board

P001093

## Best Practice Analysis: Landlord & Tenant Education and Outreach



The San Francisco Board also uses Twitter to broadcast key information concerning rental housing in the city. These tweets have included links to rent board meeting minutes and rent increase petitions for utility pass-throughs and capital improvements.

We noted that Oakland's Rent Adjustment Program information is housed under the broader banner of "Housing & Community Development." This site mapping buries critical information as evidenced in the following screens below with features of interest noted.



3

P001094

**Best Practice Analysis: Landlord & Tenant Education and Outreach**

**Berkeley Rent Stabilization Board**

This Board was founded in 1980 as a result of the Rent Stabilization and Eviction for Good Cause Ordinance[3], the mission of which is to "regulate residential rent increases...and to protect against unwarranted rent increases and evictions and to provide a fair return to property owners."

Their website has several prominent features with regard to their support of landlord and tenant information access and education:

- **Rent Adjustment Calculator** for landlords to determine how much they are legally allowed to raise the rent. (1.5% CPI for 2016)

- **Email Lists** Landlords and tenants can choose to receive emails regarding workshops, seminars, and registration announcements.

- **Rent Ceiling Confirmation** Both landlords and tenants can check to see if their property must comply with the Berkeley Rent Board requirements.

- **Frequently Asked Questions (FAQ) page** with common questions from tenants and landlords.



The Berkeley Board uses Facebook to host information pertaining to rental housing and publicizes the date, time, and topics of discussion for the next Rent Board meeting. A link to the Facebook page is posted on its website.

All workshops and seminars are also advertised with direct links to registration pages, offering users immediate access to important educational resources and a reliable pipeline for user attendance at these events.

---

[3] Berkeley Rent Stabilization Board, "About the City of Berkeley Rent Stabilization Board and Program," http://www.ci.berkeley.ca.us/Rent_Stabilization_Board/Department_Master_and_Collections/TEMP_-_About_Us_and_Contact_Us/Rent_Board_-_About_Us.aspx

4

P001095

## Best Practice Analysis: Landlord & Tenant Education and Outreach

The Berkeley Board is landlord based but sponsors and promotes its outreach to both landlords and tenants through its free workshops and seminars that are conveniently located at public libraries and/or the Rent Board offices and cover a wide range of topics.  They are listed on the homepage of the Rent Board website and are posted on Facebook and promoted through the list-serve that landlords and tenants can opt-in to receive.

Outreach includes partnering with community festivals to inform landlords and tenants about services.  The Board has been represented at annual community events over the last several years, such as the Solano Avenue Stroll, the Juneteenth Festival, and Sunday Streets.  The Board has the opportunity to connect with thousands of people who both own and lease rental property by participating in these events,

## San Leandro Rent Review Program

This began in May 2001 as a way to provide the city's tenants and landlords a forum to review and settle rent disputes[4].

The program maintains a clear, consolidated, easy to use website for landlords and tenants and includes block text, short lists of relevant web links and bold, colorful typeface to draw the reader's attention to important changes to the local rental ordinance.  It also uses the City of San Leandro's social media accounts including Facebook and Twitter to announce important messages.



---

[4] City of San Leandro, "Rent Review Program," http://www.sanleandro.org/depts/cd/housing/rentreview/default.asp

P001096

**Best Practice Analysis: Landlord & Tenant Education and Outreach**

## Recommendations for the Oakland RAP

### Organizational & Procedural Transparency

- ✓ Develop clear messaging that includes a short fact sheet about the mission and role of RAP – what it does and does not do, and a clearly worded summary of the RAP Ordinance and Regulations.
- ✓ Create a frequently asked questions (FAQ) section answering common questions from tenants and landlords, using specific content that could be applicable to similar situations.
- ✓ Offer simplified, streamlined explanations of allowable rent increases, with citations of the rental ordinance.
- ✓ Track and report the monthly and annual workload statistics for the Oakland RAP program.

