BARBARA J. PARKER, City Attorney – SBN 069722
MARIA BEE, Chief Assistant City Attorney – SBN 167716
KEVIN P. MCLAUGHLIN, Supervising Deputy City Attorney – SBN 251477
MICHAEL QUIRK, Deputy City Attorney – SBN 283351
One Frank H. Ogawa Plaza, 6th Floor
Oakland, CA 94612
Telephone: (510) 238-2961 Fax: (510) 238-6500
Email: kmclaughlin@oaklandcityattorney.org
mquirk@oaklandcityattorney.org
X05020/3354834

Attorneys for Defendant
CITY OF OAKLAND

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

IAN SMITH, SUNDAY PARKER and MITCH JESERICH, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

CITY OF OAKLAND, a public entity,

Defendant.

Case No. 4:19-cv-05398 JST

**DECLARATION OF BRYANT SPARKMAN IN SUPPORT OF JOINDER IN PLAINTIFFS' ADMINISTRATIVE MOTION TO SEAL DOCUMENTS AND TESTIMONY DESIGNATED AS CONFIDENTIAL BY DEFENDANT, OR ALTERNATIVELY, RESPONSE TO ADMINISTRATIVE MOTION TO CONSIDER WHETHER ANOTHER PARTY'S MATERIAL SHOULD BE SEALED**

**[Civ. L.R. 79-5(c), (f)]**

I, BRYANT SPARKMAN, declare as follows:

1. The facts stated herein are based on my personal knowledge and, if called as a witness, I could and would competently testify thereto.

2. I am the President and Managing Principal of Century Urban, a leading Bay Area real estate investment, advisory and asset management firm based in San Francisco, CA. I have worked in real estate investment and advising in the Bay Area for over 20 years. I have extensive experience performing asset valuations and other economic analyses of real estate transactions and development projects, as well as the broader economic impacts of projects and real estate-related policies considered or implemented by public entities. I regularly perform work for private-sector clients, as well as for public-sector clients in the Bay Area, including the City & County of San Francisco, City of San Jose, and the City of Oakland, among others. My qualifications and experience are further described in my report in this case and the curriculum vitae attached to the report, a true and correct copy of which is attached hereto as Exhibit A.

3. I was retained by the Oakland City Attorney's Office in this matter to analyze the potential ramifications of expanding Oakland's Rent Adjustment Program ("RAP," also known as rent control) to newer buildings, particularly in light of the RAP ordinance's stated goals, which include providing relief from rent increases to tenants, encouraging rehabilitation of existing units, and encouraging investment in new residential property.

4. The materials contained in Exhibit 8 to the Declaration of Thomas Zito in Support of Plaintiffs' Motion to Exclude Evidence (Dkt. 119) are tables containing assumptions, and formulas utilizing those assumptions, in order to derive estimated values of exemplar multifamily rental properties. Exhibit 2 to the Declaration of Thomas Zito in Support of Plaintiffs' Motion to Exclude Evidence at pages 227 to 249 is a portion of my deposition testimony, pertaining to those assumptions and formulas.

5. Both the assumptions and the formulas that utilize the assumptions were created by myself and the company by which I am employed, Century Urban, over approximately 15 years. Hundreds of hours have been invested in creating these proprietary materials,

1

DECL. OF BRYANT SPARKMAN ISO JOINDER IN PLAINTIFFS' ADMIN. MOTION TO SEAL, OR ALTERNATIVELY, RESPONSE TO ADMIN. MOTION TO CONSIDER WHETHER ANOTHER PARTY'S MATERIAL SHOULD BE SEALED 4:19-CV-05398 JST

particularly the formulas, and many years of industry experience inform the assumptions and the formulas.

6. The assumptions and formulas allow Century Urban to quickly estimate the value of an actual or hypothetical property for purposes of underwriting or financing a purchase of a multifamily housing property, or development of a multifamily housing property, whether large or small.

