UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IAN SMITH, et al.,<br><br>　　　　Plaintiffs,<br><br>　v.<br><br>CITY OF OAKLAND,<br><br>　　　　Defendant. | Case No. 19-cv-05398-JST<br><br>**ORDER RE: MOTIONS TO EXCLUDE OR LIMIT TESTIMONY**<br><br>Re: ECF Nos. 118, 121 |

Before the Court are Plaintiffs' motion to exclude the testimony of Defendant City of Oakland's ("the City") expert witness Bryant Sparkman and limit the testimony of expert witnesses Matt Kowta and Steven Winkel, ECF No. 118; and the City's motion to exclude portions of the testimony of four of Plaintiffs' expert witnesses: Glenn Dea, Richard Drogin, Shelley Lapkoff, and Mark Paul, ECF No. 121. The Court will grant in part and deny in part Plaintiffs' motion and grant in part and deny in part the City's motion.

I.   **LEGAL STANDARD**

The proponent of expert testimony "has the burden of proving admissibility." *Lust ex rel. Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996). Under Rule 702 of the Federal Rules of Evidence:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods;

>   and
>
>   (d) the expert has reliably applied the principles and methods to the facts of the case.

Following *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), trial courts serve a "gatekeeping" role "to ensure the reliability and relevancy of expert testimony." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

"Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry. And it is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013) (quoting *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010)). The question "is not the correctness of the expert's conclusions but the soundness of his methodology." *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1318 (9th Cir. 1995). Thus, courts should "screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Alaska Rent-A-Car*, 738 F.3d at 969. "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano*, 598 F.3d at 564.

## II. PLAINTIFFS' MOTION

### A. Bryant Sparkman

Plaintiffs first argue that the Court should exclude the expert testimony of Defendant's expert Bryant Sparkman. ECF No. 118 at 8–20. Sparkman is the president and managing principal of Century | Urban, a "real estate economic consulting, advisory, and project management firm." ECF No. 119-1 at 4. He holds a bachelor's degree in business administration and "has over 23 years of real estate investment, advisory, development, and institutional asset management experience that encompasses a wide range of property types, including market-rate apartments, affordable and middle income housing, office buildings, full-service hotels, and largescale mixed-use projects[.]" *Id.*

The City retained Sparkman "to perform an economic analysis of the impact of imposing rent control on rental units not currently covered by the City of Oakland's ("the City") Rent Adjustment Program . . . ." *Id.* at 5. Sparkman developed and conducted two analyses that form

1  the basis for his opinions in this case: (1) the "Existing Building Analysis," Sparkman Rep., ECF
2  No. 119-1 at 8, 10–11; and (2) the "New Development Project Analysis," *id.* at 9–13.  Sparkman's
3  initial report is dated December 22, 2023.  ECF No. 119-14.  He submitted an updated
4  supplemental report on January 26, 2024, ECF No. 119-15, and another on February 9, 2024, ECF
5  No. 119-1.  Sparkman opines in his final report "that applying RAP rent increase restrictions to
6  new development could result in a value differential of approximately 23% and a lower developer
7  return." *Id.* at 6.[1]

Plaintiffs object to the admission of Sparkman's opinions on several grounds:  that "he lacks the necessary knowledge, skill, experience, training, or education to perform the task for which he was retained"; that "the methodology by which Mr. Sparkman arrived at his opinions is entirely opaque, and based on supposedly 'proprietary' formulas that he refused to disclose or subject to real-time testing"; and that "Sparkman's expert opinions are unreliable and subject to exclusion because they mistake correlation for causation, and fail to account for other factors that—by his own admission—have a substantial impact on the development of new rental housing."  ECF No. 118 at 5.

Some of Plaintiffs' criticisms of Sparkman's opinions might be fodder for cross-examination but are not grounds for exclusion.  These include that Sparkman "has not authored any relevant publications," *id.* at 9 (although Plaintiffs concede that "Rule 702 does not require experts to be published authors," ECF No. 129 at 7); that Sparkman "failed to review almost all the relevant literature," ECF No. 118 at 10; and that Sparkman's analysis "ignores contrary results from Mr. Sparkman's own data," ECF No. 129 at 14.  These alleged "flaws, errors, and unfounded assumptions . . . are not sufficient grounds to conclude that [Sparkman's] proposed testimony is inadmissible." *Trekeight, LLC v. Symantec Corp.*, No. 04-CV-1479 H(BLM), 2006 WL 5201349, at *5 (S.D. Cal. May 23, 2006).  Rather, "[a]s the Supreme Court stated in *Daubert,* '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of

---

[1] Sparkman concluded in his initial and first supplemental reports that applying RAP to new developments would cause their value to decrease by 11 to 12%, *see* ECF No. 119-14 at 12, and 12 to 13%, *see* ECF No. 119-15 at 12, respectively.

