NIELSEN MERKSAMER LLP
   Christopher E. Skinnell, Esq. (S.B. No. 227093)
2350 Kerner Boulevard, Suite 250
San Rafael, California 94901
Telephone: (415) 389-6800
Facsimile:  (415) 388-6874
Email: cskinnell@nmgovlaw.com

*Attorneys for (Proposed) Amicus Curiae*
CALIFORNIA APARTMENT ASSOCIATION

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND COURTHOUSE

| | |
|---|---|
| IAN SMITH, SUNDAY PARKER, and MITCH JESERICH, on behalf of themselves and all others similarly situated,<br><br>     *Plaintiffs,*<br><br>vs.<br><br>CITY OF OAKLAND, a public entity,<br><br>     *Defendant.* | Case No. 4:19-cv-05398-JST<br><br>**[Proposed] BRIEF *AMICUS CURIAE* OF THE CALIFORNIA APARTMENT ASSOCIATION IN OPPOSITION TO PLAINTIFFS' SUPPLEMENTAL MOTION FOR SUMMARY JUDGMENT**<br><br>Date:   May 28, 2026<br>Time:   2:00 p.m.<br>Courtroom: Via Zoom<br>Judge: Hon. Jon S. Tigar |
| ROB BONTA, in his official capacity as Attorney General of California,<br><br>     *Intervenor-Defendant,*<br><br>CALIFORNIA APARTMENT ASSOCIATION, a California nonprofit mutual benefit corporation,<br><br>     *Proposed Amicus Curiae.* | |

## **TABLE OF CONTENTS**

Page

I.      INTRODUCTION .................................................................................................. 9

II.     ABOUT COSTA HAWKINS & NEW CONSTRUCTION EXEMPTIONS ...................... 11

III.    THE PURPOSES AND LEGISLATIVE HISTORY OF COSTA-HAWKINS ARE RELEVANT TO BOTH THE REASONABLENESS OF THE PROPOSED MODIFICATIONS AND THE "FUNDAMENTAL ALTERATION" ANALYSIS............................................................................................................. 13

IV.     PLAINTIFFS' PROPOSED MODIFICATIONS ARE NOT REASONABLE ................... 16

        A.      The Evidence Shows That the Costs of Plaintiffs' Proposed Modifications Will Be Clearly Disproportionate to the Limited Benefits ....................................... 17

        B.      The Requested Modifications Are Substantially Overbroad ................................... 23

        C.      The Evidence on Which Plaintiffs Rely Is Not Sufficient to Carry Their Burden........................................................................................................................ 24

                1.      The Attorney General's discussion of the Tenant Protection Act/Assembly Bill 1482 doesn't establish the reasonableness of the proposed modifications to Costa-Hawkins ..................................................... 24

                2.      Plaintiffs' other evidence also does not establish the reasonableness of modifying Costa-Hawkins or the RAP ...................................................... 26

V.      PLAINTIFFS' PROPOSED MODIFICATIONS WOULD FUNDAMENTALLY ALTER THE CITY'S RAP AND COSTA-HAWKINS ....................................................... 29

VI.     CONCLUSION..................................................................................................... 33

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*A.L. v. Walt Disney Parks & Resorts U.S., Inc.*,
    50 F.4th 1097 (11th Cir. 2022) ................................................................................................ 31

*Alexander v. Choate*,
    469 U.S. 287 (1985)................................................................................................................ 30

*Anderson v. City of San Jose*,
    42 Cal. App. 5th 683 (2019) ................................................................................................... 29

*Ardor Mgmt. Corp. v. Div. of Hous. & Cmty. Renewal*,
    104 A.D.2d 984 (N.Y. App. Div. 2nd Dep't 1984) ................................................................. 12

*Barden v. City of Sacramento*,
    292 F.3d 1073 (9th Cir. 2002) ................................................................................................ 14

*Barrientos v. 1801-1825 Morton LLC*,
    583 F.3d 1197 (9th Cir. 2009) ................................................................................................ 11

*Bay Area Addiction Research & Treatment, Inc. v. City of Antioch*,
    179 F.3d 725 (9th Cir. 1999) ............................................................................................ 15, 32

*Bentley v. Peace & Quiet Realty 2 LLC*,
    367 F. Supp. 2d 341 (E.D.N.Y. 2005) ..................................................................................... 21

*Birdwell v. AvalonBay Cmtys., Inc.*,
    2023 U.S. Dist. LEXIS 173120 (N.D. Cal. Sept. 27, 2023) .................................................... 17

*Birdwell v. AvalonBay Cmtys., Inc.*,
    742 F. Supp. 3d 1024, 1034 (N.D. Cal. 2024)........................................................................ 22

*Borkowski v. Valley Cent. Sch. Dist.*,
    63 F.3d 131 (2d Cir. 1995) ................................................................................................ 16, 17

*Burien, LLC v. Wiley*,
    230 Cal. App. 4th 1039 (2014) ......................................................................................... 20, 33

*Cal. Bldg. Indus. Ass'n v. City of San Jose*,
    61 Cal. 4th 435 (2015) .............................................................................................................. 9

*Chicago v. Fieldcrest Dairies, Inc.*,
    316 U.S. 168 (1942).................................................................................................................. 16

*Cmty. Hous. Improvement Program v. City of N.Y.*,
  59 F.4th 540 (2d Cir. 2023) ................................................................................................ 13

*Cmty. Hous. Improvement Program v. City of N.Y.*,
  492 F. Supp. 3d 33 (E.D.N.Y. 2020) ................................................................................... 10

*CP VI Admirals Cove, LLC v. City of Alameda*,
  113 Cal. App. 5th 1167 (2025) ........................................................................................... 20

*Dupont v. Sterling Family Tr.*,
  No. 2:23-cv-09785-SVW, 2025 LX 591715 (C.D. Cal. Nov. 14, 2025) .................................. 21

*Easley by Easley v. Snider,*
  36 F.3d 297 (3d Cir. 1994) .......................................................................................... 30, 31

*E.T. v. Paxton*,
  19 F.4th 760 (5th Cir. 2021) ................................................................... 17, 23, 24, 26

*Giebeler v. M&B Assocs.*,
  343 F.3d 1143 (9th Cir. 2003) ...................................................................................... 21, 22

*Guggenheim v. City of Goleta*,
  638 F.3d 1111 (9th Cir. 2010) (en banc) ............................................................................ 10

*Haves v. City of Miami*,
  52 F.3d 918 (11th Cir. 1995) ............................................................................................... 11

*Hemisphere Bldg. Co. v. Vill. of Richton Park*,
  171 F.3d 437 (7th Cir. 1999) ............................................................................................... 22

*Hindel v. Husted*,
  875 F.3d 344 (6th Cir. 2017) ............................................................................ 14, 15, 30

*Hubbard v. SoBreck, LLC*,
  554 F.3d 742 (9th Cir. 2009) ............................................................................................... 15

*La. Power & Light Co. v. City of Thibodaux*,
  360 U.S. 25 (1959) ............................................................................................................... 16

*Ling v. City of L.A. Cal.*,
  No. 2:11-cv-07774-SVW-E, 2012 U.S. Dist. LEXIS 199609 (C.D. Cal. Nov. 14,
  2012) ..................................................................................................................................... 21

*Make UC a Good Neighbor v. Regents of Univ. of Cal.*,
  16 Cal. 5th 43 (2024) ............................................................................................................ 9

*Mary Jo C. v. N.Y. State & Local Ret. Sys.*,
    707 F.3d 144 (2d Cir. 2013) ............................................................................................... 16

*McGary v. City of Portland*,
    386 F.3d 1259 (9th Cir. 2004) ........................................................................................... 16

*Mitchell v. McDavid*,
    116 N.E.2d 757 (Ohio 1953) .............................................................................................. 13

*Mont. Med. Ass'n v. Knudsen*,
    119 F.4th 618 (9th Cir. 2024) ...................................................................................... 17, 24

*Nat'l Fed'n of the Blind v. Lamone*,
    813 F.3d 494 (4th Cir. 2016) .............................................................................. 14, 15, 30

*NCR Props., LLC v. City of Berkeley*,
    89 Cal. App. 5th 39 (2023) ......................................................................................... 10, 11

*O'Campo v. Chico Mall, LP*,
    758 F. Supp. 2d 976 (E.D. Cal. 2010) ............................................................................... 15

*Oconomowoc Residential Programs, Inc. v. City of Greenfield*,
    23 F. Supp. 2d 941 (E.D. Wis. 1998) ........................................................................... 15, 16

*Patterson v. City of Seattle*,
    No. C94-768WD, 1995 U.S. Dist. LEXIS 22453 (W.D. Wash. Apr. 18, 1995) ........................ 17

*PGA Tour, Inc. v. Martin*,
    532 U.S. 661 (2001) ................................................................................................... 30, 31

*Pierce v. County of Orange*,
    526 F.3d 1190 (9th Cir. 2008) ........................................................................................... 16

*Powers v. McDonough*,
    163 F.4th 1162 (9th Cir. 2025) .......................................................................................... 32

*Ruegg & Ellsworth v. City of Berkeley*,
    63 Cal. App. 5th 277 (2021) .............................................................................................. 33

*Saenz v. Roe*,
    526 U.S. 489 (1999) ............................................................................................................ 9

*Salute v. Stratford Greens Garden Apartments*,
    136 F.3d 293 (2d Cir. 1998) .............................................................................................. 22

