EXHIBIT OO

Shelley Lapkoff, Ph.D.
4367 Short Hill Road
Oakland, CA 94605
Phone: 510-435-2453
Lapkoff@Demographers.com

**Expert Witness Rebuttal Report of Dr. Shelley Lapkoff**

*Smith et al. v. City of Oakland*, Case No. 4:19-cv-05398-JST

**Table of Contents**

I.     Introduction………………………………………………………………..………2

II.    Kowta Memo section *Basic Demographic Information*…………………………..2

III.   Kowta Memo section *Analysis of Relevant Conclusions of 2011 AHS Report Re: Accessible Housing*…………………………………………………………..2

IV.    A Note on My Estimation of the Effect That Adding Accessible Units Would Have on the Opportunity to Access RAP Rent Protections for Renters with Ambulatory Disabilities…………………………………………………………...7

1

## I.  Introduction

This report discusses my analysis of Matt Kowta's Memorandum ("Kowta Memo") regarding the Oakland Rent Adjustment Program Research, dated December 22, 2023.

## II.  Kowta Memo section *Basic Demographic Information*:

I have very similar results to what was reported in Mr. Kowta's Memo section titled *Basic Demographic Information*. Specifically, our findings from the American Community Survey:

   a) Mr. Kowta found 100,787 renter-occupied housing units in the City of Oakland, compared to my 100,612 renter-occupied housing units.

   b) We both agree that 7.1 percent of the renter population reported a mobility disability;

   c) Mr. Kowta found 14 percent of renter households reported at least one member with a mobility disability; my analyses found 13.9 percent of renter households reported at least one member with a mobility disability.

## III.  Kowta Memo section *Analysis of Relevant Conclusions of 2011 AHS Report Re: Accessible Housing*:

Except for Table numbers, Mr. Kowta's discussion of the data from *Accessibility of America's Housing Stock: Analysis of the 2011 American Housing Survey (AHS)* is the same reported in the Declaration of Raymond Kennedy in Support of Opposition to Plaintiffs' Motion for Class Certification, dated November 12, 2020. ECF No. 56.

I have concerns about the data Mr. Kowta uses. In my Supplemental Declaration in Support of Plaintiff's Motion for Class Certification (dated December 1, 2020), I discussed several flaws with the 2011 AHS data. ECF No. 62-5. Mr. Kowta lists my report as part of the materials he reviewed. Yet, Mr. Kowta does not respond to my concerns about the 2011 AHS data, and this is a primary data source in his report.

My three concerns are repeated here. First, the AHS data described in the Accessibility Report appear to be flawed and should not be used to evaluate the number or characteristics of

accessible units. Second, the authors of the 2011 AHS report expressed concern about the AHS survey questions related to accessibility and recommended that additional questions be asked in future surveys to clarify responses. This supports my finding that the survey data appear to be flawed. Third, the AHS data provide information for Alameda and Contra Costa Counties combined (called the "Oakland MSA") and no data are available for the City of Oakland alone, which is a relatively small part of the MSA. Each concern, as well as a fourth concern, is discussed below.

I believe the AHS data are flawed because respondents reported fewer accessible units than the law would allow. We know that under federal law, all units in multifamily (four or more unit) buildings built after March 13, 1991, must be accessible if the building contains an elevator. 24 C.F.R. §§ 100.201, 101.205(a).

Table 4, on Kowta Memo page 12, shows that less than one percent of housing units in buildings with 50 or more units in the United States are wheelchair accessible. I assume these buildings – or the vast majority of them – would contain an elevator, especially if they were built after 1991. Any such building built after 1991 should be wheelchair accessible. As Table 1 on the subsequent page shows, 34 percent of such buildings were built in 2000 or later in the United States. We should expect at least 34 percent of such buildings to be wheelchair accessible. Yet, the AHS data show only one percent accessible. This suggests that something is wrong with AHS data on accessibility, and that any conclusions derived from that data should be viewed with caution.

