Thomas Zito (CA Bar No. 304629)
tzito@dralegal.org
Sean Betouliere (CA Bar No. 308645)
sbetouliere@dralegal.org
DISABILITY RIGHTS ADVOCATES
2001 Center Street, Third Floor
Berkeley, California 94704-1204
Tel:    (510) 665-8644
Fax:    (510) 665-8511

Emily Roznowski, (*pro hac vice*)
eroznowski@dralegal.org
Raika Kim (*pro hac vice*)
rkim@dralegal.org
DISABILITY RIGHTS ADVOCATES
300 South Wacker Drive, Floor 32
Chicago, IL 60606-6680
Tel: (332) 217-2319
Fax: (212) 644-8636

Michael Rawson (CA Bar No. 95868)
mrawson@pilpca.org
Craig Castellanet (CA Bar No. 176054)
ccastellanet@pilpca.org
PUBLIC INTEREST LAW PROJECT
449 15th Street, Suite 301
Oakland, CA 94612-06001
Tel: (510) 891-9794
Fax: (510) 891-9727

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

| | |
|---|---|
| IAN SMITH and MITCH JESERICH, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF OAKLAND, a public entity,<br><br>Defendant.<br>v.<br><br>ROB BONTA, in his official capacity as Attorney General of California,<br><br>*Intervenor-Defendant* | Case No. 4:19-cv-05398-JST<br><br>**Plaintiffs' Response to California Apartment Association's Amicus Brief (ECF No. 200)**<br><br>Date:      May 28, 2026<br>Time:      2:00 p.m.<br>Crtrm.:   Zoom Hearing<br><br>Judge:    Hon. Jon S. Tigar<br><br>Trial Date: April 20, 2025 |

Case No. 4:19-cv-05398-JST

Plaintiffs' Response to California Apartment Association's Amicus Brief (ECF No. 200)

# Table of Contents

I.      INTRODUCTION ...................................................................................................................1

II.     ARGUMENT...........................................................................................................................1

    A.    Costa-Hawkins is not the "service, program, or activity" to which Plaintiffs seek access, and the purposes of that law have no bearing on the reasonableness or fundamental alteration analyses. ...................................................................................1

    B.    Plaintiffs have shown that their proposed modification is reasonable, effective, and necessary to provide them with complete relief. ....................................................4

    C.    Nothing in CAA's brief undermines the reasonableness of Plaintiffs' proposed modification, or the evidence Plaintiffs offer to support that reasonableness. .........................5

    D.    CAA does not point to any evidence in the record that would support the City's fundamental alteration defense. ..............................................................................7

III.    CONCLUSION.....................................................................................................................10

Case No. 4:19-cv-05398-JST

Plaintiffs' Response to California Apartment Association's Amicus Brief (ECF No. 200)

## I.    **INTRODUCTION**

The California Apartment Association (CAA) claims that Plaintiffs' proposed modification to Oakland's rent control Program—bringing in newer units that were required to be accessible—would "sacrifice" the Program's goal of encouraging developers to invest in new residential rental property, but it does not cite to a single piece of record evidence that supports this supposition. Instead, CAA relies on a twenty-six-year-old New York Times opinion piece and a single law review article that actually undermines its argument, because it concedes that there is no good evidence that "modern-day rent regulation programs" negatively impact development. *See* § II(B), below.

CAA also argues that that the Court's reasonableness and fundamental alteration analysis should focus on Costa-Hawkins, rather than on the actual rent control Program to which Plaintiffs seek meaningful access, but this argument is directly contrary to binding Ninth Circuit caselaw. *See* § II(A), below.

CAA's remaining arguments are similarly wrong on the law or unmoored from the factual record. Mere argument and speculation—no matter how strident—cannot support summary judgment and falls far short of what would be necessary to prove the City's fundamental alteration defense. *See* § II(D), below. For this reason, the Court should disregard CAA's amicus brief and find in Plaintiffs' favor on all claims.

## II.    **ARGUMENT**

### A.    **Costa-Hawkins is not the "service, program, or activity" to which Plaintiffs seek access, and the purposes of that law have no bearing on the reasonableness or fundamental alteration analyses.**

CAA argues that "the effects of Plaintiffs' proposed modifications on Costa-Hawkins must be central to the Court's analysis" of both reasonableness and fundamental alteration, but as Plaintiffs have pointed out repeatedly, this is contrary to the plain text of Title II and its regulations, and to the holdings of appellate courts across the country. *See* ECF No. 190 § III(C)(3); ECF No. 201 § I(C).

