**Western Center on Law & Poverty**
Madeline Howard (SBN 254660)
mhoward@wclp.org
Richard A. Rothschild (SBN 67356)
rrothschild@wclp.org
3701 Wilshire Blvd., Suite 208
Los Angeles, California 90010
T: (213) 235-2628
F: (213) 487-0242

**National Housing Law Project**
Parisa Ijadi-Maghsoodi (SBN 273847)
pijadimaghsoodi@nhlp.org
90 New Montgomery St., Suite 1015
San Francisco, California 94105
T: (415) 636-7372

Attorneys for *Amici Curiae*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IAN SMITH, SUNDAY PARKER, and MITCH JESERICH, on behalf of themselves and all others similarly situated, Plaintiffs, <br><br> v. <br><br> CITY OF OAKLAND, a public entity, Defendant, <br><br> v. <br><br> ROB BONTA, in his official capacity as Attorney General of California, <br><br> Intervenor-Defendant. | Case No. Case No. 4:19-cv-05398-JST <br><br> **[PROPOSED]** *AMICUS CURIAE* **BRIEF IN SUPPORT OF PLAINTIFFS' SUPPLEMENTAL MOTION FOR SUMMARY JUDGMENT** <br><br> Local Rule 7-11 <br><br> Date: May 28, 2026 <br> Time: 2:00 p.m. <br> Crtrm: Zoom Hearing <br><br> Judge: Hon. Jon S. Tigar |

1

[Proposed] *Amici Curiae* Brief in Support of Plaintiffs' Supplemental Motion for Summary Judgment;
Case No. 4:19-cv-05398-JST

## TABLE OF CONTENTS

**Page**

STATEMENT OF INTEREST OF AMICI CURIAE ................................................................ 3

INTRODUCTION ................................................................................................................... 3

ARGUMENT ........................................................................................................................... 4

I. CAA'S ECONOMIC FRAMING DOES NOT REFLECT CONTEMPORARY HOUSING ECONOMICS ....................................................................................................... 4

II. NO EMPIRICAL EVIDENCE SHOWS RENT STABILIZATION REDUCES HOUSING SUPPLY OR NEW CONSTRUCTION .................................................................. 5

    A. The Massachusetts Natural Experiment: Repeal Did Not Produce a Construction Boom ............ 5

    B. New Jersey: Over 100 Jurisdictions, No Significant Effect on Construction ............................... 5

    C. The Binding Constraint Is Land-Use Regulation, Not Rent Regulation ...................................... 6

III. LANDLORDS HAVE SUBSTANTIAL MARKET POWER; CAA'S $90 MILLION FIGURE IS THE ARTIFACT OF A THEORETICAL COMPETITIVE-MARKET MODEL .............................. 6

    A. Direct Empirical Evidence of Landlord Pricing Power ................................................................ 7

    B. The CAA's $90 Million Figure Assumes the Market Structure the Evidence Contradicts .......... 7

    C. Policy Design Matters: First-Generation Rent Freezes Differ from Second-Generation Rent Stabilization ................................................................................................................................. 8

IV. THE "DEVELOPER FLIGHT" ARGUMENT IS CONTRADICTED BY THE EMPIRICAL RECORD ................................................................................................................................. 9

    A. New York City: The Most Restrictive Regime in America Is Also Its Leading Multifamily Builder ......................................................................................................................................... 9

    B. The CAA's Anecdotes Do Not Rebut the Record ....................................................................... 10

V. THE 15-YEAR ROLLING EXEMPTION TRACKS THE LEGISLATURE'S OWN JUDGMENT AND IS AN ECONOMICALLY REASONABLE HOUSING POLICY ......................................... 10

CONCLUSION ........................................................................................................................ 11

APPENDIX .............................................................................................................................. 12

## STATEMENT OF INTEREST OF AMICI CURIAE

Amici curiae are professional economists with substantial expertise in housing markets, rent regulation, and the empirical analysis of housing policy, and nonprofit organizations that advocate for sustainable housing policy.[1] Amici write in support of Plaintiffs' Supplemental Motion for Summary Judgment to address the economic claims in the California Apartment Association's amicus brief. Amici's collective familiarity with housing market economics makes them distinctively qualified to brief the Court on the impact of the proposal to apply a 10 or 15 year rolling coverage provision to Oakland's Rent Adjustment Program (RAP).

