RYAN RICHARDSON, City Attorney – SBN 223548
MARIA BEE, Chief Assistant City Attorney – SBN 167716
KEVIN P. MCLAUGHLIN, Supervising Deputy City Attorney – SBN 251477
MICHAEL QUIRK, Deputy City Attorney – SBN 283351
One Frank H. Ogawa Plaza, 6th Floor
Oakland, CA  94612
Telephone: (510) 238-2961 Fax:  (510) 238-6500
Email: kmclaughlin@oaklandcityattorney.org
        mquirk@oaklandcityattorney.org
X05020/3468629

Attorneys for Defendant
CITY OF OAKLAND

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| IAN SMITH, SUNDAY PARKER and MITCH JESERICH, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF OAKLAND, a public entity,<br><br>Defendant. | Case No. 4:19-cv-05398 JST<br><br>**DEFENDANT CITY OF OAKLAND'S RESPONSE TO *AMICI CURIAE* BRIEF OF TENANT ADVOCATES [Dkt. 207-1]**<br><br>Summary judgment hearing: May 28, 2026 |

DEFENDANT CITY OF OAKLAND'S RESPONSE TO AMICI CURIAE BRIEF OF       4:19-CV-05398 JST
TENANT ADVOCATES

## I.   INTRODUCTION

The City of Oakland strongly supports tenants' rights, and regrets that the City is bootstrapped to a much broader policy debate and must respond to an amici curiae brief of tenant advocates and various economists.  It is not the City's function here to debate the merits or parameters of rent control.  That is a uniquely legislative matter, to be determined at the ballot box, local city council meetings, and the State Capitol.

The briefs of the parties and the two amici make several things plain.  First, there are diverse views among economists and "experts" about the benefits of rent control.  Second, there is little dispute that applying rent control to newer development makes those buildings less valuable and may drive away new development, especially if Oakland is the only city in California to do so.  Third, there is a local and regional housing crisis, and relieving it is a complex and delicate exercise, involving many state and local laws, and macro- and micro-economic concerns.  Fourth, the Court has no evidence about how Plaintiffs' proposals may impact this complex crisis, whether the proposals will drive away new development or spur withdrawal of rental units from the market, whether ripple effects will require changes to other laws or initiatives, or whether it may miraculously go without a hitch.  Truly, nobody knows, including the policy folks.

Plaintiffs' only evidence relating to the policy impacts of their proposed modifications is that decades ago, the City applied rent control to newer development, and that the City Council and City employees support having the ability to expand rent control.  None of that begins to solve the line-drawing exercise Plaintiffs ask the Court to perform.  There is no dispute that Plaintiffs seek a major change to an important policy, without any evidence of the impacts to that policy.  No such modification has ever been found reasonable.

## II.   ARGUMENT

The City's attorneys are not economists, and do not have access to certain materials cited by amici.  Some of the jargon in the brief is difficult to understand.  The City provides the best response to these economic issues that it can in the one week allotted.

//

1

**A.      There Are Significant Policy Disputes About The Benefits Of Rent Control.**

The brief highlights the political, economic, and policy-driven nature of rent control, including any expansion of rent control.  The information the amici rely upon is far more equivocal than how it is presented, and other studies demonstrate a need for great caution in any revamping of rent control.  The brief also reinforces just how complex housing policy is, and that tinkering in one area carries consequences in other areas.

1.      The brief skews the facts.

The brief focuses on four jurisdictions – Massachusetts, New Jersey, New York City, and Minneapolis/St. Paul – to argue that empirical evidence does not show that rent control negatively impacts new construction.  Notably, the brief does not say that Plaintiffs' modifications will not negatively impact new construction; none of the situations described are similar to Plaintiffs' modifications.  The studies of rent control each involve different situations.

*Massachusetts.*  Relying on one article, amici assert that a 1994 statewide repeal of rent control (which impacted three cities) did not create a construction boom.  That study did not consider actual construction activity or consider macroeconomic factors, and found that the number of building permits "rose markedly" after the end of rent control, but that building permit numbers were also higher in the 1980s, and states in the conclusion that rent control "decreases the quantity of rental units supplied[.]"[1]  If true, this counsels caution in expanding rent control.  The study also found that rent control induced owners to remove units from the rental market, and led to significant decreases in the maintenance of rental units, which are problems that Oakland's rent control ordinance expressly seeks to prevent.

