United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IAN SMITH, et al.,<br>Plaintiffs,<br>v.<br>CITY OF OAKLAND,<br>Defendant. | Case No. 19-cv-05398-JST<br><br>**ORDER GRANTING SUMMARY JUDGMENT TO DEFENDANT**<br><br>Re: ECF Nos. 178, 190, 195 |

Before the Court are the parties' supplemental motions for summary judgment. ECF No. 190, 197. The Court grants summary judgment to the City and denies it to Plaintiffs.

## I. BACKGROUND

In 1995, the California Legislature enacted the Costa-Hawkins Rental Housing Act, Cal. Civ. Code §§ 1954.50–1954.535" ("Costa-Hawkins") "to moderate what it considered the excesses of local rent control." *NCR Props., LLC v. City of Berkeley*, 89 Cal. App. 5th 39, 47 (2023). As relevant here, Costa-Hawkins provides that any rental unit is categorically exempt from local rent control rules if it (1) received a certificate of occupancy after February 1, 1995, or (2) was already exempt from the residential rent control ordinance of a public entity on or before February 1, 1995, pursuant to a local exemption for newly constructed units. *Id.*; Cal. Civ. Code § 1954.52(a)(1)–(2). The first provision encourages new construction to address California's housing shortage, and the second provision "grandfathers in" units within preexisting rent control jurisdictions that were built in reliance on parallel exemptions in local laws. *Burien, LLC v. Wiley*, 230 Cal. App. 4th 1039, 1047 (2014); *NCR Props.*, 89 Cal. App. 5th at 51–52.

Plaintiffs, disabled renters in Oakland, California, filed the complaint on August 28, 2019, alleging that Oakland's RAP violated the Americans with Disabilities Act ("ADA") and the

California Disabled Persons Act ("CDPA"). ECF No. 1. The RAP allows landlords to set initial rents at market rate but limits annual rent increases. *Id.* ¶ 4. All units constructed after January 1, 1983 are exempted from the RAP, meaning they also fall within the scope of the Costa-Hawkins grandfather provision at Cal. Civ. Code § 1954.52(a)(2). *Id.* ¶ 40. Moreover, before 1985, there were no state or federal laws or regulations requiring privately funded multifamily housing in Oakland to be accessible to people with disabilities. *Id.* ¶ 41; ECF No. 152 at 2. Highlighting the intersection of the RAP and disability accessibility law, Plaintiffs argue that very few of the housing units covered by RAP are accessible to mobility-disabled individuals, and seek a court order modifying the RAP to add "units that were required to be accessible under state or federal law, but that were built after the current January 1, 1983 cutoff date for Program coverage." ECF No. 111-1 at 2.[1]

For buildings of four or more units certified for occupancy in California after March 13, 1991, all units must be accessible if the building has an elevator, but only all ground floor units must be accessible if the building does not have an elevator. *See* 24 C.F.R. § 100.205(a) (requiring an accessible entrance); 42 U.S.C. § 3604(f)(7) (defining "covered multifamily dwellings" under federal law); 24 C.F.R. § 100.201 (same); Cal. Gov't Code § 12955.1.1 (defining "covered multifamily dwellings" under state law); Cal. Code Regs, tit. 24, Chapters 2 § 202 (same), 11A §§ 1101A.1-1102A.4 (noting applicability of requirements).

On April 26, 2024, Plaintiffs moved for summary judgment. ECF No. 111. After the Court heard and adjudicated several *Daubert* motions, Plaintiffs indicated their intent to rest on the motion they had already filed. ECF No. 140. The City of Oakland moved for summary judgment on April 22, 2025. ECF No. 141. The Court ruled on the motions on August 25, 2025. ECF No. 152.