### Clear & Consolidated Web Resources

- ✓ Restructure the website to include reader-friendly features such as 'white-space' and updated webpage layout, to avoid scrolling through the page to find relevant links; text-only or audio-now formatting; Spanish- and Mandarin-language resources; and use of sparse, large-point, easy-to-read san serif fonts where block text is required.
- ✓ Provide access to major links in a simple toolbar that runs along the top of the webpage. Offer secondary links or connections to other relevant resources in a separate sidebar.
- ✓ Develop a "Frequently Requested Forms" link that directs users to the most important documents (e.g., rent increase notice, petition filing evidence gathering).
- ✓ Make all forms required by landlords and tenants at any stage of the rental resolution process digital, fillable PDF documents that can be completed and submitted online while maintaining the current paper process through the US mail for those parties that do not have online access.

### Social Media Presence & Programming

- ✓ Develop a presence on sites like Facebook and Twitter as a means of enhancing outreach, education, and visibility of the Oakland RAP.
- ✓ Coordinate with the existing social media presence of other Oakland City government administrations—who have established a following—to direct traffic to RAP social media outlets.
- ✓ Cross-index or link to RAP resources across all platforms. Oakland RAP social media should link to the RAP web page and other social media outlets, and vice versa.
- ✓ Use social media platforms to issue landlords and tenants regular reminders about important deadlines for administrative purposes, notifications about critical changes to rental ordinance, or updates about important local news pertinent to rent adjustment regulations and services.
- ✓ Generate YouTube or Vimeo video tutorials to help users navigate the RAP website.

P001097

## Best Practice Analysis: Landlord & Tenant Education and Outreach

### Workshops & Seminars

One of the most important ways the case study municipalities have educated and reached landlords is through the use of community-based workshops and seminars.  Hosting such events allows landlords and tenants to ask specific questions and seek personalized consultation from RAP staff and partners.

- ✓ Although Oakland RAP currently holds workshops and presentations, we recommend furthering the program - scheduling regular, well-publicized events at public meeting sites in various parts of the City, such as libraries or City Hall.  These should be available to all stakeholders, landlords and tenants alike.

### Collaboration with other Agencies

Collaborative partnerships between the local rent adjustment program and other community agency stakeholders is an education and outreach best practice identified in San Francisco, San Leandro, and Berkeley.

Rental services are mostly targeted to tenants In the Bay Area.  There are multitudes of tenant-centric services such as the East Bay Community Law Center and Centro Legal De La Raza, as well as many private law firms that offer pro bono and paid legal services.  Property owners and managers, by contrast, often only have paid member access to singular property owners' associations or advocacy bodies, such as the East Bay Rental Housing Association.  As a result, Oakland landlords are often left out of creative inter-organizational partnerships intended to address the local housing crisis.

- ✓ Establish Oakland RAP presence at community events, such as Oakland First Fridays and the Oakland Pride Festival.
- ✓ Solicit partnerships with organizations well versed in housing advocacy and landlord education services to develop new landlord and tenant education programming.

7

P001098

# City Administrator's Response



CITY OF OAKLAND

CITY HALL • 1 FRANK H. OGAWA PLAZA • OAKLAND, CALIFORNIA 94612

Office of the City Administrator
Sabrina B. Landreth
City Administrator

June 24, 2016

(510) 238-3302
FAX (510) 238-2223
TDD (510) 238-2007

The Honorable Brenda Roberts
Oakland City Auditor
1 Frank Ogawa Plaza, 4th Floor
Oakland, CA 94612

RE:  Performance Audit of the City of Oakland Rent Adjustment Program

Dear City Auditor Roberts:

The Administration and the Housing & Community Development Department (Department) welcome audits to improve efficiency, effectiveness and the safeguarding of taxpayer dollars.

The Rent Adjustment Ordinance was adopted more than 30 years ago to provide stable housing and support to Oakland tenants.  In the past several years, residential rent has increased to levels that has caused many Oaklanders to no longer be able afford to live in our City.