7. The assumptions and formulas were not uniquely created for this case but are the longstanding business work product of Century Urban. Century Urban routinely utilizes these assumptions and formulas in connection with a wide variety of business dealings, including support of clients' pursuit of funding for real estate projects, and decisions on whether to pursue acquisition of a property or how to develop a property. Without these assumptions and formulas, Century Urban would be forced to undertake a lengthy and painstaking analysis anew each time in order to arrive at an estimated value of an existing property or potential development. By instead utilizing these assumptions and formulas, Century Urban is able to save the costs of that lengthy analysis for itself and its customers, thereby giving it an advantage over its competitors. Being able to quickly perform these types of analyses is also itself a competitive advantage for Century Urban, as it is often called upon by clients to assist in making determinations regarding the value of existing or proposed developments in very short time, often days.

8. If these assumptions and formulas were made known to Century Urban's competitors, it would lose these advantages. The investment of hundreds of hours and years of experience would become widely available to anyone who wanted it. Potentially, Century Urban's customers would no longer need to retain Century Urban to perform these sorts of computations; instead, they could perform the analysis themselves, or a competitor could perform the analysis at a reduced cost.

9. Century Urban has kept these assumptions and formulas confidential at all times, and it derives a significant business advantage by doing so, and it will continue to keep these materials confidential.

10. With respect to the specific materials attached as Exhibit 8 to the Declaration of Thomas Zito, Century Urban performed this analysis at the request of the City of Oakland for this litigation. The analysis was performed at significant cost. However, without the existing assumptions and formulas, the analysis likely could not have been performed at all, due to time and budgetary constraints. The hours and cost involved would have been prohibitive.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on this 5th day of June, 2024, in San Francisco, California.

Bryant Sparkman
BRYANT SPARKMAN

# EXHIBIT A



Century | Urban

# Supplemental Expert Witness Report for Smith v. City of Oakland

Presented to:

City of Oakland

February 9, 2024

235 Montgomery Street, Suite 629 | San Francisco, CA 94104 | www.centuryurban.com



## TABLE OF CONTENTS

INTRODUCTION....3

EXECUTIVE SUMMARY....5

OAKLAND RENT ADJUSTMENT PROGRAM....5

PRIOR ECONOMIC RESEARCH....7

ECONOMIC ANALYSIS METHODOLOGY AND APPROACH....7

ECONOMIC ANALYSIS FINDINGS....10

CONCLUSION....12



## INTRODUCTION

Century Urban, LLC ("Century | Urban") is a privately held, full-service real estate economic consulting, advisory, and project management firm, established in 2010 and headquartered in San Francisco. Our team is comprised of 12 real estate professionals with extensive expertise in real estate development and economics. Our Managing Principals have over 45 years of experience in asset management, development, acquisitions, dispositions, economic and development financial feasibility analysis, and public-private partnership negotiations. We have worked with major property types, such as industrial, office, retail, apartments, affordable housing, mixed-use and institutional projects.

Our services include programmatic reviews of residential, commercial and mixed-use development projects, feasibility assessments of underutilized land and properties, ground lease structuring, public-private partnership negotiations, asset disposition analysis, and provision of a full suite of real estate investment management services. The firm's Managing Principals have in-depth real estate development, underwriting and capital markets knowledge from having worked with leading Bay Area cities, real estate developers and owner-operators.

*Expert Witness Qualifications*

Bryant Sparkman is the President and Managing Principal of Century | Urban and provides strategic real estate investment and advisory services to third-party clients. These services include economic analysis, affordable housing evaluation, transaction structuring, establishment of public-private-partnerships, and acquisition-related services to enhance and preserve long-term value for Century | Urban's clients.

Bryant has over 23 years of real estate investment, advisory, development, and institutional asset management experience that encompasses a wide range of property types, including market-rate apartments, affordable and middle income housing, office buildings, full-service hotels, and large-scale mixed-use projects such as the landmark Hotel and Residences at L.A. Live in downtown Los Angeles. Bryant has provided advisory services for over $5 billion of real estate projects in the Bay Area and has significant expertise in the successful consummation of public-private-partnerships such as the Mission Rock mixed-used project in San Francisco.

Prior to founding Century | Urban, Bryant was Vice President, Investments in the urban investment group of MacFarlane Partners, where he originated investments and oversaw multiple development and redevelopment projects. He played a role in deploying $500 million of equity capital for acquisitions and ground-up development projects in partnership with leading real estate operating and development companies.