3

1  proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *Id.*
2  (quoting *Daubert*, 509 U.S. at 596).

3        Plaintiffs' other criticisms, however, are more substantial. First, the Court agrees that
4  Sparkman is not qualified to perform the economic analysis for which he was retained because he
5  "lacks the necessary knowledge, skill, experience, training, or education . . . ." ECF No. 118 at 5.
6  He has a bachelor's degree in business administration but no post-secondary training in
7  economics. His experience in real estate investment and asset management may be sufficient to
8  qualify him as an expert on the topic of property valuation in general. *See, e.g.*, *Oracle Am., Inc.*
9  *v. Hewlett Packard Enter. Co.*, No. 16-CV-01393-JST, 2018 WL 6511146, at *2 (N.D. Cal. Dec.
10 11, 2018); *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1015–16 (9th Cir. 2004)
11 (affirming decision to admit testimony from expert whose qualifications consisted of twenty-five
12 years of work experience in the insurance industry). But the task assigned to Sparkman required
13 more than an estimation of the value of certain real estate—it required an estimation of the *effects*
14 *of the City's rent control program* on those values compared to other potential causes.
15 Determining the impact of competing market conditions on prices is the province of an economist,
16 and practical experience is not a substitute for specific expertise. *See United States v. Chang*, 207
17 F.3d 1169, 1173 (9th Cir. 2000) ("It was not an abuse of discretion for the district court to
18 determine that Lausier's 'practical experience in international finance' did not amount to practical
19 experience determining whether a particular security is counterfeit, the fact at issue in this case.").

20        Sparkman submitted a declaration in opposition to the motion to exclude in which he states
21 that "[r]egression analyses are not utilized by real estate industry professionals in ascertaining
22 property values or, in my experience, in scrutinizing the impacts of local policies on property
23 values." ECF No. 125-2 at 3. Yet the only comparable study that Sparkman cites as a model for
24 his opinions about the effect of rent control on real estate values is just that—a regression analysis
25 of the kind performed by economists. ECF No. 119-1 at 8 & n.3; *see also* NYU Furman Center,
26 Housing Stability and Tenant Protection Act: An Initial Analysis of Short-Term Trends, at 6 (July
27 2021), available at https://furmancenter.org/research/publication/housing-stability-and-tenant-
28 protection-act-an-initial-analysis-of-short-te ("[W]e use a regression model to control for

4

differences in size, age, location, and other key characteristics of properties. The regression models allow us to examine whether buildings with different shares of rent stabilized units that otherwise have similar characteristics behaved differently after the passage of HSTPA.").

The City next argues that "Mr. Sparkman's opinions are based on," among other things, "the extensive analysis demonstrated by his models," ECF No. 125 at 6, but he has not made his models available. This makes his methodology "an untested and untestable 'black box'" whose reliability cannot be determined. ECF No. 118 at 5.

A court may consider several factors to assess the reliability of an expert's opinion, including whether a theory or technique has been tested, has been subjected to peer review and publication, has a high known or potential rate of error, and "enjoys 'general acceptance' within a 'relevant scientific community.'" *Kumho Tire Co.*, 526 U.S. at 149–50 (quoting *Daubert*, 509 U.S. at 592–94); *see also Primiano*, 598 F.3d at 565 (explaining that a court has discretion to decide how to test reliability "based on the particular circumstances of the particular case"). "The party offering the expert bears the burden of establishing that Rule 702 is satisfied." *Monster Energy Co. v. Vital Pharms., Inc.*, No. EDCV 18-1882-JGB (SHKx), 2022 WL 17218077, at *4 (C.D. Cal. Aug. 2, 2022) (internal quotation marks and citation omitted).

Sparkman performed the New Development Project Analysis using his "existing proprietary intellectual property to prepare an economic model for each building type." Sparkman Rep., ECF No. 119-1 at 9. The analysis relies on the data in six "pro formas" that Sparkman's firm created. Sparkman Dep., ECF No. 119-2 at 180:10–18, 181:2–183:17; *see also* ECF No. 119-7 (pro formas). These documents list various dollar amounts without indicating how the values were obtained. They are the output of Sparkman's proprietary economic models, which are a series of Microsoft Excel spreadsheets developed at least partly by using data from proprietary internal databases. *See, e.g.*, Sparkman Dep., ECF No. 119-2 at 241:20–244:3. At his deposition, Sparkman maintained that, despite the existence of a protective order in the case, he would not permit Plaintiffs' counsel to review the Excel files because they are "intellectual property" and "trade secrets." *Id.* at 20:1–23:3. When asked to explain what changes led him to different conclusions in his earlier and later reports, Sparkman provided some information about the

difference but noted that he could not fully explain without doing a "full forensic analysis" or a "full forensic review." *Id.* at 263:22–264:17.