*SED, Inc. v. Dayton*,
    519 F. Supp. 975 (S.D. Ohio 1981) .............................................................................. 16, 26

*Shavelson v. Bonta*,
   608 F. Supp. 3d 919 (N.D. Cal. 2022) .............................................................................. 24, 31, 32

*Sheen v. Wells Fargo Bank, N.A.*,
   12 Cal. 5th 905 (2022) ........................................................................................................... 9

*Southeastern Cmty. Coll. v. Davis*,
   442 U.S. 397 (1979) .............................................................................................................. 30

*US Airways, Inc. v. Barnett*,
   535 U.S. 391 (2002) ........................................................................................................ *passim*

*Vande Zande v. Wisconsin Dep't of Admin.*,
   44 F.3d 538 (7th Cir. 1995) .................................................................................................. 17

*Where Do We Go Berkeley v. Cal. DOT*,
   32 F.4th 852 (9th Cir. 2022) .................................................................................... 14, 17, 19

*Wong v. Regents of Univ. of Cal.*,
   192 F.3d 807 (9th Cir. 1999) ................................................................................................ 20

*Wood v. Cty. of Alameda*,
   875 F. Supp. 659 (N.D. Cal. 1995) ...................................................................................... 15

*Woodstone Ltd. P'ship v. City of Saint Paul*,
   674 F. Supp. 3d 571 (D. Minn. 2023) .............................................................................. 12, 13

**Statutes**

42 U.S.C. § 3604(f)(3)(C) ............................................................................................................ 12

Assem. Bill 36 (2019-2020 Reg. Sess.) ...................................................................................... 25

Cal. Govt. Code § 65913 ............................................................................................................... 9

Cal. Health & Saf. Code § 50003(a) .............................................................................................. 9

Costa-Hawkins Rental Housing Act, Cal. Civ. Code §§ 1954.50-1954.535 ........................... *passim*

   § 1954.52(a)(1) ............................................................................................................... 10, 11

   § 1954.52(a)(2) ............................................................................................................... 10, 11

   § 1954.53 .............................................................................................................................. 11

D.C. Code § 42–3502.05(a)(2) .................................................................................................... 12

Ellis Act, Cal. Govt. Code § 7060 *et seq.* ............................................................................... 19

Federal Housing and Rent Act of 1947, 61 Stat. 193 (June 30, 1946) ...................................... 13

Oakland Muni. Code § 8.22.010(A) .......................................................................................... 30

Oakland Muni. Code § 8.22.010(C) .......................................................................................... 30

Oakland Muni. Code § 8.22.070(B)(3) ...................................................................................... 25

St. Paul, MN, Ord. No. 25-29 (May 7, 2025) ........................................................................... 13

Tenant Protection Act of 2019 ............................................................................................. 24, 25

    Cal. Civ. Code § 1947.12 ................................................................................................. 24

    Cal. Civ. Code § 1947.12(a)(1) ....................................................................................... 25

    Cal. Civ. Code § 1947.12(g)(3) ....................................................................................... 25

    Cal. Civ. Code § 1947.12(m)(1) ...................................................................................... 25

    Cal. Civ. Code § 1947.12(m)(2) ...................................................................................... 25

    Cal. Civ. Code § 1947.12(o) ............................................................................................ 25

**Other Authorities**

28 C.F.R. § 35.130(b)(7)(i) ................................................................................................ 13, 14

Assem. Floor Analysis, Concurrence in Sen. Amend. to Assem. Bill No. 1164 (1995–
    1996 Reg. Sess.) July 24, 1995 ...................................................................................... 10

Cal. Dep't of Hous. & Cmty. Devel., *Statewide Housing Plan: 2022 Update* (2022),
    *available online at*
    https://storymaps.arcgis.com/stories/94729ab1648d43b1811c1698a748c136  (last
    visited Apr. 6, 2026) ........................................................................................................ 9

City of Oakland, "Do I Need to Register My Unit?," *online at*
    https://www.oaklandca.gov/Community/Housing-Programs-Support/For-
    Landlords/Do-I-Need-To-Register-My-Unit (last visited Apr. 8, 2026) ...................... 29

Gardiner and Korte, "Republicans ... for rent control?," POLITICO, Apr. 2, 2024,
    *online at* https://www.politico.com/newsletters/california-
    playbook/2024/04/02/republicans-for-rent-control-00150082 (last visited Apr. 6,
    2026) ............................................................................................................................... 10

Krugman, *Reckonings; A Rent Affair*, N.Y. TIMES (June 7, 2000)..................................................... 10

N.Y. Div. of Hous. and Cmty. Renewal, Office of Rent Admin., "Fact Sheet #1: Rent Stabilization and Rent Control" (Jan. 2024), *online at* https://hcr.ny.gov/system/files/documents/2024/01/fact-sheet-01-01-2024_0.pdf (last visited Apr. 6, 2026) ....................................................................................................... 12

N.Y. Div. of Hous. and Cmty. Renewal, Office of Rent Admin., "Rent Control: Overview," *online at* https://hcr.ny.gov/rent-control (last visited Apr. 6, 2026) ....................... 12

Sen. Floor Analysis, Sen. Bill 1257 (1995-1996 Reg. Sess.) May 11, 1995.................................... 12

Sen. Judiciary Comm., Analysis for S.B. 1257 (1995-1996 Reg. Sess.) as introduced Apr. 4, 1995 ........................................................................................................................ 11

Shaver, "Camden seeking to Exit California: Real Estate Alert," MULTIFAMILYDIVE (Jan. 28, 2026), *at* https://www.multifamilydive.com/news/camden-exit-california-dispositions-regulations/810687/ (last visited Apr. 9, 2026)......................................................... 19

Vicki Been, *et al.*, *Laboratories of Regulation: Understanding the Diversity of Rent Regulation Laws*, 46 FORDHAM URB. L.J. 1041, 1052 (2019).............................................. *passim*

I.    **INTRODUCTION**.

It's no secret that California has some of the highest housing costs in the nation. *See, e.g., Saenz v. Roe,* 526 U.S. 489, 494 n.2 (1999) (noting that, at the time, California trailed only Massachusetts); *Sheen v. Wells Fargo Bank, N.A.*, 12 Cal. 5th 905, 947 (2022) (noting the "prohibitively high cost of housing in California"). In response to those high costs, many local governments in California have imposed rent control policies—as Oakland did in the early 1980s.

It is also no secret that a major driver of the State's high housing costs is an acute shortage of housing stock, *i.e.*, a lack of supply. As early as 1980, the Legislature declared that shortage to be one of the State's most pressing concerns and further recognized the need to encourage the production of new housing:

> [T]here exists a severe shortage of affordable housing, especially for persons and families of low and moderate income, and that there is an immediate need to encourage the development of new housing, not only through the provision of financial assistance, but also through changes in law designed to … [a]ssure that local governments make a diligent effort through the administration of land use and development controls and the provision of regulatory concessions and incentives to significantly reduce housing development costs and thereby facilitate the development of affordable housing…

Cal. Govt. Code § 65913.[1]

"It will come as no surprise to anyone familiar with California's current housing market that the significant problems arising from a scarcity of affordable housing have not been solved over the past [five] decades. Rather, these problems have become more severe and have reached what might be described as epic proportions in many of the state's localities." *Cal. Bldg. Indus. Ass'n v. City of San Jose*, 61 Cal. 4th 435, 441 (2015). The California Department of Housing and Community Development recently estimated that the State must produce approximately 2.5 *million* new homes by 2030 to meet projected needs, and current production significantly lags that pace.[2]

A vexing difficulty in addressing this problem is that the short-term "solution" of rent control

---

[1] *See also, e.g.,* Cal. Health & Saf. Code § 50003(a) (adopted in 1977, declaring "a serious shortage of decent, safe, and sanitary housing"); *Make UC a Good Neighbor v. Regents of Univ. of Cal.*, 16 Cal. 5th 43, 48 (2024) (referring to "the Bay Area's regional housing crisis").

[2] *See* Cal. Dep't of Hous. & Cmty. Devel., *Statewide Housing Plan: 2022 Update* (2022), *available online at* https://storymaps.arcgis.com/stories/94729ab1648d43b1811c1698a748c136 (last visited Apr. 6, 2026).

conflicts with the longer-term solution of new construction. Indeed, this is Economics 101: As economist Paul Krugman has summarized the issue:

> The analysis of rent control is among the best-understood issues in all of economics, and—among economists, anyway—one of the least controversial. In 1992 a poll of the American Economic Association found 93 percent of its members agreeing that "a ceiling on rents reduces the quality and quantity of housing." Almost every freshman-level textbook contains a case study on rent control, using its known adverse side effects to illustrate the principles of supply and demand. Sky-high rents on uncontrolled apartments, because desperate renters have nowhere to go—***and the absence of new apartment construction, despite those high rents, because landlords fear that controls will be extended? Predictable....***

*Cmty. Hous. Improvement Program v. City of N.Y.*, 492 F. Supp. 3d 33, 52 (E.D.N.Y. 2020) (emphasis added) (quoting Krugman, *Reckonings; A Rent Affair*, N.Y. TIMES (June 7, 2000)). *See also Guggenheim v. City of Goleta*, 638 F.3d 1111, 1123 (9th Cir. 2010) (*en banc*) ("Students in Economics 101 have for many decades learned that rent control causes the higher rents and scarcity it is meant to alleviate"). Like most difficult policies, housing policy requires complicated tradeoffs.