(Report continued on next page)

3

**Table 1**

| U.S. Housing Stock, Buildings with 50 or more units | | |
| --- | --- | --- |
| | Number | Percent |
| Built 2000 or later | 2,546,989 | 34% |
| Built 1980-1999 | 1,694,884 | 22% |
| Built before 1980 | 3,297,111 | 44% |
| Total | 7,538,984 | 100% |

Source:
U.S. Census Bureau. "Tenure by Year Structure Built by Units in Structure." American Community Survey, ACS 5-Year Estimates Detailed Tables, Table B25127, 2022, https://data.census.gov/table/ACSDT1Y2022.B25127?q=housing by structure by year built.

The authors of the *Accessibility of America's Housing Stock: Analysis of the 2011 American Housing Survey (AHS)* recommend that AHS questions about accessibility be modified in the future to provide more information, so that responses are more reliable. The authors write on page 2: "The AHS should provide respondents with a short explanation of a wheelchair user's needs, including turning radius, and width and height requirements for items such as doorways, counters and the location of switches. This will improve the quality of responses, as *it appears likely that some measures are currently misreported* due to subjectivity and limited respondent knowledge." [italics added] ECF No. 56-2 at 8 of 134; *id*. at 57 of 134 (noting that respondents "may not have any experience with wheelchairs or know anyone who uses one").

In addition, the authors of the Accessibility Report note that many key aspects of accessibility – including turning radius in bathrooms – were not addressed at all by the AHS questions used in 2011. ECF No. 56-2 at 27 of 134; *see also id*. at 58-66 of 134.

4

Perhaps the shortcomings of the AHS survey instrument produced the data flaw I identified above. Survey respondents were not asked about key aspects of accessibility and were not given explanations that would lead to reliable responses.

My third concern is that the Oakland MSA is being used as a proxy with the City of Oakland. No mention is given in Mr. Kowta's report that the MSA differs from the City. Differences in geographical coverage (the Oakland MSA versus City of Oakland) may cause estimates of accessibility for the City to be inaccurate. The City of Oakland is a relatively small part of the Oakland MSA, which consists of all of Alameda and Contra Costa counties: Oakland contains only 17 percent of the two-county housing stock. Also, the City's housing stock has a higher percentage of rental units than the surrounding areas of the MSA. Of the City's housing stock, 35 percent of units are in buildings with 5 or more units per building, whereas in the Oakland MSA two-county area, only 23 percent of units are in buildings with five or more units per building. The surrounding areas are more suburban than the City, and thus are more likely to have single family housing than Oakland itself. See Table 2 which compares the City of Oakland and the Oakland MSA with respect to the current housing stock and housing built after 1990.

(Report continued on next page)

5

**Table 2**

| Housing Stock in April 2020 | | | | |
|---|---|---|---|---|
| | City of Oakland | % Distribution | Oakland MSA | % Distribution |
| Single Family Detached | 75,665 | 42% | 607,095 | 58% |
| Single Family Attached | 7,337 | 4% | 83,682 | 8% |
| 2 to 4 units per Bldg | 32,594 | 18% | 94,823 | 9% |
| 5+ units per Bldg | 62,336 | 35% | 245,030 | 23% |
| Mobile Homes | 537 | 0% | 14,670 | 1% |
| Total | 178,469 | 100% | 1,045,300 | 100% |

| Housing Growth Between 1990 and 2020* | | | | |
|---|---|---|---|---|
| | City of Oakland | % Distribution | Oakland MSA | % Distribution |
| Single Family Detached | 6,686 | 28% | 137,704 | 61% |
| Single Family Attached | 1,452 | 6% | 24,642 | 11% |
| 2 to 4 units per Bldg | 3,726 | 16% | 12,919 | 6% |
| 5+ units per Bldg | 11,531 | 49% | 49,402 | 22% |
| Mobile Homes | 337 | 1% | 354 | 0% |
| Total | 23,732 | 100% | 225,021 | 100% |

**Percentage of units built after 1990**

| | City of Oakland | Oakland MSA |
|---|---|---|
| 5+ Units | 18% | 20% |

\* Note: The growth shown is *net* growth - demolished units would offset new housing.