The Second Circuit addressed such an argument directly, and rejected it, in *Hargrave v. Vermont*—a facial Title II challenge to Vermont's "Act 114," which allowed invalidation of Durable Power of Attorney (DPOA) documents executed by mentally ill patients who had been committed. 340 F.3d 27, 32-33 (2d Cir. 2003). On appeal, Vermont argued that that the district court's injunction would "fundamentally alter" a variety of possible programs, including Act 114 itself, which it described as "the actual statutory program enacted by the legislature." *Id.* at 37-38. The Second Circuit flatly rejected this argument, holding that the

Plaintiffs' Response to California Apartment Association's Amicus Brief (ECF No. 200)

relevant "service, program, or activity at issue is neither Vermont's entire civil commitment program nor the specific procedures set forth in Act 114, but rather, Vermont's program of permitting its citizens to execute DPOAs," and therefore "Vermont's DPOA program is also the relevant program or activity for purposes of section 35.130(b)(7)"[1] and the fundamental alteration analysis. *Id*. at 38 (affirming district court's finding that "the relevant 'service, program, or activity' . . . is 'the statutorily created opportunity to execute a DPOA for health care and the right *to have it recognized and followed*.'" (citation omitted)) (citation modified). Because the State had "failed even to assert clearly, much less show, that the injunction issued by the District Court would fundamentally alter Vermont's program authorizing and enforcing DPOAs," the Second Circuit rejected its fundamental alteration defense and upheld the district court's decision permanently enjoining enforcement of the challenged sections of Act 114. *Id.*

In reaching this result, the Second Circuit also noted that while "the ADA's preemption of these statutory provisions may have consequences not contemplated by the Vermont legislature and burdensome for health care professionals," the legislature was free to enact a revised law that did not discriminate against people with disabilities. *Id*. at 38 n.10. The same is true here.

Neither *Hindel* nor *Lamone*, on which CAA relies, demand a different result. *See* ECF No. 201 § I(C) (discussing both cases). Moreover, even if those two cases did support CAA's position, this Court would still be bound by the Ninth Circuit's decision in *Crowder*, where—in remanding the case for consideration of whether modifying quarantine requirements for guide dogs would be reasonable or a fundamental alteration—the Ninth Circuit ordered the district court to consider **not** the conflicting state regulation, but the factors relevant to the purpose of the quarantine program the plaintiffs sought to modify: namely, "the nature of the rabies disease, the extent of the risk posed by the disease, and the probability that the infected animals would spread it." *Crowder v. Kitagawa*, 81 F.3d 1480, 1486 (9th Cir. 1996).

*Where Do We Go Berkeley*, in which the Ninth Circuit considered "whether a six-month delay in clearing the encampments [was] a 'fundamental alteration'" to Caltrans's encampment clearing Program,

---

[1]   28 C.F.R. § 35.130(b)(7) sets forth a public entity's obligation to make reasonable modifications when "necessary to avoid discrimination on the basis of disability," unless the public entity can demonstrate that doing so "would fundamentally alter the nature of the service, program, or activity" at issue. 28 C.F.R. § 35.130(b)(7)(i).

similarly supports Plaintiffs on this point. *Where Do We Go Berkeley v. Cal. Dep't of Transp.,* 32 F.4th 852, 862 (9th Cir. 2022). As the Ninth Circuit stated plainly, "[a] modification's reasonableness depends on how it impacts **the goals of an agency's program**."[2] *Id.* (emphasis added) (finding that the six-month delay was a fundamental alteration because it effectively required Caltrans to "house [p]laintiffs on its property until [p]laintiffs found new housing," and providing "housing solutions" was not part of Caltrans's existing program).

Here, there is no genuine dispute that what Plaintiffs seek is a real chance to benefit from Oakland's rent control Program, which provides tens of thousands of Oakland tenants with stability and protection from displacement, but which—as this Court has already found—does not give Plaintiffs or others who need accessible housing with a meaningful opportunity to access these same protections. *See* ECF No. 111 § II ("PSOF") ¶¶ 2-23; ECF No. 152 (Order) at 7-8; *see also* ECF No. 190 § III(C)(3); ECF No. 201 § I(C). For this reason, it is the rent control Program itself, and not Costa-Hawkins, that must be the focus of the reasonableness and fundamental alteration analyses. ECF No. 190 § III(C)(3); ECF No. 201 § I(C); *see also Hargrave*, 340 F.3d at 38.