## INTRODUCTION

There is no credible empirical evidence that the rolling coverage provision at issue here reduces housing supply, including new construction. CAA's contrary claim rests on outdated and oversimplified introductory textbook reasoning that the empirical record does not bear out, and its asserted $90 million annual "cost" figure rests on a competitive-market baseline that recent direct measurement of landlord pricing power has rendered untenable. *See* ECF No. 200, California Apartment Association's *Amicus Brief in Opposition* at 19. The 15-year rolling new construction exemption the Attorney General describes as moderating any conflict with Costa-Hawkins is well within the range that contemporary housing economics regards as economically reasonable, and tracks the benchmark the California Legislature itself adopted in the Tenant Protection Act of 2019.[2]

CAA's arguments rest on a 2000 newspaper column and selective quotation of a single law review article. The  premise on which CAA depends—that rent stabilization reduces housing supply—is not supported by the modern empirical record. There is no body of peer-reviewed evidence finding that second-generation rent stabilization reduces new construction, or that its repeal increases construction.

---

[1] The names of individual amici are listed in Appendix 1. Affiliations are listed for identification only.
[2] ECF No. 178 (CA AG Statement); Mark Paul, *Economists Are Rethinking Rent Control* (PolicyLink 2025); Gonçalo Pessa Costa, *Dynamic Monopoly in the Rental Market: Evidence from New York City Housing* (working paper 2025); Sophie Calder-Wang & Gi Heung Kim, *Coordinated vs. Efficient Prices: The Impact of Algorithmic Pricing on Multifamily Rental Markets* (Wharton working paper 2024).

[Proposed] *Amici Curiae* Brief in Support of Plaintiffs' Supplemental Motion for Summary Judgment; Case No. 4:19-cv-05398-JST

Shifting the cut-off date for RAP coverage would not fundamentally alter state law, and as the Attorney General's brief points out, would maintain "sufficient financial incentives for constructing new housing in a manner that complements the Legislature's recent Tenant Protection Act of 2019." ECF No. 178 (CA AG Statement) at 13.

ARGUMENT

## I. CAA'S ECONOMIC FRAMING DOES NOT REFLECT CONTEMPORARY HOUSING ECONOMICS

CAA's economic case rests on two sources. The first is a 2000 *New York Times* column by Paul Krugman, sourced to a 1992 AEA poll, for the proposition that rent control "causes the higher rents and scarcity it is meant to alleviate."[3] The second is the Ninth Circuit's parallel "Economics 101" observation in *Guggenheim*, sourced to the same textbook pedagogy. Neither captures the contemporary state of housing economics.[4]

Within housing economics, the inflection point the CAA ignores arrived three decades ago. Richard Arnott's 1995 article in the premier *Journal of Economic Perspectives*, titled "Time for Revisionism on Rent Control?," concluded that economists' traditional hostility rested on "models that treat the housing market as perfectly competitive" and on the experience with "'hard' controls" in the postwar period that limit or prohibit *all* rent increases. For the modern "soft" regimes operative today where rent increases are permitted in specified circumstances, both the theoretical and empirical cases were "weak." Arnott's diagnosis has been confirmed by subsequent work.[5]

The CAA's sole academic citation, Been, Ellen, House, and Stehlik-Barry's *Laboratories of Regulation*, is a descriptive catalog of regulatory diversity. It does not estimate supply effects and endorses no particular exemption period. The proposed relief here, a 10 or 15-year rolling exemption,

---

[3]ECF No. 200 (CAA Amicus) at 9–10 (quoting Paul Krugman, *Reckonings; A Rent Affair*, N.Y. TIMES (June 7, 2000)). Krugman's 2008 Nobel was awarded for foundational work in international trade theory and economic geography; he is not a specialist in housing economics. His 2000 column is popular commentary summarizing what "almost every freshman-level textbook" taught at the time, sourced to a 1992 American Economic Association poll.

[4] *Id*. at p. 10 (quoting *Guggenheim v. City of Goleta*, 638 F.3d 1111, 1123 (9th Cir. 2010) (en banc)).

[5]Richard Arnott, *Time for Revisionism on Rent Control?*, 9 J. ECON. PERSP. 99, 99 (1995).

4

preserves a new construction exemption; on the question of its length, Been *et al.* offers no view. The CAA's most-quoted passage from that article—that "investment may still decrease if market actors fear the trigger will be moved forward with subsequent legislation"—is an argument for regulatory stability, which a clearly defined rolling exemption provides.