*New Jersey.*  Relying on two studies that survey rent control in New Jersey (where it is widespread), amici assert that the studies show no significant effect on new construction.  But New Jersey exempts multifamily buildings less than 30 years old from rent control.  N.J. Stat. Ann. § 2A:42-84.2.  This may be in part because many mortgages are 30 years in duration.  As

---

[1] Sims, *Out of control: What can we learn from the end of Massachusetts rent control?*, 61 JOURNAL OF URBAN ECON. 129 (2007), available at https://www.scribd.com/document/809138760/Out-of-Control-What-Can-We-Learn-From-the-End-of-Mas-2007-Journal-of-Urban-4.

DEFENDANT CITY OF OAKLAND'S RESPONSE TO AMICI CURIAE BRIEF OF      4:19-CV-05398 JST
TENANT ADVOCATES

one of the cited articles states, "the construction of new residential buildings continues because builders are exempt and reluctant to leave a familiar community."[2]

**New York City.** Amici contend that New York City leads the nation in multifamily construction permitting, despite having strict rent control.[3] But New York City exempts buildings constructed after 1947 from its more restrictive rent control, and those constructed after 1974 from its less restrictive rent-stabilization – permanently. *See* N.Y.C. Admin. Code § 26-504. The state 2019 Housing Stability and Tenant Protection Act likewise generally exempts units built after 1974 from rent stabilization.[4] Therefore it's not possible that rent control in New York could impact new development, and this tells us nothing about Plaintiffs' proposal.

**Minneapolis/St. Paul.** Amici assert that in St. Paul, which has rent control, housing production in 2024 fell 81 percent, while in Minneapolis, which does not have rent control, housing production fell that year by 88 percent. But St. Paul only enacted rent control in late 2021, immediately amended it in 2022 to include a 20-year exemption for new construction, and in 2025 it permanently exempted new construction, specifically because of the concern that rent control was driving away new development.[5] Some have characterized Minneapolis as having a boom in development in 2022 while St. Paul saw a substantial decline,[6] and a study of St. Paul's rent control found that Minneapolis had confounding events that made it an improper comparator

---

[2] Gilderbloom & Ye, *Thirty Years of Rent Control: A Survey of New Jersey Cities*, 29 JOURNAL OF URBAN AFFAIRS 207 (April 2007), available at https://www.documentcloud.org/documents/23815428-thirty_years_of_rent_control_a_survey_of_new_jerse/.
[3] This information appears to be taken from a blog, which refers to the New York-Newark-Jersey City "Core-Based Statistical Area," which is by far the largest CBSA in the nation, and should be expected to have the most total building permits.
[4] Outside of New York City, it is a system where cities and counties can vote to opt in to state renter protections for residential properties with six or more units built prior to 1974, provided there is a vacancy rate below 5% as required to declare a state of public emergency. *See* https://hcr.ny.gov/rent-stabilization-and-emergency-tenant-protection-act. Regarding New York City, *see* https://www.nyc.gov/site/mayorspeu/programs/rent-stabilization.page.
[5] *See* McVan, *St. Paul walks back rent control*, MINNESOTA REFORMER (May 8, 2025) https://minnesotareformer.com/2025/05/08/st-paul-walks-back-rent-control/, and DiBenedetto, *St. Paul talks rent control, again*, THE MAC WEEKLY (May1, 2025), available at https://themacweekly.com/2025/05/st-paul-talks-rent-control-again/.
[6] Jordan B., *Rent Control Lessons from Twin Cities Housing Policies*, CRE DAILY (Dec. 16, 2025), available at https://www.credaily.com/briefs/rent-control-lessons-from-twin-cities-housing-policies/.