In that order, the Court found that Plaintiffs were entitled to summary judgment on the

[1] The complaint frames the request in broader terms, seeking "[a]n order requiring the City of Oakland to bring its Rent Adjustment Program into compliance with state and federal law, such that people with disabilities who need accessible housing have a meaningful and equal opportunity to access the same Rent Adjustment Program benefits that the city affords to its nondisabled renters, on the same terms, and without having to endure the hardship of life in an inaccessible unit as a condition of coverage." ECF No. 1 § VII. ¶ 3.

prima facie elements of their disparate impact discrimination claim under Title II of the ADA. ECF No. 152 at 8. "Where the prima facie elements of an ADA Title II disparate impact discrimination claim are shown, the public entity must make a reasonable modification unless 'the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.'" *Id.* (quoting *Payan v. Los Angeles Cmty. Coll. Dist.*, 11 F.4th 729, 738 (9th Cir. 2021)). In part, the City argued that the requested modification was not reasonable because it would "place the City in violation of" Costa-Hawkins. *Id.* at 9. In view of the City's response that the ADA preempted contrary state law, the Court found that the record before it was inadequate to resolve the question of preemption and that the proper defendant in a challenge to a state law was the state attorney general. *Id.* at 9–10.

The Court therefore certified the constitutional question concerning whether the ADA preempted Costa-Hawkins to the California Attorney General ("AG"), who accepted the Court's invitation to intervene on November 10, 2025. *Id.* at 11; ECF Nos. 157, 162.

The Court's summary judgment order also noted a dispute between the parties concerning whether Plaintiffs had properly moved for summary judgment on the issue of whether the City could prove the affirmative defense that the requested relief constituted a "fundamental alteration" to its rent control program. ECF No. 152 at 11. The Court therefore ordered the parties to "meet and confer regarding an appropriate resolution to this dispute." *Id.* The parties agreed to address this issue, as well as the preemption question, in supplemental briefs. ECF No. 155; ECF No. 169 at 4–6.

On December 11, 2025, the Court issued an order indicating that it sought briefing on all issues left unresolved by its prior summary judgment issue, which included ADA preemption, whether the relief sought was a reasonable accommodation, and whether it constituted a fundamental alteration to the underlying program. ECF No. 170; *see* ECF No. 152. The Court then issued a scheduling order requiring (1) a brief from the AG regarding the certified constitutional issue; (2) a supplemental motion for summary judgment and response to the AG brief from Plaintiffs; (3) a supplemental motion for summary judgment, response to Plaintiffs' supplemental motion, and response to the AG brief from the City; and (4) a reply brief by

Plaintiffs. ECF No. 184.

The Court also received motions for leave to file amicus briefs by the California Apartment Association in support of the City and by economists in support of Plaintiffs. ECF Nos. 196, 207. Granting both motions, the Court gave leave for the opposing parties to file responsive briefs. ECF Nos. 199, 209.

Finally, the City filed a motion to strike portions of Plaintiffs' supplemental motion for summary judgment, arguing that it exceeds the scope authorized by this Court. ECF No. 197. The City opposed the motion, ECF No. 203, and Plaintiffs replied, ECF No. 205.

The Court held argument on the supplemental summary judgment briefs and the motion to strike on May 28, 2026.

## II. JURISDICTION

The Court has jurisdiction under 28 U.S.C. § 1331.

## III. LEGAL STANDARD

Summary judgment is proper when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine only if there is sufficient evidence "such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material only if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When deciding a motion for summary judgment, the court must draw "all justifiable inferences" in the nonmoving party's favor and may not weigh evidence or make credibility determinations. *Id.* at 255.

Where the party moving for summary judgment would bear the burden of proof at trial, that party "has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000). Where the party moving for summary judgment would not bear the burden of proof at trial, that party "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

If the moving party satisfies its initial burden of production, the nonmoving party must produce admissible evidence to show a genuine issue of triable fact, "identify[ing] with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (quoting *Richards v. Combined Ins. Co.*, 55 F.3d 247, 251 (7th Cir. 1995)). If the nonmoving party fails to make the required showing, the moving party is entitled to summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). When cross-motions for summary judgment are filed, each motion is evaluated separately under this standard. *See Comcast of Sacramento I, LLC v. Sacramento Metro. Cable Television Comm'n*, 923 F.3d 1163, 1168 (9th Cir. 2019).