This audit brings to light areas in need of improvement which will help the Rent Adjustment Program function as a service to both tenants and landlords in the resolution of housing disputes.

In the interest of communicating the message of this audit timely, we urge you to issue this report without my formal response at this time.  We acknowledge that certain recommendations in your report are a part of a long-term strategy and may take some time to implement.  Other changes may have already been initiated and action plans are underway.  My office will work with the Department to formulate responses and to identify the status of each of the recommendations in this audit report within the next 45 to 60 days.

I look forward to working with you in continuing to target key areas that could result in improvements to the Rent Adjustment Program in order to better serve the Oakland community.

Sincerely,

Sabrina B. Landreth
City Administrator

cc:    Michele Byrd, Director Housing & Community Development
       Margaret O'Brien, Interim Revenue & Tax Administrator, Revenue Management Bureau

P001099



# CITY OF OAKLAND

CITY HALL •1 FRANK H. OGAWA PLAZA • OAKLAND, CALIFORNIA 94612

OFFICE OF THE CITY ADMINISTRATOR
Sabrina B. Landreth
City Administrator

(510) 238-3301
FAX: (510) 238-2223
TDD: (510) 238-3254

October 21, 2016

Honorable Brenda Roberts
Oakland City Auditor
1 Frank Ogawa Plaza, 4th Floor
Oakland, CA  94612

**RE: City Administrator's Response to the Oakland Rent Adjustment Program Performance Audit**

Dear City Auditor Roberts:

The City Administration and the Housing and Community Development Department (HCD) appreciate the Rent Adjustment Program (RAP) audit report, which highlighted areas and functions in need of further attention and improvement. HCD developed a management action plan to address these issues based on the recommendation tracking matrix provided to them. Staff has read and begun implementing the recommendations and some of them are almost completed. Other recommendations are multifaceted and contain various timelines, responsible parties, and are dependent on legislative and / or contracting processes. All of the items are a part of the City Administration's longer-term strategies for improvement of the RAP and Housing services in general.

The matrix that follows lists the audit recommendations and includes staff comments to each. Staff identified the responsible parties for implementation as well as the initial estimated timeframes to complete each recommendation. As noted above, some of these recommendations have now been almost fully implemented and are so noted.

Staff plans to provide the City Council with an update on the RAP and the progress of the program in February 2017. This meeting will be an opportunity to reassess timing and implementation plans for each of these items and other RAP priorities which staff seeks to implement. Staff will reevaluate deadlines on an ongoing basis. To assess progress and to receive feedback, we suggest having regular check-ins with you and your staff which will help us continue to move forward productively.

P001100

**RE: City Administrator's Response to the Oakland Rent Adjustment Program Performance Audit**
Page 2

I want to extend my gratitude to the City Auditor and her staff for providing a report that assists us in better serving the Oakland community.

Sincerely,

Sabrina B. Landreth
City Administrator

cc:          Michele Byrd, Director, Housing and Community Development
             Margaret O'Brien, Revenue and Tax Administrator, Revenue Management Bureau

Attachment:  Tracking Matrix

P001101

**City Auditor's Office Rent Adjustment Program Audit (June 27, 2016)**
**City Administrator's Responses as of October 21, 2016**