Bryant began his real estate career as a Financial Analyst in the real estate investment banking group of Banc of America Securities, participating in engagements involving mergers and acquisitions, recapitalizations, and joint ventures.

Bryant is a member of the Policy Advisory Board for the Fisher Center for Real Estate & Urban Economics at UC Berkeley and an active member of Lambda Alpha International, a global land economics society. He has actively served as a member of the Urban Land Institute (ULI) San

Francisco Executive Committee since 2005, formerly led the ULI Residential Local Product Council and ULI Programs Committee and was a member of the ULI National Urban Development and Mixed Use Council. Bryant graduated cum laude from the University of Southern California, earning a bachelor's degree in business administration with a concentration in finance and entrepreneurship.

***Publications Authored***

Century | Urban has prepared various expert witness reports in addition to numerous subject matter reports on behalf of its public agency clients, and non-profits. These reports include the following:

- Expert opinion regarding real estate investments related to the Huyn vs. Hassan real estate matter (2017)
- San Jose Affordable Housing Cost Study (2022 and 2023)
- San Jose Residential Feasibility Study (2022 and 2023)
- Fiscal Impacts of the Waterfront Ballpark District at Howard Terminal (2021)
- Burlingame Commercial Linkage Fee Analysis (2022)
- Presented Urban Land Institute Advanced Residential Development Capital Structures (2008)

***Witness Expert Experience***

Bryant Sparkman has served as an expert witness for the following cases over the past five years.

| Year | Law Firm | Case Description |
|---|---|---|
| 2017 | Blevans & Blevans, LLP | Huyn vs. Hassan Real Estate Matter |
| 2017 | Law Office of Steven B. Piser | Spengers Grotto Entitlement Matter |
| 2023 | Steyer Lowenthal Boodrookas | Kaufman vs. Nicalo, LLC Real Estate Matter |

***Scope of Engagement***

The Office of the City Attorney has engaged Century | Urban to perform an economic analysis of the impact of imposing rent control on rental units not currently covered by the City of Oakland's ("the City") Rent Adjustment Program ("RAP" or "Program") and to present these findings in an expert witness report, provided herein. In addition, Century | Urban may be requested to provide expert testimony and/or attend depositions. Century | Urban will be compensated on an hourly basis for actual hours worked in preparation of this report and preparation and participation in depositions or trial as an expert witness. The billable hourly rate for this work is $600.00 for Principals, $400.00 for Vice Presidents and $300.00 for Financial Analysts.



## EXECUTIVE SUMMARY

It is Century | Urban's expert opinion that an expansion of the City's RAP could result in a decline in real estate values for both existing non-covered rental buildings and new development projects. This in turn could lead to a decline in new construction or reduction in housing supply from property owners converting existing rental buildings to non-rental uses such as condominiums. In addition, an expansion of rent control may lower projected investment returns thereby disincentivizing rehabilitation of existing housing.

Per a review of existing building sales since 2017, properties built prior to 1983, which are subject to RAP, transacted at a per unit sales price of between 49% and 109% less than the per unit sales price of buildings of similar type that were constructed during or after 1983, which are not subject to RAP. Furthermore, our analysis shows that applying RAP rent increase restrictions to new development could result in a value differential of approximately 23% and a lower developer return. A lower developer return may lead to lower construction activity as developers and investors would seek projects in markets with fewer constraints and higher return potential.

## OAKLAND RENT ADJUSTMENT PROGRAM

In 1980, the Oakland City Council passed its first rent control ordinance which established the Housing, Residential Rent Arbitration and Relocation Board and the Rent Adjustment Program, which has since been amended to the current ordinance, O.M.C. Section 8.22.010 et seq. ("Ordinance"). The Ordinance states that "among the purposes of this Chapter are providing relief to residential tenants in Oakland by limiting rent increases for existing tenants; encouraging rehabilitation of rental units, encouraging investment in new residential rental property in the city; reducing the financial incentives to rental property owners who terminate tenancies under California Civil Code Section 1946 ("Section 1946") or where rental units are vacated on other grounds under state law Civil Code Sec. 1954.50, et seq. ("Costa-Hawkins") that permit the city to regulate initial rents to new tenants, and allowing efficient rental property owners the opportunity for both a fair return on their property and rental income sufficient to cover the increasing cost of repairs, maintenance, insurance, employee services, additional amenities, and other costs of operation."