The City did eventually produce PDF printouts of Sparkman's Excel spreadsheets, but the formulas in the spreadsheet were truncated, preventing Plaintiffs from identifying the formulas even from that static, nonmanipulable format. When Plaintiffs questioned Sparkman about the truncated or missing parts of the PDFs, he again replied only that "this is very advanced intellectual property" that "others should not be using" because "they may not know the source code, they may not understand how to break it or fix it, and this is a complicated piece of IP, it shouldn't—it shouldn't be used by others who have not been trained . . . ." *Id.* at 224:18–23. Sparkman also shared his screen with Plaintiffs to scroll through the native Excel files, but declined to alter cells within the files to demonstrate how changing variables would change the output. *Id.* at 226:5–18.

The City acknowledges that it produced some, but not all, of the formulas and assumptions contained in Sparkman's Microsoft Excel spreadsheets. *See* ECF No. 119-6 at 5; ECF No. 125 at 9 ("In the course of converting the Model Formula documents from Excel to PDF, unfortunately it appears several formulas were inadvertently cut off."). It argues, however, that Plaintiffs do not need the working files because they "simply underlie the opinions" and are "proprietary trade secret information." ECF No. 125 at 12. It contends that Sparkman's models are reliable because they are "similar to what he would use elsewhere" and "are the products of formulas and assumptions he and his company developed over 15 years." *Id.*; *see also id.* ("intuitive conclusions, based on Mr. Sparkman's analysis and his experience"); *id.* (Sparkman's conclusions are "reflective of the type of analysis that a developer or large owner of multifamily housing would perform"). As an attachment to its opposition to this motion to exclude, the City submitted an additional declaration from Sparkman explaining the missing portions of the PDF printouts for the first time. *See* ECF No. 125-2.

"Experts must follow some discernable methodology, and may not be 'a black box into which data is fed at one end and from which an answer emerges at the other.'" *GPNE Corp. v. Apple, Inc.*, No. 12-CV-02885-LHK, 2014 WL 1494247, at *4–5 (N.D. Cal. Apr. 16, 2014)

6

(quoting *Lawrence v. Raymond Corp.*, No. 09-cv-1067, 2011 WL 3418324, at *7 (N.D. Ohio Aug. 4, 2011) *aff'd*, 501 F. App'x 515 (6th Cir. 2012) (internal quotation marks omitted)). "[T]he Court must be able to see the mechanisms in order to determine if they are reliable and helpful." *Id.* (internal quotation marks and citation omitted); *cf. Daubert*, 43 F.3d at 1319 (explaining that in the absence of pre-litigation research or peer review, to show that Rule 702 is satisfied, "experts must explain precisely how they went about reaching their conclusions and point to some objective source . . .").

The City has not met its burden to show that Mr. Sparkman's New Development Project Analysis is the product of reliable methods. The additional declaration from Sparkman that the City submitted in opposition to this motion, ECF No. 125-2, does not cure its past refusal to disclose the underlying analysis for evaluation; in fact, it suggests that the City realizes its past production was inadequate. Accordingly, Sparkman's opinions based on the New Development Project Analysis are excluded.

The Court also excludes Sparkman's opinions on the separate and independent ground that Sparkman's methodology fails to consider the effect of any other factor besides Oakland's rent control program on either the historical sales price per unit of Oakland rental housing or the projected sales price after 10 years. ECF No. 119-2 (Sparkman Deposition) at 69:23-70:6. Sparkman's failure to account for other potential causes in the sales price differences among buildings, where he has acknowledged those potential causes, means his correlation conclusions are unreliable. *In re Live Concert Antitrust Litigation* is instructive. 863 F. Supp. 2d 966 (C.D. Cal. 2012). In that case, plaintiffs sued promoter Clear Channel, Inc. and related entities, alleging that they had engaged in anticompetitive conduct in connection with their nationwide promotion of live music concerts. *Id.* at 969. Defendants moved to exclude Plaintiffs' expert economist, Dr. Owen Phillips. *Id.* at 970. "Dr. Phillips performed several statistical analyses in order to estimate the damages suffered by Plaintiffs as a result of Defendants' allegedly anticompetitive conduct." *Id.* at 972. Defendants argued that Dr. Phillips's regression analysis failed to consider the "major factors" bearing on determination of the ticket prices paid by concertgoers. *Id.* at 974.