In 1995, the California Legislature sought to strike a balance when it adopted the Costa-Hawkins Rental Housing Act, Cal. Civ. Code §§ 1954.50-1954.535 (Costa-Hawkins) "to moderate what it considered the excesses of local rent control." *NCR Props., LLC v. City of Berkeley*, 89 Cal. App. 5th 39, 47 (2023). To that end, it preserved local governments' ability to regulate rents, but it imposed significant guardrails. In particular, as relevant here, Costa-Hawkins included a provision to encourage new construction by preempting local rent control rules as applied to any unit that "has a certificate of occupancy issued after February 1, 1995," Cal. Civ. Code § 1954.52(a)(1),[3] and it further "grandfathered in" pre-existing new construction exemptions in ordinances like Oakland's to assure developers that the balance was not transitory and illusory, Cal. Civ. Code § 1954.52(a)(2).

This case threatens to undermine the Legislature's carefully-struck balance, and, in doing so, undercut a chief policy lever by which the State encourages construction of new housing stock. If

---

[3] *See, e.g.,* Assem. Floor Analysis, Concurrence in Sen. Amend. to Assem. Bill No. 1164 (1995–1996 Reg. Sess.) July 24, 1995, p. 5 (exemption "necessary to encourage construction of much needed housing units, which is discouraged by strict local rent controls"). Indeed, in recent years local officials hostile to the Legislature's efforts to encourage new development have endorsed the repeal of Costa-Hawkins and the adoption of rent control in jurisdictions that have not historically had it, precisely because they recognize the anti-development impacts. *See* Gardiner and Korte, "Republicans ... for rent control?," POLITICO, Apr. 2, 2024, *online at* https://www.politico.com/newsletters/california-playbook/2024/04/02/republicans-for-rent-control-00150082 (last visited Apr. 6, 2026).

developers come to understand that "new construction" exemptions are at risk of simply being overridden by the courts, they will inevitably shun the California market in favor of opportunities elsewhere, and California's program of housing regulation will be—to use a particularly apt phrase—fundamentally altered. That being the case, Plaintiffs' efforts to impose rent control policies that the Legislature (and California voters) have rejected should be denied by this Court.

## II.    ABOUT COSTA HAWKINS & NEW CONSTRUCTION EXEMPTIONS.

The express purpose of Costa-Hawkins was to "establish statewide guidelines for any local regulation of rental rates for residential accommodations" and to "pre-empt more restrictive controls." *See* Sen. Judiciary Comm., Analysis for S.B. 1257 (1995-1996 Reg. Sess.) as introduced Apr. 4, 1995, p. 3. The Act's state law limitations on local rent control ordinances consists of two main sections. One prohibits local governments from imposing "vacancy control" on rent-controlled units.[4] "With few exceptions, it gives California landlords the right to set the rent on a vacant unit at whatever price they choose." *NCR Props., LLC*, 89 Cal. App. 5th at 47 (citing Cal. Civ. Code § 1954.53). The other provision exempts three categories of rental property from local rent control altogether where it applies. Single-family homes and condominiums are exempt. Cal. Civ. Code § 1954.52(a)(1). In jurisdictions that did not have rent control at the time Costa-Hawkins was enacted, new units built after February 1, 1995, were exempted. Cal. Civ. Code § 1954.52(a)(2). And in jurisdictions (like Oakland) that already had rent control, and that already exempted new construction, Costa-Hawkins "grandfathered in" those exemptions, because "even categorically exempting new buildings may not address the disincentive to investment. Investment may still decrease if market actors fear the trigger will be moved forward with subsequent legislation." Vicki Been, *et al.*, *Laboratories of Regulation: Understanding the Diversity of Rent Regulation Laws*, 46 FORDHAM URB. L.J. 1041, 1052 (2019) (hereafter "*Diversity of Rent Regulation*"). *See also Haves v. City of Miami*, 52 F.3d 918, 922 (11th Cir. 1995) ("A state may legitimately use grandfather

---

[4] Vacancy control means that limits continue from one tenant to the next upon vacancy in the unit. "Vacancy *decontrol*," by contrast—which Costa-Hawkins adopts—means that "when a tenant voluntarily leaves or is lawfully evicted [from an otherwise rent-controlled dwelling], the landlord may raise the rent to market levels." *Barrientos v. 1801-1825 Morton LLC*, 583 F.3d 1197, 1205 (9th Cir. 2009).

provisions to protect property owners' reliance interests.").[5]

Consistent with the recognition that rent control discourages new housing, "[m]ost [existing rent control] ordinances [in California] exempt[ed] new construction" at the time Costa-Hawkins was enacted, including San Francisco, Los Angeles, Berkeley, Santa Monica, and others. Sen. Floor Analysis, Sen. Bill 1257 (1995-1996 Reg. Sess.) May 11, 1995, pp. 2 & 4. Nor was California unique in that respect. "A study on nationwide rent-stabilization policies by [the Center for Urban and Regional Affairs at the University of Minnesota] found that the 'most common' exemption to rent-stabilization laws 'is an exemption for new construction,' with 'most' jurisdictions instituting one." Woodstone Ltd. P'ship v. City of Saint Paul, 674 F. Supp. 3d 571, 588 (D. Minn. 2023). See also Diversity of Rent Regulation, 46 FORDHAM URB. L.J. at 1050 ("Most [rent control] systems do not cover new buildings, other than those accepting rent regulation as a condition for a benefit").

For example, New York's state "rent stabilization" law (which municipalities can opt-into), exempts units built or substantially rehabilitated on or after January 1, 1974. Ardor Mgmt. Corp. v. Div. of Hous. & Cmty. Renewal, 104 A.D.2d 984, 987 (N.Y. App. Div. 2nd Dep't 1984). The more stringent "rent control" law that pre-dated New York's rent stabilization law only applies in municipalities that have not ended their post-World War II housing emergencies, including New York City and a handful of other municipalities. It applies to buildings built before February 1947.[6]

The District of Columbia exempts units built after 1975. See D.C. Code § 42–3502.05(a)(2).

The rent control ordinance St. Paul, MN, enacted in 2021 initially lacked a "new construction" exemption. In 2022, however, the City amended the law, adopting a 20-year "rolling" new construction exemption "designed to spur new housing development, given the many developers who backed out of planned construction after the City's voters first approved the ordinance."

---

[5] Somewhat analogously, Congress recognized the merit of such "grandfathering" when it exempted existing residential buildings from accessibility requirements in enacting the Fair Housing Act Amendments of 1988, which provide that only buildings built or substantially renovated after March 13, 1991, need to be accessible. See 42 U.S.C. § 3604(f)(3)(C). That policy determination gave rise to this case.

[6] More on how New York "rent control" works can be found at N.Y. Div. of Hous. and Cmty. Renewal, Office of Rent Admin., "Rent Control: Overview," online at https://hcr.ny.gov/rent-control (last visited Apr. 6, 2026). More on how New York "rent stabilization" works can be found at N.Y. Div. of Hous. and Cmty. Renewal, Office of Rent Admin., "Fact Sheet #1: Rent Stabilization and Rent Control" (Jan. 2024), online at https://hcr.ny.gov/system/files/documents/2024/01/fact-sheet-01-01-2024_0.pdf (last visited Apr. 6, 2026).

*Woodstone Ltd. P'ship*, 674 F. Supp. 3d at 588. In 2025, the City amended the law again to exempt units built after a date certain—December 1, 2004—"to prevent a loss of capital investment, relocation of builders to more predictable locations and asset types, negative impacts on housing supply, and long term increases to housing costs." *See* St. Paul, MN, Ord. No. 25-29 (May 7, 2025).

Even Congress has seen the wisdom of such exemptions. When, following World War II, it enacted the Federal Housing and Rent Act of 1947, 61 Stat. 193 (June 30, 1946), "buildings constructed after February 1, 1947, were exempted from controls while older buildings remained covered." *Cmty. Hous. Improvement Program v. City of N.Y.*, 59 F.4th 540, 545 (2d Cir. 2023). The "purpose of Congress" in enacting that exemption was "to encourage new construction by freeing property from the restrictions of rent control so that the property owner could obtain a fair return upon his new investment and the public would obtain the advantage of additional housing accommodations." *Mitchell v. McDavid*, 116 N.E.2d 757, 759 (Ohio 1953).

In short, Costa-Hawkins stands in the broad mainstream in adopting a new construction exemption from rent control in light of the recognized ill effects rent limits can have on the production or new housing stock that is so desperately needed.

## III.    THE PURPOSES AND LEGISLATIVE HISTORY OF COSTA-HAWKINS ARE RELEVANT TO BOTH THE REASONABLENESS OF THE PROPOSED MODIFICATIONS AND THE "FUNDAMENTAL ALTERATION" ANALYSIS.

DOJ regulations under Title II of the ADA require public agencies to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7)(i). Plaintiffs bear the burden of establishing that their proposed modifications are reasonable, and then the burden shifts to defendants to show that the proposed modification would result in a fundamental alteration.