Source: State of California, Department of Finance, E-5 Population and Housing Estimates for Cities, Counties and the State — various years.

I have a fourth concern: Mr. Kowta's analysis of the 2019 AHS reports only national level data. As he notes, "there was no data available specific to the two-county Oakland metropolitan area." Thus, his "key results" on page 14 are at the national level, and thus of limited relevance when discussing the situation in the City of Oakland.

Both the 2011 and 2019 AHS ask respondents for their subjective experience of accessibility. The 2019 questionnaire specifically asks respondents in households with a disability to rank on a scale of 1 to 5 the accessibility of the house for the particular disability experienced by members of the household. They also ask for a few objective criteria of accessibility, like stairs, ramps, and whether bedrooms and bathrooms are on the first floor. Many or all of the controversial questions in the 2011 survey were eliminated in 2019, so much so that the authors of the 2019 report say that the two surveys results should not be compared to one another. In any event, neither AHS results measure the legal accessibility of post 1991 multi-family units, nor were the surveys intended to do so.

**IV.    A Note on My Estimation of the Effect That Adding Accessible Units Would Have on the Opportunity to Access RAP Rent Protections for Renters with Ambulatory Disabilities:**

In my December 2023 report, I illustrated the probabilities that households with and without a disability would have in obtaining a RAP unit, under different assumptions around the availability of accessible units. Table 6 in my report summarized the findings. After reviewing my calculations, I realized a slight error in my calculations. I have a revised Table 6.  The probabilities of non-disability households renting a RAP unit is slightly lower than what I originally presented. The revised Table 6 is on the subsequent page.

(Report continued on next page)

7

**Table 6 (Revised)**

|  | Probability that Non-disability Households can rent a RAP unit | Probability that Disability Households* can rent a RAP unit |
|---|---|---|
| Assuming Currently 42,934 RAP units and NO Accessible units | | |
| No Accessible Units | 50% | 0% |
| 5,000 added units | 54% | 9% |
| 10,000 added units | 59% | 17% |
| 15,000 added units | 64% | 26% |
| Assuming Currently 63,981 RAP units and NO Accessible units | | |
| No added Units | 74% | 0% |
| 5,000 added units | 79% | 14% |
| 10,000 added units | 84% | 27% |
| 15,000 added units | 88% | 41% |

*"Disability households" refer to households in which at least one member has an ambulatory disability.

One can also use the formula to calculate the probabilities of renting a RAP unit for a subset of the disability population, for example those that need a wheelchair or other motorized device. I estimated there are 4,869 such renter households in Oakland. Using the same formula as above, Table 3 below shows the results.

16. The probability of renting a RAP unit for a disability household remains the same. The probability is independent of the number of disability households, because all households can compete for the accessible units. Thus, the probability only depends on the number of accessible units compared to the total renter population. Neither of these variables change when we go to a subset of the disability household population.

17. The probability of renting a RAP unit for a non-disability household goes down slightly when a smaller disability population is assumed. This is because there are more renter

8

households competing for the inaccessible units. Instead of excluding 13,995 renter households from the RAP program, only 4,869 renter households would be excluded.

**Table 3**

|  | Probability that Non-disability Households can rent a RAP unit | Probability that Households with a member that uses a wheelchair/motorized scooter/similar other aid can rent a RAP unit |
|---|---|---|
| | Assuming Currently 42,934 RAP units and NO Accessible units | |
| No Accessible Units | 45% | 0% |
| 5,000 added units | 50% | 9% |
| 10,000 added units | 55% | 17% |
| 15,000 added units | 60% | 26% |
| | Assuming Currently 63,981 RAP units and NO Accessible units | |
| No added Units | 67% | 0% |
| 5,000 added units | 72% | 14% |
| 10,000 added units | 77% | 27% |
| 15,000 added units | 82% | 41% |

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, to the best of my knowledge.

DATED: February 19, 2024

Respectfully submitted,

_____
Shelley Lapkoff

9