Even if CAA were correct that Costa-Hawkins, and not the rent control Program itself, must be the focus of the Court's reasonableness and fundamental alteration analysis, this would be a distinction without a difference, because the underlying substantive purpose of Oakland's current January 1983 cutoff date and of sections 1954.52(a)(1) and (2) of Costa-Hawkins is the same: to avoid discouraging new housing development. *See* ECF No. 201 § I(C). Because neither CAA nor the City of Oakland has offered evidence proving that Plaintiffs' proposed modification would have this effect, Oakland's fundamental alteration defense must fail regardless of whether Costa-Hawkins or the rent control Program itself is the focus of the Court's analysis. *See* ECF No. 190 at 15:15-19:19 (detailing lack of evidence to support the City's

---

[2]    This language does not imply, as both CAA and the City have argued, that it is part of Plaintiffs' prima facie "reasonableness" burden to disprove a fundamental alteration defense, or to prove affirmatively that there will be no negative impact on the goals of a given program. Rather, it reflects the simple reality that if a requested modification is shown to be a fundamental alteration—because, for example, it would defeat the goals of an agency's program—it is not reasonable. *See Where Do We Go Berkeley*, 32 F.4th at 862; *see also* 28 C.F.R. § 35.130(b)(7)(i). Nothing about *Where Do We Go Berkeley* undermines the fact that the public entity defendant has the burden to plead and prove fundamental alteration. *See* ECF No. 201 § I(D).

fundamental alteration defense); *see also* ECF 143 § II(E).

  **B.** <u>**Plaintiffs have shown that their proposed modification is reasonable, effective, and necessary to provide them with complete relief.**</u>

  Plaintiffs have provided more than enough evidence to establish that bringing newer units that were required to be accessible into Oakland's rent control Program—whether immediately, or according to a rolling deadline—would be both reasonable and effective, and that this modification is necessary to give them a genuine opportunity to access the protections of City rent control for the first time.[3] *See* ECF No. 201 § I(D); *see also* ECF No. 190 § III(B); ECF No. 143 § II(D); ECF No. 111 § IV(E).

  CAA argues that this modification is "overbroad" because nondisabled renters could also live in the newer units that would be covered under Plaintiffs' proposal. However, it is well established that an injunction can benefit people other than the plaintiffs, if necessary to provide Plaintiffs and the class with "complete relief" (which, here, is the meaningful opportunity to access the Program). *Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1501-02 (9th Cir. 1996) (upholding statewide injunction that would benefit all motorcyclists in California); *see also Trump v. CASA, Inc.*, 606 U.S. 831, 851 (2025) (explaining that an injunction, if necessary to afford "complete relief" to plaintiffs, may benefit non-parties).

  As Plaintiffs have established, there is no narrower modification that would actually give them the meaningful opportunity to benefit from Oakland's rent control Program that they seek and are entitled to.[4] *See* ECF No. 201 § I(B) (discussing issues with each of the City's proposed alternative accommodations). For example, while the City's idea of making newer units subject to rent control "only for disabled tenants" has a superficial appeal, it would have the predictable perverse impact of incentivizing owners of such units not to rent to Plaintiffs or members of the class.[5] *See* ECF No. 201 § I(B). Because Plaintiffs' proposed

---

[3] Because these issues have already been briefed extensively, Plaintiffs incorporate their prior arguments by reference, rather than reiterating them here.

[4] At hearing, the Court described this as "one of [Plaintiffs'] strongest points." ECF No. 191-1 at 48:19-21.

[5] The perverse incentives of such a regime are obvious and widely-recognized. *See, e.g.*, Nicole Montojo, Stephen Barton & Eli Moore*, Opening the Door for Rent Control* 28, Haas Inst. for a Fair & Inclusive Soc'y (2018), *available at* https://belonging.berkeley.edu/sites/default/files/ARCHIVE/haasinstitute_rentcontrol.pdf. ("Proponents of rent control point out an important reality: that any means-testing would very likely lead to discrimination against low-income renters because landlords would be incentivized to evict eligible tenants or solely rent to

Plaintiffs' Response to California Apartment Association's Amicus Brief (ECF No. 200)

modification is the only one that will provide them with "complete relief," it is not overbroad.[6]

**C.    Nothing in CAA's brief undermines the reasonableness of Plaintiffs' proposed modification, or the evidence Plaintiffs offer to support that reasonableness.**

Plaintiffs have provided ample evidence that it would be reasonable to bring newer units that should be accessible into the rent control Program—most of which is taken directly from testimony of the City's own employees or the text of its recent City Council resolutions, and all of which is uncontested. *See* ECF No. 201 § I(D); ECF No. 190 § III(B); *see also* ECF No. 143 § II(D); ECF No. 111 § IV(E). The Court should reject CAA's attempts to wave this evidence away.