## II. NO EMPIRICAL EVIDENCE SHOWS RENT STABILIZATION REDUCES HOUSING SUPPLY OR NEW CONSTRUCTION

The core proposition on which the CAA depends—that rent stabilization suppresses housing supply, particularly new construction—is not supported by the empirical record. It is contradicted by the best experiments available to test it.

### A. The Massachusetts Natural Experiment: Repeal Did Not Produce a Construction Boom

The cleanest empirical test of whether rent control suppresses new construction is provided by the United States' only clean repeal: the 1994 statewide elimination of rent control in Massachusetts, ending the regimes in Cambridge, Boston, and Brookline. If rent control held down construction, lifting it should have released the constraint. David Sims's 2007 study in the *Journal of Urban Economics*—which opens with explicit reference to Arnott's 1995 call for revisionism—found no such effect. [6] Sims's formal regression estimate of the effect of decontrol on relative housing supply was 0.2 percentage points, not statistically different from zero. Multifamily building permits in the three cities peaked in 1985–1987—while rent control was in full effect—and the low permit years of the early 1990s, in Sims's own characterization, are the anomaly. Construction dynamics in those cities were driven by demand, financing, land-use regulation, and land availability, not by rent control.

### B. New Jersey: Over 100 Jurisdictions, No Significant Effect on Construction

The state with the most extensive experience with moderate rent regulation in the United States is

---

[6]David P. Sims, *Out of Control: What Can We Learn from the End of Massachusetts Rent Control?*, 61 J. URB. ECON. 129 (2007). *See also* David H. Autor, Christopher J. Palmer & Parag A. Pathak, *Housing Market Spillovers: Evidence from the End of Rent Control in Cambridge, Massachusetts*, 122 J. POL. ECON. 661 (2014).

[Proposed] *Amici Curiae* Brief in Support of Plaintiffs' Supplemental Motion for Summary Judgment; Case No. 4:19-cv-05398-JST

New Jersey.[7] More than 100 New Jersey municipalities have maintained rent regulation for decades, providing substantial empirical leverage. The principal studies converge on the same finding: no statistically significant effect on new construction. This becomes readily explicable once one considers the basic architecture of second-generation rent stabilization. Most modern stabilization regimes—including Oakland's—exempt new construction from coverage initially. A developer in such a jurisdiction sets the initial rent at a landlord determined price. The direct channel through which the CAA's textbook model predicts a supply effect is closed at the outset.[8] With a rolling deadline model, developers have stability for the entire defined period – which under the Tenant Protection Act is 15 years.

### C. The Binding Constraint Is Land-Use Regulation, Not Rent Regulation

The empirical literature on what actually constrains housing production in high-cost American cities converges on a different culprit. The Joint Center for Housing Studies and the broader work of Joseph Gyourko, Edward Glaeser, and others identify restrictive land-use regulation—zoning, density limits, parking minimums—as the binding constraint.[9] Rent stabilization and new construction are complements, not substitutes: stabilization protects incumbent tenants from displacement while longer-run supply-side measures take effect.[10]

## III. LANDLORDS HAVE SUBSTANTIAL MARKET POWER; CAA'S $90 MILLION FIGURE IS THE ARTIFACT OF A THEORETICAL COMPETITIVE-MARKET MODEL

The textbook analysis on which the CAA's case depends presupposes a perfectly competitive rental market. The assumption of a perfectly competitive market is made in introductory economics

---

[7]Joshua D. Ambrosius, John I. Gilderbloom, William J. Steele, Wesley L. Meares & Dennis Keating, *Forty Years of Rent Control: Reexamining New Jersey's Moderate Local Policies After the Great Recession*, 49 CITIES 121 (2015); John I. Gilderbloom & Lin Ye, *Thirty Years of Rent Control: A Survey of New Jersey Cities*, 29 J. URB. AFF. 207 (2007).
[8] *Id.*
[9]Joint Center for Housing Studies of Harvard University, *America's Rental Housing 2024* (2024); Joseph Gyourko & Raven Molloy, *Regulation and Housing Supply*, in 5 HANDBOOK OF REGIONAL AND URBAN ECONOMICS 1289 (2015); Edward Glaeser & Joseph Gyourko, *The Economic Implications of Housing Supply*, 32 J. ECON. PERSP. 3 (2018).
[10] *Id.*

6

instruction because it yields a tractable model, not because it describes actual rental markets. Recent empirical work has quantified the divergence directly.