DEFENDANT CITY OF OAKLAND'S RESPONSE TO AMICI CURIAE BRIEF OF TENANT ADVOCATES                                    4:19-CV-05398 JST

to St. Paul.[7]  In any case, none of this bears a relation to the situation in Oakland.

The brief also echoes Plaintiffs' invocation of California's 2019 Tenant Protection Act, but only to say that the 15-year-rolling exemption of the TPA was not chosen arbitrarily, because a legislature chose it.  (Dkt. 207-1 at 11:4-9.)  The brief does not describe the significant differences between the TPA and Oakland's rent control in terms of the returns allowed to developers and owners, or analyze the results of the TPA since it was enacted.  As noted in one policy brief, the TPA's "high rent increase limit [which is 5% plus inflation] does not serve as a binding constraint on market rent increases."[8]

No attempt is made to extrapolate from the four jurisdictions discussed above to the situation in Oakland.  There is no discussion of any particular local needs, existing policies, or other issues specific to Oakland.  Demand and macroeconomic forces impacting Oakland are not addressed.  And there is no discussion of the impacts on development, withdrawal of units, or maintenance of units in Oakland if it were to become the only jurisdiction in the State to apply rent control to new development.  Such an outlier position, imposed not through legislative machinery but by court oversight, can reasonably be anticipated to scare off new development.

2.    There are significant countervailing views.

The studies and information above provide little support for the proposition that expanding rent control would not impact new development or shrink the population of rental units, and none of the situations are similar to Plaintiffs' proposals.  Other academic studies and papers show potential negative impacts, and some of them are closer to home.

One is an analysis of rent control in San Francisco, which found that landlords reduced rental housing supply by 15% in response to an expansion of rent control in 1994, converting properties to other uses or rebuilding them to fit within a new construction exemption.[9]  Another

---

[7] Ahern & Giacoletti, *Robbing Peter to Pay Paul? The Redistribution of Wealth Caused by Rent Control*, NAT'L BUREAU OF ECON. RESEARCH, Working Paper 30083 (May 2022), available at https://www.nber.org/papers/w30083.

[8] Carlton, et al., *The Impact of Rent Control Policies on Bay Area Housing Supply: Developer Perceptions & Development Calculus*, CENTER FOR COMM. INNOVATION AT UC BERKELEY & ECONORTHWEST (Spring 2021), available at https://www.urbandisplacement.org/wp-content/uploads/2021/08/svcf_rentcontrol_policybrief_2021.pdf.

[9] Diamond, et al., *The Effects of Rent Control Expansion on Tenants, Landlords, and Inequality: Evidence from San Francisco*, 109 AM. ECON. REV. 3365 (Sept. 2019), available at

---

4

DEFENDANT CITY OF OAKLAND'S RESPONSE TO AMICI CURIAE BRIEF OF     4:19-CV-05398 JST
TENANT ADVOCATES

compares data in the rent-control cities of San Francisco, Berkeley, and Santa Monica from before and after Costa Hawkins, and found a significant increase in new development after the enactment of Costa Hawkins.[10]  Another recent analysis found that Bay Area developers seek to pay less for rent-controlled properties, and that if stricter local rent control policies were applied to new development, "they would make that development infeasible."[11]  At minimum, these papers demonstrate a significant policy dispute, and that modifications to local rent control programs must be done very carefully.

A 2024 empirical review of 112 other studies worldwide found that rent control had unintended effects of reduced residential construction, higher rents for uncontrolled units, and lower tenant mobility.[12]  Another study, of the end of rent control in Cambridge, Massachusetts, found "compelling evidence that the elimination of rent control raised the market values of both decontrolled and never-controlled properties."[13]  A different paper, authored in part by one of the amici, found not much evidence that moderate rent stabilization impacts new construction in the U.S., which "makes sense given the ways in which moderate regimes tend to exclude new units from coverage."[14]  Again, this illustrates the swirling policy dispute at hand.

The City's retained expert, Bryant Sparkman, shares the opinion that rent control negatively impacts the value of properties, and if expanded too far, may drive away development or lead property owners to withdraw rental units from the market.  (Dkt. 119-1.)  He has vastly more experience developing housing in the Bay Area than any of the amici, as far as the City can discern.  The opinions in his report are backed by real calculations and direct experience.