## IV. DISCUSSION

### A. Preemption

Under the Supremacy Clause of the United States constitution, federal law preempts contrary state law. *See Mut. Pharm. Co. v. Bartlett*, 570 U.S. 472, 475 (2013) ("[S]tate laws that conflict with federal law are 'without effect.'" (quoting *Maryland v. Louisiana,* 451 U.S. 725, 746 (1981)). The parties do not dispute this fact. *See* ECF No. 178 at 7; ECF No. 190 at 28–30; ECF No. 195 at 9–13. "[F]ederal preemption 'may be either express or implied.'" *Atay v. Cnty. of Maui*, 842 F.3d 688, 699 (9th Cir. 2016) (quoting *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 95 (1983)). The ADA does not by its terms prevent states from limiting the scope of local rent control, so only implied preemption is at issue here.

Implied preemption "exists 'where it is impossible for a private party to comply with both state and federal law,' known as impossibility preemption, or where 'the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,' known as obstacle preemption." *Montana Med. Ass'n v. Knudsen*, 119 F.4th 618, 623 (9th Cir. 2024) (quoting *Atay v. Cnty. of Maui*, 842 F.3d 688, 699 (9th Cir. 2016)).

Plaintiffs rely on obstacle preemption. ECF No. 190 at 28–29; ECF No. 201 at 7. Obstacle preemption applies where the state law "undermines the intended purpose and 'natural effect' of the federal law." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000). "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal

statute as a whole and identifying its purpose and intended effects." *Id.* (emphasis added). "[T]he purpose of Congress is the ultimate touchstone in every pre-emption case." *Hughes v. Talen Energy Mktg.*, LLC, 578 U.S. 150, 163 (2016) (quoting *Altria Group, Inc. v. Good,* 555 U.S. 70, 76 (2008)); *see also* City of Auburn v. U.S. Gov't, 154 F.3d 1025, 1031 (9th Cir. 1998), *as amended* (Oct. 20, 1998) ("[T]he pivotal question is not the nature of the state regulation, but the language and congressional intent of the specific federal statute.").

The Ninth Circuit has developed a body of caselaw considering conflict preemption in the ADA reasonable accommodation context. Most recently, that court decided *Montana Medical Association v. Knudsen*, which considered a challenge under the ADA to Montana House Bill 702, prohibiting discrimination based on vaccination status. 119 F.4th at 620. "[B]ecause plaintiffs s[ought] to enjoin HB 702 across all health care settings—which 'implicate[s] the enforcement of the law against third parties'—plaintiffs' ADA preemption theory [wa]s properly analyzed as a facial challenge." *Id*. at 623–24 (quoting *Hoye v. City of Oakland*, 653 F.3d 835, 855 (9th Cir. 2011)). The same principle applies here: the relief Plaintiffs seek would effectively enjoin Costa-Hawkins as to all post-1983 units that were required to be accessible, implicating enforcement against third parties. In *Montana Medical*, the district court found that "HB 702 conflicted with the ADA" because "health care facilities needed to know employee vaccination status and to discriminate based on that status to make ADA-required accommodations for immunocompromised disabled persons," particularly patients. *Id*. at 625. Rejecting the district court's findings as evincing "at most only 'the existence of a hypothetical or potential conflict,'" the Ninth Circuit held that "Plaintiffs have not demonstrated that HB 702 creates a genuine conflict with the ADA in any specific case." *Id*. The Ninth Circuit faulted the district court for failing to "properly consider whether ADA beneficiaries could be reasonably accommodated in ways that do not violate HB 702, such as through uniform PPE requirements, testing measures, appropriate alternative work arrangements, and so on." *Id*. at 626.