CITY OF OAKLAND

| | City Auditor's Recommendations | Management Response | Responsible Party | Target Date to Complete |
|---|---|---|---|---|
| 1 | Increase the number of Rent Board alternates to provide sufficient volunteer Board members. | The City Council passed legislation (Ordinance No. 13373 C.M.S.) which added 3 additional alternates to the Rent Adjustment Board (1 neutral; 1 tenant; and 1 landlord). The Mayor's Office has been very diligent in appointing members to fill those new alternate positions. All 3 new alternates will be appointed by November 2017. | City Council and the Mayor's Office | October 2016 |
| | The Mayor needs to:<br>• Appoint members to open Board positions timely<br>• Fully communicate to appointees their responsibilities and obligations as members of this Board<br>• Replace Board members who don't fulfill their duties | As of the date of this report, no vacancies remain for the Rent Board. The Mayor's Office has begun using Granicus to track current terms and all vacant positions for City boards and committees. The Office is almost caught up on all of the term dates and expiration dates for all Rent Adjustment Board (RAB) members in Granicus. The electronic tool will help the Mayor's Office and RAP to easily keep track of upcoming vacant board seats in order to ensure no time lost between appointments. Staff provides the Mayor's Office with attendance records on a quarterly basis in order to ensure appointees are attending the meetings. In terms of communication to appointees of their responsibilities, etc. as board members, staff will work to formalize such communication material to ensure that new and existing board members are aware of their role and expectations as RAB members.<br><br>Staff will create a summary document which can be used to explain duties to new and existing board members. This document will be created by March 2017. | Mayor's Office and RAP staff liaison to the Rent Adjustment Board | Timely appointments: Ongoing<br><br>Replace Board Members: Ongoing<br><br>Communicate Duties: Ongoing |
| | Attendance records should be provided to the Mayor on a semiannual basis. | The Mayor's Office and the RAP program have decided that the RAP staff will send RAB attendance records to the Mayor's Office on a quarterly basis. | RAP staff through Granicus | Almost completed. Otherwise ongoing. |
| 2 | A content-focused training program should be developed for Board members:<br>• This program should be scheduled over the course of the year with expected time frames for completion<br>• The training can be presented at regular Board meetings in some cases | The City Administrator's Office will work with the RAP program to determine the training structure and curriculum by December 2016. Staff will survey RAB members to see what type of training they would like to see. In addition, staff will add other important topic ideas for the training curriculum. | RAP staff with help from CAO | December 2016 (draft curriculum)<br><br>Training program finalized and implemented by the end of March 2017. |
| | RAP management should:<br>• Track the progress of the training sessions<br>• Include completion information and Board member attendance records in the semiannual report to the Mayor | Staff will create a template for ongoing training requirements as well as a tracking sheet and share it on a semi-annual basis to the Mayor's Office. | RAP staff | Ongoing |

P001102

**City Auditor's Office Rent Adjustment Program Audit (June 27, 2016)**
**City Administrator's Responses as of October 21, 2016**



CITY OF OAKLAND

| | City Auditor's Recommendations | Management Response | Responsible Party | Target Date to Complete |
|---|---|---|---|---|
| 3 | A communication strategy should be adopted by the Rent Board, which will:<br>• Allow for ease of access and use for different types of users<br>• Include internet-based technology | Staff is currently working with the City Clerk's Office to use Granicus for communication and access to all the information contained in the Board packets. Staff is also working to provide the RAB members with tablets for use to access and review the packets prior to and during meetings. | RAP staff consulting with the City Clerk's Office | February 2017 |
| | Rent Board preparation materials, including Case Appeals packets should be scanned and uploaded to the RAP website rather than mailed to each Rent Board member. | While the database is being implemented, RAP staff is working with the City Clerk's Office on Granicus to electronically make packet information available to RAB members who want an electronic packet. In the new database, which will be available in February 2017, RAB members will likely have their own user accounts with permissions which will allow them to see necessary information related to cases for meetings. | RAP staff | February 2017 for Granicus;<br><br>February 2017 for the database |
| | The Rent Board should formulate an accessible online public communication strategy that provides interested parties with all appropriate information in advance of the meeting and other relevant staff reports. | Staff is currently working with the City Clerk's Office to use Granicus for communication and access to all the information contained in the Board packets. Staff is also working to provide the RAB members with tablets for use to access and review the packets prior to and during meetings. | RAP staff consulting with the City Clerk's Office | February 2017 |
| 4 | RAP management should post Petition Hearing and Rent Board decisions to the RAP website or other electronic portals to make these more accessible to the public. | The new database will address this. | RAP staff with CAO staff | February 2017 for the database |
| 5 | Management should address resource needs and work towards using temporary staffing to immediately address the caseload backlog. Permanent staffing should be planned for to fill needed positions as workload continues to increase. | RAP staff have been working with the Human Resources and Management Department (HRMD) to fill the current authorized positions. There are currently 2 positions unfilled and recruitment efforts are underway to fill them. With the recruitment being initiated by December 2016, it is expected that the new employees will be hired by March 2017. | RAP staff | December 2016 – start recruitment;<br><br>March 2017 – employees hired |