RAP applies to rental units that were constructed before January 1, 1983 and excludes the following types of units:

- Units that are controlled or regulated by a governmental unit or agency, such as a housing authority.
- Cooperative units controlled by a majority of the residents.
- Single family residences and condominiums if rented as a single unit and not room-by-room.
- Uses such as motels, hotels and rental units in health facilities, substance abuse recovery or homeless housing.

The program does not include units that were constructed on or after January 1, 1983; however, excluded units may be subject to the California's Tenant Protection Act of 2019 (the "Act"), which applies to projects where a certificate of occupancy was issued more than 15 years ago, on a rolling



basis. Thus, projects that received a certificate of occupancy in 2008 or earlier would be covered by the Act. The Act has a higher rent increase limit as compared to the Program with a cap of 5% plus the applicable Consumer Price Index ("CPI") up to a maximum of 10% per year. The Act has not had a significant impact on new development activity as it does not apply to a project's first 15 years of operations and allows for higher potential annual rent increases.

***Rent Increases***

The Oakland Rent Adjustment Ordinance allows an annual rent increase based on the regional CPI. In 2023, the City Council implemented a change to the annual allowable rent increase revising the increase to be equal to 60% of the change in CPI-All Items, or 3%, whichever is lower. The allowable CPI increase under RAP is published once per year and is currently set at 2.5% for the period August 1, 2023 through July 31, 2024. An owner can increase the rent on a covered unit only once in a 12-month period and the first increase cannot be effective less than 12 months after the tenant first moves into the unit.

In a given year, an owner can choose to increase rent up to the maximum allowable rent increase, choose not to increase rent, or increase rent by an amount less than the allowable annual increase. If an owner chooses not to increase rent up to the maximum allowable amount, the owner may "bank" the unused rent increase and apply it to future rent increases. However, the rent increase in any single year may not exceed the total of three times the allowable CPI increase or the maximum increase under the Act.

There are exceptions to the rent increase maximums. For example, an owner may pass through 70% of the allowable costs for capital improvement expenditures made and paid for within 24 months before filing a pass-through petition. Capital improvement costs are amortized, or spread out, over the useful life of the improvement. In addition, an owner may petition for a higher rent increase to achieve a fair return or to account for additional occupants that exceed the base occupancy level. Each of these exceptions must be approved under RAP and no increase resulting from an exception can be greater than 10% in one year, or 30% over any five-year period of tenancy.

The rent increase caps are not applicable to qualifying vacant units per the Costa-Hawkins Rental Housing Act ("Costa-Hawkins"), which was passed in 1995 by the California legislature. Costa-Hawkins allows owners to set a market rent for vacant units. For units covered by RAP, the property owner may set a new rent on a vacant unit but subsequent rent increases are subject to the Program's rules.

To determine the economic impact of RAP on new development, RAP rent increase restrictions were applied to financial pro forma analyses for prototypical new development projects to estimate their effect on future value as described in greater detail in the following pages.



## PRIOR ECONOMIC RESEARCH

The RAP ordinance describes several goals for the program including providing relief from rent increases to tenants, encouraging rehabilitation of existing units, and encouraging investment in new residential property. However, when applied to newer buildings not covered by rent control or new development, the reduction in income and property value may serve as a disincentive for rehabilitation of existing units and investment in new development. There is a substantial body of research regarding the potential effects of rent control on rental housing supply and rental housing values, much of it indicating that further expansion of rent control may negatively impact new development and the supply of housing.

For example, a study conducted by Kenneth Rosen and the UC Berkeley Fisher Center for Real Estate and Urban Economics in September 2018[1] concluded that rent control reduces the supply of rental housing by: incentivizing property owners to convert rental units to other uses such as for-sale housing units or non-residential uses; creating an inefficient allocation of housing whereby renters are incentivized to remain in their units over a longer term; and by discouraging development activity. This report relied on a study by Stanford Graduate School of Business published in the American Economic Review journal in September 2019[2], which found that landlords actively responded to the imposition of rent control in San Francisco by converting their properties to exempt uses, leading to a 15 percent decline in rental housing units. Finally, a recent study following the passage of New York State Housing Stability and Tenant Protection Act ("HSTPA") in 2019[3] found that the sales price per square foot of all rental properties evaluated fell after its passage.