The court started by acknowledging that "[a]s a general matter, flaws in a proffered

expert's analysis typically go to the weight, rather than the admissibility, of the expert's testimony." *Id.* at 973 (citations omitted). Also, "[n]ormally, failure to include variables [in a regression] will affect the analysis' probativeness, not its admissibility." *Id.* (quoting *Bazemore v. Friday*, 478 U.S. 385, 400 (1986) (Brennan, J., concurring in part). However, the court noted, "courts have recognized that by its own terms, the Supreme Court's reasoning in *Bazemore* applies only to a regression analysis 'which accounts for the major factors.'" *Id.* (quoting *Bazemore*, 478 U.S. at 400). The court found that Dr. Phillips had failed to include the "major factors" in his analysis, including differences in artist popularity and venue size. Thus, plaintiffs had failed to meet their burden of showing that Dr. Phillips' damages analysis satisfied the requirements of Rule 702. *Id.* at 976.

Here, Sparkman considered only whether the application of Oakland's rent control regime affected actual or expected sales prices in Oakland's rental housing stock, but he failed to consider or control for several other important variables. Sparkman Dep., ECF No. 119-2 at 69:23-70:6. Sparkman himself recognized that other factors necessarily contributed to the differences in sales price between older, RAP buildings and newer, non-rent-controlled buildings:

> Although some of the variance may be due to the age of RAP Buildings as compared to Exempt Buildings, which are newer and may have lower maintenance expenses, age alone does not explain the magnitude of the difference. For example, RAP Buildings likely have more deferred maintenance than Exempt Buildings due to a reduced incentive for property owners to make capital improvements. This in turn leads to lower market rents at turnover and lower net operating income.

ECF No. 119-1 at 12. He conceded that differences in the age of the buildings at issue would affect price. ECF No. 119-2 at 80:13–14. He acknowledged that the Tenant Protection Act of 2019, macroeconomic conditions including the cost of debt capital, and inflation all played a part in determining real estate prices. *Id.* at 118:23–119:10. He noted that real estate sales prices can be artificially depressed when distressed properties and properties in foreclosure are forced into sale by lenders. *Id.* at 120:24–121:7. But none of these factors made their way into his analysis. While differences in opinion concerning the other factors to be considered might be a basis for cross-examination rather than exclusion, not including *any* such factors renders Sparkman's

8

1  opinions unreliable, and the Court will exclude them on that additional basis.

### B.    Matt Kowta

The City hired demographer Matt Kowta to rebut Plaintiffs' expert Shelley Lapkoff's report concerning the availability of accessible housing to persons with ambulatory disabilities. Lapkoff, a demographer, provides expert testimony concerning, *inter alia*, the number and share of Oakland's renter households that include at least one member with an ambulatory disability. *See* ECF No. 121-1 at 228. For purposes of her analysis, she assumes that there are "few if any accessible units subject to Oakland's rent control Program." *Id.* at 298. As relevant here, she concludes that "an estimated 12.8 percent of Oakland renter households include at least one member who uses a mobility device," meaning that "12,914 renter households would include a member who uses a mobility device." *Id.* at 240.

In his report, Kowta opines that because approximately 12,100 rental units in Oakland had working elevators, "[m]any of these units would potentially be accessible to households containing a member with an ambulatory disability as far as entry to the building is concerned, and many if not most of these units were likely covered by the recently established rent control and could still be in the RAP [Oakland rent control] program today." ECF No. 119-10 at 6. Plaintiffs ask the Court to exclude this testimony because "Kowta has no training in architecture, accessible housing, accessible buildings, or the accessibility needs of people with ambulatory disabilities." ECF No. 118 at 21. Kowta further opines that "[m]ost households including a member with an ambulatory disability do not use a wheelchair or similar device, and may potentially occupy some housing units not meeting the accessibility standards mandated by federal fair housing rules." ECF No. 119-10 at 8. Plaintiffs ask the Court to exclude this testimony on the grounds that Kowta has no knowledge of the accessibility needs of people with ambulatory disabilities. ECF No. 118 at 21.

The Court will grant the motion because these opinions are outside the areas of Kowta's expertise. "A lay[person], which is what an expert witness is when testifying outside [their] area of expertise, ought not to be anointed with ersatz authority as a court-approved expert witness for what is essentially a lay opinion." *White v. Ford Motor Co.*, 312 F.3d 998, 1008–09 (9th Cir.

9

2002), *opinion amended on denial of reh'g,* 335 F.3d 833 (9th Cir. 2003). Kowta's opinion regarding the accessibility of buildings with elevators is excluded for the additional reason that it is speculative. As Kowta acknowledged at his deposition, the presence of an elevator in the *building* does not equate to the accessibility of *individual units*. *Id.* at 58:21–60:4 ("Q: So you say many of these units would be potentially accessible to households containing a member with an ambulatory disability as far entry to the building is concerned. How many of these units? A: We don't know. Because all—all we know is this of—of units that were in a building that had an elevator. But beyond that, we don't know the details of these units.").