Plaintiffs' approach to Costa-Hawkins as it relates to the first prong is to continue to assert that state law *can* be preempted if necessary to comply with the ADA—which this Court has found to be the case as a general matter—and then to largely ignore the question of whether the proposed modification to Costa-Hawkins is actually reasonable *in this case*, training their firepower almost

exclusively on arguing that modifications to the City's RAP are reasonable. They don't affirmatively argue that the effect of their proposed modifications on Costa-Hawkins is irrelevant with respect to the "reasonableness" prong—they simply don't address it.

With respect to the "fundamental alteration" question, they do go so far as to argue that Costa-Hawkins is irrelevant. (ECF No. 190 at 27-28.) In fact, however, the effects of Plaintiffs' proposed modifications on Costa-Hawkins must be central to the Court's analysis. Plaintiffs are not merely seeking a modification of Oakland's "policies, practices, or procedures" in this case. They are undeniably seeking a modification of California's policies, practices, or procedures as well, and "[a] modification's reasonableness depends on how it impacts the goals of an agency's program." *Where Do We Go Berkeley v. Cal. DOT*, 32 F.4th 852, 862 (9th Cir. 2022).

Plaintiffs nevertheless argue that the Court should disregard the impacts on Costa-Hawkins because that law is not part of the City's "service, program, or activity," *i.e.*, the RAP. (ECF No. 190 at 27-28, quoting 28 C.F.R. § 35.130(b)(7)(i) [boldface in original].) This is a false dichotomy. For one thing, Costa-Hawkins is part-and-parcel of the current structure of the RAP. Moreover, Costa-Hawkins is part of the State of California's "program" or "activity" of regulating the rental housing market, and Plaintiffs are proposing, by extension, to modify the that "program" or "activity" as well.

No authority that Plaintiffs cite—or that *Amicus* has found—supports such a segmented interpretation of the phrase "service, program, or activity" as Plaintiffs propose. Instead, the Ninth Circuit has held that phrase is to be construed broadly, to encompass anything a public entity does, *Barden v. City of Sacramento*, 292 F.3d 1073, 1076-77 (9th Cir. 2002), and two of the cases Plaintiffs cite in support of their argument—*Hindel v. Husted*, 875 F.3d 344 (6th Cir. 2017), and *Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494 (4th Cir. 2016) ("*Lamone*")—actually undermine it.

In those cases, blind voters contended that the paper-ballot absentee voter systems of Ohio and Maryland, respectively, discriminated against them, and they sought a reasonable modification that would allow them to use online absentee ballots. In both cases, the State objected that the change would be a "fundamental alteration" because it conflicted with separate state law requirements that all voting tools be certified by state boards of elections to ensure election integrity. Neither the Sixth Circuit nor the Fourth held that the purposes of the certification requirement were irrelevant to the

"fundamental alteration" analysis, as Plaintiffs imply.

*Hindel* merely held that the district court erred in holding—at the motion to dismiss stage—that the purposes of the certification requirement would be defeated by the proposed accommodation as a matter of law. Noting that the online voting system Plaintiffs sought had been successfully used elsewhere, the Sixth Circuit remanded to allow the State to advance the fundamental alteration argument after development of a factual record.

Similarly, the *Lamone* court did not hold that the purposes of Maryland's certification requirement were irrelevant. Rather, it acknowledged that "Certain requirements of state law could in fact be fundamental to a public program in a way that might resist reasonable modifications otherwise necessary to bring that program into compliance with the ADA." 813 F.3d at 509. The court further concluded that "The relevant inquiry here is not whether certification qua certification is fundamental to Maryland's voting program, but whether use of the tool without certification would be so at odds with the purpose of certification that such use would be unreasonable," and it credited the district court's factual findings that the purposes of the certification requirement—maintaining the integrity of the electoral process—were not undermined by proposed modification. *Id.*

In other words, both courts found that the purposes of the state laws sought to be modified were *relevant*—they merely held that in those cases a fundamental alteration had not been established. None of the other cases that Plaintiffs cite support the opposite conclusion.

As discussed more fully below, the need to consider the purpose of Costa-Hawkins derives from the nature of the "reasonableness" and "fundamental alteration" tests, and, though ADA cases, neither *Hubbard v. SoBreck, LLC*, 554 F.3d 742, 747 (9th Cir. 2009), *Wood v. Cty. of Alameda*, 875 F. Supp. 659, 665-66 (N.D. Cal. 1995), nor *O'Campo v. Chico Mall, LP*, 758 F. Supp. 2d 976, 985 (E.D. Cal. 2010), addressed those standards. They were conflict preemption cases.

*Oconomowoc Residential Programs, Inc. v. City of Greenfield*, 23 F. Supp. 2d 941, 954 (E.D. Wis. 1998), did address those standards, but its discussion was arguably dicta because the court had already invalidated the challenged rule on the grounds that it was facially discriminatory. (Under Ninth Circuit case law, the "reasonable modification" test does not apply to facially discriminatory laws. *See Bay Area Addiction Research & Treatment, Inc. v. City of Antioch*, 179 F.3d 725, 733 (9th

Cir. 1999).) In any event, that court did consider "the extent to which the accommodation would undermine the legitimate purposes and effects of" the challenged law in assessing whether the proposed modification was reasonable, contrary to Plaintiffs' position. 23 F. Supp. 2d at 956.

McGary v. City of Portland, 386 F.3d 1259 (9th Cir. 2004), has no relevance to this question at all. It did not address the interplay of overlapping laws. And Mary Jo C. v. N.Y. State & Local Ret. Sys., 707 F.3d 144, 161-65 (2d Cir. 2013), merely rejected the premise that an accommodation that conflicts with a state law is a *per se* unreasonable accommodation as a matter of law at the motion to dismiss stage. It remanded for a fact-specific assessment as to whether waiving the deadline at issue there would be unreasonable or a fundamental alteration. Id. at 161-65.

To adopt Plaintiffs' view would have profound federalism implications. By ignoring the modifications' impact on Costa-Hawkins, it would elevate the City of Oakland's (optional) preferred solution to high housing costs—rent control—over the Legislature's contrary determination that the pursuit of new housing construction is of greater overall importance, and it would do so without due consideration for the State's goals. *Cf.* SED, Inc. v. Dayton, 519 F. Supp. 975, 978 (S.D. Ohio 1981) ("The state-city relationship, regardless of the specific context in which it arises, is in itself a delicate and paramount issue of predominantly, if not exclusively, local concern" in which federal courts should be reluctant to interfere) (citing La. Power & Light Co. v. City of Thibodaux, 360 U.S. 25, 28 (1959); Chicago v. Fieldcrest Dairies, Inc., 316 U.S. 168, 171-73 (1942)).

## IV.     PLAINTIFFS' PROPOSED MODIFICATIONS ARE NOT REASONABLE.

A plaintiff seeking a modification of a public entity's policies or procedures under the ADA bears the burden of demonstrating that the requested modification is reasonable on its face—"*i.e.*, ordinarily or in the run of cases." US Airways, Inc. v. Barnett, 535 U.S. 391, 401 (2002); Pierce v. County of Orange, 526 F.3d 1190, 1217 (9th Cir. 2008). Plaintiffs have not carried their burden of showing that the modifications they seek—either the extension of rent control to all accessible units in Oakland immediately, or a "rolling" basis—meets this standard.

"'Reasonable' is a relational term: it evaluates the desirability of a particular accommodation according to the consequences that the accommodation will produce. This requires an inquiry not only into the benefits of the accommodation but into its costs as well." Borkowski v. Valley Cent.

*Sch. Dist.*, 63 F.3d 131, 138 (2d Cir. 1995). *See also Mont. Med. Ass'n v. Knudsen*, 119 F.4th 618, 624 (9th Cir. 2024). "An accommodation is 'reasonable' if it is both 'efficacious' and its cost is not disproportionate to the benefit." *Patterson v. City of Seattle*, No. C94-768WD, 1995 U.S. Dist. LEXIS 22453, at *7-8 (W.D. Wash. Apr. 18, 1995) (quoting *Vande Zande v. Wisconsin Dep't of Admin.*, 44 F.3d 538, 542-43 (7th Cir. 1995)). *See also Birdwell v. AvalonBay Cmtys., Inc.*, 2023 U.S. Dist. LEXIS 173120, *14 (N.D. Cal. Sept. 27, 2023). A court "would not, for example, require an employer to make a multi-million dollar modification for the benefit of a single individual with a disability, even if the proposed modification would allow that individual to perform the essential functions of a job that she sought. In spite of its effectiveness, the proposed modification would be unreasonable because of its excessive costs." *Borkowski*, 63 F.3d at 138.

Moreover, while the "costs" in question include dollars and cents, they are not limited to fiscal considerations. When the issue is a proposed modification to a government policy designed to address a matter of fundamental public policy, "reasonableness depends on the nature of the [problem the policy seeks to address], whether the proposed modification would affect the agency's ability to address [it], and the probability of worsening [the problem] if the agency is forced to alter its programs." *Where Do We Go Berkeley*, 32 F.4th at 862.

Finally, and relatedly, the requested relief must be tailored to the harm and not sweep more broadly than is justified by the substantive law at issue. *Mont. Med. Ass'n*, 119 F.4th at 627; *E.T. v. Paxton*, 19 F.4th 760, 769 (5th Cir. 2021).

Plaintiffs' requested modifications fall short on all these points.