First, CAA attempts to dismiss the fact that the January 1983 cutoff date for rent control, which originally exempted only ten months of newly-built units, now serves to exempt all rental units built over the past forty three years—a state of affairs that the City itself describes as driving the balance between the rent control Program's purposes "out of whack too far in favor of landlords." *See* ECF No. 190 § III(B)(2). CAA suggests that because Oakland did not change its cutoff date between 1983 and the enactment of Costa-Hawkins in 1995, it must have wanted that original date to be set in stone forever. The City Council's repeated resolutions seeking repeal or reform of Costa-Hawkins suggest this is not the case. *See id*.

Second, CAA dismisses testimony from the current and former managers of Oakland's rent control Program that having a later cutoff date for rent control would not impair any purpose of that Program, and that the only current purpose of exempting units built after January 1, 1983 was to comply with Costa-Hawkins—arguing, among other things, that such testimony should be disregarded because neither City employee was "designated as an expert." But of course, there is no expert testimony in this case suggesting that Plaintiffs' proposed modification would **not** be reasonable either. In the absence of any expert testimony one way or another, the admissions of the people who actually run Oakland's rent control Program—and who gave uncontradicted 30(b)(6) testimony about that Program on the City's behalf—

non-qualifying tenants who could pay higher rents.")

[6]    *Montana Medical Association v. Knudsen*, which held that an injunction was overbroad because it applied to healthcare settings that were already exempted from the challenged statute, has no bearing on this case. 119 F.4th 618, 627 (9th Cir. 2024). Nor does *E.T. v. Paxton*, where the court found that a statewide injunction prohibiting enforcement of GA-38 (a law prohibiting mask mandates) went beyond what was necessary to provide relief to the seven schoolchildren on whose behalf the case was brought. 19 F.4th 760, 769 (5th Cir. 2021).

Plaintiffs' Response to California Apartment Association's Amicus Brief (ECF No. 200)

should be given considerable weight. *See* PSOF ¶¶ 36-37.

Third, CAA tries to downplay the City Council's many resolutions supporting repeal or reform of Costa-Hawkins so that it would be free to expand the rent control Program, arguing that what the Council seeks is "flexibility," not a new "one-size-fits-all approach." But nothing about Plaintiffs' proposed remedy would prevent the City from adjusting its rent control Program to address what CAA describes as the "complicated trade-offs" between its various purposes. The City could, for example, choose to alter its limit on allowable annual rent increases, if it determined that doing so was necessary to encourage development—nothing about either Costa-Hawkins or Plaintiffs' proposed modification would prevent this change. And of course, the rent control Program would still contain ample safeguards to ensure that landlords always receive a fair rate of return. ECF No. 143 at 20:9-15; *see also* § II(D), below. The only thing the City will not be able to do, if this Court decides in Plaintiffs' favor, is continue to maintain an arbitrary January 1983 cutoff date that permanently denies Plaintiffs and the class a real chance to access the rent control Program's protections.

In addition to its failed attempts to undermine Plaintiffs' evidence, CAA argues that Plaintiffs' proposed modification is not reasonable because, while "[t]he ADA requires reasonable adjustments to ensure access to public programs . . . it does not authorize courts to redesign those programs themselves." Setting aside CAA's inaccurate characterization of Plaintiffs' proposed modification as a "redesign," this is contrary to *Crowder*, which held not only that Courts **can** make their own analysis of what is possible—independent of the one conducted by lawmakers—but that they **must** do so, because "it is incumbent upon the courts to insure [sic] that the mandate of federal law is achieved." 81 F.3d at 1485.