### A. Direct Empirical Evidence of Landlord Pricing Power

Tenants face large frictions in moving from one rental unit to another—search costs, application fees, security deposits, moving costs, disruption of established neighborhood and school relationships. These frictions confer substantial pricing power on landlords. A 2025 study of the New York City rental market found average rent markups of approximately 22 to 55 percent above what the price would be in a perfectly competitive market.[11] The Department of Justice's pending antitrust case against RealPage demonstrates landlords' ability to raise rents beyond what a truly competitive market would allow.[12]

A 2023 study by the Council of Economic Advisors (CEA) and 2024 study by Calder-Wang and Kim of algorithmic pricing utilized by landlords to set rental prices reaches the same conclusion: market power is rampant and leads to higher rents without delivering additional housing services. The 2024 study, using data on revenue-management software adoption across the top fifty U.S. metropolitan areas from 2005 to 2019, find that landlords are able to charge substantially higher rents due to anticompetitive behavior, while the CEA finds that in 2023 alone, a lower bound of anticompetitive behavior by landlords use of algorithmic pricing resulted in an estimated cost of $3.8 billion to tenants.[13]

### B. The CAA's $90 Million Figure Assumes the Market Structure the Evidence Contradicts

The CAA asserts that Plaintiffs' proposed modifications would impose a "staggering" cost of approximately $90 million annually on landlords, derived by multiplying an $832 monthly rent differential for one plaintiff's unit across 9,034 units. ECF No. 200 (CAA Amicus) at 14.

---

[11]Costa, *supra* note 2. The 22–55 percent markup range is derived from estimated residual demand elasticities ranging from -1.9 to -4.7 across two sample periods (2001–2013 and 2015–2021).
[12] Calder-Wang & Kim, *supra* note 2 (finding that market-average rent in a fully penetrated market is 3.0 percent higher than in an unpenetrated market); Heather Vogell, *Rent Going Up? One Company's Algorithm Could Be Why*, PROPUBLICA (Oct. 15, 2022) (reporting that property managers accept RealPage's rent recommendations as much as 90 percent of the time); *United States v. RealPage, Inc.*, No. 1:24-cv-00710 (M.D.N.C. filed Aug. 23, 2024).
[13] *Id.; The Cost of Anticompetitive Pricing Algorithms in Rental Housing*, (Dec. 17, 2024); https://bidenwhitehouse.archives.gov/cea/written-materials/2024/12/17/the-cost-of-anticompetitive-pricing-algorithms-in-rental-housing/

7

The calculation has a hidden premise. It treats the entire gap between observed market rent and the counterfactual stabilized rent as a transfer that represents pure loss to the landlord of profits to which they are entitled—which implicitly assumes that market rent equals marginal cost, the defining property of a perfectly competitive market. The evidence just summarized shows that assumption is unfounded. If average landlord markups in comparable rental markets run 22 to 55 percent above marginal cost, then a substantial fraction—and in many cases the majority—of the gap reflects the exercise of pricing power, not payment for genuine housing services. The $90 million figure thus characterizes, in significant part, a redistribution of surplus from landlords to tenants as if it were a destruction of economic value. It is not.

To the contrary, in the context of a market where there is not enough affordable housing to meet the needs of residents, there are significant externalities that result from these rent markups. Lack of affordable housing leads to homelessness and increased demands on local emergency response services, social services and medical facilities.[14]  These costs are exacerbated when those who cannot find affordable housing are people with disabilities.[15]

**C. Policy Design Matters: First-Generation Rent Freezes Differ from Second-Generation Rent Stabilization**

One reason the rent regulation literature sometimes appears to speak with different voices is that "rent control" is not a single policy. First-generation rent control—wartime federal price ceilings, the original New York City regime, and Berlin's 2020 *Mietendeckel*—consists of hard, unindexed price freezes that prohibit all rent increases; recent empirical work documents many of the textbook-predicted effects of those regimes. Second-generation stabilization, of which Oakland's Rent Adjustment Program is a representative example, permits annual increases pegged to or below inflation, allows landlords to recover capital improvements, resets rents to market on vacancy, and exempts new construction for a

---

[14] Soucy, Daniel, et al. "State of Homelessness: 2025 Edition." National Alliance to End Homelessness, 4 Sept. 2025, endhomelessness.org/state-of-homelessness/#report.