---

https://www.aeaweb.org/articles?id=10.1257/aer.20181289.
[10] Rosen, *The Case for Preserving Costa-Hawkins: Three Ways Rent Control Reduces the Supply of Rental Housing*, FISHER CENTER WORKING PAPERS (Sept. 2018), available at https://escholarship.org/uc/item/9dn0n4g7.
[11] Carlton, *supra*, n. 8.
[12] Kholodilin, *Rent control effects through the lens of empirical research: An almost complete review of the literature*, 63 JOURNAL OF HOUSING ECON. 101983 (Mar. 2024), available at https://www.sciencedirect.com/science/article/pii/S1051137724000020.
[13] Autor, et al., *Housing Market Spillovers: Evidence from the End of Rent Control in Cambridge, Mass.*, 122 JOURNAL OF POLITICAL ECON. 661 (2014), available at https://economics.mit.edu/sites/default/files/publications/housing%20market%202014.pdf.
[14] Pastor, et al., *Rent Matters: What are the Impacts of Rent Stabilization Measures?*, USC DORNSIFE PROGRAM FOR ENV'T & REG'L EQUITY (Oct. 2018), available at https://dornsife.usc.edu/eri/publications/rent-matters/.

DEFENDANT CITY OF OAKLAND'S RESPONSE TO AMICI CURIAE BRIEF OF       4:19-CV-05398 JST
TENANT ADVOCATES

In sum, there is a significant policy debate about the merits of rent control generally, including whether it negatively impacts new development, withdrawal of units from the market, and maintenance of units.  But there is little debate that expanding rent control to new development – which other jurisdictions in America do not do – may negatively impact new development.

3.   <u>Rent control sits in a tangle of economic and policy concerns.</u>

It is undisputed that the City is in a housing crisis; that the City promotes housing development, including of private rental properties, and in fact is required by law to do so; that the City has an Ellis Act (Gov. Code § 7060, *et seq*.) ordinance setting requirements for property owners to remove units from the market; that it has multiple ordinances to protect tenants, including a just cause for eviction ordinance, a tenant protection ordinance, and a uniform relocation ordinance;[15] and that the rent control program is but one initiative among many to address this housing crisis.  (Dkt. 141-3, ¶¶ 3-8, 16.)

As the amicus brief points out, there are many other drivers of housing development, including interest rates, construction costs, and supply chain issues.  (Dkt. 207-1 at 10:12-14.) Zoning and other land-use regulations also factor in heavily, and should work in complement with development-promotion and tenant protection.  (*Id*. at 5:20-21, 6:9-15.)  The brief also raises complicated public policy questions about imperfect competition and the pricing power of landlords, how much landlord profit in the open market is too much, and about the externalities of "rent markups," such as homelessness.  (*Id*. at 6:17-8:13.)  And the brief notes that the details of rent control policy design matter.  (*Id*. at 8:14-9:2.)

All of this demonstrates the City's point.  Housing policy is a Gordian knot.  Plaintiffs invite the Court to cut through it in a single hack, without considering the consequences.  *Who knows, just take a swing!*  This is not a reasoned modification, and it is not reasonable.

---

[15] It is widely recognized that rent control, coupled with vacancy decontrol, creates an incentive for landlords to evict tenants.  For example, a recent study found a significant, positive effect of rent control on eviction filing rates in San Francisco.  Gardner & Asquith, *The Effect of Rent Control Status on Eviction Filing Rates: Causal Evidence From San Francisco*, 35 HOUSING POLICY DEBATE 334 (Sept. 2024), available at https://www.tandfonline.com/doi/full/10.1080/10511482.2024.2393629.  Numerous eviction protections are connected to curbing the improper evictions which are done to evade rent control.

DEFENDANT CITY OF OAKLAND'S RESPONSE TO AMICI CURIAE BRIEF OF TENANT ADVOCATES                    4:19-CV-05398 JST

**B.      The Court Is Still Unequipped To Rewrite Local Housing Policy.**

Notwithstanding the amici effort to bolster the record, neither party presents evidence of the impacts of expanding rent control in Oakland.  There is no doubt that the benefits and detriments of rent control, and expanding rent control, are heavily disputed.  The issue is one of economic theory, and of public policy – a fundamentally legislative matter.