The outcome in *Montana Medical* was guided by the Fifth Circuit's analysis in *E.T. v. Paxton*, 19 F.4th 760 (5th Cir. 2021). *Id*. at 626. In *E.T.*, the plaintiffs argued that the ADA preempted a Texas law prohibiting mask mandates in schools because it denied plaintiffs a quality

education based on their disabilities. *Id*. at 763–64. The Fifth Circuit held that "plaintiffs are not entitled to their preferred accommodation, but only a reasonable accommodation." *Id*. at 767. "Given the availability of vaccines, voluntary masking, and other possible accommodations—options barely acknowledged by either plaintiffs or the district court—the record before us likely does not support the conclusion that a mask mandate would be both necessary and obvious[2] under the ADA." *Id*. at 768 (emphasis omitted). The state law thus did not "render[ ] it a 'physical impossibility' for schools to comply with the ADA," nor would the state law "'disturb, interfere with, or seriously compromise the purposes of' " the ADA. *Id*. (quoting *City of Morgan City v. S. La. Elec. Coop. Ass'n*, 31 F.3d 319, 322 (5th Cir. 1994)).

*Ellis v. San Francisco State University* exemplifies the rigor with which a court must analyze whether conflict between the ADA and state law is inevitable in conducting the preemption analysis. 136 F. Supp. 3d 1140, 1145 (N.D. Cal. 2015). In that case, a former professor at San Francisco State University challenged the University's right to require her to submit to a physical examination. *Id.* at 1141. Section 43404 of Title 5 of the California Code of Regulations stated that "[a]ny permanent . . . employee may be required to submit to medical examination by a physician or physicians designated by the appointing power to evaluate whether or not the employee is disabled from performing the duties of the position." *Id*. at 1143. The pertinent section of the ADA provided that "[a] covered entity shall not require a medical examination . . . unless such examination . . . is shown to be job-related and consistent with business necessity." *Id*. (quoting 42 U.S.C. § 12112(d)(4)). The plaintiff argued that that "Section 43404 'stands as an obstacle' to Congressional intent" in enacting the ADA "because under Section 43404, Defendant was able to require an examination without first showing job-

[2] In this Court's view, the *E.T.* court unnecessarily conflated the "necessary and obvious" analysis under the ADA with the preemption analysis. The Ninth Circuit's standard for evaluating whether an accommodation is necessary does not require that an accommodation be the only way to mitigate disparate impact discrimination. *See, e.g.*, *Baughman v. Walt Disney World Co.*, 685 F.3d 1131, 1134 (9th Cir. 2012). Its preemption jurisprudence, by contrast, holds that a conflict with the ADA is averted and a state law is *not* preempted if the disparate impact it creates may be mitigated by other means. *See Montana Medical*, 119 F.4th at 625–26. So in this circuit, at least, whether an accommodation is necessary for the purposes of the Title II ADA merits analysis is a distinct question from whether it is the sole available accommodation for preemption purposes.

relatedness and business necessity, and terminated her when she refused to comply." *Id*. at 1144. In other words, "Plaintiff identifies one scenario where Section 43404 purportedly allowed Defendant to circumvent Congress's intent in enacting the ADA." *Id*.

The court concluded that "[t]his is not the correct analysis." *Id*. The Ninth Circuit requires courts analyzing preemption to "distinguish those situations in which the concurrent exercise of a power by the Federal Government and the states . . . may *possibly* lead to conflicts and those situations where conflicts will *necessarily* arise." *Id*. (emphasis added) (quoting *Pac. Legal Found. v. State Energy Res., Conserv. & Dev. Comm'n*, 659 F.2d 903, 925 n. 3 (9th Cir.1981), *aff'd sub nom. Pac. Gas & Elec. Co. v. State Energy Res., Conserv. & Dev. Comm'n*, 461 U.S. 190 (1983)). "Thus, under conflict preemption, 'the test is whether compliance is impossible, not whether noncompliance is possible.'" *Id*. (quoting *Draper v. Chiapuzio*, 9 F.3d 1391, 1393 (9th Cir. 1993)). The court found that the two statutes could coexist because Section 43404 authorized examinations and the ADA merely imposed additional limitations upon them. *Id*. at 1145.