P001103

**City Auditor's Office Rent Adjustment Program Audit (June 27, 2016)**
**City Administrator's Responses as of October 21, 2016**



CITY OF OAKLAND

| | City Auditor's Recommendations | Management Response | Responsible Party | Target Date to Complete |
|---|---|---|---|---|
| 5 cont. | Other recommendations for management are:<br>• Review workflow processes for efficiencies and identify opportunities to leverage staff, limit document handling, and maximize consistent and secure file organization. Management should update policies and procedures accordingly<br>• Determine appropriate staffing levels given the current and expected workload and prepare a budget for additional full time personnel expense<br>• Implement a formal, routine quality assurance program to ensure conformance to set standards and compliance with the RAP Ordinance and regulations, and department and city procedures-a standard in legal practices.<br>• Hearing officers should not conduct onsite inspections of properties. Rather, RAP should contract professional building inspector services in the Planning & Building Department to perform these site inspections, allowing Hearing Officers to devote their time to case file preparations<br>• Management should work with the City Attorney to propose changes to the RAP Ordinance and regulations to eliminate inefficiencies that may be creating delays in adjudicating cases | • The workflow process will be reviewed in the database creation process. In order to incorporate process efficiencies into the new database, the database project team is factoring the process into the database design.<br><br>• Appropriate staffing levels will be reviewed in the HCD budget proposal where HCD leadership and RAP staff will assess new staff needed based on: new legislation, the expected number of petitions, the petition process, and the expected program efficiencies based on the database upgrades.<br><br>• For inspections, such an approach would require budgetary changes as well as staff training. A budget discussion for dedicated inspection staff will occur during FY 2017-2019 bi-annual budget process. For changes to the RAP ordinance, staff will be looking for efficiencies in the database design process.<br><br>• Staff will also ask the Office of the City Attorney about proposed changes throughout that process. In addition to and separate from the database, RAP staff will engage with the Attorney's Office about other program efficiencies and assess if legislation is needed.<br>• In terms of quality assurance, all of the current changes are an effort towards this. With the ballot measures and landlord petition changes, further quality assurance work may not be done comprehensively or timely at this time. | RAP staff with other offices such as Planning and Building and the Office of the City Attorney | The database will be completed in February 2017<br><br>Budget will be reviewed during the FY 2017-2019 bi-annual budget process<br><br>Timeline for the inspections conversation would be first quarter in FY 2017-2018.<br><br>Other efficiencies conversations would occur later in 2017 to allow time for database completion and testing |

P001104

**City Auditor's Office Rent Adjustment Program Audit (June 27, 2016)**
**City Administrator's Responses as of October 21, 2016**