## ECONOMIC ANALYSIS METHODOLOGY AND APPROACH

Century | Urban reviewed the complaint filed on behalf of plaintiffs Ian Smith, Sunday Parker and Mitch Jeserich as a class action on August 28, 2019 in the United States District Court Northern District of California. The complaint states that nearly all of Oakland's accessible rental units were built after January 1, 1983 and therefore most accessible units are not covered by RAP. The complaint requests relief that would provide those with disabilities who need accessible housing to have equal opportunity to the City's Rent Adjustment Program by expanding the Program to include units not currently covered including new construction.

To evaluate the impact of an expansion of RAP, Century | Urban analyzed its potential effect on the economic value of existing buildings not currently covered by the Program and new development projects. To perform this analysis, Century | Urban relied on information provided by the City, publicly available information and paid subscription data. The data and information collected and reviewed for this analysis includes the following:

- A presentation prepared by the City that compares the requirements under California's Tenant Protection Act of 2019 to RAP.
- A list of RAP covered buildings, which includes nearly 25,000 properties.

[1] https://escholarship.org/uc/item/9dn0n4g7
[2] https://www.aeaweb.org/articles?id=10.1257/aer.20181289
[3] https://furmancenter.org/research/publication/housing-stability-and-tenant-protection-act-an-initial-analysis-of-short-te

- Sales price, existing building and proposed development data from CoStar, a paid subscription service, which identifies itself as the "industry leader in commercial real estate information, analytics and news".
- Published reports by the Fisher Center for Real Estate & Urban Economics, the Terner Center, the NYU Furman Center for Real Estate and Urban Policy and The California Legislative Analyst's Office.
- RAP annual allowable rent increases published on the City's website[4].

Utilizing the data and information listed above, Century | Urban completed two analyses to evaluate the economic impact of an expansion of RAP on existing non-covered buildings and on new development projects. An analysis was performed for three different building types: lowrise, midrise and high rise as defined by CoStar. CoStar defines lowrise as containing one to three stories, midrise as containing four to 14 stories and highrise as any building of 15 or more stories. These building types were analyzed separately as they typically differ in unit mix, development and operating costs. CoStar maintains information for over 12,400 market rate lowrise buildings, over 2,300 market rate midrise buildings and nearly 50 market rate highrise buildings in the City.

**Existing Building Analysis**

Century | Urban obtained data for all market rate rental building sales in CoStar's database that occurred between 2017 and December 2023. The data set included 1,167 transactions including 1,068 lowrise, 96 midrise and one highrise transactions. Century | Urban organized the data into two categories, buildings that were completed before January 1, 1983 and buildings that were completed on or after January 1, 1983. Buildings that were completed before January 1, 1983 are assumed to be covered by RAP ("RAP Buildings") and those that were built on or after January 1, 1983 are assumed to be exempt from RAP ("Exempt Buildings"). Each dataset was then subsequently organized by building type. For each building type, Century | Urban calculated the weighted average sales price per unit for RAP Buildings and Exempt Buildings separately, which were compared to determine if a variance exists.

**New Development Project Analysis**

Century | Urban created utilized its existing proprietary intellectual property to prepare an economic model for each building type that reflects the unit mix, building height and number of units for projects that have been built since 2017. To do so, Century | Urban reviewed recently completed market rate projects included in CoStar's database for each building type. CoStar's database includes 19 lowrise projects, 49 midrise projects and nine highrise projects constructed since January 1, 2017. A weighted average unit mix, building stories and unit size was prepared based on the dataset for each building type to establish a development program for each building prototype. Using these prototype development programs, Century | Urban prepared Excel-based economic pro forma models. The pro forma model for each building prototype includes a projected development budget, as well as financing and operating assumptions such as market rents and operating expenses based on current market conditions.

---

[4] https://www.oaklandca.gov/resources/learn-more-about-allowable-rent-increases.