### C. Steven Winkel

The City retained Steven Winkel, an expert in architecture and state and federal accessible design requirements, to submit an initial expert report as well as rebuttal reports to the expert reports of Glenn Dea and Edward Steinfeld. Plaintiffs ask the Court to exclude certain of Winkel's opinions in the rebuttal report to Edward Steinfeld, Winkel Rep., ECF No. 119-12, because they are beyond the scope of Winkel's expertise in architecture and building code accessibility requirements.

The first disputed portion of Winkel's report opines that federal fair housing regulations are overinclusive and that specific tenants with specific disabilities may not require all the accessibility features mandated by these regulations. Winkel Rep., ECF No. 119-12 at 3 (opining that "the issue of access in a specific dwelling unit by a specific tenant will likely need to be using only a subset of the range of requirements contained in the broad regulations intended for new construction"). The Court will exclude this testimony. Plaintiffs are correct that Winkel has no expertise in the amount of space that persons who use various mobility devices need to maneuver freely. He acknowledged at his deposition that he lacks the training in "anthropomorphics"[2] possessed by Plaintiff's expert Edward Steinfeld. ECF No. 119-13 at 64:6–11. Instead, he bases his opinions solely on his personal experience, which includes "the use of a walker when [he] had a bad leg," *id.* at 64:22–65:1, and "watching [his] wife when she did knee surgery and two knees

---

[2] The Court assumes Winkel was referring to anthropometry.

10

1  at the same time and two hips at the same time," *id.* at 65:2–5.  That experience is not sufficient to
2  confer the necessary expertise.
3     Plaintiffs also seek to exclude Winkel's opinion that Steinfeld should have considered
4  different or additional building regulations in reaching his opinions than the ones he did consider.
5  ECF No. 118 at 22.  Plaintiffs' argument on this point is essentially that they believe Winkel is
6  wrong on the law.  *Id.*  Plaintiffs can address this point on cross-examination, and their motion to
7  exclude this testimony is denied.[3]

## III. THE CITY'S MOTION

### A. Glenn Dea

Plaintiffs hired Expert Certified Access Specialist ("CASp") Glenn Dea to conduct an accessibility survey "assessing whether the subset of 41 randomly-selected dwelling units . . . meet the accessibility requirements of the '1998 FHADM' and ANSI A117.1-1986" standards."  Dea Rep., ECF No. 121-1 at 10.  The sample was divided into rental units that are currently covered by the City's rent control Program ("Group 2") and newer units that were subject to state or federal accessible design requirements when built ("Group 3").  ECF No. 124 at 6.  To perform this analysis, Dea reviewed "photos, building plans, elevator permits or lack thereof, property websites, information from Google Maps or Google Earth, and—for many units in both Groups— exterior building photos and measurements gathered during a series of site visits."  *Id.* at 7 (citing Dea Rep., ECF No. 121-1 at 14–17).

The City argues that Dea's conclusions are based on an unreliable inspection methodology because he did not physically enter any units and because his methodology "assumes a binary outcome" regarding whether a unit is accessible or inaccessible under the 1998 FHADM' and ANSI A117.1-1986 standards.  ECF No. 121 at 9.  These objections are based largely on Dea's explanation that when he encountered a violation of the standards, such as stairs to enter the

---

[3] Plaintiffs also ask the Court to exclude Winkel's testimony about whether landlords are required to allow a tenant, at the tenant's expense, to reasonably modify any unit to make it accessible. ECF No. 118 at 22 n.10.  Because Plaintiffs relegate the request to a footnote, the Court does not consider it.  *Almaznai v. S-L Distrib. Co.*, No. 20-CV-08487-JST, 2021 WL 4457025, at *10 n.11 (N.D. Cal. June 21, 2021).

11

1  building with no ramp, he did not continue the inspection further because there was no need:  he
2  could conclude that the building was inaccessible due to the code violation he observed.  *See id.* at
3  7–9; *see* Dea Rep., ECF No. 121-1 at 16 (describing method of starting by determining whether
4  each unit had an "accessible route"); *id.* at 18–20 (describing findings of barriers to access); *see*
5  *also* Dea Rep., 121-1 at 25 (indicating that all 22 units in the second group failed to meet at least
6  one of the accessibility standards' requirements).[4]  With regard to newer, Group 3 units found to
7  be accessible, Dea is clear that his opinion is only that 16 of 19 units are "designed in substantial
8  conformance with applicable requirements," ECF No. 121 at 9, which does not require him to
9  have entered the units.  While the City may be correct that interior visual inspection would have
10 provided useful information to Dea's analysis, it has not established that Dea's methodology was
11 flawed.  The Court overrules this objection.
12      The City next objects to Dea's use of different measures of accessibility for Groups 2 and
13 3:

> For the Group 2 units covered by rent control, Mr. Dea decided to fail all 22 units for not "meet[ing] *one or more* of the requirements." (Ex. A [Dea Report] at 21 (emphasis added).) But for the Group 3 units not covered by rent control, Mr. Dea applied a completely different standard: that 16 of 19 units are "*designed* in *substantial conformance* with applicable requirements." (*Id.* (emphasis added.))