**A.    The Evidence Shows That the Costs of Plaintiffs' Proposed Modifications Will Be Clearly Disproportionate to the Limited Benefits.**

The evidence in this case, including in support of Plaintiffs' own motion, indicates that Plaintiffs' proposed modifications would have limited efficacy, at best, in expanding their access to the City's RAP program. It certainly would not guarantee that disabled renters seeking accessible housing could obtain the benefits of rent stabilization, because the record indicates that the accessibility of all rental housing in Oakland is poor, whether new or old. (*See* ECF No. 145 [City's Motion for Summary Judgment] at 16-17 [summarizing the evidence].) While this Court held that "the relative merits of older versus newer rental units have little bearing on the question of whether

Plaintiffs are denied meaningful access to housing in the RAP," it acknowledged that "they might bear on the question of whether Plaintiffs' proposed remedy is effective"—the very question presented by the current motion. (ECF No. 152 at 8.)

Plaintiffs' evidence indicates that there are an estimated 9,034 accessible units that could become RAP-covered.[7] (ECF No. 112-32 at 15-16). At best, the proposed modification would merely create the possibility that a tenant *might* obtain the benefits of the RAP if one of these units happened to become available and the tenant is otherwise qualified to rent it. Plaintiffs' own motion urges that the chances of finding an accessible unit would increase to between 9% and 27%, depending on how many units were added to the Program. (ECF No. 190 at 18.)

Conversely, however, the costs of Plaintiffs' proposed modifications—to the rental housing industry and to the City's and State's policy goals—are profound.

Regarding the costs to landlords, the evidence Plaintiffs cited in support of their initial motion for summary judgment indicates that, had the RAP been applicable to Ian Smith's current rental unit from the inception of the tenancy in 2012 through to 2020, the monthly cost to his landlord—*i.e.,* the monthly reduction in rent—would be at least $832 per month, or approximately $10,000 per year. (*See* ECF No. 111 at 13 ¶¶ 16-17.) And that's just one unit during a limited period. As this Court has held that Mr. Smith's circumstance is typical of members of the class (*see* ECF No. 66 at 12-13), it is reasonable to estimate that similar costs would be borne by the landlords of all the units that are currently exempt from rent control but would come under its strictures if the Plaintiffs' proposed modifications were adopted. Most remarkably, those costs would not be limited to units in which members of the class live. *All* accessible rental units would bear those costs—either all at once or on a rolling basis (*see* ECF No. 38 at 17:3-5). Put another way, the costs are structurally disproportionate to the benefits, as the costs are borne 100% of the time, while the benefits of the modification are conferred *at most* 27% of the time. Plaintiffs' expert's report estimates that 13.9% of all renter

---

[7] The report excludes from the unit count 5,346 units that are part of the Low Income Housing Tax Credit (LIHTC) program, which are exempt from the RAP pursuant to a different exemption. Applying Dr. Lapkoff's own accessibility assumptions (33%, 50%, and 100% by building type), this indicates roughly 5,000 accessible LIHTC units are excluded. Inexplicably, Plaintiffs do not challenge that exemption in this litigation, despite such units accounting for a third of all newly constructed accessible units in Oakland since 1991.

households in Oakland have an ambulatory disability (ECF No. 112-32 ¶ 2), so the proposed modification seeks to control the rent charged for 100% of accessible units to give 13.9% of the renter population a 9-27% greater chance of finding one.

And the costs are staggering. Multiplying the $832 per month cost, noted above, across the estimated 9,034 units that could be brought under the RAP yields approximately $7.5 million in reduced rental revenue *per month*—more than $90,000,000 annually. Importantly, that is not a one-time cost. That reduced rent level would persist going forward *and* it would compound each year. Thus, the $90 million figure is not a static estimate, but one that would grow over time.

The magnitude of those costs, in turn, bear directly on the question of whether the proposed modifications would affect the City of Oakland's and the State of California's ability to address the fundamental problem of the crisis-level housing shortage that both face, and the probability of worsening it if the modifications are granted. *Where Do We Go Berkeley*, 32 F.4th at 862. The estimated difference in revenue between Ian Smith's actual lease in 2020 and his hypothetical lease under rent control is approximately 30%. If developers come to understand that they will be able to earn 30% less revenue on their developments going forward, they will surely be less likely to build in Oakland—and probably California more generally—going forward. Investment in Florida or Texas will become all that more attractive relative to investment in California.[8] Furthermore, reductions of that scale will encourage the owners of existing units to withdraw their properties from the rental market pursuant to the Ellis Act, Cal. Govt. Code § 7060 *et seq.*, to "convert their properties to condominiums or other ownership forms, demolish them, or occupy them as their own homes," thereby further reducing the City's housing stock. *Diversity of Rent Regulation, supra*, 46 FORDHAM URB. L.J. at 1047-1048.

The RAP and Costa-Hawkins reflect legislative efforts to balance competing objectives, including protecting tenants while preserving incentives for housing construction. Plaintiff's proposed modifications seek to abandon one of these objectives (encouraging new housing) to ensure

---

[8] *Cf.* Shaver, "Camden seeking to Exit California: Real Estate Alert," MULTIFAMILYDIVE (Jan. 28, 2026), *at* https://www.multifamilydive.com/news/camden-exit-california-dispositions-regulations/810687/ (last visited Apr. 9, 2026) ("'You're always going to have the – what's the next bullet in California from a regulatory standpoint?,' Camden Executive Vice Chairman of the Board Keith Oden said").

meaningful access to the provisions of the RAP that serve other objectives (tenant protection). The ADA does not compel such wholesale negation of a program objective as a reasonable modification.

*US Airways v. Barnett* is instructive. There, a disabled employee sought reassignment to a physically undemanding position in the mailroom after suffering a back injury. That position, like others, was subject to seniority-based employee bidding. The employee requested an accommodation that would allow him to be assigned to the mailroom position despite more senior employees bidding for the position, which was denied. 535 U.S. at 394. The Supreme Court, in considering whether the denial violated the ADA, stated that normally such a request would be reasonable within the meaning of the statute were it not for the seniority system, but that it would not be reasonable in the run of cases that the assignment in question trump the rules of a seniority system. *Id*. at 403.[9]

In so holding, the Court in *Barnett* looked to "the importance of seniority to employee-management relations" and noted that "the typical seniority system provides important employee benefits by creating, and fulfilling, employee expectations of fair, uniform treatment." *Id.* at 403-04. The Court expressed concern that making exceptions would undermine those employees' confidence that they would receive that fair, uniform treatment. *Id.* at 404-405. The Court further held that "the statute does not require proof on a case-by-case basis that a seniority system should prevail." *Id.* at 403. In other words, a facially neutral policy that serves important policy purposes like Costa-Hawkins should not have to be justified time and time again to comply with the Act.

Such is the case here as well. Like the seniority system in *Barnett*, both case law and academic research have recognized the importance of new construction exemptions—and particularly the certainty of such exemptions guaranteed by Costa-Hawkins—to the goal of promoting housing production. *See Burien, LLC v. Wiley*, 230 Cal. App. 4th 1039, 1047 (2014) (construing Costa-Hawkins' new construction exemptions to advance their purpose of "encouraging construction and conversion of buildings which add to the residential housing supply"); *CP VI Admirals Cove, LLC v. City of Alameda*, 113 Cal. App. 5th 1167, 1181 (2025) (Costa-Hawkins "new construction" case

---

[9] Though *Barnett* concerned a claim under Title I of the ADA, the Ninth Circuit has held that the "reasonable accommodation" standard of Title I does not differ from the "reasonable modification" standard of Titles II and III and thus uses the terms "interchangeably." *Wong v. Regents of Univ. of Cal.*, 192 F.3d 807, 816 n.26 (9th Cir. 1999).

noting that "housing investment decisions often ride on certainty in advance"); *Diversity of Rent Regulation*, 46 FORDHAM URB. L.J. at 1050. By ensuring that newly constructed housing remains outside the reach of local rent control, the statute provides investors and developers with a clear and reliable signal about the regulatory treatment of new housing, notwithstanding the risk of changing political winds at city hall. Allowing *ad hoc* exceptions would undermine the certainty that framework was designed to create.

As this Court knows, the Ninth Circuit has observed that it would "expect, for example, that mandating lower rents for disabled individuals would fail the kind of reasonableness inquiry conducted in *Barnett*," *i.e.,* whether it is reasonable "ordinarily or in the run of cases." *Giebeler v. M&B Assocs.*, 343 F.3d 1143, 1154 (9th Cir. 2003) (quoting *Barnett*, 535 U.S. at 401). Of course, *Amicus* is aware that this Court characterized that statement as *dicta* in rejecting the City's motion to dismiss, distinguishing *Giebeler* from this case on the ground that " rather than 'mandating lower rents for disabled individuals,' [citation], the modification Plaintiffs seek would extend a pre-existing rent control program to additional units that would be available to disabled and non-disabled renters alike." (ECF No. 38 at 17.) But in the context of a summary judgment motion, where Plaintiffs bear the burden, that distinction is a bug, not a feature, given the requirement that a "reasonable" modification must not impose costs disproportionate to the benefits conferred. Moreover, whether the statement in *Giebeler* is *dicta* or not, it comes in the context of a broader discussion that surely counsels considerable caution in ordering substantial rent reductions[10] (which would be the inevitable effect of Plaintiffs' proposed modifications), *especially* on a categorical basis—at significant cost to landlords and the State's regulatory program—when the vast majority of the likely beneficiaries are not disabled.