Finally, *Easley*, on which CAA relies, is wholly distinguishable from this case. There, the Third Circuit found that allowing people with severe mental disabilities to use surrogates to direct their attendant care would not be a reasonable modification to Pennsylvania's Attendant Care Services program, because the core purpose of that program was to provide physical attendant care services to people who, but for their physical disabilities, could lead fully independent lives. *Easley by Easley v. Snider*, 36 F.3d 297, 304-05 (3d Cir. 1994); *see also id*. at 303-04 (finding that "mental alertness" was an essential eligibility requirement of the program and discussing the difference between the attendant services the program offered and the types of personal care services the plaintiffs would need). In other words, the plaintiffs in *Easley* ultimately

needed and sought a different benefit than the one the state actually provided. *See id.* at 303-04. By contrast, the modification Plaintiffs request here would give them a meaningful opportunity to access the **same** benefits and protections the City already provides to tens of thousands of Oakland tenants who can live in the inaccessible units that its rent control Program currently covers. ECF No. 143 at 15:2-12.

> ### D.    CAA does not point to any evidence in the record that would support the City's fundamental alteration defense.

Throughout its brief, CAA asserts that Plaintiffs' proposed modification would "sacrifice" the rent control Program's goal of encouraging new development, but it does not cite to a single piece of evidence in the record that supports this proposition. As Plaintiffs have pointed out repeatedly, mere argument and speculation cannot support the City's "fundamental alteration" defense, or undermine the reasonableness of Plaintiffs' requested modification. *See Lentini v. Cal. Ctr. for the Arts*, 370 F.3d 837, 846 (9th Cir. 2004) (defendant's "reasonable speculation about the effect" an accommodation might have was not sufficient to support an affirmative defense); *see also Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081-82 (9th Cir. 1996) (noting that "a scintilla of evidence is not enough to create a genuine issue of material fact," and that "mere allegation and speculation do not create a factual dispute for purposes of summary judgment" (citation modified)). Indeed, CAA's own cited cases reaffirm this point, holding that "if there is no factual basis in the record demonstrating that accommodating the individual would require a fundamental modification or an undue burden," those defenses must fail. *Easley*, 36 F.3d at 302.

Instead of grounding its argument in actual record evidence, CAA relies on a twenty-six-year-old New York Times opinion piece (which Plaintiffs object to as inadmissible hearsay), and a single law review article for the proposition that "most [rent control] systems do not cover new buildings," and the supposition that, even if they did, investment in new housing "may" decrease "if market actors fear the trigger"—that is, the cutoff date—"will be moved forward with subsequent legislation." Vicki Been, Ingrid Gould Ellen & Sophia House, *Laboratories of Regulation: Understanding the Diversity of Rent Regulation Laws*, 46 Fordham Urb. L.J. 1041, 1050, 1052 (2019) (hereinafter "*Diversity of Rent Regulation*"); *but see id.* at 1050 (describing jurisdictions with rolling deadlines).

Neither point has any bearing on the reasonableness of the modification requested here: Under either of Plaintiffs' two proposed methods of bringing in newer units that were required to be accessible (all at

once, or over time), new construction would continue to be exempted, and Plaintiffs do not suggest a "trigger" that would continually move forward. *See* ECF No. 201 at 10:8-19. Rather, either everything built after a new date certain would be exempt, or newly-built units would be exempted for a firmly-set period of years. *Id.* And to the extent "market actors" are genuinely discouraged from investing by the possibility of "subsequent legislation," that possibility already exists independently of Plaintiffs: As CAA acknowledges, there have been many recent efforts to repeal Costa-Hawkins, and the City Council has repeatedly expressed a desire to modify the current cutoff date of its rent control Program. As the California Court of Appeal held decades ago, "[r]ent control, like the imposition of a new tax, is simply one of the usual hazards of the business enterprise." *Interstate Marina Dev. Co. v. Cnty. of Los Angeles*, 155 Cal. App. 3d 435, 447 (1984).

Moreover, the article CAA relies on actually undermines its sky-would-fall argument, because the article concedes that "there is little rigorous research about modern-day rent regulation programs and even less about which particular features drive the effects rent regulation may have upon the housing market"—in other words, that there is no good evidence that "modern-day rent regulation programs" negatively impact development. *Diversity of Rent Regulation* at 1076-77.

CAA also asserts without evidence that the costs of Plaintiffs' proposed modification are "profound," but its argument on this point is both legally and logically unsound. First, the only cost-based defense available under Title II is "undue financial or administrative burden," but that—like fundamental alteration—must focus on the actual program at issue, and the costs to the public entity itself. *See* 28 C.F.R. § 35.150(a)(3); *see also* 28 C.F.R. pt. 35 app. B (Department of Justice Guidance) § 35.150 ("In determining whether financial and administrative burdens are undue, all public entity resources available for use in the funding and operation of the service, program, or activity should be considered."). Speculative costs to third party landlords cannot support this defense.