[15] Benioff Homelessness and Housing Initiative, *Toward Thriving: Understanding Health and Homelessness*, July 2023, https://homelessness.ucsf.edu/toward-thriving-understanding-health-and-homelessness

[Proposed] *Amici Curiae* Brief in Support of Plaintiffs' Supplemental Motion for Summary Judgment; Case No. 4:19-cv-05398-JST

period of time. The economic effects of these regimes are categorically different, and evidence about first-generation freezes provides limited guidance to the present question.[16]

## IV. THE "DEVELOPER FLIGHT" ARGUMENT IS CONTRADICTED BY THE EMPIRICAL RECORD

A central rhetorical move in the CAA's brief is the prediction that any modification of Costa-Hawkins will trigger a developer exodus from California.[17] This claim is contradicted by direct empirical observation across multiple jurisdictions, including the jurisdiction most often invoked as the paradigm of stringent rent regulation.

### A. New York City: The Most Restrictive Regime in America Is Also Its Leading Multifamily Builder

New York City operates the most comprehensive and restrictive rent stabilization regime of any major American city. Its regime covers approximately one million rental units—roughly half the city's rental stock. The 2019 Housing Stability and Tenant Protection Act substantially tightened that regime. By every design dimension, New York's regime is materially more restrictive than anything California has imposed or would impose under the relief contemplated here. Under CAA's theory, New York City should have become a construction desert. The empirical record is unambiguously contrary: New York City has, in many years of the last decade, led the nation in multifamily permitting, and investment has continued at high levels through the post-2019 period.[18]

CAA offers no theory to explain why Oakland—which would impose materially less stringent regulation—would experience developer flight that New York has not.

---

[16]Konstantin A. Kholodilin, Sebastian Kohl & Linus Pfeiffer, *Rent Control: How It Has Worked and Could Work in the Future*, DIW Berlin Discussion Paper No. 2059 (2024); Anja M. Hahn et al., *Forward to the Past: Short-Term Effects of the Rent Freeze in Berlin*, 70 MGMT. SCI. 1972 (2024).

[17]ECF No. 200 (CAA Amicus) at 11 ("If developers come to understand that 'new construction' exemptions are at risk of simply being overridden by the courts, they will inevitably shun the California market…").

[18]New York State's Housing Stability and Tenant Protection Act of 2019 substantially tightened New York City's rent stabilization regime—eliminating high-rent and high-income deregulation, constraining vacancy and preferential rent provisions, and limiting major capital improvement increases. Multifamily permitting nonetheless continued at historically high levels. *See* Joint Center for Housing Studies, *supra* note 9; Chuck Ehmann, *Has the Next Supply Cycle Started?*, RealPage Analytics Blog (June 30, 2025).

[Proposed] *Amici Curiae* Brief in Support of Plaintiffs' Supplemental Motion for Summary Judgment; Case No. 4:19-cv-05398-JST

**B. The CAA's Anecdotes Do Not Rebut the Record**

The CAA offers two specific counter-examples. The first is a 2026 trade-press report quoting a single REIT executive about wanting to exit California. Individual industry executives have predicted exits from high-regulation markets for decades; the empirical question is what aggregate investment looks like, and the aggregate record (in California after AB 1482, and in New York after the 2019 HSTPA) does not bear the prediction out.[19]

The second is Saint Paul, Minnesota, which has rent stabilization laws. The most direct comparison is Minneapolis, separated only by the Mississippi River, with substantially the same housing market and no rent stabilization. According to the very analysis on which the CAA-friendly trade-press narrative rests, Saint Paul's housing production in 2024 fell approximately 81 percent relative to its prior three-year average—and Minneapolis's fell even more steeply, by approximately 88 percent, over the same period. The Twin Cities pattern is what one would expect if the primary drivers were macroeconomic: interest rates, construction costs, and post-pandemic supply chain disruption. The Saint Paul story is better understood as a case study in political economy than as evidence about supply effects.[20]

## V. THE 15-YEAR ROLLING EXEMPTION TRACKS THE LEGISLATURE'S OWN JUDGMENT AND IS AN ECONOMICALLY REASONABLE HOUSING POLICY

The case for any new construction exemption rests on developer and lender certainty. Developers underwrite returns on a multi-year horizon and require reasonable confidence that the regulatory environment will be predictable over that horizon. The certainty function depends on the existence and clarity of the exemption, not on its indefinite duration. A rolling exemption is a stable rule: every

---

[19]ECF No. 200 (CAA Amicus) at 19 n.8 (citing Shaver, *Camden seeking to Exit California: Real Estate Alert*, MULTIFAMILYDIVE (Jan. 28, 2026)). The quoted executive's concern, framed as "what's the next bullet in California from a regulatory standpoint," describes a generic business-climate complaint, not a supply-specific effect of any coverage-cutoff adjustment.