According to Plaintiffs, it does not matter that they have no evidence about the impacts.  They claim it is the defendant's burden to prove a negative impact to the purposes of a program.  Plaintiffs are wrong; that's not what a fundamental alteration – a change to the essential nature of a program – is about.  But in the end, regardless of burden, it falls to the Court to change important housing policy, without any evidence on which to base the change.

So far, Plaintiffs don't specify a modification, but propose that the Court can pick from one of four options, like a deck of cards.  No caselaw countenances this choose-your-own-adventure.  How does the Court determine any one of these options is reasonable, and order a re-set of local housing policy, in an evidentiary vacuum?

The policy-related evidence is thin to the point of non-existent.  Plaintiffs' evidence pertaining to policy consists of the basic desire of the City Council and City employees to have freedom to expand rent control themselves, along with the simple fact of the old rent-control cut-off line where it was drawn in 1983, or where it was drawn as of 1995 when the City lost the ability to change it.  That's all Plaintiffs have, and it does not remotely show that one of Plaintiffs' modifications could be done without significant negative impacts on the program, its purposes, and the broader housing market.

There is no way the Court can conclude that Plaintiffs' modifications will not negatively impact new development, prompt withdrawal of existing rental units from the market, or discourage maintenance of units – all contrary to the purposes of the rent control ordinance.  There is also no way the Court can have assurance that Plaintiffs' modifications will still allow the City to plan for and develop the volume of housing required by the Regional Needs Housing Cycle.  (Dkt. 141-3, ¶ 6.)  The evidence, and the amicus briefing, does not permit any such conclusions to be drawn.

DEFENDANT CITY OF OAKLAND'S RESPONSE TO AMICI CURIAE BRIEF OF      4:19-CV-05398 JST
TENANT ADVOCATES

Addressing the housing crisis requires a complicated mix of highly reactive ingredients. Adding a lot more of one ingredient may render a toxic brew, or require significant changes to other ingredients. With an absence of evidence, and a never-done-before modification, what Plaintiffs promote is to make Oakland an experiment. A city as a petri dish, adding more of one policy and watching to see how things react, with real-time, real-life, long-term implications for thousands of people. It could be a calamity. It is exceedingly fraught.

Indeed, the rewriting of a local law by a court is a fragile and rare exercise. Courts strike down laws, but very rarely redraft them. That is the quintessential legislative function, and for very good reasons. In our democracy, setting policy amidst uncertainty is for the people to do.

Both amici make clear that this case is now in the middle of the "political thicket" which the City identified in its motion to dismiss. Plaintiffs propose that the Court can simply fight its way through, choose a remedy, cast state law aside though voters refused to do so three times in recent years, and can – without guidance – reconfigure important local housing policy with major impacts on a great number of people, most of them not disabled.

In the final analysis, the burden ultimately falls upon the Court, and it is an impossible errand. The Court has no underpinning to order any of the relief that Plaintiffs seek. Judgment should therefore be entered for the defendant.

## III.  CONCLUSION

The amici curiae brief highlights the policy dispute at the heart of this case. Rent control policy is a delicate matter, with divided opinions about its efficacy, and operating in the middle of many other impacts on local housing development, and many other local and regional housing policies. The Court cannot know the effects of the requested recalibration of local housing policy, and should grant the City's motion for summary judgment.

Respectfully submitted,

Dated: May 19, 2026                RYAN RICHARDSON, City Attorney

By: /s/ Kevin P. McLaughlin
Kevin P. McLaughlin, Supervising Deputy City Attorney
Michael J. Quirk, Deputy City Attorney
Attorneys for Defendant
CITY OF OAKLAND

DEFENDANT CITY OF OAKLAND'S RESPONSE TO AMICI CURIAE BRIEF OF TENANT ADVOCATES                4:19-CV-05398 JST