Along the same lines, the City argues that it is possible to comply with both the ADA and Costa-Hawkins because modifications exist that would not violate Costa-Hawkins. ECF No. 195 at 12 (citing *Montana Medical*, 119 F.4th at 626). They cite several possible options, among which are expanding the City's Access Improvement Program ("AIP"), and creating a subsidy or credit for "disabled tenants in newer units, to make their rents equivalent to rent-controlled rent."[3] *Id*.

The Court finds that either option could accommodate the mandates of the ADA without violating Costa-Hawkins. First, as Plaintiffs point out, the AIP in its current form is woefully inadequate to address the inequity to disabled renters caused by the dearth of accessible units subject to the RAP. It has had a waitlist or backlog of between six months to one year since at least 2020; has an income limit for renter applicants; requires landlords to agree to rigid tenancy restrictions; caps how much an access improvement can cost; and results in a miniscule number of

[3] The City also suggests that there could be "[a] special carve-out where rent control does apply to newer units, but only for disabled tenants," but this would violate Costa-Hawkins in the same way as Plaintiffs' proposed modification, although on a somewhat lesser scale. ECF No. 195 at 12.

actual improvements, with between zero and six completed projects per year since 2017. ECF No. 143 at 20 (citing ECF No. 143-5). Nonetheless, the concept has some advantages. It allows units currently subject to the RAP to be modified to fit disabled tenants' exact needs. This tailoring is valuable because federal accessibility standards "represent consensus on minimal requirements" and do not address every possible combination of needs. ECF No. 112-22 at 9–10. And because it utilizes an application process, it can provide disabled renters access to the benefits of rent-stabilized units without providing costly spillover benefits to nondisabled renters (as a blanket expansion of the RAP would). The Court does not suggest that the AIP in its current form is sufficient to render Oakland's RAP compliant with the ADA. But an expanded, better-funded, and more expedient version without income limits could do so.

The possibility of a rent subsidy is also persuasive. First, the relief it would afford to disabled renters is indistinguishable from the relief sought by Plaintiffs: the payment by disabled tenants of rents equivalent to those available under the RAP. Second, the relief is more narrowly tailored and avoids violating Costa-Hawkins with respect to the thousands of accessible units Plaintiffs seek to subject to rent control that are or will be occupied by non-disabled tenants.

These proposals may have complex policy implications. The Court recognizes that a state- or city-funded rent subsidy, compared to an expansion of the RAP, has the practical effect of shifting the costs of accommodation from landlords to taxpayers. At the same time, a subsidy could avert certain possible market effects from the adoption of Plaintiffs' proposed remedy, such as a potential decline in the availability of rental housing resulting from lower rates of return. It could also adversely incentivize landlords to raise rents excessively as the government foots the bill for rent increases in excess of the allowable amount. The Court takes no position on the merits of any of these approaches from a policy perspective. But all three modifications—an expanded and improved AIP, a rent subsidy, and a blanket expansion of the RAP—secure the same relief for disabled renters and only one is prohibited by Costa-Hawkins. While California voters, through their legislature, prohibited expanding the RAP in Oakland past 1983, they did not prohibit either rent subsidies for disabled tenants or a robust access improvement program.