CITY OF OAKLAND

| | City Auditor's Recommendations | Management Response | Responsible Party | Target Date to Complete |
|---|---|---|---|---|
| 6 | RAP management should evaluate the type of automated caseload system that would be most cost-effective given its workflow-one that will allow the department to track cases, store records electronically, reduce reliance on paper documents, and produces performance metrics and trend analyses that can be used to regularly report on RAP activities. | Staff conducted a Request For Qualifications (RFQ) process for a firm to help with the initial business process design and database creation for the RAP program. The system will factor in this recommendation. | CAO and RAP staff | February 2017 |
| 7 | Formulate a strategy to develop a public outreach communication plan.<br>• Develop a curriculum that is based on the current ordinance written in plain, clear language<br>• Use innovative ideas to create a broad strategic communication and education plan. | Staff will work with the community engagement staff to develop a communications strategy after November 2016 (allowing staff to assess all new program changes and determine the best strategy to communicate the changes at large). In the meantime, staff is currently working on developing information packets to clearly articulate the ordinance and how it applies to tenants and landlords. It will be translated in all the appropriate languages to accommodate the diverse population within the City. Staff will also work with Community Based Organizations (CBOs) to provide training to enable them to provide assistance to staff to do outreach. | RAP staff, Comm. staff, and CBOs | February or March 2017 for draft plan;<br><br>No later than first quarter of FY 2017-2018 for CBO plan |
| | Goldman School recommendations for best practices in public outreach and communication:<br>• Re-design the RAP website using webpage design best practices that include PDF fillable forms for online submission and links to critical information<br>• Coordinate social media campaigns and other similar content for widespread education of the RAP(Facebook, Twitter and Instagram)<br>• Host information centers at City public events that attract residents and others to communicate RAP materials and at housing trade fairs and other industry functions<br><br>Other practices that should be considered:<br>• Develop and distribute brochures, postcards and notices to libraries, city buildings, escrow offices and legal firms that include information on RAP<br>• Include direct mail inserts with the annual business tax invoice informing recipients of links and references to RAP | • Forms, the database will factor this in as well.<br><br><br>• Webpage redesign and social media campaigns, this will be factored into the communications strategy (also keeping the database changes in mind as well as the costs for a new website).<br><br>• Public events, RAP has been working to increase their public appearances and they will continue to do so.<br><br><br>These items will be factored into a larger communications strategy as described above. | RAP staff and Comm. staff | February 2017 for database and forms<br><br>Initial website crafted by mid-2017.<br><br>Ongoing for participation at public events |

P001105

**City Auditor's Office Rent Adjustment Program Audit (June 27, 2016)**
**City Administrator's Responses as of October 21, 2016**



CITY OF OAKLAND

| | City Auditor's Recommendations | Management Response | Responsible Party | Target Date to Complete |
|---|---|---|---|---|
| 8 | Design a dedicated professional office space for hearings and other public business of RAP that is appropriate for the seriousness of the matters discussed, to include standard security measures (locking doors, security cameras) | CAO staff will work with RAP staff to assess costs for security upgrades including space reconfiguration and other security measures identified in the CPTED analysis, by staff, and within the audit report. | CAO and RAP staff | Improvements and cost will be assessed by December 2016; will then be part of FY 2017-2019 budget process |
| 9 | The City Administrator should conduct an audit of the residential rentals database to validate properties are appropriately assessed under the RAP or Just Cause Ordinances. Likewise, budgeted revenues should be revised to account for all valid assessments. | The Revenue Bureau's new system will be live in late 2016 or early 2017. It will provide a better tracking mechanism for this recommendation. RAP staff will continue to work with the Revenue Bureau to further refine the numbers for the upcoming years. | RAP and Revenue Bureau | September 2017 |
| 10 | Management should develop and monitor the RAP budget in detail, confirming that expenditures are accurate and allocations to the RAP budget are valid and add value to RAP operations and stakeholders.<br><br>Some steps that Management should take are:<br><br>• Confirm that efficiencies are in place in the department that will provide short- and long-term savings for the City, and that resource needs are thoughtfully considered. This is consistent with a budgetary review expected of all city department managers<br><br>• Use financial planning tools such as trends and statistics and economic forecasts to anticipate and estimate how changes in the housing market will impact RAP<br><br>• Develop a policy for reserves management outlining the disposition of these funds including taxpayer refunds, program enhancements, or funding future investments in RAP systems and operations<br><br>• Develop a Capital Investment plan to identify necessary significant investments that will reduce costs over the long term | With the FY 2017-2018 biennial budget process coming up, HCD leadership will work with the RAP manager to develop a budget that reflects upcoming program needs. In this, they can evaluate and incorporate the steps listed into the budget process, for implementation by the first quarter in FY 2017-2018. | RAP staff | Approximately June 2017 |

P001106