Net operating income is equal to operating income such as rental revenue minus operating expenses such as utilities, payroll and property taxes. For a market rate building, rental revenue is determined by the market-rate rental rate per unit that can be charged to a tenant. Market-rate rental rates can vary over time based on market conditions and supply and demand factors but generally increase over time.

The pro forma models estimate net operating income over a long-term hold period to evaluate the potential effect of rent control on the future sales price of a new development project to compare the sales prices of a rent-controlled and a non-rent-controlled building.

A pro forma model was created for the building prototypes under a rent control scenario ("RAP Scenarios") applying the RAP requirements and non-rent-control scenarios ("Market-Rate Scenario") resulting in a total of six economic models. Both scenarios contain the same underlying assumptions for each building prototype, but the RAP Scenarios include the following adjustments to reflect the effect of RAP requirements:

***Rent Growth***

As noted above, the City Council recently amended the annual allowable rent increase under RAP to be equal to 60% of the annual change in CPI-All Items, which has averaged 3.3% over the past 10 years. Therefore, the projected annual rent growth rate in the RAP Scenarios is approximately 2.0% (60% of 3.3%). Under the Market-Rate Scenario, rents are projected to increase each year at a rate equal to the average annual change in the CPI-Rent of Primary Residence, which is 4.2% over the past 10 years.

**CPI-ALL ITEMS & CPI-RENT ANNUAL INCREASE**

| Year | CPI-All Items | CPI-Rent |
|---|---|---|
| 2014 | 2.8% | 5.5% |
| 2015 | 2.6% | 6.1% |
| 2016 | 3.0% | 6.6% |
| 2017 | 3.2% | 5.5% |
| 2018 | 3.9% | 5.3% |
| 2019 | 3.3% | 3.5% |
| 2020 | 1.7% | 2.6% |
| 2021 | 3.2% | 0.1% |
| 2022 | 5.6% | 1.6% |
| 2023 | 3.7% | 4.9% |
| **10-Year CAGR** | **3.3%** | **4.2%** |

*Turnover to Market Rent*

As renters in RAP covered units are incentivized to remain in their units for a longer term, an average tenancy of 7 years was assumed in the RAP Scenarios. Thus, approximately 14 percent of units each year would be vacated and increased to market-rate rent levels. According to the Stanford study in the American Economic Review journal on rent control in San Francisco, over 50% of residents in rent-controlled buildings in San Francisco remained at their address for over 5 years and approximately 13% of residents remained at their address for over 10 years[5].

*Capitalization Rate*

The projected capitalization rate at sale was increased by 0.50% or 50 basis points for the RAP Scenarios to account for a higher level of return that a developer and future buyer would require for a project due to its restricted rent growth. The capitalization rate is based on the net income that the property is expected to generate in a year and is calculated by dividing net operating income by property asset value and is expressed as a percentage. Investors use capitalization rates to estimate the purchase price of a potential real estate investment. All else equal, a project with a lower net operating income will yield a lower value when the same capitalization rate is applied. Century | Urban derived the 0.50% capitalization rate spread based on discussions with market participants including appraisers, brokers, developers and investors regarding the target return threshold that would be required for a rent-controlled project.

The economic models project net operating income over a 10-year hold period for each building prototype. A 10-year hold period is generally used by real estate investors to underwrite potential investments. The estimated net operating income in the eleventh year of operations for each building prototype and scenario is divided by the applicable capitalization rate to determine the projected sales price at the end of the 10-year period. The sales prices for the RAP Scenarios and Market Rate Scenarios are compared to evaluate the impact of applying rent control to new development projects.

## ECONOMIC ANALYSIS FINDINGS

As described above, two analyses were performed to evaluate the economic impact of an expansion of RAP on non-covered buildings. One analysis evaluates the difference in sales price between existing buildings covered by RAP and existing buildings not covered by RAP, and the other analysis evaluates the impact of applying RAP requirements on the future value of new development projects.