18 ECF No. 121 at 9.  The City explains that with respect to 16 out of 19 units in Group 3, "no
19 interior or exterior accessibility barriers were found in the plans or design drawings, and that there
20 were also no external barriers ascertainable during site visits, in photos, or in the other sources of
21 information consulted."  ECF No. 124 at 11.  Thus, while Dea could not opine that a unit was
22 actually accessible because he did not physically inspect it, he "was able to determine that these
23 units were at least *designed* in compliance with the accessibility requirements of federal law."  *Id.*
24 at 9.  By contrast, because he had observed barriers to accessibility in all the units in Group 2, he

---

[4] In its original motion, the City also argued that Dea used different methodologies between the two groups of units, examining the constructed buildings in Group 2 and reviewing design plans for Group 3.  ECF No. 121 at 7–8.  In opposition, Plaintiffs argued that "Dea used the exact same methodology to assess the accessibility of units in both randomized-sample Groups."  ECF No. 124 at 7.  The City's reply does not respond to this contention, and the Court finds that the City has abandoned the argument.

12

could state that those units were inaccessible. *Id.* at 8.

Again, the City has failed to establish a flaw in Dea's methodology. To the extent his differences in approach are relevant, they can be addressed on cross-examination. The Court overrules the City's objection on this score.

Finally, the City objects to Dea's providing a cost estimate for the installation of ramps at two units, arguing that this opinion is outside his expertise. ECF No. 121 at 10; *see* Dea Rep., ECF No. 121-1 at 23; *see also* Dea Dep., ECF No. 124-6 at 117:10–118:4 (explaining that Mr. Dea chose the particular properties for which to estimate the cost of ramp installation). Dea is a long-practicing architect with substantial experience providing cost estimates to his clients. ECF No. 124 at 12 (citing Dea Dep., 124-6 at 116:9–117:9). This objection is overruled.[5]

### B.     Richard Drogin

Plaintiffs hired statistical expert Richard Drogin "to provide statistically valid estimates of the proportion rental units in the populations represented by each of the following sample groups that are accessible to people with mobility disabilities: Group 1—All private rental units in the City of Oakland; Group 2—Units currently covered by the City of Oakland's rent control Program; [and] Group 3—Units in Oakland required to be accessible under state or federal access laws." ECF No. 124-7 ¶ 3. Drogin's firm developed the random sampling protocol that Dea implemented to conduct the accessibility survey discussed above. *See* ECF No. 124-7 ¶¶ 4, 11. "[T]he results of that random sample survey [were then] reported back to [Drogin's] firm for purposes of providing statistically-valid estimates regarding the accessibility of the rental unit population as a whole that corresponded to each random sample group." *Id.*; *see id.* ¶¶ 11–13 (summarizing results of the accessibility survey). "Based on numbers derived from . . . Dea's survey results and an earlier stipulation regarding inaccessible units entered into by the Parties . . . , Drogin concluded with a high degree of confidence that at least 92.9% of rent-controlled units in Oakland are inaccessible to Plaintiffs and other people who need accessible housing—and

---

[5] The City also complains that Dea failed to determine whether the units in Group 2 "could be reasonably modified" to make them accessible. ECF No. 121 at 11. This objection addresses the scope of Dea's opinion, not his methodology, and is not a basis for exclusion.

1    that, at worst, every single unit currently covered by City rent control is inaccessible. By contrast,
2    he found that only between 3.4% and 38.6% of the newer Group 3 units were likely to be
3    inaccessible as designed." ECF No. 124 at 6 (emphasis omitted).

4        The City makes three objections to Drogin's testimony. First, it argues that he relied on
5    Dea's opinions in reaching his own conclusions, and both the foundation for and methodology of
6    Dea's opinions are deficient. ECF No. 121 at 10–11. Second, as with Dea, the City argues that
7    Drogin fails to acknowledge that certain units could be modified to make them accessible.
8    Finally, the City contends that Drogin ignores the opinion of Plaintiffs' expert Shelley Lapkoff
9    "that approximately 25.6% of privately-owned multifamily units built since 1991 – units Plaintiffs
10   propose should become covered by rent control – are not even subject to accessibility
11   requirements." *Id.* at 12.