---

[10] *See, e.g., Ling v. City of L.A. Cal.*, No. 2:11-cv-07774-SVW-E, 2012 U.S. Dist. LEXIS 199609, at *20-*21 (C.D. Cal. Nov. 14, 2012) ("Plaintiff has failed to identify, nor has the Court found, any case holding a request that a landlord accept $1,500 less than market-rate rent 'reasonable' under the FHA," citing *Giebeler*); *Dupont v. Sterling Family Tr.*, No. 2:23-cv-09785-SVW, 2025 LX 591715, at *11 (C.D. Cal. Nov. 14, 2025) ("the Court determines that Plaintiffs' request for Defendants to absorb the costs of a more expensive unit for permanent relocation is unreasonable. … Accepting lower rent, permanently, is an undue financial burden on the Defendants," citing *Giebeler*); *Bentley v. Peace & Quiet Realty 2 LLC*, 367 F. Supp. 2d 341, 348-49 (E.D.N.Y. 2005) ("Clearly, in the ordinary run of cases, the landlord of a rent-stabilized building is not required to forgo the opportunity for a vacancy increase merely because a disabled individual seeks to inhabit that apartment unit").

It wasn't just a random observation—it was made in the context of the Ninth Circuit addressing why the parade of horribles that led the Second and Seventh Circuits to hold that accommodations for the economic circumstances caused by disability were categorically excluded from the ADA was overblown. Those courts feared that if such economic accommodations were permitted, all sorts of broad, neutral policy regulations—such as "building codes, minimum wage laws, or construction safety regulations that made construction of housing for the disabled more expensive" would be subject to modification as well. *Hemisphere Bldg. Co. v. Vill. of Richton Park,* 171 F.3d 437, 440 (7th Cir. 1999); *Salute v. Stratford Greens Garden Apartments,* 136 F.3d 293, 302 (2d Cir. 1998). The Ninth Circuit concluded, however, that the fears were unfounded because the "reasonableness" analysis under *Barnett* would be expected to do some heavy lifting:

> [T]he reasoning of these two opinions captures concerns that *are* taken into account within the analysis required by *Barnett* and by the FHAA as we understand it. Under the FHAA, as under the RA and the ADA, only *reasonable* accommodations that do not cause undue hardship or mandate fundamental changes in a program are required. *Barnett* held that although adjustments in seniority rules could be accommodations within the intendment of the disability statutes, such adjustments are ordinarily not *reasonable* accommodations, and therefore are required only in unusual circumstances. Similarly, it is probable that all or most of the changes in long-established policies that *Salute* and *Hemisphere* march out as inevitably mandated by the FHAA unless the economic circumstances caused by disability are cordoned off entirely from the accommodation requirement would be deemed, on examination, unreasonable "ordinarily or in the run of cases," *Barnett*, 535 U.S. at 401, and therefore not required. We expect, for example, that mandating lower rents for disabled individuals would fail the kind of reasonableness inquiry conducted in *Barnett*.

*Giebeler,* 343 F.3d at 1154. In short, the Ninth Circuit was unwilling to hold—as *Salute* and *Hemisphere* did—that economic accommodations could *never* meet the appropriate standard—if the remedy was sufficiently tailored to the harm and the accommodation would not impose an undue burden on the landlord[11]—but it clearly anticipated that broad systemic modifications would be the exception and not the rule under *Barnett*.

Along those lines, the *Barnett* Court recognized that accommodations that are not reasonable in normal circumstances may become reasonable if there are "special circumstances" that separate

---

[11] *See, e.g., Birdwell v. AvalonBay Cmtys., Inc.*, 742 F. Supp. 3d 1024, 1034 (N.D. Cal. 2024) (Tigar, J.) (ordering rental of two-bedroom apartment at one-bedroom rate as an accommodation to an individual plaintiff, where landlord "stipulated that paying the difference in rent between a one- and two-bedroom unit would not cause it undue financial burden")

the case from the "ordinary run" of cases—such as a showing that the employer, having retained the right to change the seniority system unilaterally, exercises that right fairly frequently, or that the system already contains exceptions such that, in the circumstances, one further exception is unlikely to matter to the point where one more departure, needed to accommodate an individual with a disability, will not likely make a difference. 535 U.S. at 405. But, while Plaintiffs appear to claim that rule applies here (*see* ECF No. 190 at 14), they have presented no evidence that the circumstances of this case are unusual. To the contrary, the circumstances are entirely ordinary. They involve the intersection of a neutral federal law which compels unit accessibility only for post-1991 construction with the mainstream, facially neutral policy of new construction exemptions from rent control to create an unintended disparity. These are circumstances which are not "particular" or "special" to Plaintiffs, to Oakland, or even to California. (*See* discussion, *supra*, regarding new construction exemptions.) Further, the unique nature of Costa-Hawkins as a preemptive statute, which exists for the very purpose of establishing a uniform rule and not allowing local governments to make exceptions heavily tilts against a finding of such "special circumstances." Likewise, efforts to repeal or weaken Costa-Hawkins have been considered and, in every case, rejected. (*See* ECF No. 163-1 [Decl. of Thomas K. Bannon] at ¶¶ 9-10 [summarizing failed legislative and ballot measure efforts to weaken or repeal Costa-Hawkins].)

Because there is a clear, structural disproportion between the theoretical benefits the Plaintiffs might receive and the very real—and overly broad—harms their proposed modifications will impose on landlords and the State's housing policy, Plaintiffs have not met their burden of showing that the proposed modifications are reasonable.

## B.    The Requested Modifications Are Substantially Overbroad.

As noted above, a "reasonable" modification must not sweep more broadly than the harm it seeks to address. Thus, in *E.T. v. Paxton*, the Fifth Circuit held a district court ruling enjoining enforcement of Texas's ban on masking in schools during the COVID-19 pandemic as being in violation of the ADA may have wrongly judged the likelihood of plaintiffs' success on the merits, but "at a minimum" was "overbroad." 19 F.4th at 769. "[T]he injunction could have been tailored to address only the seven plaintiffs in th[at] action, as well as their school districts. More generally, the

district court's injunction could also have been tailored to require only individualized accommodations by schools, on a case-by-case basis, while leaving GA-38's general ban on mask mandates in place. Imposing a broad-brush injunction to prohibit enforcement of GA-38 in all schools in Texas was likely erroneously overbroad." *Id*.

And citing *E.T. v. Paxton* with approval, the Ninth Circuit likewise held in *Montana Medical Association* that a district court injunction against enforcement of a state law prohibiting discrimination (in both employment and provision of government services) based on vaccination status, on the ground that the prohibition was preempted by the ADA, was overbroad because it even reached facilities that were exempt from the prohibition. 119 F.4th at 626-27.

Here, Plaintiffs' requested modifications would extend rent control to thousands of rental units in Oakland, even though Plaintiffs' own evidence shows most would house renters who are not members of the plaintiff class—who do not have a mobility disability. Thus, Plaintiffs' proposed remedy sweeps far, far more broadly than the harm it seeks to address, further supporting the conclusion that the requested modifications are not "reasonable" within the meaning of the ADA.[12]

    **C.**    **The Evidence on Which Plaintiffs Rely Is Not Sufficient to Carry Their Burden.**

        **1.**    **The Attorney General's discussion of the Tenant Protection Act/Assembly Bill 1482 doesn't establish the reasonableness of the proposed modifications to Costa-Hawkins.**

Plaintiffs rely heavily on the Attorney General's discussion of the California's Tenant Protection Act of 2019 (Assembly Bill 1482 or the "TPA"), and specifically California Civil Code § 1947.12, which established certain limited caps on rents for some units that are exempt from local rent control, and which adopted a 15-year "rolling" new construction exemption, as evidence that their proposal to adopt a similar rolling exemption is facially reasonable. But that's not what the Attorney General said. His brief expressly takes no position regarding the reasonableness of the proposed modifications. Rather, he noted that *if* relief is mandated by the ADA, then it may be

---

[12] Plaintiffs also should not be permitted to shift gears and request a substantially narrowed modification—imposing rent control only on units occupied by class members—at this late date, to save their motion. *See Shavelson v. Bonta*, 608 F. Supp. 3d 919, 930 (N.D. Cal. 2022) (rejecting exactly such a narrowing of the requested modification under the ADA in response to a motion to dismiss on the ground of fundamental alteration, because "It is almost as if the plaintiffs have proposed a new lawsuit in response to the motion").

possible to craft relief in such a manner that moderates a conflict with the Costa-Hawkins Act. But that begs the question of whether relief is mandated by the ADA.

Plaintiffs' reliance on the TPA's 15-year rolling exemption makes the fundamental mistake of considering the appropriate length of a new construction exemption in a vacuum, divorced from the various other interlocking components of state housing policy. As discussed above, housing regulation requires a series of tradeoffs, and Plaintiffs' discussion (and the Attorney General's) fails to address the trade-offs that the Legislature made in enacting the TPA.

For one thing, the rent limits of the TPA are far, far more generous than Oakland's. The TPA allows landlords to increase rents annually by the lesser of 5% *plus* inflation (as measured by the regional Consumer Price Index) or 10%. Cal. Civ. Code § 1947.12(a)(1), (g)(3). Oakland, by contrast, limits annual rent increases to no more than 60% of the percentage increase in CPI (*i.e.*, a fraction of the inflation measure that the TPA allows in its entirety in addition to a 5% base) or 3%, whichever is less. Oakland Muni. Code § 8.22.070(B)(3). In a year with no inflation, Oakland will allow no rent increase while the TPA still allows 5%; in a year with 10% inflation, Oakland would allow a 3% increase to the TPA's 10%. Additionally, the TPA is temporary legislation; it expires by its own terms on January 1, 2030. Cal. Civ. Code § 1947.12(o).