Second, CAA's "calculation" of costs—which takes the $832 difference between what Plaintiff Smith's rent actually was in 2020 and what it could have been if his unit was subject to rent control when he moved in in 2012, and then applies that same number to every existing rental unit in Oakland that was required to be accessible—has no basis in reality. Setting aside CAA's dubious insinuation that the inability to impose an excessive rent increase is properly characterized as a "cost" to landlords, this "calculation" assumes that the current housing market would continue to bear the sort of rent increases that took place

between 2012 and 2020, assumes that all landlords throughout the City could or would impose equally-enormous increases on their tenants, and assumes that tenancies would not turn over (which would allow landlords to bring rents up to market rate).

There is nothing to support such assumptions, and there is also no evidence at all to suggest that CAA's supposed "costs"—even if they were reliably-calculated—would actually deter new development or otherwise impair any purpose of the rent control Program. In short, the excessive annual rent increases that Mr. Smith was forced to bear between 2012 and 2020 cannot form the basis for any reliable estimate of landlord (or, for that matter, class member) costs. What they are, at best, is an illustrative example of the **kinds of** real economic harms that Plaintiffs and the class incur, as a consequence of being denied a meaningful opportunity to access the rent control Program's protections—and that they would continue to be uniquely vulnerable to, if CAA has its way.

CAA's unreliable calculation of landlord "costs"—and its more general argument that Plaintiffs' proposed modification would negatively impact new development—also ignores that the rent control Program guarantees landlords a fair rate of return "on their property and rental income," including by allowing them to impose greater annual rent increases than would otherwise be allowed. *See* ECF No. 143 20:9-15; ECF No. 141-1, Ex. J (Oakland Municipal Code) § 8.22.010(c); *see also id.* § 8.22.070(A)(2), (A)(3)(b), (C)(1)(d) (allowing for greater increases); ECF No. 143-6 (Cohen Dep.) at 82:24-83:19 (testifying that there is a process by which landlords may petition for rent increases as necessary to ensure a fair return); *id.* at 13:13-20 (affirming that she is the City's designee on the petition process).

Plaintiffs' proposed modification would have no impact on these provisions, or on the constitutional guarantee of a fair return that underpins them. *See, e.g.*, *Birkenfeld v. City of Berkeley*, 17 Cal. 3d 129, 165 (1976) (holding that rent control must "provide landlords with a just and reasonable return on their property"). Indeed, California Courts of Appeal have held that a fair return must be "commensurate with returns in comparable enterprises" and high enough to "discourage the flight of capital"—just "not so high as to defeat the purpose of rent control to prevent excessive rents." *San Marcos Mobilehome Park Owners' Ass'n. v. City of San Marcos*, 192 Cal. App. 3d 1492, 1502 (1987); *accord Rainbow Disposal Co. v. Escondido Mobilehome Rent Rev. Bd.*, 64 Cal. App. 4th 1159, 1172 (1998). In other words, the rent control Program's guarantee of a fair return must, by law, work to strike the very balance between protecting

tenants and encouraging development that CAA asserts (without basis) would be undermined by Plaintiffs' proposed modification. *See Cotati All. for Better Hous. v. City of Cotati*, 148 Cal. App. 3d 280, 285 (1983) (applying *Birkenfeld* and clarifying that, in order to pass constitutional muster, local rent control must guarantee a fair and reasonable return on investment). CAA appears to suggest that in order to continue building in Oakland, developers must receive not just a **fair** return on their investment, but an excessive or extractive one. However, CAA offers no support for this proposition, and it is particularly inapplicable here, because under Plaintiffs' proposed modification, new development will continue to be exempt from the rent control Program (either entirely, or for a period of at least fifteen years).

## III.   CONCLUSION

The Court should disregard CAA's amicus brief and find in Plaintiffs' favor on all issues, so that Plaintiffs and the class can finally have a real opportunity to benefit from Oakland's rent control Program.

DATED: May 7, 2026                    DISABILITY RIGHTS ADVOCATES


By: _____
     Sean Betouliere
     Thomas Zito
     Emily Roznowski
     Raika Kim
     *Attorneys for Plaintiffs*


PUBLIC INTEREST LAW PROJECT


By:     _/s/ Michael Rawson_
     Michael Rawson
     Craig Castellanet
     *Attorneys for Plaintiffs*

Plaintiffs' Response to California Apartment Association's Amicus Brief (ECF No. 200)