[20]*Id.* at 12–13 (citing St. Paul, MN, Ord. No. 25-29 (May 7, 2025)). According to the MinnPost analysis on which the CAA's narrative ultimately rests, Saint Paul's housing production in 2024 fell approximately 81 percent relative to its prior three-year average—and Minneapolis, separated only by the Mississippi River and with no rent stabilization, fell approximately 88 percent over the same period. *See* Max Nesterak, *St. Paul Walks Back Rent Control*, MINN. REFORMER (May 8, 2025); Ricky Campbell, *St. Paul's Rent Control Relaxed in Response to Development Downturn*, TWIN CITIES BUSINESS (May 28, 2025).

[Proposed] *Amici Curiae* Brief in Support of Plaintiffs' Supplemental Motion for Summary Judgment; Case No. 4:19-cv-05398-JST

prospective developer knows, on the date of certificate of occupancy, exactly when coverage will attach. The rolling new construction exemption of 10 to 15 years is, as a matter of housing economics, a reasonable design choice.

The 15-year rolling exemption contemplated by the Attorney General is not arbitrary. It is the benchmark the California Legislature itself selected in the Tenant Protection Act of 2019. According to the Legislature's own contemporaneous floor analyses, the 15-year window was chosen specifically "[i]n response to the concern that the bill could otherwise discourage new housing development."[21] The Legislature, in other words, answered precisely the question the CAA now presses with the choice of a 15-year window.

### CONCLUSION

The Court is being asked to consider a modification well within the range that contemporary housing economics regards as reasonable. The CAA's contrary submission depends on a twenty-five-year-old newspaper column, on selective quotation of a single law review article that does not in fact support its supply claim, and on a cost calculation that presupposes a market structure recent empirical work has directly contradicted. On the empirical proposition that most matters—whether rent stabilization reduces new construction—the best available natural experiment (Massachusetts) and the largest available body of evidence (New Jersey) point in the same direction: no detectable effect. Amici submit that the economic foundations on which CAA's brief rests do not survive contemporary scrutiny.

DATED:  May 7, 2026                                 Respectfully submitted,

                                                    WESTERN CENTER ON LAW & POVERTY


                                                    By: _____
                                                        Madeline Howard
                                                        Attorneys for *Amici* Curiae

---

[21]California Office of Senate Floor Analyses, Third Reading Analysis, Assemb. Bill 1482, Reg. Sess. 2019–2020, at 8 (Sept. 9, 2019) ("In response to the concern that the bill could otherwise discourage new housing development, the author has exempted new construction—buildings up to 15 years old—from the bill.").

[Proposed] *Amici Curiae* Brief in Support of Plaintiffs' Supplemental Motion for Summary Judgment; Case No. 4:19-cv-05398-JST

**APPENDIX**

*(in alphabetical order; affiliations for identification only)*

1. James K. Boyce, Ph.D., Senior Fellow, Political Economy Research Institute, University of Massachusetts Amherst

2. Kenton Card, Ph.D., Postdoctoral Research Associate, University of Minnesota

3. Climate and Community Institute

4. Community Service Society

5. Anthony Damiano, Ph.D., Center for Urban & Regional Affairs, University of Minnesota

6. Anders Fremstad, Ph.D., Associate Professor of Economics, Colorado State University

7. Edward Goetz, Ph.D., Professor of Urban and Regional Planning, University of Minnesota

8. Janelle Jones, Previous Chief Economist at US Department of Labor

9. Osman Keshawarz, Ph.D., Assistant Professor of Labor Economics, University of Hawaii—West Oʻahu

10. J.W. Mason, Ph.D., Associate Professor of Economics, John Jay College

11. Manuel Pastor, Ph.D. in Economics, Distinguished Professor of Sociology, University of Southern California

12. Mark Paul, Ph.D., Associate Professor of Economics, Bloustein School of Public Policy, Rutgers University

13. Policy Link

14. Samuel Stein, Ph.D., Housing Policy Analyst, Community Service Society

15. Mark Stelzner, Ph.D., Associate Professor of Economics, Connecticut College

16. Isabella Webber, Ph.D., Associate Professor of Economics, University of Massachusetts Amherst

[Proposed] *Amici Curiae* Brief in Support of Plaintiffs' Supplemental Motion for Summary Judgment; Case No. 4:19-cv-05398-JST