Plaintiffs respond that a rent subsidy for disabled tenants would be an "entirely new and

separate program[], not [a] way[] of ensuring that Plaintiffs have a real chance to benefit from the rent control Program that actually exists." ECF No. 201 at 8. But Plaintiffs define the problem too narrowly. The RAP is a mechanism for providing more stable rents to tenants. Whether the landlord is constrained from imposing a higher rent increase or the government pays a portion of the increase, the result for the tenant is the same: a lower rent. And Plaintiffs do not argue that the RAP affords any benefits beyond more stable (and therefore lower) rent. It is not true, as Plaintiffs suggest, that "there is a concrete and present conflict between [Costa-Hawkins] and *any* modification that would actually provide Plaintiffs and the class with a meaningful opportunity to benefit from City rent control"—e.g., by receiving functionally lower rents. ECF No. 201 at 8 (emphasis added). A subsidy *is* such a modification. So is a program—like the AIP—facilitating accessibility modifications to existing rent-controlled units.

Neither an expanded AIP nor a rent subsidy is a perfect solution to the difficult social problem before the Court. The Court does not opine on whether they represent fundamental alterations to municipal and state rent governance, as Plaintiffs suggested at oral argument. But under *Montana Medical*, it is enough for the Court to observe that these alternative remedies exist and that they appear likely to address the troublesome disparate impact without violating state law.

*Montana Medical* did not analyze whether the alternative accommodations methods it considered would redress any disparate impact to the same extent as the plaintiff's preferred accommodation. 119 F.4th at 625–26. It also did not analyze whether the alternative accommodations were reasonable and whether the ADA would actually require them. *Id*. This seems to suggest a circular or incomplete logic. The Court held that HB 702 was not preempted because alternative accommodations existed, but did not analyze those alternatives. If the alternative accommodations were deficient such that the ADA could not compel them, and violating HB 702 were the only way to remedy the discrimination at issue, then surely the ADA *would* preempt HB 702.

But *Montana Medical* was careful to articulate its limits. It did not hold that the ADA could never preempt HB 702, but only that the record before it was insufficient to conclude that preemption applied. *Id*. at 627. It faulted the plaintiffs and the court below for failing to consider

"whether ADA beneficiaries could be reasonably accommodated in ways that do not violate HB 702" and noted that its decision "d[id] not foreclose future as-applied ADA preemption challenges . . . based upon a proper showing." *Id*. at 626, 627. That showing is what is missing here. Faced with a conflict with governing state law, it was incumbent upon the plaintiffs to show that alternative methods of remedying the discrimination were deficient compared to their method. They made no such showing.

Plaintiffs rely on *Wood v. County of Alameda*, but that case falls short of supporting preemption here. 875 F. Supp. 659 (N.D. Cal. 1995). In *Wood*, the court considered the sole question of whether a state worker's compensation statute containing an exclusive remedy clause could limit the scope of relief available to ADA plaintiffs. *Id*. at 661. The answer, not surprisingly, was an emphatic "no." The defendant's theory was that the state statute could categorically bar reasonable accommodations under the ADA—besides those matching the remedy provided for in the worker's compensation statute—because "the ADA should defer to" state law. *Id*. at 663. This theory was contrary to the purpose of the ADA "to guarantee individuals with disabilities a baseline level of protection through the establishment and enforcement of *federal* standards," and its text, which contained no expression of intent to defer to state law. *Id*. at 663–64 (emphasis in original).

*Wood* predated *Montana Medical*. It is also plainly distinguishable. In *Montana Medical*, the state statute would bar one category of proposed reasonable accommodation—those reasonable accommodations requiring discrimination against unvaccinated health care workers—but others existed that could equally remedy the disparate impact at issue. In *Wood*, the state statute at issue narrowed the relief available under the ADA to a single option—worker's compensation payments—and no party argued that those payments fully remedied the discrimination to the same extent that other reasonable accommodations would. In fact, worker's compensation payments manifestly did *not* remedy the discrimination to the same extent as the proposed accommodations sought by the plaintiff in *Wood*—to be reinstated to the position she held before the workplace injury rendering her disabled or a comparable one. 875 F. Supp. at 661.