**Existing Building Analysis**

As noted above, Century | Urban reviewed data for all market rate rental building sales contained in the CoStar database that occurred between 2017 and December 2023. The majority of sales consisted of lowrise buildings, followed by midrise buildings. Only one high rise transaction occurred during that period. As a result, insufficient data exists to draw conclusions related to

[5] https://www.aeaweb.org/articles?id=10.1257/aer.20181289



highrise buildings; however, it should be noted that there are few highrise buildings constructed prior to 1983 that would be covered by RAP.

As shown in the table below, there is a significant variance between the sales price per unit for buildings constructed prior to 1983 and during/after 1983 for both lowrise and midrise building types. Lowrise Exempt Buildings had a weighted average sales price per unit of $341,000 as compared to $229,000 for RAP Buildings. This equates to a 49% difference in the sales price per unit between lowrise rent-controlled and non-rent-controlled buildings. The variance in sales price per unit for midrise buildings is even more pronounced with RAP buildings selling at a weighted average sales price per unit of $269,000 compared to $562,000 for Exempt Buildings or a 109% difference. A review of capitalization rates found that lowrise RAP Buildings had a higher capitalization rate than lowrise Exempt Buildings, which indicates that investors require a higher risk-adjusted return for rent-controlled buildings. The capitalization rates for midrise buildings fell in the same approximate range, which may be the result of the smaller dataset for this building type. However, the significant difference in sales price indicates that net operating income for non-rent-controlled buildings is significantly higher than for rent-controlled buildings. Although some of the variance may be due to the age of RAP Buildings as compared to Exempt Buildings, which are newer and may have lower maintenance expenses, age alone does not explain the magnitude of the difference. For example, RAP Buildings likely have more deferred maintenance than Exempt Buildings due to a reduced incentive for property owners to make capital improvements. This in turn leads to lower market rents at turnover and lower net operating income.

**SALES PRICE PER UNIT COMPARISON 2017-2023**

|  | Lowrise | Midrise | Highrise |
|---|---|---|---|
| RAP Buildings | $229,000 | $269,000 | NA |
| Exempt Buildings | $341,000 | $562,000 | NA |
| Percent Variance | 49% | 109% | NA |
|  |  |  |  |
| RAP Building Transactions | 1,041 | 73 | 1 |
| Exempt Building Transactions | 27 | 23 | 0 |

**New Development Project Analysis**

As shown in the table below, the new development project analysis described above under Economic Analysis Methodology and Approach estimates that imposition of rent control on new development projects would result in a value differential of approximately 23% between the RAP Scenario and Market Rate Scenario. This is due to the lower net operating income that would be generated by a



rent-controlled project and the risk premium that would be applied by developers and investors to a rent-controlled project.

**PROJECTED SALES PRICE PER UNIT AFTER 10 YEARS**

| | Lowrise | Midrise | Highrise |
|---|---|---|---|
| RAP Scenario | $906,000 | $920,000 | $979,000 |
| Market Rate Scenario | $1,114,000 | $1,130,000 | $1,207,000 |
| Percent Variance | 23% | 23% | 23% |
| | | | |
| Prototype Unit Count | 40 | 140 | 330 |
| Prototype Stories | 3 | 6 | 25 |

## CONCLUSION

As noted above, an expansion of RAP could result in a decline in real estate values for both existing non-covered rental buildings and new development projects and a corresponding reduction in property tax revenue to the City's general fund. This in turn could lead to a decline in new construction or reduction in rental housing supply from property owners converting existing rental buildings to non-rental uses such as condominiums.

Properties built during or after 1983, which are not subject to RAP, had a per unit sales price of between 49% and 109% more than the per unit sales price of buildings of similar type that were constructed prior to 1983, which are subject to RAP. Furthermore, applying the RAP requirements to new development projects could result in a value differential of approximately 23% and a lower developer return.

As mentioned above, among the purposes of RAP are encouraging rehabilitation of existing rental units and investment in development of new rental units. Applying rent control to newer units may negatively impact rehabilitation of existing rental units and investment in development of new rental units.