12       The Court overrules these objections. First, the Court has overruled the City's objections
13   to Dea's opinions, so Drogin may properly consider them. Second, the fact that a unit could be
14   *modified* to become accessible does not mean that it *is* accessible. While the City may raise on
15   cross-examination Drogin's failure to consider the ability to modify a unit, that failure does not
16   impeach Drogin's opinion regarding accessibility. Lastly, as to both Drogin's reliance on Dea and
17   his lack of reliance on Lapkoff, "[t]he factual basis of an expert opinion goes to the credibility of
18   the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis
19   for the opinion in cross-examination." *See Rearden LLC v. Walt Disney Co.*, No. 17-cv-04006-
20   JST, 2023 WL 6796017, at *2 (N.D. Cal. Oct. 13, 2023) (quoting *Hangarter v. Provident Life &*
21   *Accident Ins. Co.*, 373 F.3d 998, 1017 n.14 (9th Cir. 2004)). The Court denies the motion to
22   exclude Drogin's testimony.

23       **C.    Shelley Lapkoff**

24       Plaintiffs asked Shelley Lapkoff, an expert in applied demographics, "to provide
25   demographic analyses of the numbers of Oakland's rental units and shares of renters with an
26   ambulatory disability" and "to consider the effect that adding various numbers of accessible units
27   to Oakland's rent control Program would have on the opportunity for Plaintiffs and other class
28   members to rent an accessible unit covered by the Program[.]" ECF No. 124 at 16.

14

Lapkoff submitted her initial report on December 22, 2023. On February 23, 2024, the City served the rebuttal report of Matt Kowta. Lapkoff's deposition took place on March 8, 2024. On March 22, 2024, the last day of the expert discovery period, Plaintiffs served Lapkoff's amended report.

Because Lapkoff's amended report was submitted after her deposition and too late for further rebuttal, Defendants argue that it should be excluded under Federal Rule of Civil Procedure 37(c)(1). ECF No. 121 at 13. Plaintiffs respond that the corrected report was submitted before the expert discovery cutoff and within a reasonable time once Lapkoff "realiz[ed] that parts of her original report were incorrect in some material respect." ECF No. 124 at 19 (citing Fed. R. Civ. P. 26(e)). They note that the City was informed of the upcoming changes to Dr. Lapkoff's report during her deposition. *See* Lapkoff Depo., ECF No. 124-10 at 29:18–31:20 (explaining that, "since [Lapkoff] read the rebuttal report from Mr. Kowta," she was in the process of amending her estimates to include children five and older).

The parties characterize the nature and extent of the amendments somewhat differently, but they identify the same core changes as follows: (1) the inclusion of SIPP survey respondents aged five and older rather than adults only; and (2) the exclusion of Low-Income Housing Tax Credit units from the units subject to the rent control program.

Defendants focus on the addition of data tables and new analysis, observing:

> Several new tables are included, along with four new paragraphs addressing the impact of Low Income Housing Tax Credit (LIHTC) units on the number of multifamily units built in Oakland since 1983, and newly analyzing the probabilities of renting a rent-controlled unit for persons who use wheelchairs or other motorized devices. [Lapkoff Supp. Rep., ECF No. 121-1 at 227] ¶¶ 52, 67–69. Figures from her initial report of December 22, 2023 are modified on the majority of pages.

ECF No. 121 at 13.

For their part, Plaintiffs describe the changes as "merely correct[ing] inaccuracies" in the original. ECF No. 124 at 20. Specifically, they explain:

> Upon realizing that her original calculations only included SIPP data for respondents age 18 and older and included ACS data for respondents age 5 and older, Dr. Lapkoff updated her calculations to include SIPP data on respondents age 5 and older. *See* [Lapkoff

15

> Supp. Rep., ECF No. 124-8] ¶¶ 40–41.  Likewise, when Dr. Lapkoff became aware that Low-Income Housing Tax Credit units are not included in the rent control Program for reasons not having to do with the Program's current January 1, 1983 cutoff date, she excluded those units from her estimate of units subject to state or federal accessibility requirements that could be brought into the Program. *See id.* ¶ 52.

ECF No. 124 at 20.

A party must submit its expert witness disclosures "at the times and in the sequence that the court orders." Fed. R. Civ. P. 26(a)(2)(C).  However, "if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing," the party "must supplement or correct its disclosure or response." *Id.* 26(e)(1).

Parties wishing to rely on expert opinions must disclose those opinions and the facts or data considered in forming them "at the times and in the sequence that the court orders." Fed. R. Civ. P. 26(a)(2)(D).  Failure to comply with a court's discovery orders may lead to discovery sanctions pursuant to Federal Rule of Civil Procedure 37(b).  Moreover, "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).  In addition to or instead of that sanction, the court may also impose any of the other appropriate sanctions provided for in Rule 37.  Fed. R. Civ. P. 37(c)(1)(C).