It is entirely rational for the Legislature to conclude that a shorter new construction exemption is needed to encourage development when the outer limits of rental limits are relatively loose and the duration of the restriction is brief, as under the TPA, than is necessary when the limits are subinflationary and permanent, as is the case in Oakland. Supporting that conclusion is (1) the fact that when it enacted the TPA in 2019, the Legislature expressly declined to expand local governments' power to impose rent control, leaving Costa-Hawkins in full force, *see* Cal. Civ. Code § 1947.12(m)(1) & (2), and (2) during the same session that it adopted the TPA the Legislature rejected a proposal (co-sponsored by then-Assemblymember, now-Attorney General Bonta) that would have amended Costa-Hawkins to adopt a 20-year rolling new construction exemption. *See* Assem. Bill 36 (2019-2020 Reg. Sess.).

To the extent the TPA is relevant at all, it suggests an alternative "modification" to Oakland's RAP. The RAP is broader than just Oakland's rent control provisions. It consists of various other

provisions (voluntary mediation and administrative adjudication, disclosures and notices, translation requirements, etc.) that State law does not preclude. The Court could order that all of those provisions, which do not implicate controlling the rental rate, apply to post-1983 units but that all RAP-covered units in Oakland, including those constructed prior to 1983, should be subject *only* to the rent limits imposed by the TPA. "Plaintiffs are not entitled to their preferred [modifications] under the ADA and Rehabilitation Act if other reasonable [modifications] are available." *E.T. v. Paxton*, 19 F.4th at 767. Applying the TPA's limits across the board together with the administrative apparatus the City provides would put Plaintiffs on the same playing field as all other renters—they would have equal access to the City's "program"—and it would have the added benefit of complying with both federal law <u>and</u> state housing policy, thereby minimizing this Court's interference with the State's relationship to its municipalities. *See* *SED, Inc.*, 519 F. Supp. at 978. To the extent Plaintiffs (or the City) object that such a change would fundamentally alter the RAP, that merely highlights the extent to which Plaintiffs' proposed changes in the opposite direction would do so as well.

### 2. Plaintiffs' other evidence also does not establish the reasonableness of modifying Costa-Hawkins or the RAP.

Aside from the Attorney General's brief, the evidence that Plaintiffs rely on in an effort to meet their burden of showing reasonableness is largely the same evidence that they relied on in their original motion for summary judgment, reply and oral argument. (*See* ECF No. 190 at 14-17 [citing these sources].) None of that evidence is sufficient to carry their burden either.

First, Plaintiffs make an historical argument as to the City Council's purpose in adopting the 1983 cutoff in the first place. They argue that "[w]hen Oakland's rent control Program ordinance was enacted in 1980, it contained no exemption for new construction at all. The current January 1, 1983 cutoff date for rent control Program coverage was not added until November 1, 1983—at which time it exempted only ten months' worth of newly-built rental units. Now, that same January 1983 cutoff date for rent control serves to exempt all rental units built over the past 43 years." (ECF No. 190 at 14-15.) And also, "The fact that even recently-built units were covered by the rent control Program when the January 1, 1983 cutoff date was originally enacted strongly suggests that recently-built units could be covered again, without fundamentally altering the Program or upsetting the

balance between its various purposes that the City Council originally intended to strike." (*Id.* at 14:26-15:7.)

These arguments are simply a *non sequitur*. The cited evidence indicates that the City Council, recognizing the harmful effect of rent control on new construction, decided to exempt it on a prospective basis, and they chose a date certain to do so. It in no way follows that this "strongly suggests that recently-built units could be covered again." It is the immutability of the date certain that gives developers and property owners confidence to invest in construction. Constant updates undermine that reliability. *See Diversity of Rent Regulation Laws, supra*, 46 FORDHAM URB. L.J. at 1052 ("Investment may still decrease if market actors fear the trigger will be moved forward with subsequent legislation.").

Further, Plaintiff's point that at the time the exemption was adopted it covered only 10 months of units is irrelevant. Surely, the Council understood that the exemption would capture an increasing portion of the housing stock over time, yet they made that policy choice anyway. This point also ignores the reality that Costa-Hawkins was not enacted until 1995—twelve years after the RAP. At any point prior to then the City could have repealed or changed their 1983 cut off, but it didn't, supporting the conclusion that the Council, at least until that time, did not believe that paring back the new construction exemption would be appropriate.

Thereafter, Plaintiffs shift focus to the views of the current Council and City administration.

First, they cite the testimony of current RAP Manager Victor Ramirez that "in his personal view," having a later cutoff date for rent control Program coverage would not impair any purpose of the Program, but they ignore conflicting testimony that he gave to the effect that encouraging investment in new construction remains a purpose of the RAP (*see* ECF No. 112-38 at 8:6-11) and that, when asked "what about the Rent Adjustment Program, as it currently exists, serves to encourage investment in new residential rental property in the city?," he responded:

> I believe that the fact that, because of the state law, the units—the new units are not subject to the rent ordinance, property owners could still invest in the City of Oakland, understanding that there is a population that is being protected by that ordinance.

(*Id.* at 12:18-22; *see also id.* at 13:11-16 ["So because of a state law, in Oakland, any properties that are built from the ground up after eighty—1983 are not subject to this ordinance. So if they are any

concerns about those units—those newly 15 built units about being subject to this ordinance, that's not the case."].) Moreover, Mr. Ramirez is not designated as an expert, and there is no indication that his current role gives him any personal knowledge as to what, if anything, will encourage a developer to build new housing in Oakland.

In a similar vein, they claim that Chanée Franklin Minor—the City's 30(b)(6) designee regarding its RAP and the former Program Manager of that Program—similarly "testified that the only current purpose of exempting units built after January 1, 1983 from rent control Program coverage was to comply with the Costa-Hawkins Act, and that if state law were different, she would make a recommendation to City Council to change the cutoff date." (ECF No. 190 at 15:18-21.) Of course, compliance with Costa-Hawkins was not the only reason for the adoption of the RAP's new construction exemption. Costa-Hawkins didn't exist until 12 years later. The purpose was to indisputably to encourage new construction, and, like Mr. Ramirez, Ms. Franklin Minor is not designated as an expert, and there is no indication that her former role gives her any personal knowledge as to what, if anything, will encourage a developer to build new housing in Oakland.

Next, Plaintiffs note that in 2016 and 2017 the city council adopted resolutions, supporting the repeal or modification of Costa-Hawkins, that in their 2023 housing element they did the same, and that in 2024 the Council endorsed the "Justice for Renters Act," which would have repealed the Costa-Hawkins Rental Housing Act in its entirety. There are several problems with this.

For one, none of these resolutions mean the City would necessarily agree that applying the RAP *as it presently exists* to either all post-1983 units or to new construction on a rolling basis, is reasonable. Plaintiffs presume that the Council would not make any other modifications to the RAP to address the complicated trade-offs summarized above. Perhaps the rent restrictions would be loosened along the lines of the TPA. Perhaps landlords would be offered other incentives. The City Council seeks greater flexibility (*see* ECF No. 191-1 [Tr. of 8/21/25 Hrg.] at 33:13-3:12), but Plaintiffs' proposed modifications propose to replace one one-size-fits-all approach with another.

Far more importantly, though, this argument ignores the fundamental fact that regardless of whether City officials believe that a different new construction cutoff might be appropriate, the California Legislature has determined otherwise, and the Legislature has supreme authority over

housing policy in the State. *Anderson v. City of San Jose*, 42 Cal. App. 5th 683, 709-10 (2019).

Finally, Plaintiffs note that in June of 2022 the City adopted a rent registry program, that all units covered by the RAP must be registered, and there is "no foreseeable reason" that post-1983 units could not be added. This argument, too, is a *non sequitur*. For one thing, units built between 1983 and 2016 are already included in the registry, because they are subject to the just cause for eviction requirements. *See* City of Oakland, "Do I Need to Register My Unit?," *online at* https://www.oaklandca.gov/Community/Housing-Programs-Support/For-Landlords/Do-I-Need-To-Register-My-Unit (last visited Apr. 8, 2026). But more to the point, this says nothing about whether the imposition of stringent rent control limits on those units would interfere with the purpose of the RAP to encourage investment in new housing.

## V. PLAINTIFFS' PROPOSED MODIFICATIONS WOULD FUNDAMENTALLY ALTER THE CITY'S RAP AND COSTA-HAWKINS.

Even if Plaintiffs could satisfy their threshold burden regarding reasonableness, the requested modifications should still be rejected because they would fundamentally alter the structure of Oakland's rent stabilization program *and* California's comprehensive program of housing regulation.