*Hubbard* and *O'Campo*, also cited by Plaintiffs, are even less relevant because they

concerned procedural hurdles imposed on ADA claims. *Hubbard* considered a state attorney's fees provision that conflicted with the attorney's fees scheme laid out in the ADA and easily concluded that the latter preempted the former. *Hubbard v. SoBreck, LLC*, 554 F.3d 742, 747 (9th Cir. 2009). And in *O'Campo v. Chico Mall, LP*, the defendant in an ADA action sought a stay and early evaluation conference—procedural mechanisms afforded by the California Construction-Related Accessibility Standards Compliance Act to protect certain defendants in actions asserting construction-related accessibility claims. 758 F. Supp. 2d 976, 983 (E.D. Cal. 2010). The court held that the Compliance Act "is preempted to the extent that it imposes any additional procedural hurdles to a plaintiff bringing a claim under the ADA" not present in the ADA itself. *Id*. at 984–85. Here, Plaintiffs do not argue that Costa-Hawkins imposes procedural barriers to the relief made available by the ADA. They merely argue that Costa-Hawkins is incompatible with one proposed reasonable modification—but others are available that may equally remedy the disparate impact identified by Plaintiffs.

In an attempt to save their preemption argument, Plaintiffs emphasize that they are seeking a finding of obstacle preemption, not impossibility preemption. They assert, without authority, that the Court need not find that compliance with both the ADA and the RAP is impossible. ECF No. 201 at 5. But both *Montana Medical* and *Ellis* explicitly considered obstacle preemption and nonetheless concluded that a state law is not preempted if it can be reconciled with the allegedly conflicting federal law. *See Montana Medical*, 119 F.4th at 625, 628; *Ellis*, 136 F. Supp. 3d at 1144. *Ellis*, in particular, observed the plaintiff's argument that Section 43404 stood as an obstacle to the ADA because of one scenario allowing the defendant to circumvent Congress's intent, and concluded that "[t]his is not the correct analysis." *Id*. So it is here.

Because the Court cannot conclude that the ADA preempts Costa-Hawkins under these circumstances, the relief Plaintiffs seek is unavailable and the Court grants summary judgment in favor of the City. Having reached this conclusion, the Court does not analyze whether the Plaintiffs' requested modification would otherwise be required by the ADA—e.g., whether it is a

United States District Court
Northern District of California

reasonable modification that would not "fundamentally alter" Oakland's RAP.[4]

## CONCLUSION

The Court grants summary judgment to the City and denies it to Plaintiffs. However, because the Court's summary judgment rulings in this case have concluded that Plaintiffs did establish the elements of a prima facie case of disparate impact discrimination under the ADA, and because other reasonable modifications may exist to remedy that discrimination that do not conflict with governing state law, the Court grants Plaintiffs leave to amend their complaint with 28 days of the date of this order.[5]

**IT IS SO ORDERED.**

Dated: September 23, 2026

JON S. TIGAR
United States District Judge

---

[4] In their briefs and in the City's motion to strike, the parties dispute whether Plaintiffs properly raised their proposal that new units be added to the RAP in a rolling manner. *See* ECF No. 197 at 4; *see generally* ECF No. 143 at 7–9 (discussing history of proposed modifications). Defendants also object to the portion of Plaintiffs' motion seeking summary judgment on the "necessity" element of a reasonable accommodation claim, which they argue was not included in Plaintiffs' original motion for summary judgment and exceeds the permissible scope of the supplemental motion. ECF No. 197 at 4. Because the court finds that the ADA does not preempt Costa-Hawkins, and because a 15-year rolling expansion of the RAP would violate Costa-Hawkins just as would a lump expansion, the motion to strike is denied as moot. *See* ECF No. 178 at 18 (noting that "to be sure," applying the RAP to newer units under a rolling deadline "would conflict with the letter of Costa-Hawkins").

[5] "Granting leave to amend after summary judgment is . . . allowed at the discretion of the trial court." *Nguyen v. United States*, 792 F.2d 1500, 1503 (9th Cir. 1986)