Bryant Sparkman

Bryant Sparkman
President & Managing Principal
February 9, 2023

CENTURY | URBAN

**Exhibit A**

PAGE 13

# M. Bryant Sparkman

## PROFESSIONAL EXPERIENCE:

**Century | Urban, President & Managing Principal**
*(January 2010 – Present)* *San Francisco, California*

- Founder of Century | Urban, a leading Bay Area real estate investment, advisory and asset management firm headquartered in San Francisco, CA.
- Provide strategic real estate investment and advisory services to third-party clients, including economic analysis, transaction structuring, establishment of public-private-partnerships, and acquisition-related services to enhance and preserve long-term value.
- Advisory services include economic analysis, development oversight, entitlement support, joint venture structuring, negotiating public-private partnerships, asset and partner level due diligence, asset management and valuation support.
- Oversee and lead underwriting and economic analysis on market rate apartments, middle income housing, affordable housing, in addition to commercial properties.
- Manage team of real estate professionals with expertise in project underwriting, financing plans, development agreements and ground lease negotiations in all major product types.
- Assist clients with identifying non-core real estate assets and surplus properties and preparing and implementing business plans that optimize the value of client holdings through strategic approaches that may include outright sale, ground-lease structures, tenant leasing strategies, and equity joint ventures with strategic partners.
- Underwrite and value real estate portfolios and investments including surplus land for future development, apartments, parking facilities, office buildings, hotels, and retail centers.

**MacFarlane Partners – Vice President, Investments**
*(December 2003 – December 2009)* *San Francisco, California*

- Underwrite and lead prospective and existing, joint venture investments, in addition to the negotiation of legal documentation, including purchase and sale agreements, operating agreements, and review of loan documentation.
- Perform active asset management and operational oversight of existing portfolio investments inclusive of multifamily apartments, residential condominiums, retail, and a mixed-use hotel.
- Present findings to Investment Committee and coordinate due diligence process by working with senior management.
- Coordinate interdisciplinary teams comprised of senior management, outside counsel, accountants, consultants and lenders.
- Provide guidance to Analysts in the completion of financial analytics, research, and preparation of acquisition submittals.
- Representative Transactions:
  - *Hotel & Residences at LA Live* – JV with Anschutz Entertainment Group to develop 54-story JW Marriott and Ritz-Carlton hotel and 224 Ritz-Carlton branded residences, Los Angeles, CA – *June 2007*.
  - *Time Warner Center* – Acquired equity interest in the six-story Shops at Columbus Circle and parking garage in November 2004 after holding a construction loan secured by the two components – *August 2004*.
  - *Met Lofts* – JV with Forest City including the development of 264 apartment units financed with tax exempt bonds, Los Angeles, CA – *December 2003.*

**Banc of America Securities –Financial Analyst, Real Estate Investment Banking Group**
*(June 2000 – June 2003)* *San Francisco, California*

- Active member of deal teams that advised clients on mergers and acquisitions, strategic alternatives, fairness opinions, asset sales, initial public offerings, follow-on offerings, convertible securities, and joint ventures.
- Valued companies based on valuation metrics that include discounted cash flow analysis, precedent transactions, comparable trading company multiples, leveraged buyout analysis, and net-asset-value analysis.
- Prepared M&A models to accompany various deal structures with the functionality to accommodate multiple potential suitors.
- Crafted Offering Memoranda for select sell-side engagements, including an industrial Real Estate Investment Trust with a market capitalization in excess of $1.6 billion, a private regional homebuilder, and sale of a $1.0 billion Class "A" trophy asset.
- Representative transactions:
  - Recapitalization of equity joint venture between DP Partners and Lazard Frères Real Estate Investors – *February 2003.*
  - Sale of Crow Holdings Industrial Trust valued in excess of $1.6 billion – *December 2002.*

## ADDITIONAL INFORMATION:

- Policy Advisory Board for the Fisher Center for Real Estate & Urban Economics at UC Berkeley.
- Honorary Member of Lambda Alpha International, a Global Land Economics Society.
- Urban Land Institute ULI SF Executive Committee Member, and Member of NAIOP and SPUR.
- Former Volunteer for Rebuilding Together San Francisco, City of Hope and Florence Crittenton Children Services.

**EDUCATION:** **University of Southern California,** *Los Angeles, California,* Bachelor of Science, Marshall School of Business Administration with an emphasis in Finance and Entrepreneurship, cumulative GPA 3.7 / 4.0, 5/99. *cum laude*.