Here, the Court agrees with Plaintiffs that Lapkoff's report provides "updated figures using the same methodology" that are not "significantly different from the original reports," and thus are properly considered under Rule 26(e)(1). *Moussouris v. Microsoft Corp.*, 311 F. Supp. 3d 1223, 1239–40 (W.D. Wash. 2018) (citing *Holiday Resales, Inc. v. Hartford Cas. Ins. Co.*, No. 07–1321JLR, 2008 WL 11343449, at *1–2 (W.D. Wash. Oct. 2, 2008)).  And while the City is correct that Rule 26(e)(1) cannot be used as a loophole for experts who "wish[] to revise [their] disclosures in light of her opponent's challenges to the analysis and conclusions therein," *Luke v. Family Care & Urgent Med. Clinics*, 323 F. App'x 496, 499–500 (9th Cir. 2009), the City fails to identify any respect in which Lapkoff's report relies on new or changed methodology.

The City's authorities are distinguishable. In *Rovid v. Graco Children's Products Inc.*, for example, the court excluded plaintiffs' expert report that was served almost two months after the expert discovery deadline. No. 17-cv-01506-PJH, 2018 WL 5906075, at *11–12 (N.D. Cal. Nov. 9, 2018). Plaintiffs there did not contend that the supplemental report "correct[ed] inaccuracies" or was otherwise admissible under Rule of Evidence 26(e). *Id.* Similarly, in *Luke v. Family Care & Urgent Medical Clinics*, the Ninth Circuit affirmed the district court's exclusion of new expert declarations that were disclosed more than two months after the deadline for rebuttal disclosures, which "presented a new theory as to a key element of Plaintiffs' medical negligence claim" and for which plaintiffs "provided no justification." 323 F. App'x 496, 499 (9th Cir. 2009). Here, by contrast, Lapkoff's supplemental declaration was served within the expert discovery cut-off and did not present a new theory or methodology.

Accordingly, the Court will deny the City's motion to exclude Lapkoff's supplemental report on this ground. The Court recognizes, however, that while permitted by Rule 26(e)(1), the report does contain new information. To ameliorate any potential prejudice to the City from that new information, the City may take Lapkoff's deposition remotely for up to one hour solely to explore any changes in her opinions as reflected in her supplemental report.

The City also argues that Lapkoff's model lacks foundation because the City disagrees with several of the working assumptions that she made for purposes of the analysis in either report. ECF No. 121 at 13–14. "Because the Court acts merely as a gatekeeper and not a factfinder, an expert whose methodology is otherwise reliable should not be excluded simply because the facts upon which his or her opinions are predicated are in dispute, unless those factual assumptions are 'indisputably wrong.'" *In re MyFord Touch Consumer Litig.*, 291 F. Supp. 3d 936, 967 (N.D. Cal. 2018) (quoting *Guillory v. Domtar Indus. Inc.*, 95 F.3d 1320, 1331 (5th Cir. 1996)). The City's criticisms do not rise to that level. Accordingly, the motion to exclude Lapkoff's testimony is denied, and the City can explore any errors in her assumptions on cross-examination.

### D.     Mark Paul

Plaintiffs retained economist Mark Paul to "provide [a] rebuttal report and related

17

testimony in response to the report prepared by the City's expert, Bryant Sparkman on behalf of Century Urban, and to offer [his] own opinion on the economic impacts of expanding the city of Oakland's Rent Adjustment Program to cover accessible units." ECF No. 121-1 at 290–91. The City moves to exclude his testimony on the grounds that Paul is unqualified to opine as an expert; that he testified beyond the scope of the opinions that he seeks to rebut; that his methodology is flawed because he reviewed existing studies and literature rather than performing data-based calculations; and that his opinions lack foundation. ECF No. 121 at 15–21.

Rebuttal expert testimony is "evidence is intended solely to contradict or rebut evidence on the same subject matter identified by another party." Fed. R. Civ. P. 26(a)(2)(D)(ii). Because Paul was retained to rebut Sparkman's testimony, and the Court has excluded that testimony, "[Paul]'s testimony must also be excluded as irrelevant." *Golden Unicorn Enters., Inc. v. Audible, Inc.*, 682 F. Supp. 3d 368, 381 (S.D.N.Y. 2023); *see also Utica Mut. Ins. Co. v. Lifequotes of Am., Inc.*, No. CV-06-0228-EFS, 2011 WL 1984423, at *4 (E.D. Wash. May 20, 2011) (excluding testimony offered to rebut an expert whose opinion was withdrawn). The City's motion is therefore granted on that alternative ground.

## CONCLUSION

For the foregoing reasons, both parties' motions are granted in part and denied in part as described above.

The Court sets a case management conference on March 4, 2025 at 2:00 p.m. *See* ECF No. 135 at 3 ("Based on the above stipulation, the Parties respectfully request that the Court . . . schedule a further Case Management Conference as soon as practicable after ruling on the parties' pending *Daubert* motions"). An updated joint case management statement is due February 25, 2025

**IT IS SO ORDERED.**

Dated: February 13, 2025

_____
JON S. TIGAR
United States District Judge

18