"Observers, both critics and advocates, tend to regard the adoption of rent regulation as a binary choice; however, policymakers must make a host of decisions when enacting rent regulations. Legislators must decide, among other things, how broadly the program will apply; how annual increases will be determined; and the rights of tenants in regulated units. All of these choices involve difficult trade-offs." *Diversity of Rent Regulation, supra*, 46 FORDHAM URB. L.J. at 1048. With respect to the first of these—which units to cover—"[c]asting a broader net protects more sitting tenants but risks discouraging investment in new construction," and "[j]urisdictions have made a variety of decisions about which homes to regulate." *Id*. at 1049-50. Those that impose stricter limits on rent increases often regulate a narrower segment of the housing stock, while jurisdictions that extend rent regulations more broadly may adopt more permissive rent caps or other flexibility mechanisms. *See generally id.* But because "[r]egulating the rents charged in new buildings is particularly problematic, … [m]ost systems do not cover new buildings…" *Id*. at 1050. The resulting systems reflect complex legislative judgments about how best to reconcile competing objectives—

protecting tenants from excessive rent increases while preserving incentives for housing construction and investment. Because these design choices operate together as part of a broader policy equilibrium, modifying one element of the system in isolation risks upsetting the balance the legislature sought to achieve.

Along these lines, Oakland's ordinance and Costa-Hawkins both reflect a legislative effort to balance competing housing policy objectives—allowing rent control to protect tenants from excessive rent increases while preserving incentives for the construction and investment necessary to address the City's housing shortage (and the State's). Oakland's ordinance expressly identifies several purposes, including providing relief to residential tenants, encouraging rehabilitation of rental housing, encouraging investment in new residential rental property, and allowing landlords a fair return on their property. *See* Oakland Muni. Code § 8.22.010(A), (C). These goals necessarily pull in different directions: measures that strengthen tenant protections may also reduce incentives to build or invest in rental housing, while policies designed to encourage housing production may limit the reach of rent regulation. The ordinance reflects the City's effort to reconcile those competing objectives, and Costa-Hawkins reflects the Legislature's further attempt to calibrate the balance.

The Supreme Court has long recognized that disability law requires meaningful access to public programs but does not compel modifications that would alter the essential nature of those programs. *See Alexander v. Choate,* 469 U.S. 287, 300 (1985); *Southeastern Cmty. Coll. v. Davis,* 442 U.S. 397, 410 (1979). Whether a modification constitutes a fundamental alteration typically turns on whether the requested change would undermine the objective the challenged rule is designed to serve. *Hindel* and *Lamone*, discussed above, illustrate this principle, as do *Easley by Easley v. Snider,* 36 F.3d 297 (3d Cir. 1994), and *PGA Tour, Inc. v. Martin,* 532 U.S. 661 (2001).

In *Easley*, plaintiffs sought to expand an existing state attendant-care program so that individuals with cognitive disabilities could participate with the assistance of surrogates. 36 F.3d at 304-05. The program, however, was designed to help individuals with physical disabilities maintain independence and potentially enter the workforce. Because that objective depended on participants directing their own care, the program excluded individuals who could not do so. *Id.* Although that limitation meant some disabled individuals—including the plaintiffs—could not benefit from the

program, the Eleventh Circuit held that eliminating it would fundamentally alter the program because the restriction served a core legislative objective. *Id.* at 305.

*Martin* illustrates the opposite situation. "There, the Supreme Court, in considering whether allowing an amateur golfer to participate in the PGA Tour's golf tournament with a golf cart would fundamentally alter the tournament, emphasized the purpose of the walking rule from which Martin sought an exemption." *A.L. v. Walt Disney Parks & Resorts U.S., Inc.*, 50 F.4th 1097, 1111 (11th Cir. 2022) (citing *Martin,* 532 U.S. at 690). The Court explained that the purpose of the rule was to subject players to fatigue and that this purpose would not be subverted by allowing Martin to use a cart. The district court had found that Martin's condition subjected him to greater fatigue, even when using a cart, than his competitors experienced by walking. The Court held that "[a] modification that provides an exception to a peripheral tournament rule without *impairing its purpose* cannot be said to 'fundamentally alter' the tournament." *Martin,* 532 U.S. at 690 (emphasis added).

The modification sought here is more like the one rejected in *Easley* than the one permitted in *Martin*. Oakland's (and Costa-Hawkins') new construction cutoff exists precisely to preserve incentives for housing construction and investment—a core objective of the ordinance, as stated in the findings, and an expressly identified purpose of Costa Hawkins, both of which are consistent with rent stabilization systems across the country that routinely adopt similar approaches. Eliminating that boundary would sacrifice that objective in favor of expanding rent control coverage. Laudable though Plaintiffs may believe that goal to be, disability law does not authorize courts to recalibrate the policy balance the Legislature chose to strike. (For *Martin* to be analogous to this case, the plaintiff golfer in that case would have to have proposed to allow *all* players to use golf carts because *some* players have disabilities.)

*Shavelson v. Bonta, supra,* further illustrates this point. That case involved California's End of Life Option Act, which permits terminally ill patients to obtain aid-in-dying medication but requires that the medication be self-administered. The plaintiffs argued that the requirement prevented some individuals with disabilities from benefiting from the statute and sought a modification under the ADA allowing physicians to help administer the medication. This court rejected that request after noting that the Act addressed a "polarizing issue" and that policymakers

had "taken pains to craft a statutory framework that would provide choice and peace to many, while acknowledging the weighty moral issues involved and protecting against abuse and coercion." 608 F. Supp. 3d at 927. Altering the self-administration requirement, the court concluded, would cross the statute's "sharp boundary" between allowing a person to end their own life and allowing someone else to do so and would therefore "fundamentally alter the Act." Id. at 927–28. The same concern is present here. Rent control is also a polarizing issue. (*See* ECF No. No. 163-1.) Oakland's new construction cutoff reflects the City's and the State's effort to balance competing housing objectives—protecting tenants from excessive rent increases while preserving incentives for new housing construction. Eliminating that boundary would not merely adjust the ordinance's operation; it would rewrite the policy compromise the City and the California Legislature deliberately adopted.

Finally, Plaintiffs cite *Powers v. McDonough*, 163 F.4th 1162, 1195 (9th Cir. 2025), suggesting in a parenthetical that it can be read as standing for the proposition that merely "expanding" a program is not an alteration. (*See* ECF 190 at 15.) But that misreads the opinion. In that case, the VA claimed that being ordered to build specific types of supportive and temporary housing on their campus would "forc[e] it to provide one single type of housing, thereby limiting veterans' options to decide where to live," and that was the fundamental alteration. The Ninth Circuit rejected this argument, noting that the order would not "limit" veterans' choices, it would expand the program (and thereby veteran's choices). It was not a holding that *any* expansion of a program is *per se* not a fundamental alteration as Plaintiffs suggest; instead, it was simply noting the fallacy in the VA's argument that complying with the order would limit the options available to veterans.

The Ninth Circuit has recognized that expanding the scope of a regulatory scheme *can* constitute a fundamental alteration as a matter of law. In *Bay Area Addiction Research & Treatment, Inc.*, 179 F.3d at 725, the court explained that a zoning ordinance prohibiting methadone clinics— but not other clinics at which medical services were provided—from operating within 500 feet of a residential area could only be rendered neutral by "expanding the covered establishments dramatically" or striking the reference to methadone clinics entirely—either of which would fundamentally alter the ordinance. *Id*. at 734. Though that discussion arose in in the context of the court explaining why the "reasonable modification" test does not apply to facially discriminatory

laws, it illustrates the relevant principle here: a modification that substantially expands the scope of regulated entities is not a modest adjustment to a program but a restructuring of the program itself.

Granting the modifications Plaintiffs seek would require the Court to redraw the legislative boundary that defines Oakland's rent stabilization program and to recalibrate the policy balance embedded in the ordinance and in State law. The ADA requires reasonable adjustments to ensure access to public programs, but it does not authorize courts to redesign those programs themselves.

Finally, Plaintiffs' proposed modifications would be a fundamental alteration of the State's housing programs because, though this case is nominally limited only to Oakland, any interference with housing policy in Oakland will have ripple effects that threaten to impact other neighboring jurisdictions. For one thing, housing has long been recognized to be a matter of regional or even statewide, rather than purely local, concern, *see, e.g., Ruegg & Ellsworth v. City of Berkeley*, 63 Cal. App. 5th 277, 312-13 (2021), and the State assesses housing needs—and imposes housing requirements—on a regional basis. If Oakland is unable to carry its burdens under the law, because developers simply won't build there, other jurisdictions will face greater regional pressures on their affordable housing. Moreover, an adverse ruling here will naturally discourage development in other cities as well, as it will put developers on notice that they can no longer rely on Costa-Hawkins to protect their investments. They will surely anticipate that comparable lawsuits are likely to follow in Los Angeles (Oct. 1, 1978, new construction cutoff, *see Burien*, 230 Cal. App. 4th at 1038), San Francisco (1979 cutoff, *see id.* at 1048), and other jurisdictions throughout the State.

## VI.    CONCLUSION.

California already struggles mightily to produce enough housing for its population and has struggled for years, and it strains to balance current protections for renters with the need to incentivize developers to build new housing units that would alleviate the pressure on the State's limited housing supply. Costa-Hawkins' new construction exemptions are some of the principal tools that the Legislature has adopted in an effort to mitigate that shortage. Plaintiffs' proposal to undermine those exemptions—and, with them, a key piece of the State's housing policy—is not reasonable and it would fundamentally alter state regulatory programs and activities. As such, their proposal should be denied.

Respectfully submitted,

Dated: April 10, 2026                    NIELSEN MERKSAMER LLP

By:      /s/      Christopher E. Skinnell

*Attorneys for Amicus Curiae*
CALIFORNIA APARTMENT
ASSOCIATION